## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INSTITUTIONAL SHAREHOLDER
SERVICES INC.,

702 King Farm Blvd., Suite 400
Rockville, MD 20850

PLAINTIFF,

v.

SECURITIES AND EXCHANGE
COMMISSION and WALTER CLAYTON III
in his official capacity as Chairman of the
Securities and Exchange Commission,

100 F Street, NE
Washington, DC 20549

DEFENDANTS.

CIVIL ACTION NO. _____

### COMPLAINT

Plaintiff Institutional Shareholder Services Inc. (ISS) brings this civil action against Defendants

Securities and Exchange Commission (SEC) and Walter Clayton III, in his official capacity as

Chairman of the SEC, for declaratory and injunctive relief and alleges as follows:

### INTRODUCTION

1.     On August 21, 2019, the SEC issued a purported "guidance" document that

significantly changed the regulatory regime applicable to proxy voting advice provided by firms such

as Plaintiff ISS; that document was published in the Federal Register on September 10, 2019. *See*

*Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice*,

Exchange Act Rel. No. 86721, 84 Fed. Reg. 47416 (Sept. 10, 2019) ("Proxy Adviser Release").

2.     A proxy adviser is an independent third party that is hired by an investor to provide

advice and recommendations about how to vote the investor's shares. A proxy adviser aggregates

publicly available data, analyzes voluminous proxy materials, offers research and analysis about issuer and shareholder proposals on the ballot, and provides voting advice in response to the investor's own criteria and priorities regarding corporate governance matters. Proxy advisers such as ISS are subject to regulation as investment advisers under the Investment Advisers Act of 1940 ("Advisers Act") and, as such, owe their clients the highest fiduciary duties of care and loyalty in providing advice about how to vote their shares.

3.      Even though the Advisers Act provides a comprehensive regulatory framework to protect investors from fraud or abuse by investment advisers, that was seemingly not enough for the SEC. In the Proxy Adviser Release, the SEC announced—for the first time—that all expert proxy voting advice rendered at the request of investors, and provided in accordance with policies designated by those investors, would also be subject to the separate regulatory regime for proxy *solicitation* under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act").

4.      The Proxy Adviser Release is unlawful for several independent reasons and must be enjoined and set aside. *First*, the Release exceeds the SEC's statutory authority under Section 14(a) of the Exchange Act and is contrary to the plain language of the statute. The provision of proxy advice is not a proxy solicitation and cannot be regulated as such. Whereas a proxy adviser offers independent advice and research to its clients about how to vote their shares based on the proxy voting policy guidelines selected by the client, a person who "solicits" proxies urges shareholders to vote a certain way *in order to achieve a specific outcome* in a shareholder vote. The text, purpose, history, and structure of the Exchange Act and Advisers Act all confirm that proxy advice and proxy solicitation are fundamentally distinct activities that are regulated in different ways. The SEC lacks authority to regulate proxy advice as though it were a solicitation, and its holding otherwise in the Proxy Adviser Release is contrary to law.

5.     *Second*, the Proxy Adviser Release is procedurally improper because it is a substantive rule that the SEC failed to promulgate pursuant to the notice-and-comment procedures of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §553.

6.     *Third*, the Proxy Adviser Release must be set aside as arbitrary and capricious because, even though it marks a significant change in the regulatory regime applicable to proxy advice, the SEC has denied that it is changing its position *at all*. The agency has thus flouted the basic requirement of reasoned decision-making that it at least display awareness that it is changing its position. *See FCC v. Fox Television Stations*, 556 U.S. 502, 514-15 (2009). The SEC, moreover, has acted in an arbitrary and capricious manner by entirely "fail[ing] to consider an important aspect of the problem." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-44 (1983). In particular, and without limitation, the SEC has not even attempted to explain why regulating proxy advice through the regulatory framework applicable to investment advisers under the Advisers Act is insufficient to protect the investing public and advance the SEC's regulatory goals.

## PARTIES

7.     Plaintiff ISS is an investment adviser that supplies proxy voting advice and other forms of investment advice to institutional investors such as pension plans, investment companies, asset managers, asset owners, and other registered investment advisers. ISS is registered as an investment adviser with the SEC under the Advisers Act.

8.     Defendant SEC is an agency of the United States government within the meaning of 5 U.S.C. §551(1). The SEC is responsible for the promulgation and enforcement of the Proxy Adviser Release.

9.     Defendant Walter Clayton III is the Chairman of the SEC and is sued in his official capacity.

## JURISDICTION & VENUE

10.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§1331, 2201; 5 U.S.C. §§701-706.

11.     Venue is proper because the SEC resides in this District and a substantial part of the events or omissions giving rise to the claims occurred here. 28 U.S.C. §1391(b)(1)-(2).

## BACKGROUND

### I.     The Exchange Act's Regulation of Proxy Solicitation.

12.     Public companies are generally required by state law to hold annual shareholders meetings to address matters that require shareholder approval, such as the election of directors. Under the Dodd-Frank Wall Street Reform and Consumer Protection Act, public companies must also periodically give shareholders the right to a non-binding vote on executive compensation through so-called "say on pay" votes. *See* 15 U.S.C. §78n-1. Moreover, a company may call a special meeting to seek shareholder approval of time-sensitive transactions such as mergers or acquisitions. Shareholders may vote either in person or by authorizing a "proxy" to vote on their behalf. During a contested vote, proponents or opponents of a ballot measure may solicit shareholders to encourage them to support or oppose the measure. They may also engage a "proxy solicitor" to help gather proxy votes in support of or in opposition to the measure.

