**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

INSTITUTIONAL SHAREHOLDER
SERVICES INC.,

702 King Farm Blvd., Suite 400
Rockville, MD 20850

                      PLAINTIFF,

v.

SECURITIES AND EXCHANGE
COMMISSION and WALTER CLAYTON III
in his official capacity as Chairman of the
Securities and Exchange Commission,

100 F Street, NE
Washington, DC 20549

                      DEFENDANTS.

No. 1:19-cv-3275-APM

## FIRST AMENDED COMPLAINT

Plaintiff Institutional Shareholder Services Inc. ("ISS") hereby brings this First Amended

Complaint against Defendants Securities and Exchange Commission and Walter Clayton III, in his

official capacity as Chairman of the Commission, for declaratory and injunctive relief. Pursuant to

Federal Rule of Civil Procedure 15(a)(2), this First Amended Complaint is being filed with the consent

of Defendants and pursuant to the Court's scheduling order issued on August 17, 2020.

## INTRODUCTION

1.      On August 21, 2019, the Commission issued a purported "guidance" document that

significantly changed the regulatory regime applicable to proxy voting advice provided by firms such

as Plaintiff ISS; that document was published in the Federal Register on September 10, 2019. *See*

*Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice*, 84

Fed. Reg. 47416 (Sept. 10, 2019) ("Proxy Guidance"). Following a notice-and-comment rulemaking

proceeding, the Commission subsequently issued regulations that formalize the interpretations set forth in the Proxy Guidance and impose significant new regulatory obligations on proxy advisers. *See Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55082 (Sept. 3, 2020) ("Final Rules").

2. A proxy adviser is an independent third-party firm that is hired by an investor to provide advice and recommendations about how to vote the investor's shares. A proxy adviser aggregates publicly available data, analyzes voluminous proxy materials, offers research and analysis about issuer and shareholder proposals on the ballot, and provides voting advice in response to the investor's selected criteria and priorities regarding corporate governance matters. Proxy advisers such as ISS are subject to regulation as investment advisers under the Investment Advisers Act of 1940 ("Advisers Act") and, as such, owe their clients the highest fiduciary duties of care and loyalty in providing advice about how to vote their shares.

3. Even though the Advisers Act provides a comprehensive regulatory framework to protect investors from fraud or abuse by investment advisers, that was not enough for the Commission. In the Proxy Guidance, the Commission announced—for the first time—that all expert proxy voting advice rendered at the request of investors, and provided in accordance with policies selected by those investors, would also be subject to the separate regulatory regime for proxy *solicitation* under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act").

4. The Final Rules formally amend the Commission's regulations under Section 14(a) to reflect this novel interpretation of proxy solicitation. Based on that redefinition of proxy advice as proxy solicitation, the Final Rules then impose several burdensome new obligations on proxy advisers, which the Commission clunkily renames "proxy voting advice businesses." Most notably, the Final Rules seek to inject corporate issuers into the development and promulgation of proxy advice by requiring proxy advisers to share their recommendations and analyses with issuers and develop a

"mechanism" to disseminate issuers' responses. The Final Rules would also impose potential liability under Rule 14a-9 for alleged misstatements or omissions in proxy advice.

5.    The Proxy Guidance and Final Rules are contrary to law, arbitrary and capricious, and unconstitutional, and must be declared unlawful, vacated, and permanently enjoined.

6.    *First*, the Final Rules and Proxy Guidance exceed the Commission's statutory authority under Section 14(a) of the Exchange Act, which is limited to regulating persons who "solicit any proxy." The provision of proxy advice is not a proxy solicitation and cannot be regulated as such. Whereas a proxy adviser offers independent advice and research to its clients about how to vote their shares based on the voting guidelines selected by the client, a person who "solicits" proxies urges shareholders to vote a certain way *in order to achieve a specific outcome* in a shareholder vote. The text, purpose, history, and structure of the Exchange Act and Advisers Act all confirm that proxy advice and proxy solicitation are fundamentally distinct activities that are regulated in different ways. The Commission lacks authority to regulate proxy advice as though it were a solicitation, and its contrary interpretation in the Final Rules and Proxy Guidance is contrary to law and exceeds the Commission's statutory authority.

7.    *Second*, the Final Rules and Proxy Guidance are arbitrary and capricious for a number of reasons. Even though these regulatory actions marked a significant change in the regulatory regime applicable to proxy voting advice, the Commission has denied that it is changing its position *at all*. The agency has thus flouted the basic requirement of reasoned decision-making that it at least display awareness that it is changing its position. *See FCC v. Fox Television Stations*, 556 U.S. 502, 514-15 (2009). The Commission, moreover, has acted in an arbitrary and capricious manner by entirely "fail[ing] to consider an important aspect of the problem." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In particular, the Commission has failed to explain why regulating proxy advice through the longstanding regulatory framework applicable to investment advisers under the

Advisers Act is insufficient to protect the investing public and advance the Commission's regulatory goals. Finally, the Commission has utterly failed to demonstrate why the burdensome new requirements set forth in the Final Rules were needed at all. The rulemaking record was bereft of any legitimate concerns about proxy voting advice that could justify these rules. The investors who were the purported beneficiaries of the new rules almost uniformly *opposed* them, and the Commission's analysis of the costs and benefits of the new rules was flawed and incomplete.

8.      *Third*, the Final Rules violate the First Amendment's protection against compelled speech. The Final Rules force proxy advisers to share their voting recommendations with issuers and disseminate issuers' critiques of those recommendations to their clients. These are viewpoint-based and content-based restrictions because they single out one specific type of speech (proxy voting advice) for unique burdens merely to elevate the viewpoint of another speaker (corporate issuers). The Final Rules cannot satisfy any level of First Amendment review, much less the strict scrutiny threshold that applies to content-based speech restrictions.

9.      *Fourth*, the Proxy Guidance is procedurally improper and invalid in its entirety because it is a substantive rule that the Commission failed to promulgate pursuant to the notice-and-comment procedures of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §553.

## PARTIES

10.     Plaintiff ISS is an investment adviser that supplies proxy voting advice and other forms of investment advice to institutional investors such as government and private pension plans, investment companies, asset managers, asset owners, and other registered investment advisers. ISS is registered as an investment adviser with the Commission under the Advisers Act.