13.     Proxy solicitation poses a clear risk of abuse if, for example, a person seeks to obtain authorization to vote on behalf of a shareholder based on false or misleading information.

14.     Section 14(a) of the Exchange Act thus makes it "unlawful for any person … in contravention of such rules and regulations as the Commission may prescribe … to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security ..." 15 U.S.C. §78n(a). The Act does not define the term "solicit."

15.     When Congress enacted Section 14(a), the plain meaning of the word "solicit" was "[t]o ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, to invite." Black's Law Dictionary (3d ed. 1933); *see also* The Concise Oxford Dictionary of Current English 1150 (1931) (defining "solicit" as "[i]nvite, make appeals or requests to, importune"). Synonyms for "solicit" include "seek," "beg," "beseech" "demand," "implore," "importune," "pray," and "supplicate." Roget's 21st Century Thesaurus (3d ed. 2013). The phrase "solicit any proxy" thus has a clear and unambiguous meaning:  to seek to obtain a proxy or encourage a shareholder to vote a certain way in order to *achieve a certain outcome* in a shareholder vote.

16.     That plain meaning of "solicit" is further buttressed by the purpose and history of the Exchange Act. Congress enacted the Exchange Act with the specific goal of rectifying abuses that it believed had materially contributed to the stock market crash of 1929 and the Great Depression. Section 14(a) in particular was designed to prevent unscrupulous individuals from abusing shareholder trust to dominate proxy voting. It reflected Congress' belief that "renewal of investors' confidence in the exchange markets can be effected only by a clearer recognition upon the part of the corporate managers of companies whose securities are publicly held of their responsibilities as trustees for their corporations." H.R. Rep. 1383, 73d Cong., 2d Sess. at 13 (Apr. 27, 1934).

17.     Specifically, Congress intended that "the rules and regulations promulgated by the Commission will protect investors from promiscuous solicitation of their proxies, on the one hand, by irresponsible outsiders seeking to wrest control of a corporation away from honest and conscientious corporation officials; and, on the other hand, by unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts." S. Rep. 1455, 73d Cong., 2d Sess. at 77 (June 16, 1934).

18.     Courts have similarly recognized that Section 14(a) and the SEC's rules thereunder are designed to apply to persons seeking to use the proxy process "to maintain or gain control of a

corporation through solicitation of the corporate voting rights of the shareholders." *Greater Iowa Corp.*

*v. McLendon*, 378 F.2d 783, 795 (8th Cir. 1967); *see also Cowin v. Bresler*, 741 F.2d 410, 427 (D.C. Cir.

1984) (purpose of Section 14(a) is "to protect a shareholder's investment from self-serving designs of

those at odds with the best interest of the corporation").

## II.     The Advisers Act's Distinct Regulatory Scheme For Investment Advisers.

19.     Investment *advisers* are subject to a separate and distinct regulatory framework under

the Investment Advisers Act of 1940. Section 202(a)(11) of the Advisers Act defines an "investment

adviser" as "any person who, for compensation, engages in the business of advising others, either

directly or through publications or writings, as to the value of securities, or as to the advisability of

investing in, purchasing or selling securities, or who, for compensation and as part of a regular

business, issues or promulgates analyses or reports concerning securities …." 15 U.S.C. §80b-2(a)(11).

20.     In short, an investment adviser is someone who is paid to advise about securities. To

"advise" means "[t]o give an opinion or counsel, or recommend a plan or course of action." *E.g.*,

Black's Law Dictionary (3d ed. 1933); *see also* The Concise Oxford Dictionary of Current English

(1931) (defining "advise" as "[o]ffer counsel to" and "adviser" as a "person habitually consulted").

Synonyms for "advise" include "admonish," "point out," "recommend," "suggest," and "warn."

Roget's 21st Century Thesaurus (3d ed. 2013). Unlike a solicitor—who seeks to obtain proxies or

induce proxy votes in order to achieve a certain *outcome*—an adviser is retained merely to provide

advice and recommendations. The word "advise" "imports that it is discretionary or optional with the

person addressed whether he will act on such advice or not." Black's Law Dictionary (3d ed. 1933)

(citations omitted); *see also Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 373 (5th Cir. 2018)

("[I]n law and the financial services industry, rendering 'investment advice for a fee' customarily

distinguished salespeople from investment advisers ….").

21.     Investment advisers are subject to a comprehensive scheme of regulation under the Advisers Act. In particular, the Advisers Act established a federal fiduciary standard of conduct for investment advisers based on equitable common law principles. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963). This fiduciary standard is comprised of duties of care and loyalty, which, taken together, oblige an adviser to act in the best interests of its clients and not to place its own interests ahead of its clients' interests. *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Advisers Act Rel. No. 5248, 84 Fed. Reg. 33669, 33670-71 (Jul. 12, 2019) (quoting *Capital Gains Research Bureau*, 375 U.S. 180).