11.     Defendant Securities and Exchange Commission is an agency of the United States government within the meaning of 5 U.S.C. §551(1). The Commission is responsible for the promulgation and enforcement of the Final Rules and Proxy Guidance.

12.     Defendant Walter Clayton III is the Chairman of the Commission and is sued in his official capacity.

## JURISDICTION & VENUE

13.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§1331, 2201; 5 U.S.C. §§701-706.

14.     Venue is proper because the Commission resides in this District and a substantial part of the events or omissions giving rise to the claims occurred here. 28 U.S.C. §1391(b)(1)-(2).

15.     ISS has Article III standing to bring this suit because, as a proxy adviser, it is a directly regulated party under the Final Rules and Proxy Guidance. The Final Rules expressly state that "[p]roxy voting advice businesses"—*i.e.*, ISS—"will be affected by the final amendments." 85 Fed. Reg. at 55126; *see also id.* at 55127 (noting that ISS and Glass Lewis are "the largest and most often used proxy advisers").

## BACKGROUND

### I.     The Exchange Act's Regulation of Proxy Solicitation.

16.     Public companies are generally required by state law to hold annual shareholders meetings to address matters that require shareholder approval, such as the election of directors. Under the Dodd-Frank Wall Street Reform and Consumer Protection Act, public companies must also periodically give shareholders the right to a non-binding vote on executive compensation through so-called "say on pay" votes. *See* 15 U.S.C. §78n-1. Moreover, a company may call a special meeting to seek shareholder approval of time-sensitive transactions such as mergers or acquisitions. Shareholders may vote either in person or by authorizing a "proxy" to vote on their behalf. Proponents or opponents of a ballot measure may solicit shareholders to encourage them to support or oppose the measure. They may also engage a firm that specializes in proxy solicitation to help gather proxy votes in support of or in opposition to the measure. ISS does not offer this type of service.

17.     Proxy solicitation poses a clear risk of abuse if, for example, a person seeks to obtain authorization to vote on behalf of a shareholder based on false or misleading information.

18.     Section 14(a) of the Exchange Act thus makes it "unlawful for any person … in contravention of such rules and regulations as the Commission may prescribe … to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security ..." 15 U.S.C. §78n(a). The Act does not define the term "solicit."

19.     When Congress enacted Section 14(a), the plain meaning of the word "solicit" was "[t]o ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, to invite." Black's Law Dictionary (3d ed. 1933); *see also* The Concise Oxford Dictionary of Current English 1150 (1931) (defining "solicit" as "[i]nvite, make appeals or requests to, importune"). Synonyms for "solicit" include "seek," "beg," "beseech" "demand," "implore," "importune," "pray," and "supplicate." Roget's 21st Century Thesaurus (3d ed. 2013). The phrase "solicit any proxy" thus has a clear and unambiguous meaning: to seek to obtain a proxy or encourage a shareholder to vote a certain way in order to *achieve a certain outcome* in a shareholder vote.

20.     That plain meaning of "solicit" is further buttressed by the purpose and history of the Exchange Act. Congress enacted the Exchange Act with the specific goal of rectifying abuses that it believed had materially contributed to the stock market crash of 1929 and the Great Depression. Section 14(a) in particular was designed to prevent unscrupulous individuals from abusing shareholder trust to dominate proxy voting. It reflected Congress' belief that "renewal of investors' confidence in the exchange markets can be effected only by a clearer recognition upon the part of the corporate managers of companies whose securities are publicly held of their responsibilities as trustees for their corporations." H.R. Rep. 1383, 73d Cong., 2d Sess. at 13 (Apr. 27, 1934).

21.     Specifically, Congress intended that "the rules and regulations promulgated by the Commission will protect investors from promiscuous solicitation of their proxies, on the one hand,

by irresponsible outsiders seeking to wrest control of a corporation away from honest and conscientious corporation officials; and, on the other hand, by unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts." S. Rep. 1455, 73d Cong., 2d Sess. at 77 (June 6, 1934).

22.     Courts have similarly recognized that Section 14(a) and the SEC's rules thereunder are designed to apply to persons seeking to use the proxy process "to maintain or gain control of a corporation through solicitation of the corporate voting rights of the shareholders." *Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 795 (8th Cir. 1967); *see also Cowin v. Bresler*, 741 F.2d 410, 427 (D.C. Cir. 1984) (purpose of Section 14(a) is "to protect a shareholder's investment from self-serving designs of those at odds with the best interest of the corporation").

## II.     The Advisers Act's Distinct Regulatory Scheme for Investment Advisers.

23.     Investment *advisers* are subject to a separate and distinct regulatory framework under the Investment Advisers Act of 1940. Section 202(a)(11) of the Advisers Act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities, or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities …." 15 U.S.C. §80b-2(a)(11).

24.     In short, an investment adviser is someone who is paid to advise about securities. To "advise" means "[t]o give an opinion or counsel, or recommend a plan or course of action." *E.g.*, Black's Law Dictionary (3d ed. 1933); *see also* The Concise Oxford Dictionary of Current English (1931) (defining "advise" as "[o]ffer counsel to" and "adviser" as a "person habitually consulted"). Synonyms for "advise" include "admonish," "point out," "recommend," "suggest," and "warn." Roget's 21st Century Thesaurus (3d ed. 2013). Unlike a solicitor—who seeks to obtain proxies or induce proxy votes in order to achieve a certain outcome—an adviser is retained merely to provide

advice and recommendations. The word "advise" "imports that it is discretionary or optional with the person addressed whether he will act on such advice or not." Black's Law Dictionary (3d ed. 1933) (citations omitted); *see also Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 373 (5th Cir. 2018) ("[I]n law and the financial services industry, rendering 'investment advice for a fee' customarily distinguished salespeople from investment advisers ….").

25.     Investment advisers are subject to a comprehensive scheme of regulation under the Advisers Act. In particular, the Advisers Act established a federal fiduciary standard of conduct for investment advisers based on equitable common law principles. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963). This fiduciary standard is comprised of duties of care and loyalty, which, taken together, oblige an adviser to act in the best interests of its clients and not to place its own interests ahead of its clients' interests. *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Advisers Act Rel. No. 5248, 84 Fed. Reg. 33669, 33670-71 (Jul. 12, 2019) (quoting *Capital Gains Research Bureau*, 375 U.S. at 194).