22.     In addition to recognizing "the delicate fiduciary nature of an investment advisory relationship" and prohibiting advisers from engaging in fraudulent or deceptive conduct, the Advisers Act also reflects Congress' intent to "eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Capital Gains Research Bureau*, 375 U.S. at 191-92.

## III.     Proxy Voting Advice Is Properly Regulated Under The Advisers Act Rather Than The Exchange Act.

23.     This case concerns the proper regulatory treatment of proxy voting advice. In recent years, there has been an increase in the number and complexity of corporate ballot issues, as well as increased shareholder activism. To help navigate those complex issues, investors have increasingly sought the assistance of proxy advisers with expertise in researching and analyzing proxy-related issues.

24.     A proxy adviser is an independent third party that is hired by an investor to provide advice and recommendations about how to vote the investor's shares. A proxy adviser aggregates publicly available data, analyzes voluminous proxy materials, offers research and analysis about ballot

proposals put forth by issuers or shareholders, and provides voting advice in accordance with the investor's own criteria and priorities regarding corporate governance matters.

25.     Unlike a person or firm engaged in proxy solicitation, a firm providing proxy advice is disinterested with respect to the ultimate *outcome* of a shareholder vote and does not seek to achieve a certain result. That is, a proxy adviser does not seek "to maintain or gain control of a corporation," *Greater Iowa Corp.*, 378 F.2d at 795, or to win the passage (or defeat) of a ballot measure. Instead, a firm providing proxy advice simply offers research and analysis to its clients to help inform their evaluation of shareholder proposals as they exercise their own voting rights. The proxy adviser is indifferent as to how shareholders ultimately choose to vote, and may even make different recommendations to different investors about the same proposal if it is in each investor's best interest to do so based on the proxy voting guidelines each investor selects.

26.     The clear distinction between proxy *solicitation* and proxy *advice* is reflected in industry custom and usage. For example, in discussing "Key Participants in Proxy Voting for Shareholder Meetings," a 2016 GAO report describes a "proxy solicitor" as a "[s]pecialist (firm) hired to *gather* proxy votes," whose role is to "[h]elp public companies identify, locate, and communicate with shareholders to *secure* votes." United States Government Accountability Office, *Corporate Shareholder Meetings, Proxy Advisory Firms' Role in Voting and Corporate Governance Practices,* Report to the Chairman, Subcommittee on Economic Policy, Committee on Banking, Housing, and Urban Affairs, U.S. Senate (November 2016) ("2016 GAO Report") at 6 (emphasis added). By contrast, a "proxy advisory firm" is defined as a "[t]hird-party that provides services to institutional investors that include research and vote recommendations on proposals." *Id.*

27.     The most natural regulatory regime for firms providing proxy voting advice is the framework that applies to investment advisers under the Advisers Act. As noted, an investment adviser is any person who, for compensation, engages in the business of advising others, either directly or

through publications or writings, (1) as to the value of securities, or (2) as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as part of a regular business, (3) issues or promulgates analyses or reports about securities. 15 U.S.C. §80b-2(a)(11). Proxy advisory firms perform all three of these functions.

28.     With regard to the first function of an investment adviser—advising on the value of securities—the SEC has long recognized that "[p]roxy voting decisions by funds can play an important role in maximizing the value of the funds' investments." *Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companies*, Investment Company Act Rel. No. 25922, 68 Fed. Reg. 6564, 6566 (Feb. 7, 2003) Accordingly, proxy advisers may perform the first function by offering their clients proxy voting advice on ballot measures that could affect share prices, such as mergers and acquisitions and director nominations, particularly in contested director elections.

29.     Relatedly, when proxy advisers offer advice or recommendations on ballot measures regarding corporate transactions such as mergers, acquisitions, or spinoffs, they are engaged in the second function of investment advisers—"advising others … as to the advisability of investing in, purchasing or selling securities," 15 U.S.C. §80b-2(a)(11)—since the proposed transactions will necessarily involve the purchase or sale of securities.

30.     Finally, proxy advisers also perform the third function of investment advisers by producing comprehensive reports about companies—their boards, management, and securities—so that institutional investors can understand and assess the relevant issues before deciding how to vote.

31.     The SEC has recognized that, in addition to assisting with proxy voting, the reports and analyses that proxy advisers provide may also assist in the making of investment decisions, which is a common function of an investment adviser. *See Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934*, Exchange Act Rel. No. 54165, 71 Fed. Reg. 41978, 41988 (Jul. 24, 2006).

32.     The SEC has therefore acknowledged that proxy advisory firms meet the definition of investment adviser under the Advisers Act and that, as investment advisers, "proxy advisory firms owe fiduciary duties to their advisory clients." *Concept Release on the U.S. Proxy System*, Advisers Act Rel. No. 3052, 75 Fed. Reg. 42982, 43010 (Jul. 22, 2010) ("Concept Release"). For example, a proxy advisory firm's duty of care requires it "to make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information." *Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Advisers Act Rel. No. 4889, 83 Fed. Reg. 21203, 21207 n.31 (May 9, 2018) (quoting Concept Release, 75 Fed. Reg. at 43012).

## IV.    The SEC's Historic Interpretation Of "Solicit" Under Section 14(a) Of The Exchange Act Has Never Applied To Proxy Vote Recommendations And Analysis Furnished In The Course Of A Fiduciary Relationship.