26.     In addition to recognizing "the delicate fiduciary nature of an investment advisory relationship" and prohibiting advisers from engaging in fraudulent or deceptive conduct, the Advisers Act also reflects Congress' intent to "eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Capital Gains Research Bureau*, 375 U.S. at 191-92.

## III.    Proxy Voting Advice Is Properly Regulated Under the Advisers Act Rather Than the Exchange Act.

27.     This case concerns the proper regulatory treatment of proxy voting advice. In recent years, there has been an increase in the number and complexity of corporate ballot issues, as well as increased shareholder activism. To help navigate those complex issues, investors have increasingly

sought the assistance of independent proxy advisers with expertise in researching and analyzing proxy-related issues.

28. A proxy adviser is an independent third party that is hired by an investor to provide advice and recommendations about how to vote the investor's shares. A proxy adviser aggregates publicly available data, analyzes voluminous proxy materials, offers research and analysis about ballot proposals put forth by issuers or shareholders, and provides voting advice in accordance with the investor's selected criteria and priorities regarding corporate governance matters.

29. Unlike a person or firm engaged in proxy solicitation, a firm providing proxy advice is disinterested with respect to the ultimate *outcome* of a shareholder vote and does not seek to achieve a certain result. That is, a proxy adviser does not seek "to maintain or gain control of a corporation," *Greater Iowa Corp.*, 378 F.2d at 795, or to win the passage (or defeat) of a ballot measure. Instead, a firm providing proxy advice simply offers research and analysis to its clients to help inform their evaluation of the proposals on which they are entitled to exercise their own voting rights. The proxy adviser is indifferent as to how shareholders ultimately choose to vote and may even make different recommendations to different investors about the same proposal if it is in each investor's best interest to do so based on the proxy voting guidelines each investor selects. In some instances, a proxy adviser may even offer different recommendations about the same vote to the *same* client if that client has selected more than one set of voting criteria in response to the varying investment objectives of its own clients.

30. The most natural regulatory regime for firms providing proxy voting advice is the framework that applies to investment advisers under the Advisers Act. As noted, an investment adviser is any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, (1) as to the value of securities, or (2) as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as part of a regular

business, (3) issues or promulgates analyses or reports about securities. 15 U.S.C. §80b-2(a)(11). Proxy advisory firms perform all three of these functions.

31.     With regard to the first function of an investment adviser—advising on the value of securities—the Commission has long recognized that "[p]roxy voting decisions by funds can play an important role in maximizing the value of the funds' investments." *Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companies*, 68 Fed. Reg. 6564, 6566 (Feb. 7, 2003). Accordingly, proxy advisers may perform the first function by offering their clients proxy voting advice on ballot measures that could affect share prices, such as mergers and acquisitions and director nominations, particularly in contested director elections.

32.     Relatedly, when proxy advisers offer advice or recommendations on ballot measures regarding corporate transactions such as mergers, acquisitions, or spinoffs, they are engaged in the second function of investment advisers—"advising others … as to the advisability of investing in, purchasing or selling securities," 15 U.S.C. §80b-2(a)(11)—since the proposed transactions will necessarily involve the purchase or sale of securities.

33.     Finally, proxy advisers also perform the third function of investment advisers by producing comprehensive reports about companies—their boards, management, and securities—so that institutional investors can understand and assess the relevant issues before deciding how to vote.

34.     The Commission has recognized that, in addition to assisting with proxy voting, the reports and analyses that proxy advisers provide may also assist in the making of investment decisions, which is a common function of an investment adviser. *See Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934*, 71 Fed. Reg. 41978, 41988 (Jul. 24, 2006).

35.     The Commission has therefore acknowledged that proxy advisory firms meet the definition of investment adviser under the Advisers Act. *See* 85 Fed. Reg. at 55086 (proxy advisers

"meet the definition of an investment adviser unless an exclusion applies"); *Concept Release on the U.S. Proxy System*, 75 Fed Reg. 42982, 43010 (Jul. 22, 2010) ("Concept Release") (as investment advisers, "proxy advisory firms owe fiduciary duties to their advisory clients"). For example, a proxy adviser's duty of care requires it "to make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information." *Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 83 Fed. Reg. 21203, 21207 n.31 (May 9, 2018) (quoting Concept Release, 75 Fed. Reg. at 43012).

## IV. The Commission's Historic Interpretation of "Solicit" Under Section 14(a) of the Exchange Act Has Never Applied to Proxy Vote Recommendations and Analysis Furnished in the Course of a Fiduciary Relationship.

36. Consistent with the Exchange Act's clear text and Congress' intent, the Commission initially adopted a narrow definition of proxy "solicitation" that covered only a request, consent, authorization, or furnishing of a form of proxy. *See Securities and Exchange Commission Release Notice*, Exchange Act Rel. No. 378, 1935 WL 29270 (Sept. 24, 1935).

37. Over the years, the Commission gradually expanded its definition of proxy solicitation. However, even at its broadest point, this expansion never went so far as to include proxy voting recommendations made in the context of a fiduciary relationship by expert advisers who are disinterested with respect to the outcome of the vote.

38. The current definition of proxy "solicitation" dates from 1956 and is found in Exchange Act Rule 14a-1(*l*). *See* 17 C.F.R §240.14a-1(*l*). This rule defines a solicitation to include the "furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." *Id.* When the Commission adopted this language, it made clear that, although it was expanding the range of *communications* covered by the definition, it was not expanding the *class of persons* that it considered to be engaged in proxy solicitation. *See Amendments to Proxy Rules*, Exchange Act Rel. No. 5276, 21 Fed.

Reg. 577 (Jan. 26, 1956) ("1956 Release"). In particular, the Commission explained that "statements made for the purpose of inducing security holders to give, revoke or withhold a proxy with respect to a matter to be acted upon by security holders of an issuer, including an election of directors, *by any person who has solicited or intends to solicit proxies*, whether or not such statements are accompanied by an express request to give, revoke or withhold a proxy, may involve a solicitation within the meaning of the regulation, depending upon the particular facts and circumstances." *Id.*, 21 Fed. Reg. at 577 (emphasis added). The Commission's use of the word "procurement" in this definition confirms that the party making the solicitation has an interest in the outcome of the vote, because "procure" means "to get possession of," "obtain by particular care and effort," "to bring about," or "achieve." Webster's Ninth New Collegiate Dictionary (1987); *see also Black's Law Dictionary* (4th ed. 1951) (defining "procuration" as "the act by which one person gives power to another to act in his place, as he could do himself").