33.     Consistent with the Exchange Act's clear text and Congress' intent, the SEC initially adopted a narrow definition of proxy "solicitation" that covered only a request, consent, authorization, or furnishing of a form of proxy. *See Securities and Exchange Commission Release Notice*, Exchange Act Rel. No. 378, 1935 WL 29270 (Sept. 24, 1935).

34.     Over the years, the SEC gradually expanded its definition of proxy solicitation. However, even at its broadest point, this expansion never went so far as to include proxy voting recommendations made in the context of a fiduciary relationship by expert advisers who are disinterested with respect to the outcome of the vote.

35.     The current definition of proxy "solicitation" dates from 1956 and is found in Exchange Act Rule 14a-1(*l*). *See* 17 C.F.R §240.14a-1(*l*). This rule defines a solicitation to include the "furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." *Id.* When the SEC adopted this language, it made clear that, although it was expanding the range of *communications* covered by the definition, it was not expanding the *class of persons* that it considered to be engaged in

- 10 -

proxy solicitation. *See Amendments to Proxy Rules*, Exchange Act Rel. No. 5276, 21 Fed. Reg. 577 (Jan. 26, 1956) ("1956 Release"). In particular, the SEC explained that "statements made for the purpose of inducing security holders to give, revoke or withhold a proxy with respect to a matter to be acted upon by security holders of an issuer, including an election of directors, *by any person who has solicited or intends to solicit proxies*, whether or not such statements are accompanied by an express request to give, revoke or withhold a proxy may involve a solicitation within the meaning of the regulation, depending upon the particular facts and circumstances." *Id.*, 21 Fed. Reg. at 577 (emphasis added). The SEC's use of the word "procurement" in this definition confirms that the party making the solicitation has an interest in the outcome of the vote, because "procure" means "to get possession of," "obtain by particular care and effort," "to bring about," or "achieve." Webster's Ninth New Collegiate Dictionary (1987); *see also Black's Law Dictionary* (4th ed. 1951) (defining "procuration" as "the act by which one person gives power to another to act in his place, as he could do himself").

36.     In 1964, the SEC released an opinion addressing whether the participation of broker-dealers in the proxy process could constitute a solicitation under the 1956 definition. *See Broker-Dealer Participation in Proxy Solicitations*, Exchange Act Rel. No. 7208, 29 Fed. Reg. 341 (Jan. 15, 1964) ("1964 Release"). The opinion stated that the proxy rules could, under appropriate circumstances, apply to persons outside of the corporation, and are not limited to just corporate management or its opposition. Broker-dealers are "particularly likely to become involved in proxy solicitations both because they may have an interest in the matters to be voted on and because they may have connections with management, opposition, or other participants." *Id.*, 29 Fed. Reg. at 341. The SEC thus concluded in the 1964 Release that brokers' providing proxy voting advice to investors could, in certain instances, constitute a solicitation. *Id.* However, those situations were extremely limited. A broker-dealer could be covered by the proxy solicitation rules only if he "goes beyond [his] advisory function" and "voluntarily" distributes solicitation-type material "*to persons who have not asked for it* whether they are

his customers or not." *Id.* (emphasis added). Conversely, the SEC emphasized that a broker-dealer is not engaged in proxy solicitation when he simply gives proxy voting advice "in his capacity as adviser to the customer." *Id.*

37.     Recognizing that it would be inconsistent with the purpose of Section 14(a) to subject all financial professionals who volunteer soliciting material to the full panoply of the proxy rules, the SEC in 1979 adopted an exemption from the rules' information and filing requirements for persons who render financial advice in the ordinary course of business, if certain conditions are met. *See* 17 C.F.R. §240.14a-2(b). The purpose of this exemption was to ensure that shareholders would have "greater opportunities … to exercise their right of suffrage and to obtain information and advice with respect to matters on which they vote." *Shareholder Communications, Shareholder Participation in the Corporate Electoral Process and Corporate Governance Generally*, Exchange Act Rel. No. 16356, 44 Fed. Reg. 68764 (Nov. 29, 1979) ("1979 Release").

38.     In adopting the 1979 exemption, the SEC reaffirmed that whether proxy voting advice constitutes a "solicitation" depends on the facts and circumstances. *See* 1979 Release, 44 Fed. Reg. at 68767 n.11 (noting that the proxy rules apply only to "those who participate in the solicitation of proxies"). For example, it stated that, under ordinary circumstances, those who render advice in the course of a fiduciary relationship with an investor, such as attorneys or accountants, are *not* solicitors. *Id.* And by titling its discussion of the exemption as "Unsolicited Voting Advice Furnished by Financial Advisors," *id.*, the SEC reaffirmed that its definition of "solicitation" extends to financial advisers only in those rare circumstances where they voluntarily distribute soliciting material to *persons who have not asked for it*, whereas those who in act in their capacity as adviser to the customer are not proxy solicitors in the first place, *see* 1964 Release, 29 Fed. Reg. at 341.