39.     In 1964, the Commission released an opinion addressing whether the participation of broker-dealers in the proxy process could constitute a solicitation under the 1956 definition. *See Broker-Dealer Participation in Proxy Solicitations*, Exchange Act Rel. No. 7208, 29 Fed. Reg. 341 (Jan. 15, 1964) ("1964 Release"). The opinion stated that the proxy rules could, under appropriate circumstances, apply to persons outside of the corporation, and are not limited to just corporate management or its opposition. Broker-dealers are "particularly likely to become involved in proxy solicitations both because they may have an interest in the matters to be voted on and because they may have connections with management, opposition, or other participants." *Id.* The Commission thus concluded in the 1964 Release that brokers' providing proxy voting advice to investors could, in certain instances, constitute a solicitation. *Id.* However, those situations were extremely limited. A broker-dealer could be covered by the proxy solicitation rules only if he "goes beyond [his] advisory function" and "voluntarily" distributes solicitation-type material "t*o persons who have not asked for it*

whether they are his customers or not." *Id.* (emphasis added). Conversely, the Commission emphasized that a broker-dealer is not engaged in proxy solicitation when he simply gives proxy voting advice "in his capacity as adviser to the customer." *Id.*

40.     Recognizing that it would be inconsistent with the purpose of Section 14(a) to subject all financial professionals who volunteer soliciting material to the full panoply of the proxy rules, the Commission in 1979 adopted an exemption from the rules' information and filing requirements for persons who render financial advice in the ordinary course of business, if certain conditions are met. *See* 17 C.F.R. §240.14a-2(b). The purpose of this exemption was to ensure that shareholders would have "greater opportunities … to exercise their right of suffrage and to obtain information and advice with respect to matters on which they vote." *Shareholder Communications, Shareholder Participation in the Corporate Electoral Process and Corporate Governance Generally*, Exchange Act Rel. No. 16356, 44 Fed. Reg. 68764 (Nov. 29, 1979) ("1979 Release").

41.     In adopting the 1979 exemption, the Commission reaffirmed that whether proxy voting advice constitutes a "solicitation" depends on the facts and circumstances. *See* 1979 Release, 44 Fed. Reg. at 68767 n.11 (noting that the proxy rules apply only to "those who participate in the solicitation of proxies"). For example, it stated that, under ordinary circumstances, those who render advice in the course of a fiduciary relationship with an investor, such as attorneys or accountants, are *not* solicitors. *Id.* And by titling its discussion of the exemption as "Unsolicited Voting Advice Furnished by Financial Advisors," *id.*, the Commission reaffirmed that its definition of "solicitation" extends to financial advisers only in those rare circumstances where they voluntarily distribute soliciting material to *persons who have not asked for it*, whereas those who in act in their capacity as adviser to the customer are not proxy solicitors in the first place, *see* 1964 Release, 29 Fed. Reg. at 341.

42.     In 1992, the Commission adopted another package of reforms designed to remove "unnecessary government interference in discussions among shareholders" and to make it easier for

shareholders to challenge management through the proxy voting process. *Regulation of Communications Among Shareholders*, Exchange Act Rel. No. 31326, 57 Fed. Reg. 48276 (Oct. 22, 1992) ("1992 Release"). The Commission adopted these measures with the support of the shareholder community and over the objection of the corporate community.

43. In undertaking these reforms, the Commission traced the history of its definition of "solicitation," starting with a recognition of Section 14(a)'s goal of "prevent[ing] management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations." *Id.*, 57 Fed. Reg. at 48277 (quoting *J.I. Case v. Borak*, 377 U.S. 426, 431 (1964)). The Commission acknowledged that the 1956 revision was designed "to address abuses by persons *who were actually engaging in solicitations of proxy authority* in connection with election contests." *Id.* (emphasis added). However, the Commission acknowledged that the words "reasonably calculated to result in the procurement, withholding or revocation of a proxy" in the definition could potentially be misread to mean "'reasonably calculated' *to influence* a shareholder to give, deny or revoke a proxy," thereby inadvertently extending the proxy rules to a disinterested person who merely gives voting advice and does not affirmatively ask a shareholder to grant, revoke, or withhold a proxy. *Id.*, 57 Fed. Reg. at 48277-78 (emphasis added). The Commission explained that the "literal breadth of the new definition of solicitation was so great as potentially to turn almost every expression of opinion concerning a publicly-traded corporation into a regulated proxy solicitation." *Id.*, 57 Fed. Reg. at 48278.

44. The Commission candidly acknowledged the "excessive regulatory reach" of this construction of the 1956 definition of "solicitation" and admitted that the breadth of that definition had led to a "distortion of the purposes of the proxy rules." *Id.* To address those concerns, the Commission created a second exemption that applied to persons who do not seek proxy authority and whose only interest in the ballot proposal is a general interest as a shareholder or, in some cases, as an

employee of the registrant. *See* Rule 14a-2(b)(1), 17 C.F.R. §240.14a-2(b)(1). But the Commission made no attempt to argue that independent proxy voting advice provided in a fiduciary capacity fell within the text or purpose of the statutory language of Section 14(a).

45. In addressing the "excessive regulatory reach" of the 1956 definition of solicitation, the Commission confirmed that the "disinterested person" exemption was not meant to broaden the pool of communications or the types of persons subject to the proxy rules. Instead, the Commission explained that the exemption was intended to protect shareholders and others from the vagaries of an imprecise and overly broad definition that exposed them to the risk of baseless litigation for criticizing the quality of a company's management, thereby chilling discussion of management performance in contravention of Congress' intent. *See* 1992 Release, 57 Fed. Reg. at 48277-79.