39.     In 1992, recognizing that its own interpretation of proxy solicitation was still too broad, the SEC adopted another package of reforms designed to remove "unnecessary government

interference in discussions among shareholders" and to make it easier for shareholders to challenge management through the proxy voting process. *Regulation of Communications Among Shareholders*, Exchange Act Rel. No. 31326, 57 Fed. Reg. 48276 (Oct. 22, 1992) ("1992 Release"). The SEC adopted these measures with the support of the shareholder community and over the objection of the corporate community.

40.     In undertaking these reforms, the SEC traced the history of its definition of "solicitation," starting with a recognition of Section 14(a)'s goal of "prevent[ing] management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations." *Id.*, 57 Fed. Reg. at 48277 (quoting *J.I. Case v. Borak*, 377 U.S. 426, 431 (1964)). The SEC acknowledged that the 1956 revision was designed "to address abuses by persons *who were actually engaging in solicitations of proxy authority* in connection with election contests." *Id.* (emphasis added). However, the Commission admitted that the words "reasonably calculated to result in the procurement, withholding or revocation of a proxy" in the definition could potentially be misread to mean "'reasonably calculated' *to influence* a shareholder to give, deny or revoke a proxy," thereby inadvertently extending the proxy rules to a disinterested person who merely gives voting advice and does not affirmatively ask a shareholder to grant, revoke, or withhold a proxy. *Id.*, 57 Fed. Reg. at 48277-78 (emphasis added). The SEC explained that the "literal breadth of the new definition of solicitation was so great as potentially to turn almost every expression of opinion concerning a publicly-traded corporation into a regulated proxy solicitation"—an interpretation the SEC rejected as untenable. *Id.*, 57 Fed. Reg. at 48278.

41.     The SEC candidly acknowledged the "excessive regulatory reach" of this construction of the 1956 definition of "solicitation" and admitted that the breadth of that definition had led to a "distortion of the purposes of the proxy rules." *Id.*  However, instead of solving the problem at the definitional level, the SEC simply created another exemption from the information and filing

requirements of the proxy rules. This exemption covers a person who does not seek proxy authority and whose only interest in the ballot proposal is a general interest as a shareholder (including a shareholder proponent of a ballot proposal), and, in some cases, as an employee of the registrant. *See* Rule 14a-2(b)(1), 17 C.F.R. §240.14a-2(b)(1).

42.     In thus addressing the "excessive regulatory reach" of the definition of solicitation, the SEC confirmed that the "disinterested person" exemption was not meant to broaden the pool of communications or the types of persons subject to the proxy rules. Instead, the SEC explained that the exemption was intended to protect shareholders and others from the vagaries of an imprecise and overly broad definition that exposed them to the risk of baseless litigation for criticizing the quality of a company's management, thereby chilling discussion of management performance in contravention of Congress' intent. *See* 1992 Release, 57 Fed. Reg. at 48277-79.

43.     In adopting its 1992 package of reforms, the SEC rejected a number of arguments that corporate management had made against it. For example, the corporate community argued that management should have "'a role to play' in rebutting any misstatements or mischaracterizations" in shareholder communications to ensure "that proxies are executed on the basis of 'correct' information," but the SEC explained that an exemption was necessary to maintain an unrestricted marketplace of ideas in the flow of financial information: "[M]uch commentary concerning corporate performance, management capability or directorial qualifications or the desirability of a particular initiative subject to a shareholder vote is by its nature judgmental. As to such opinions, there typically is not a 'correct' viewpoint." *Id.*, 57 Fed. Reg. at 48278. Indeed, the SEC cautioned that "a regulatory scheme that inserted the Commission staff and corporate management into every exchange and conversation among shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment, particularly where no proxy authority is being solicited by such persons." *Id.*, 57 Fed. Reg. at 48279.

**V.      The SEC's Unprecedented Attempt To Regulate Proxy Voting Advice Provided In
The Course Of A Fiduciary Relationship As Proxy Solicitation.**

44.      As discussed above, the SEC's regulatory approach to proxy solicitation has ebbed and

flowed over the years, with successive expansions of the definition leading to a recognition by the

Commission that construing the term "solicitation" to cover any person seeking to influence proxy

voting—regardless of whether the person is also seeking authorization to act as a proxy—distorts the

purposes of the proxy rules. *Id.*, 57 Fed. Reg. at 48277-79.

45.      Even so, the Commission has been careful up until now to not treat financial advisors

as being engaged in proxy solicitation unless they go beyond their advisory function and distribute

solicitation-type material to shareholders who have not asked for it. The SEC has traditionally called

such over-the-transom material "unsolicited" proxy advice. *See* 1964 Release; 1979 Release. The SEC

has also been careful not to treat advice rendered in the context of a fiduciary relationship as a

solicitation. *See* 1979 Release, 44 Fed. Reg. at 68767 n.11.

46.      All of that changed in August 2019, however, when the SEC radically altered its

regulatory treatment of proxy voting advice in the Proxy Adviser Release, which the SEC approved

by a 3-2 vote. Using a footnote to effectuate a seismic shift in the regulatory landscape, the SEC

decreed—for the first time—that all advice a professional proxy adviser renders in the course of a

fiduciary relationship with a shareholder is "unsolicited" and thus constitutes proxy "solicitation."

Proxy Adviser Release, 84 Fed. Reg. at 47417, n.17. This is so, said the SEC, because proxy advisers

"market[] … their expertise in researching and analyzing proxy issues for purposes of helping clients

make proxy voting determinations." *Id.*, 84 Fed. Reg. at 47419.