46. In adopting its 1992 package of reforms, the Commission rejected a number of arguments that corporate interests had made against it. For example, the corporate community argued that management should have "'a role to play' in rebutting any misstatements or mischaracterizations" in shareholder communications to ensure "that proxies are executed on the basis of 'correct' information," but the Commission explained that an exemption was necessary to maintain an unrestricted marketplace of ideas in the flow of financial information: "[M]uch commentary concerning corporate performance, management capability or directorial qualifications or the desirability of a particular initiative subject to a shareholder vote is by its nature judgmental. As to such opinions, there typically is not a 'correct' viewpoint." *Id.*, 57 Fed. Reg. at 48278. Indeed, the Commission cautioned that "a regulatory scheme that inserted the Commission staff and corporate management into every exchange and conversation among shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment, particularly where no proxy authority is being solicited by such persons." *Id.*, 57 Fed. Reg. at 48279.

**V.      The Commission's Unprecedented Attempt to Regulate Proxy Voting Advice Provided in the Course of a Fiduciary Relationship as Proxy Solicitation.**

47.      As discussed above, the Commission's regulatory approach to proxy solicitation has ebbed and flowed over the years, with successive expansions of the definition leading to a recognition by the Commission that construing the term "solicitation" to cover any person seeking to influence proxy voting—regardless of whether the person is also seeking authorization to act as a proxy—distorts the purposes of the proxy rules. *Id.*, 57 Fed. Reg. at 48277-79.

48.      Even so, the Commission has been careful—until now—not to treat investment advisers as being engaged in proxy solicitation unless they go beyond their advisory function and distribute solicitation-type material to shareholders who have not asked for it. The Commission has traditionally called such over-the-transom material "unsolicited" proxy advice. *See* 1964 Release; 1979 Release. The Commission has also been careful not to treat advice rendered in the context of a fiduciary relationship as a solicitation. *See* 1979 Release, 44 Fed. Reg. at 68767 n.11.

49.      All of that changed in August 2019, however, when the Commission radically altered its regulatory treatment of proxy voting advice in the Proxy Guidance, which the Commission approved by a 3-2 vote. In that sub-regulatory guidance document, the Commission decreed—for the first time—that all advice a proxy adviser renders in the course of a fiduciary relationship with a client is "unsolicited" and thus constitutes proxy "solicitation." Proxy Guidance, 84 Fed. Reg. at 47417 & n.17. This is so, said the Commission, because proxy advisers "market[] … their expertise in researching and analyzing proxy issues for purposes of helping clients make proxy voting determinations." *Id.*, 84 Fed. Reg. at 47419. Even where an adviser is merely applying the client's own criteria or policies for how to vote its shares, the Commission reasoned that the adviser's communication constitutes a solicitation because it is "part of a commercial service that is designed to *influence*" that vote. *Id.*, 84 Fed. Reg. at 47418 (emphasis added).

50.     In articulating that unprecedented interpretation of the proxy rules, the Commission effectively redefined the term "solicitation" to include any proxy voting advice that a shareholder engages an expert to render—regardless of whether the expert is seeking to achieve a certain *outcome* of any shareholder vote; regardless of whether the expert is seeking authorization to act as the shareholder's proxy; and regardless of whether the expert is acting in a fiduciary capacity. The Commission made no attempt to justify this new rule based on the text, purpose, or history of Section 14(a).

51.     The Proxy Guidance also broke new ground with its interpretation of the antifraud provision of the proxy rules. The Commission asserted that even if proxy voting advice is exempt from the information and filing requirements of the proxy solicitation rules, such advice may still be subject to enforcement actions by the Commission or private claims under Rule 14a-9, which prohibits any solicitation from containing false or misleading statements of material fact. *See id.*, 84 Fed. Reg. at 47419. According to the Commission, "Rule 14a-9 also extends to opinions, reasons, recommendations, or beliefs that are disclosed as part of a solicitation, which may be statements of material facts for purposes of the rule." *Id.* The Commission thus directed that proxy advisers "should consider" whether they need to disclose granular information about the methodologies that underpin their recommendations, their peer group analyses, and other matters of interest to the corporate community in order to avoid liability under Rule 14a-9.

52.     The Commission issued the Proxy Guidance despite investors' universal resistance to such changes during a November 2018 roundtable discussion it had hosted on the topic. *See* Remarks of Michelle Anderson, Moderator, *Transcript of the Roundtable on the Proxy Process* at 250 (Nov. 15, 2018), https://bit.ly/2DVAbiO ("Is there anyone on the panel that thinks there should be additional regulation? I haven't heard it yet, and I'm kind of surprised.").

53. Commissioners Lee and Jackson dissented from the Proxy Guidance (as well as another release issued on the same day regarding the duties of investment advisers in selecting proxy advisers). Commissioner Lee argued that these releases "create serious risks to our system of corporate democracy by adding cost, adding time pressure, and potentially compromising the independence of voting recommendations." Statement of Commissioner Allison Herren Lee on Proxy Voting and Proxy Solicitation Releases (Aug. 21, 2019), https://bit.ly/32gpP6c. "[T]hose risks have not even been identified, much less weighed and analyzed" by the SEC in promulgating the Proxy Guidance. *Id.*

54. On October 31, 2019, ISS filed a complaint in this Court challenging the Proxy Guidance under the Administrative Procedure Act. ISS argued that the Proxy Guidance was (1) contrary to law because it impermissibly treated proxy advice as proxy solicitation; (2) procedurally invalid because it was a substantive rule issued without notice-and-comment procedures; and (3) arbitrary and capricious because it silently departed from longstanding precedent and failed to consider important aspects of the supposed problem it purported to solve.

55. On December 4, 2019, the Commission published a notice of proposed rulemaking that proposed to formalize the new interpretations set forth in the Proxy Guidance. *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, 84 Fed. Reg. 66518 (Dec. 4, 2019) ("Proposed Rules"). Based on the redefinition of proxy advice as proxy solicitation, the Commission proposed several burdensome new restrictions on proxy advice that would commandeer proxy advisers' speech for the benefit of issuers.

56. Because the Proposed Rules implicated many of the same issues that ISS raised in its challenge to the Proxy Guidance, the Court agreed to stay this case pending the outcome of the rulemaking proceeding. *See* Order, ECF No. 14 (Jan 17, 2020).

57. On July 22, 2020, the Commission finalized its new regulatory scheme for proxy advice by a 3-1 vote. The Final Rules have three basic components: proxy advice would now be reclassified

as proxy solicitation; proxy advisers would be obligated to share their analysis and voting recommendations with issuers and disseminate issuer responses; and proxy advisers would be subject to new forms of liability under Rule 14a-9.