47.      The SEC then went even farther, holding that proxy voting advice provided in the

course of a fiduciary relationship is a "solicitation" even if such advice is based on "*the client's own

tailored voting guidelines.*" *Id.*, 84 Fed. Reg. at 47418 (emphasis added). Even in those circumstances—

where an adviser is applying the client's own criteria or policies for how to vote its shares—the SEC

reasoned that the adviser's communication should be viewed as calculated to result in the *procurement* of the client's vote, because it is "part of a commercial service that is designed to *influence"* that vote. *Id.* (emphasis added).

48. In articulating that unprecedented standard, the SEC effectively redefined the term "solicitation" to include any proxy voting advice that a shareholder engages an expert to render— regardless of whether the expert has an interest in the ultimate *outcome* of any shareholder vote; regardless of whether the expert is seeking authorization to act as the shareholder's proxy; and regardless of whether the expert is acting in a fiduciary capacity. The SEC made no attempt to justify this new standard based on the text, purpose, or history of Section 14(a).

49. The Proxy Adviser Release also breaks new ground with its interpretation of the antifraud provision of the proxy rules. In particular, the SEC asserted that even if proxy voting advice is exempt from the information and filing requirements of the proxy solicitation rules, such advice may still be subject to SEC enforcement actions or private claims under Rule 14a-9, which prohibits any solicitation from containing false or misleading statements of material fact. *See id.*, 84 Fed. Reg. at 47419. According to the SEC, "Rule 14a-9 also extends to opinions, reasons, recommendations, or beliefs that are disclosed as part of a solicitation, which may be statements of material facts for purposes of the rule." *Id.* The SEC thus directed that proxy advisers "should consider" whether they need to disclose granular information about the custom or specialty methodologies that underpin their recommendations, their peer group analyses, and other matters of interest to the corporate community in order to avoid liability under Rule 14a-9.

50. Commissioners Lee and Jackson dissented from the Proxy Adviser Release (as well as another release issued on the same day regarding the duties of investment advisers in selecting proxy advisers). For example, Commissioner Lee argued that these releases "create serious risks to our system of corporate democracy by adding cost, adding time pressure, and potentially compromising

the independence of voting recommendations." Statement of Commissioner Allison Herren Lee On

Proxy Voting and Proxy Solicitation Releases (Aug. 21, 2019), available at

https://www.sec.gov/news/public-statement/statement-lee-082119. "[T]hose risks have not even

been identified, much less weighed and analyzed" by the SEC in promulgating the Proxy Adviser

Release. *Id.*

## VI.    The Proxy Adviser Release Will Result In Direct, Concrete Harm To Plaintiff ISS

51.     Founded in 1985, ISS is a full-service proxy adviser that helps institutional investors

make informed voting decisions, manage the complex process of voting their shares, and report their

votes to stakeholders and regulators. ISS annually covers approximately 44,000 shareholder meetings

in the United States and in over 110 developed and emerging markets worldwide.

52.     As part of its core offerings, ISS provides extensive corporate governance data,

research, and proxy voting recommendations. Those recommendations are based on specific policy

frameworks created or selected by institutional investors. ISS currently implements over 400 custom

voting policies on behalf of its clients. As of October 1, 2019, approximately 88% of ISS's top 100

clients used a custom proxy voting policy.

53.     Investors who choose not to create their own proxy voting policies may select among

a range of policy options offered by ISS. These include a standard benchmark policy focused on

promoting long-term shareholder value and risk mitigation at public companies, and thematic policies

that evaluate governance issues from the perspective of sustainability, socially responsible investing,

public funds, labor unions, and mission or faith-based investing.

54.     ISS does not determine which issues appear on a proxy ballot or the ballots or agenda

items on which it renders advice. It does not furnish research or make vote recommendations at the

behest of any issuer or shareholder proponent of a ballot proposal, nor does ISS advocate in support

of (or against) any ballot item.

55.     ISS has no interest in the outcome of any shareholder vote and is indifferent as to whether its clients ultimately support a proposal, reject a proposal, or abstain from voting altogether. Indeed, because ISS's clients have a wide variety of different policies and voting criteria, ISS may provide different recommendations to different clients about the same vote. For example, ISS may advise clients using its benchmark voting policy guidelines to vote for a certain proposal, while advising clients who employ faith-based or sustainability-based voting criteria to vote against that same proposal.

56.     ISS provides its proxy advisory services to its clients in exchange for a fee. ISS does not provide proxy voting advice to any shareholder who has not specifically engaged ISS for this purpose.

57.     As a registered investment adviser, ISS is subject to the comprehensive regulatory regime under the Advisers Act. As noted above, this entails a range of requirements designed to ensure that ISS renders advice in its clients' best interests and that it does not place its own interests ahead of those of its clients. These requirements include (i) acting pursuant to the highest fiduciary duties of care and loyalty in providing voting advice and recommendations; (ii) an obligation to maintain and regularly test a comprehensive compliance program, including policies and procedures relating to proxy voting, and policies and procedures designed to eliminate, or manage and disclose to clients conflicts of interest; (iii) a duty to make full disclosure to clients of the methodologies it uses in rendering advice and any real or potential conflicts of interest it might have; and (iv) a duty to maintain a comprehensive set of books and records and to submit to the SEC's periodic examination of same.