58. *First*, the Final Rules formally revise the definition of proxy solicitation to include proxy advice, based largely on the analysis set forth in the Proxy Guidance. Under the Final Rules, proxy solicitation now includes "proxy voting advice that makes a recommendation to a shareholder as to its vote, consent, or authorization on a specific matter" and that "is furnished by a person who markets its expertise as a provider of such advice, separately from other forms of investment advice, and sells such proxy voting advice for a fee." 85 Fed. Reg. at 55091. The new definition of solicitation contains an exemption for proxy voting advice provided in response to an unprompted request, but this exemption is meaningless. Because the Commission takes the position that marketing one's expertise as a provider of proxy voting advice separately from other forms of advice is akin to "prompting" a request for advice, the only parties who could respond to an unprompted request for advice would not be subject to the new definition of solicitation in the first place. *Id.* at 55095-96.

59. *Second*, having redefined proxy solicitation to include proxy advice, the Commission imposed significant new regulatory burdens on proxy advice and proxy advisers. The Final Rules amend the conditions under which proxy solicitation—now redefined to include proxy advice—may be exempt from the proxy rules' burdensome information and filing requirements. Under the Final Rules, proxy advisers must satisfy three new requirements to qualify for an exemption. The first condition—added as 14a-2(b)(9)(i)—relates to conflict-of-interest disclosures and largely duplicates the Advisers Act's regulation of that issue. *Id.* at 55098-55101. The second condition—added as 14a-2(b)(9)(ii)—requires proxy advisers to provide their reports to corporate issuers (*i.e.*, the subjects of the reports) before or at the same time they deliver them to their clients. *Id.* at 55107-12. The final condition—added as 14a-2(b)(9)(iii)—requires proxy advisers to develop "written policies and

procedures reasonably designed to inform clients who have received proxy voting advice" about an issuer's "views regarding such advice" before any voting occurs. *Id.* at 55112-15. Simply put, the Final Rules require proxy advisers to share their reports and recommendations with issuers and then disseminate the issuer's "views" to their clients, even if those views are contrary to the proxy advisers' analysis and recommendations.

60.     *Third*, the Commission expanded the scope of potential liability for proxy advice by amending Rule 14a-9 to include examples of information that, if omitted from proxy advice, could serve as the basis of anti-fraud claims against a proxy adviser. Problematic omissions include details about the proxy adviser's methodology, its sources of information, or its conflicts of interest, among others. *Id.* at 55121. The Commission based this amendment on the Proxy Guidance, which indicated that a proxy adviser could be sued for its "opinions, reasons, recommendations, or beliefs." 84 Fed. Reg. at 47419. In response to commenters' concerns, the Commission stated that the "amendment does not make *mere differences of opinion* actionable," 85 Fed. Reg. at 55121 (emphasis added), but did not explicitly disavow its statement in the Proxy Guidance that Rule 14a-9 could be implicated by "opinions, recommendations, or similar views." 84 Fed. Reg. at 47416..

61.     The Commission's rationale for adopting all of these intrusive new rules was tenuous, to put it mildly. Investors—the purported beneficiaries of the new rules—overwhelmingly *opposed* the changes. Nearly all of the support for the rules came from large, publicly traded companies and industry groups who, unsurprisingly, wanted to give more power to corporate management in the proxy process. The Proposed Rules suggested that the regulatory changes were needed to address "inaccurate or incomplete" proxy advice, 84 Fed. Reg. at 66520, but the Final Rules downplayed that rationale after numerous commenters explained why it was unfounded, *see* 85 Fed. Reg. at 55107. The Proposed Rules also relied on individual comments from so-called "main street investors," 84 Fed. Reg. at 66520, but the Final Rules disavowed that reliance as well after many of those comments were

exposed as fake, *see* 85 Fed. Reg. at 55091 n.123. At bottom, the Commission's primary basis for adopting an entirely new regulatory framework for proxy voting advice was an amorphous desire to facilitate "investor access to enhanced discussion of proxy voting matters." *Id.* at 55107.

62. Commissioner Lee again dissented, arguing that the Final Rules were "unwarranted, unwanted, and unworkable." Statement of Commissioner Allison Lee (July 22, 2020) ("Lee Dissent"), https://bit.ly/2R92vkL. She found any concerns about the "accuracy and soundness" of proxy voting advice to be "unwarranted" and "not sufficient to justify the forced consideration of issuer views that these rules require." *Id.* She emphasized that "[t]hese rules are not wanted by those they purport to benefit," and that "there was almost universal opposition from investors, the supposed beneficiaries of this rulemaking." *Id.* And, finally, Commissioner Lee noted that the new review-and-response provision of the Final Rules will lead to "uncertainty and delays" in providing proxy advice, all "to solve a problem that we have not established exists." *Id.*

## VI. The Proxy Guidance and Final Rules Will Result in Direct, Concrete Harm to Plaintiff ISS.

63. Founded in 1985, ISS is a full-service proxy adviser that helps institutional investors make informed voting decisions, manage the complex process of voting their shares, and report their votes to stakeholders and regulators. ISS annually covers approximately 44,000 shareholder meetings in the United States and in over 110 developed and emerging markets worldwide.

64. As part of its core offerings, ISS provides extensive corporate governance data, research, and proxy voting recommendations. Those recommendations are based on specific policy frameworks created or selected by institutional investors. ISS currently implements over 400 custom voting policies on behalf of its clients.

65. Investors who choose not to create their own proxy voting policies may select among a range of policy options offered by ISS. These include a standard benchmark policy focused on promoting long-term shareholder value and risk mitigation at public companies, as well as thematic

policies that evaluate governance issues from the perspective of sustainability, socially responsible investing, public funds, labor unions, and mission or faith-based investing.

66.    ISS does not determine which issues appear on a proxy ballot or the ballots or agenda items on which it renders advice. It does not furnish research or make vote recommendations at the behest of any issuer or shareholder proponent of a ballot proposal, nor does ISS advocate in support of (or against) any ballot item.

67.    ISS has no interest in the outcome of any shareholder vote and is indifferent as to whether its clients ultimately support a proposal, reject a proposal, or abstain from voting altogether. Indeed, because ISS's clients have a wide variety of different policies and voting criteria, ISS may even provide different recommendations about the *same vote*, depending on the voting criteria selected by the client. For example, ISS may advise clients using its benchmark voting policy guidelines to vote for a certain proposal, while advising clients who employ faith-based or sustainability-based voting criteria to vote against that same proposal.