58.     ISS—the largest proxy advisory firm in the United States—is directly regulated by the Proxy Adviser Release and will incur concrete and particularized harm as a result of that Release, for multiple independent reasons.

59.     First, under the Proxy Adviser Release, the proxy voting advice that ISS provides to its clients in a fiduciary capacity will be deemed a solicitation of a proxy. ISS is thus a directly regulated party under the new interpretations set forth in the Release. In particular, ISS will be subject to all of the proxy solicitation regulations unless it can show that it falls within an exemption. Having to rely on an exemption—rather than being outside the proxy solicitation framework altogether (as it has been until now)—will force ISS to incur additional regulatory and legal costs to ensure compliance.

60.     Second, the Proxy Adviser Release states in no uncertain terms that proxy voting advice is now subject to Rule 14a-9, even advice provided pursuant to a client's custom voting policies. Rule 14a-9, which prohibits making materially false or misleading statements or omissions of material fact in connection with a proxy solicitation, may be enforced by the SEC or, potentially, by private parties through an implied right of action. The Proxy Adviser Release thus opens the door to SEC enforcement actions or potential claims by *issuers* who disagree with the client voting guidelines on which ISS' recommendations are based. Furthermore, the SEC expressly stated that Rule 14a-9 extends to "opinions, reasons, recommendations, or beliefs that are disclosed as part of a solicitation." Thus, under the Proxy Adviser Release, ISS may become subject to enforcement actions by the SEC or lawsuits from issuers who dispute ISS's "opinions" or "recommendations" to its clients about how to vote their shares.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act
### (Contrary to Law)
### 5 U.S.C. §706

61.     Plaintiff incorporates all of its prior allegations.

62.     The Proxy Adviser Release is final agency action, *see* 5 U.S.C. §704, because it is the consummation of the SEC's decision-making process and is legally consequential. *See U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807 (2016).

63.     Under the APA, a reviewing court must hold unlawful and set aside agency action that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §706(2)(A), (C).

64.     The Proxy Adviser Release is contrary to law and exceeds the SEC's statutory authority under the Exchange Act to the extent it regulates proxy voting advice as proxy solicitation. The text, history, purpose, and structure of the securities laws confirm that proxy solicitation and proxy advice are fundamentally different activities, and that proxy advice may not be regulated as if it were proxy solicitation. Proxy solicitation involves activities that seek to achieve a certain outcome in a shareholder vote, whereas proxy advice involves providing independent research and analysis to a client for a fee. No court interpreting Section 14(a) of the Exchange Act or the proxy solicitation regulations has ever held, or even suggested, that those rules could be applied to independent investment advice provided by investment advisers in the course of a fiduciary relationship.

65.     It is contrary to law for the SEC to regulate proxy voting advice provided in a fiduciary capacity to fee-paying clients as though it were akin to proxy solicitation by a person seeking to achieve a certain outcome in a shareholder vote.

66.     The SEC's Proxy Adviser Release raises serious First Amendment concerns to the extent it opens firms providing proxy advice to liability under Rule 14a-9 based on the opinions or recommendations they provide to their clients. Imposing Rule 14a-9 liability on an investment adviser's mere opinions, reasons, recommendations, and beliefs would have the effect of encouraging investment advisers to insert content that advances management's interests into fiduciary communications between the proxy adviser and its shareholder clients in order to minimize litigation risk, thereby undermining the credibility of the proxy adviser's work product. Accordingly, the Proxy Adviser Release would chill—and potentially alter the content of—investment advisers' protected

speech, thereby threatening the independence of the advice that shareholders rely on to ensure they have an effective voice in corporate governance.

## COUNT II
### Administrative Procedure Act
### (Failure to Follow Notice and Comment Procedures)
### 5 U.S.C. §706

67.     Plaintiff incorporates all of its prior allegations.

68.     The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. §706(d)(2).

69.     The Proxy Adviser Release constitutes a "rule" under 5 U.S.C. §551(4) because it is an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy.

70.     The SEC issued the Proxy Adviser Release without following the notice-and-comment rulemaking procedures set forth in 5 U.S.C. §553. In particular, the SEC failed to publish a general notice of proposed rulemaking in the Federal Register that sets forth the terms or conditions of the proposed rules.

71.     Because the SEC failed to publish a notice of proposed rulemaking, interested parties had no opportunity to comment on the new proxy adviser rules before they were finalized.

72.     None of the exceptions to the APA's notice-and-comment rulemaking requirements applies here. The Proxy Adviser Release is a *substantive* rule—not an interpretative rule, general statement of policy, or rule of agency organization, procedure, or practice—because it sets a binding norm for private parties that affects their individual rights and obligations. *See Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) ("an agency may not escape the notice and comment requirements … by labeling a major substantive legal addition to a rule a mere interpretation").

73.     The Proxy Adviser Release speaks with the force and effect of law. *See id.* It uses mandatory language and does not suggest that compliance is merely advisory or optional.