68.    ISS provides its proxy advisory services to its clients in exchange for a fee. ISS does not provide proxy voting advice to any shareholder who has not specifically engaged ISS for this purpose.

69.    As a registered investment adviser, ISS is subject to a comprehensive regulatory regime under the Advisers Act. As noted above, this entails a range of requirements designed to ensure that ISS renders advice in its clients' best interests and that it does not place its own interests ahead of those of its clients. These requirements include (i) acting pursuant to the highest fiduciary duties of care and loyalty in providing voting advice and recommendations; (ii) an obligation to maintain and regularly test a comprehensive compliance program, including policies and procedures relating to proxy voting, and policies and procedures designed to eliminate, or manage and disclose to clients conflicts of interest; (iii) a duty to fully disclose to clients of methodologies it uses in rendering advice

and any real or potential conflicts of interest it might have; and (iv) a duty to maintain a comprehensive set of books and records and to submit to the SEC's periodic examination of same.

70. ISS—the largest proxy advisory firm in the United States—is directly regulated by the Proxy Guidance and Final Rules and will suffer concrete and particularized harm as a result of those regulations, for multiple independent reasons.

71. First, under the Proxy Guidance and Final Rules, the proxy voting advice that ISS provides to its clients in a fiduciary capacity will be now deemed a solicitation of a proxy. ISS is thus a directly regulated party under the new rules. In particular, ISS will be subject to all of the proxy solicitation regulations unless it can show that it falls within an exemption. Having to rely on an exemption—rather than being outside the proxy solicitation framework altogether (as it has been until now)—will force ISS to incur additional regulatory and legal costs to ensure compliance.

72. Second, under the Final Rules, ISS must now comply with the information and filing requirements of the proxy rules unless it can meet the terms of an exemption. But the Final Rules impose onerous new conditions on obtaining an exemption, such as forcing proxy advisers to provide their voting recommendations to issuers and to disseminate issuers' responses to their clients. The Final Rules make clear that proxy advisers must develop and implement formal "written procedures" to comply with these requirements. ISS will thus be forced to expend resources and divert staff time to comply with these burdensome new obligations. And ISS will suffer irreparable harm to its First Amendment rights to the extent it is required to share its speech with issuers and disseminate issuers' responses that *contradict* ISS's own recommendations.

73. Third, the Proxy Guidance and Final Rules state in no uncertain terms that proxy voting advice is now subject to Rule 14a-9's antifraud provisions. The Proxy Guidance and Final Rules thus open the door to Commission enforcement actions or potential claims by *issuers* who dispute ISS's advice or recommendations to its clients about how to vote their shares.

# CLAIMS FOR RELIEF

## COUNT I
### Administrative Procedure Act
### (Final Rules – Contrary to Law)
### 5 U.S.C. §706

74.     Plaintiff incorporates all of its prior allegations.

75.     The Final Rules are final agency action, *see* 5 U.S.C. §704, because they are the consummation of the Commission's decision-making process and are legally consequential.

76.     Under the APA, a reviewing court must hold unlawful and set aside agency action that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §706(2)(A), (C).

77.     The Final Rules are contrary to law and exceed the Commission's statutory authority under the Exchange Act to the extent they regulate independent proxy voting advice as proxy solicitation. The text, history, purpose, and structure of Section 14(a) of the Exchange Act unambiguously confirm that proxy solicitation involves seeking proxy authority or asking a shareholder to vote a certain way in order to achieve a specific outcome in a shareholder vote.

78.     It is contrary to law for the SEC to regulate proxy voting advice provided in a fiduciary capacity to fee-paying clients as though it were akin to proxy solicitation by a person seeking to achieve a certain outcome in a shareholder vote. At a minimum, the Commission's interpretation of its authority under Section 14(a) must be rejected as unreasonable.

## COUNT II
### Administrative Procedure Act
### (Proxy Guidance – Contrary to Law)
### 5 U.S.C. §706

79.     Plaintiff incorporates all of its prior allegations.

80.     The Proxy Guidance is final agency action, *see* 5 U.S.C. §704, because it is the consummation of the SEC's decision-making process and is legally consequential. *See U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1813-14 (2016).

81.     The Proxy Guidance is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §706(2)(A), (C).

82.     For the same reasons set forth above in Count I, the Proxy Guidance is contrary to law and exceeds the Commission's statutory authority to the extent it regulates independent proxy voting advice provided in a fiduciary capacity as proxy solicitation.

## COUNT III
### Administrative Procedure Act
### (Final Rules – Arbitrary and Capricious)
### 5 U.S.C. §706

83.     Plaintiff incorporates all of its prior allegations.

84.     The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

85.     The Final Rules are arbitrary and capricious for several independent reasons.

86.     The Commission failed to "articulate a satisfactory explanation for its action," or "consider an important aspect of the problem" it purported to solve. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Indeed, the Commission has failed to articulate a reasonable explanation for why the Final Rules were needed at all. The rulemaking record reflected overwhelming opposition to these rules from investors—the purported beneficiaries of the rules— who explained at length that the rules would impose burdensome, time-consuming, and unnecessary obligations while yielding no meaningful benefits. A mere desire to elevate the voice of corporate issuers in the proxy voting process cannot show that these rules were the product of reasoned decisionmaking. And the Commission has failed to discharge its duty to provide a meaningful assessment of the costs and benefits of the new rules.

87.     The Commission has also failed to consider an important aspect of the problem by failing to offer a reasonable explanation about why the Advisers Act—which already comprehensively regulates the provision of investment advice, including proxy voting advice—is inadequate to address its purported concerns about proxy voting advice. *See, e.g., Am. Equity Investors Life Ins. Co. v. S.E.C.,* 613 F.3d 166, 178-79 (D.C. Cir. 2010)

88.     Moreover, the Commission has failed even to acknowledge that it is departing from its longstanding past practice and, in doing so, is upending the legitimate reliance interests of proxy advisers and their clients. *See, e.g., FCC v. Fox Television Stations, Inc.,* 506 U.S. 502, 515 (2009).