74.     The SEC published the Proxy Adviser Release in the Code of Federal Regulations, thus further confirming the substantive character of the rule. *See American Mining Congress v. Mine Safety & Health Admin.,* 995 F.2d 1106, 1109 (D.C. Cir. 1992) ("[A]n agency seems likely to have intended a rule to be legislative if it has the rule published in the Code of Federal Regulations….").

75.     Because the Proxy Adviser Release is a substantive rule that was promulgated without observance of the required notice-and-comment rulemaking procedures under the APA, it must be held unlawful and set aside.

## COUNT III
### Administrative Procedure Act
### (Arbitrary and Capricious)
### 5 U.S.C. §706

76.     Plaintiff incorporates all of its prior allegations.

77.     The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

78.     The Proxy Adviser Release is arbitrary and capricious for several reasons, including but not limited to the following.

79.     The Proxy Adviser Release does not satisfy the basic "requirement that an agency provide reasoned explanation for its action" because the SEC has radically changed its regulatory treatment of proxy advice without even "display[ing] awareness that it is changing position." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009). Indeed, the Release neither recognizes nor acknowledges that its conclusions contradict and depart from decades of SEC precedent recognizing that advice rendered at the request of a shareholder in the context of a fiduciary relationship does not constitute proxy solicitation.

80.     The SEC should bear a heightened burden of explaining its abrupt change of position because significant reliance interests are at stake. ISS has structured and grown its businesses as a

registered investment adviser under the Advisers Act regulatory framework, and it would seriously disrupt those reliance interests for the SEC to abruptly reverse course and hold that proxy voting advice provided in the course of a fiduciary relationship is, in fact, proxy solicitation.

81.     The Proxy Adviser Release is also arbitrary and capricious because the SEC failed to consider important aspects of the problem it is purporting to solve. In particular, the SEC made no attempt to evaluate the existing regulatory regime for investment advisers under the Advisers Act or to explain why that regime was inadequate to protect consumers or advance the SEC's regulatory goals.

82.     The Proxy Adviser Release also significantly changes the SEC's approach to whether opinions or recommendations may be actionable under the proxy solicitation rules. Exchange Act Rule 14a-9 prohibits proxy solicitations by means of materially false or misleading statements or omissions of material fact. The SEC previously made clear that "much commentary concerning corporate performance, management capability or directorial qualifications or the desirability of a particular initiative subject to a shareholder vote is by its nature judgmental. As to such opinions, there typically is not a 'correct' viewpoint." 1992 Release, 57 Fed. Reg. at 48278. Yet the Proxy Adviser Release now reverses this critical guidance—designed to prevent the SEC's extremely broad 1956 definition of "solicitation" from violating the First Amendment—by holding that "opinions, reasons, recommendations, or beliefs" can be "statements of material fact" actionable under Rule 14a-9.

83.     In staking out that unprecedented position, the SEC claimed to find support in cases that are legally and factually inapposite to proxy voting advice. For example, it relies on *Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991), but in that case the Supreme Court confined its discussion to statements of belief and opinion that corporate directors made about a recommended course of action, when those directors did not actually hold the beliefs and opinions they expressed. *Id.* at 1090. Moreover, courts applying *Virginia Bankshares* have explained that, "[w]hile material statements of fact

are false if they are contradicted by true facts, material statements of opinion are false only if the opinion was not sincerely held." *Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003), *aff'd*, 87 F. App'x 772 (2d Cir. 2004) (quoting *In re McKesson HBOC, Inc. Securities Litig.*, 128 F. Supp. 2d 1248, 1265 (N.D. Cal. 2000)). The SEC's statement that "opinions, reasons, recommendations, or beliefs" can be actionable under the federal securities laws is thus contrary to both its own precedent and the relevant case law.

**WHEREFORE**, Plaintiff asks this Court to enter judgment in its favor and to provide the following relief:

a. A declaratory judgment holding that proxy voting advice provided in the course of a fiduciary relationship does not constitute proxy solicitation under Section 14(a) of the Exchange Act and may not be regulated as such, and that the Proxy Adviser Release is accordingly contrary to law;

b. A declaratory judgment holding that the Proxy Adviser Release is procedurally invalid under the APA because the SEC failed to promulgate it through proper notice-and-comment rulemaking procedures;

c. A declaratory judgment holding that the Proxy Adviser Release is arbitrary and capricious under the APA;

d. A declaratory judgment and permanent injunction finding the Proxy Adviser Release invalid and setting it aside;

e. An injunction prohibiting the SEC from taking enforcement action against ISS based on the interpretation of proxy solicitation set forth in the Proxy Adviser Release;

f. All other relief to which Plaintiff is entitled, including but not limited to attorneys' fees and costs.

Respectfully submitted,

Dated: October 31, 2019

_s/ John Michael Connolly_

Mari-Anne Pisarri (DC Bar #362597)
   (*pro hac vice* motion forthcoming)
PICKARD DJINIS & PISARRI LLP
1990 M Street, NW, Suite 660
Washington, DC 20036
(202) 223-4418
pisarri@pickdjin.com

Jeffrey M. Harris* (DC Bar #994058)
John Michael Connolly (DC Bar #489651)
Steven C. Begakis (*pro hac vice* motion forthcoming)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
mike@consovoymccarthy.com
steven@consovoymccarthy.com

*Admission approved; awaiting swearing-in ceremony

*Counsel for Institutional Shareholder Services, Inc.*