## COUNT IV
### Administrative Procedure Act
### (Proxy Guidance – Arbitrary and Capricious)
### 5 U.S.C. §706

89.     Plaintiff incorporates all of its prior allegations.

90.     The Proxy Guidance is arbitrary and capricious for many of the same reasons the Final Rules are arbitrary and capricious. In particular, the Commission has failed to adequately explain why the new definition of solicitation was needed at all; failed to acknowledge that the Proxy Guidance represents a significant departure from past precedent; and failed to adequately explain why proxy voting advice should be regulated under the proxy solicitation rules when it is already comprehensively regulated under the Advisers Act.

## COUNT V
### Administrative Procedure Act
### (Final Rules – First Amendment Violation)
### 5 U.S.C. §706

91.     Plaintiff incorporates all of its prior allegations.

92.     The APA requires a court to hold unlawful and set aside an agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. §706(2)(B).

93.     The First Amendment of the United States Constitution forbids the government from "abridging" the people's right to "freedom of speech." U.S. Const. amend I. Freedom of speech includes the freedom to decide "both what to say and what *not* to say." *Riley v. National Federation for the Blind*, 487 U.S. 781, 797 (1988).

94.     The Final Rules' requirements that proxy advisers provide their vote recommendations to issuers and disseminate issuers' responses are content-based and viewpoint-based restrictions on speech that are subject to strict scrutiny because they "impose[] a burden based on the content of speech and the identity of the speaker." *Sorrel v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011). Such laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

95.     The Commission's claimed interest in "improving the mix of information available to shareholders" is insufficient to justify the Final Rules. The Final Rules' review-and-response provisions do *not* neutrally seek to "improve the mix of information" but instead seek to elevate *one specific viewpoint*—that of corporate issuers—above all other types of speech. Elevating the specific viewpoint of one speaker at the expense of another speaker is not a legitimate government interest— it is unconstitutional viewpoint discrimination.

96.     The Final Rules are not narrowly tailored to achieving the Commission's claimed interests. The sophisticated investors who are proxy advisers' clients are perfectly capable of reviewing issuers' proxy materials, plus any analyses and voting recommendations from the proxy adviser, and making their own decisions about how to vote without the Commission's burdensome and unnecessary intervention in the process. The Commission also failed to meaningfully address why the Advisers Act's regulatory framework was an insufficient alternative to the Final Rules.

97.     The Supreme Court has repeatedly invalidated laws, like the issuer-review and issuer-response rules, that seek to commandeer one person's speech to facilitate someone else's. *See, e.g.,*

*NIFLA v. Becerra*, 138 S. Ct. 2361, 2376 (2018); *Pac. Gas & Elec. Co. v. PUC of California*, 475 U.S. 1, 15 (1986); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 243 (1974).

## COUNT VI
### Administrative Procedure Act
### (Proxy Guidance – Failure to Follow Notice and Comment Procedures)
### 5 U.S.C. §706

98.     Plaintiff incorporates all of its prior allegations.

99.     The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. §706(d)(2).

100.    The Proxy Guidance constitutes a "rule" under 5 U.S.C. §551(4) because it is an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy.

101.    The Commission issued the Proxy Guidance without following the notice-and-comment rulemaking procedures set forth in 5 U.S.C. §553. In particular, the Commission failed to publish a general notice of proposed rulemaking in the Federal Register that sets forth the terms or conditions of the proposed rules.

102.    Because the Commission failed to publish a notice of proposed rulemaking, interested parties had no opportunity to comment on the new proxy adviser rules before they were finalized.

103.    None of the exceptions to the APA's notice-and-comment rulemaking requirements applies here. The Proxy Guidance is a *substantive* rule—not an interpretive rule, general statement of policy, or rule of agency organization, procedure, or practice—because it sets a binding norm for private parties that affects their individual rights and obligations. *See Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) ("an agency may not escape the notice and comment requirements … by labeling a major substantive legal addition to a rule a mere interpretation").

104.    The Proxy Guidance speaks with the force and effect of law. *See id.* It uses mandatory language and does not suggest that compliance is merely advisory or optional.

105.     The Commission published the Proxy Guidance in the Code of Federal Regulations, thus further confirming the substantive character of the rule. *See American Mining Congress v. Mine Safety & Health Admin.,* 995 F.2d 1106, 1109 (D.C. Cir. 1992) ("[A]n agency seems likely to have intended a rule to be legislative if it has the rule published in the Code of Federal Regulations….").

106.     Because the Proxy Guidance is a substantive rule that was promulgated without observance of the required notice-and-comment rulemaking procedures under the APA, it must be held unlawful and set aside.

107.     The Commission's subsequent proposal and adoption of the Final Rules have no bearing on whether the Proxy Guidance—a separate agency document which the Final Rules treat as a binding, preexisting regulation—is, itself, unlawful.

**WHEREFORE**, Plaintiff asks this Court to enter judgment in its favor and to provide the following relief:

a.   Declare that the Final Rules and Proxy Guidance are contrary to law, in excess of statutory jurisdiction, or short of statutory right because independent proxy voting advice provided in the course of a fiduciary relationship does not constitute proxy solicitation under Section 14(a) of the Exchange Act and may not be regulated as such;

b.   Declare that the Final Rules and Proxy Guidance are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law;

c.   Declare that the Final Rules violate the First Amendment;

d.   Declare that the Proxy Guidance is procedurally invalid because it is a substantive rule that was promulgated without observance of the APA's notice and comment procedures;

e.   Vacate and set aside the Final Rule and Proxy Guidance;

f.   Permanently enjoin Defendants and anyone acting in concert with them from implementing, applying, or taking any action under the Final Rule and Proxy Guidance;

g.  Award all other relief to which Plaintiff is entitled, including but not limited to attorneys' fees and costs.

Respectfully submitted,

Dated: September 18, 2020

*s/Jeffrey M. Harris*

Jeffrey M. Harris (DC Bar #994058)
James F. Hasson (*pro hac vice* motion pending)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
james@consovoymccarthy.com

Mari-Anne Pisarri (DC Bar #362597)
PICKARD DJINIS & PISARRI LLP
1990 M Street, NW, Suite 660
Washington, DC 20036
(202) 223-4418
pisarri@pickdjin.com

*Counsel for Institutional Shareholder Services Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2020, I filed the foregoing document through the

CM/ECF system, thereby serving all counsel of record.

_s/ Jeffrey M. Harris_