## SECURITIES AND EXCHANGE COMMISSION

**17 CFR Part 240**

**[Release No. 34–89372; File No. S7–22–19]**

**RIN 3235–AM50**

## Exemptions From the Proxy Rules for Proxy Voting Advice

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** The Securities and Exchange Commission ("Commission") is adopting amendments to its rules governing proxy solicitations so that investors who use proxy voting advice receive more transparent, accurate, and complete information on which to make their voting decisions, without imposing undue costs or delays that could adversely affect the timely provision of proxy voting advice. The amendments add conditions to the availability of certain existing exemptions from the information and filing requirements of the Federal proxy rules that are commonly used by proxy voting advice businesses. These conditions require compliance with disclosure and procedural requirements, including conflicts of interest disclosures by proxy voting advice businesses and two principles-based requirements. In addition, the amendments codify the Commission's interpretation that proxy voting advice generally constitutes a solicitation within the meaning of the Securities Exchange Act of 1934. Finally, the amendments clarify when the failure to disclose certain information in proxy voting advice may be considered misleading within the meaning of the antifraud provision of the proxy rules, depending upon the particular facts and circumstances.

**DATES:** *Effective date:* The rules are effective November 2, 2020.

*Compliance dates:* See Section II.E.

**FOR FURTHER INFORMATION CONTACT:** Daniel S. Greenspan, Senior Counsel, Office of Rulemaking, at (202) 551–3430 or Valian Afshar, Special Counsel, Office of Mergers and Acquisitions, at (202) 551–3440, in the Division of Corporation Finance, U.S. Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549.

**SUPPLEMENTARY INFORMATION:** We are adopting amendments to 17 CFR 240.14a–1(l) ("Rule 14a–1(l)"), 17 CFR 240.14a–2 ("Rule 14a–2"), and 17 CFR 240.14a–9 ("Rule 14a–9") under the Securities Exchange Act of 1934 [15 U.S.C. 78a *et seq.*] ("Exchange Act").[1]

## Table of Contents

I. Introduction
II. Discussion of Final Amendments
  A. Codification of the Commission's Interpretation of "Solicitation" Under Rule 14a–1(l) and Section 14(a)
  1. Proposed Amendments
  2. Comments Received
  3. Final Amendments
  B. Amendments to Rule 14a–2(b): Conflicts of Interest
  1. Proposed Amendments
  2. Comments Received
  3. Final Amendments
  C. Amendments to Rule 14a–2(b): Notice of Proxy Voting Advice and Response
  1. Proposed Amendments
  2. Comments Received
  3. Final Amendments
  D. Amendments to Rule 14a–9
  1. Proposed Amendments
  2. Comments Received
  3. Final Amendments
  E. Compliance Dates
III. Other Matters
IV. Economic Analysis
  A. Introduction
  1. Overview of Proxy Voting Advice Businesses' Role in the Proxy Process
  2. Commenter Concerns Regarding the Rule's Economic Justification
  B. Economic Baseline
  1. Affected Parties and Current Market Practices
  2. Current Regulatory Framework
  C. Benefits and Costs
  1. Overview of Benefits and Costs and Comments Received
  2. Codification of the Commission's Interpretation of "Solicitation" Under Rule 14a–1(l) and Section 14(a)
  3. Amendments to Rule 14a–2(b)
  4. Amendments to Rule 14a–(9)
  5. Effect on Smaller Entities
  D. Effects on Efficiency, Competition, and Capital Formation
  1. Efficiency
  2. Competition
  3. Capital Formation
  E. Reasonable Alternatives
  1. Use a More Prescriptive Approach in the Final Amendments
  2. Require Proxy Voting Advice Businesses To Include Full Registrant Response in the Businesses' Voting Advice
  3. Public Disclosure of Conflicts of Interest
  4. Require Additional or Alternative Mandatory Disclosures in Proxy Voting Advice
  5. Require Disabling or Suspension of Pre-Populated and Automatic Submission of Votes
  6. Exempt Smaller Proxy Voting Advice Businesses From the Additional Conditions to the Exemptions
  7. Require a Narrower Scope of Registrant Notice
V. Paperwork Reduction Act
  A. Background
  B. Summary of Comment Letters to PRA Estimates
  C. Burden and Cost Estimates for the Amendments
  1. Impact on Affected Parties
  2. Aggregate Increase in Burden
  3. Increase in Annual Responses
  4. Incremental Change in Compliance Burden for Collection of Information
  5. Program Change and Revised Burden Estimates
VI. Final Regulatory Flexibility Analysis
  A. Need for, and Objectives of, the Final Amendments
  B. Significant Issues Raised by Public Comments
  C. Small Entities Subject to the Final Amendments
  D. Projected Reporting, Recordkeeping, and Other Compliance Requirements
  E. Agency Action To Minimize Effect on Small Entities
VII. Statutory Authority

## I. Introduction

Annual and special meetings of publicly traded corporations, where shareholders are provided the opportunity to vote on various matters, are a key component of corporate governance. The applicable laws are set by the state in which the corporation is incorporated. For various reasons, including the widely dispersed nature of public share ownership, most shareholders do not attend these meetings in person. Rather, most shareholders of publicly traded companies exercise their right to vote on corporate matters through the use of proxies.[2] Congress vested in the Commission the broad authority to oversee the proxy solicitation process when it originally enacted the Securities Exchange Act of 1934 (the "Exchange Act").[3] As the securities markets have become increasingly more sophisticated and complex, and the intermediation of share ownership and participation of various market participants has grown in kind,[4] the Commission's interest in

---

[1] Unless otherwise noted, when we refer to the Exchange Act, or any paragraph of these Act, we are referring to 15 U.S.C. 78a of the United States Code, at which the Exchange Act is codified, and when we refer to rules under the Exchange Act, or any paragraph of these rules, we are referring to title 17, part 240 of the Code of Federal Regulations [17 CFR 240], in which these rules are published.

[2] *See Concept Release on the U.S. Proxy System,* Release No. 34–62495 (Jul. 14, 2010) [75 FR 42982 (July 22, 2010)] ("Concept Release"), at 42984.

[3] *See Regulation of Communications Among Shareholders,* Release No. 34–31326 (Oct. 16, 1992) [57 FR 48276 (Oct. 22, 1992)] ("Communications Among Shareholders Adopting Release"), at 48277 ("Underlying the adoption of Section 14(a) of the Exchange Act was a Congressional concern that the solicitation of proxy voting authority be conducted on a fair, honest and informed basis. Therefore, Congress granted the Commission the broad 'power to control the conditions under which proxies may be solicited'. . . .").

[4] *See Concept Release* at 42983 ("This complexity stems, in large part, from the nature of share ownership in the United States, in which the vast majority of shares are held through securities intermediaries such as broker-dealers or banks. . . .").

ensuring fair, honest, and informed markets, underpinned by a properly functioning proxy system, dictates that we regularly assess whether the system is serving investors as it should.[5]

In today's financial markets, which are characterized by significant intermediation and institutional investor participation,[6] proxy voting advice businesses[7] have come to play an important role in the proxy voting process by providing an array of voting services that can help investment advisers and institutional investor clients manage their substantive and procedural proxy voting needs.[8] Investment advisers and institutional investors often retain proxy voting

advice businesses to assist them in making their voting determinations on behalf of their own clients and to handle other aspects of the voting process, which for certain investment advisers has become increasingly complex and demanding over time.[9] Investment advisers voting on behalf of clients (including retail investors) and institutional investors, by virtue of their holdings in many public companies, including as a result of indexing and other broad portfolio management strategies, must manage the logistics of voting in potentially hundreds, if not thousands, of shareholder meetings and on thousands of proposals that are presented at these meetings each year, with the significant portion of those voting decisions concentrated in a period of a few months.[10]

Proxy voting advice businesses typically provide investment advisers, institutional investors, and other clients with a variety of services that relate to the substance of voting decisions, such as: Providing research and analysis regarding the matters subject to a vote; promulgating their generally applicable benchmark voting policies (a "benchmark policy") or specialty voting policies (a "specialty policy"), such as a socially responsible policy, a sustainability policy, or a Taft-Hartley labor policy,[11] that their clients can use; and making specific voting recommendations to their clients on matters subject to a shareholder vote, either based on the proxy voting advice business's benchmark or specialty policies or based on custom voting policies that are proprietary to a proxy voting advice business's clients ("custom policy").[12] This advice is often an important factor in the clients' proxy voting decisions. Clients may use the proxy voting advice business's

recommendations in a variety of ways, including as an alternative or supplement to their own internal resources in analyzing matters when deciding how to vote.[13]

Proxy voting advice businesses may also provide services that assist clients in handling the administrative tasks of the voting process, typically through an electronic platform that enables their clients to cast votes more efficiently.[14] In some cases, proxy voting advice businesses are given authority to execute votes on behalf of their clients in accordance with the clients' general guidance or specific instructions.[15]

Although estimates vary, each year proxy voting advice businesses provide voting advice to thousands of clients that exercise voting authority over a sizable number of shares.[16] Because proxies have become the predominant means by which shareholders of publicly traded companies exercise their right to vote on corporate matters,[17] and institutional investors hold a significant and increasing number of shares, proxy voting advice businesses have become uniquely situated in today's market to influence,[18] and in many cases directly execute, these investors' voting decisions.[19]

In recognition of the important and unique role that proxy voting advice businesses play in the proxy voting process[20] and in the voting decisions of investment advisers and institutional investors[21] who often vote on behalf of retail investors, the Commission proposed amendments to the Federal proxy rules in November 2019 to enhance the transparency, accuracy, and completeness of the information provided to clients of proxy voting advice businesses in connection with their voting decisions.[22]

Specifically, the Commission proposed amendments to codify its interpretation that proxy voting advice generally constitutes a solicitation within the meaning of Exchange Act Section 14(a) and therefore is subject to the Federal proxy rules. In addition, the Commission proposed to condition the

---

[5] *See, e.g., id.* at 43020 ("The U.S. proxy system is the fundamental infrastructure of shareholder suffrage since the corporate proxy is the principal means by which shareholders exercise their voting rights. The development of issuer, securities intermediary, and shareholder practices over the years, spurred in part by technological advances, has made the system complex and, as a result, less transparent to shareholders and to issuers. It is our intention that this system operate with the reliability, accuracy, transparency, and integrity that shareholders and issuers should rightfully expect.").

[6] *See Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice,* Release No. 34–87457 (Nov. 5, 2019) [84 FR 66518 (Dec. 4, 2019)] ("Proposing Release") at 66519.

[7] For purposes of this release, we refer to firms that advise investment advisers and institutional investors on their voting determinations, and any person who markets and sells such advice, as "proxy voting advice businesses." Unless otherwise indicated, the term "proxy voting advice" as used in this release refers to the voting recommendations provided by proxy voting advice businesses on specific matters presented at a registrant's shareholder meeting, or for which written consents or authorizations from shareholders are sought in lieu of a meeting, and the analysis and research underlying the voting recommendations that are delivered to the proxy voting advice business's clients through any means, such as in a standalone written report or multiple reports, an integrated electronic voting platform established by the proxy voting advice businesses, or any combination thereof. The reference to "proxy voting advice," as used in this release, is not intended to encompass (1) administrative or ministerial services, (2) data or research that is not used by a proxy voting advice business to formulate its voting recommendations, or (3) the identity of any of the proxy voting advice business's clients that receive such advice. To the extent any data or research underlies a proxy voting advice business's voting recommendations but is not delivered to its clients (such as internal work product), such data or research also would not constitute that business's proxy voting advice. Further, we recognize that, in formulating its voting recommendations, a proxy voting advice business may use data and research that was prepared by another party, such as market intelligence and database providers. For the avoidance of doubt, the fact that a third party's data and research is used by the proxy voting advice business would not, by itself, cause such third party to be a proxy voting advice business. However, if a proxy voting advice business uses a third party's data and research in formulating its voting recommendations and delivers such data and research to its clients, then the data and research would constitute part of the proxy voting advice business's proxy voting advice.

[8] *See* Proposing Release at 66520, n.17.

[9] *Id.* at 66519, n.9.

[10] *Id.* at n.8.

[11] For example, the various benchmark and specialty policies of one proxy voting advice business, Institutional Shareholder Services (ISS), are set forth on the following web page: *https://www.issgovernance.com/policy-gateway/voting-policies/.* The various benchmark and specialty policies of another proxy voting advice business, Egan-Jones, are set forth on the following web page: *https://www.ejproxy.com/methodologies/.*

[12] *See* Proposing Release at 66519. As discussed *infra* Section II.C.3.c.i., we are excluding from the requirements of new Rule 14a–2(b)(9)(ii) proxy voting advice to the extent that such advice is based on custom policies. Custom policies would not include the proxy voting advice businesses' benchmark or specialty policies, even if those benchmark or specialty policies were to be adopted by proxy voting advice businesses' clients. *See infra* note 394 for a discussion of how a proxy voting advice business may satisfy the requirements of new Rule 14a–2(b)(9)(ii) in situations in which a client's custom policy is identical to the benchmark or specialty policies.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 66520, n.18.

[17] *Id.* at 66518, n.2.

[18] *See, e.g.,* letter from Council of Inst. Investors (Nov. 14, 2019) ("CII I") (noting that proxy voting advice businesses' "recommendations and related analysis" may be "market-moving").

[19] *See also infra* note 36 for a discussion of the increased institutional investor holdings in the U.S. markets.

[20] *Id.* at 66520.

[21] *Id.*

[22] *See generally* Proposing Release.

availability of certain existing exemptions from the information and filing requirements of the Federal proxy rules commonly used by proxy voting advice businesses upon compliance with additional disclosure and procedural requirements. Finally, the Commission proposed to amend Exchange Act Rule 14a–9, the antifraud provision of the Federal proxy rules, to clarify that, depending upon the particular facts and circumstances at issue, the failure to disclose certain information in proxy voting advice may be considered materially misleading within the meaning of the rule.

We received many comment letters in response to the Proposing Release.[23] After considering the public comments, we are adopting the proposed rules with certain modifications as described, and for the reasons set forth, below. Consistent with the proposal, we are adhering to—and adopting an amendment to Rule 14a–1(l) to codify— our longstanding view that proxy voting advice generally constitutes a "solicitation" under Section 14(a).[24] Absent an applicable exemption, a person providing such proxy voting advice would be subject to the Federal proxy rules' information and filing requirements, including the obligation to file and furnish definitive proxy statements. For reasons previously stated in the Proposing Release, we believe that proxy voting advice businesses should be eligible to rely on an exemption from such information and filing requirements for their proxy voting advice, but only to the extent that such exemption is appropriately tailored to their unique role in the proxy process and facilitates the transparency, accuracy, and completeness of the information available to those making voting decisions. As such, under the new rules that we are adopting, persons furnishing proxy voting advice constituting a solicitation as defined in new 17 CFR 240.14a–1(l)(1)(iii)(A) ("Rule 14a–1(l)(1)(iii)(A)") will be eligible to rely on the exemptions in 17 CFR 240.14a–2(b)(1) ("Rule 14a–2(b)(1)") and 17 CFR 240.14a–2(b)(3) ("Rule 14a–2(b)(3)")[25] only upon satisfaction of the conditions of new 17 CFR 240.14a–2(b)(9) ("Rule 14a–2(b)(9)").

As described in more detail below, we have modified these conditions in a number of respects in response to comments received to provide appropriate flexibility to proxy voting advice businesses to meet the principles that underlie the objectives of the rule, and to avoid unnecessary potential disruptions to their ability to provide their clients with timely voting advice. In addition, consistent with the amendments to 17 CFR 240.14a–2(b) ("Rule 14a–2(b)"), we are amending Rule 14a–1(l) to make clarifying changes to the definition of solicitation as it relates to proxy voting advice and amending Rule 14a–9 to add to the list of examples provided in the Note to that rule. We are adopting these amendments to Rule 14a–1(l) and Rule 14a–9 substantially in the form proposed, with certain modifications as described in the discussion that follows.

We recognize that for some shareholders, the services provided by proxy voting advice businesses can be an important component of the larger proxy voting process and, as such, help facilitate the participation of shareholders in corporate governance through the exercise of their voting rights.[26] We are also mindful that the efficacy and effectiveness of the proxy voting system depend on the ability of shareholders to obtain transparent, accurate, and materially complete information from an array of relevant parties before making their proxy voting decisions. To enable shareholders to make informed voting decisions, Congress and the Commission have placed varying obligations on participants in the proxy voting process, including through Commission rulemakings pursuant to the broad authority granted by Congress to regulate proxy solicitation.[27]

For example, registrants and others who engage in a proxy solicitation generally must furnish shareholders with a definitive proxy statement containing numerous specified disclosures.[28] They must also generally file all of their additional soliciting materials with the Commission, which ensures that all shareholders and interested parties have access to their soliciting statements and have an ability to consider such statements as part of their voting decisions and, in certain situations such as in a proxy contest, respond to them.[29] The Commission, however, has long recognized that these general requirements applicable to registrants and others engaged in a proxy solicitation may not be necessary under certain circumstances and, throughout the years, has tailored the application of these requirements as needed. For example, shareholders who beneficially own more than $5 million of securities and who do not seek proxy voting authority are exempt from the requirement to file a definitive proxy statement when they engage in a solicitation, but they still must publicly file with the Commission any written soliciting materials sent to security holders and are subject to the antifraud provisions of Rule 14a–9 with respect to the content of those soliciting materials.[30] Parties conducting certain other solicitation activities, including the furnishing of proxy voting advice, have relied on other exemptions from the requirement to file proxy statements.[31] Still other activity has

[23] *See generally* letters submitted in connection with the Proposing Release, *available at https://www.sec.gov/comments/s7-22-19/s72219.htm.* Unless otherwise specified, all references in this release to comment letters are to those relating to the Proposing Release. In addition, the SEC's Investment Advisory Committee adopted recommendations asking the Commission to: prioritize improvements to the proxy system (end-to-end vote confirmations, reconciliations, and universal proxies); improve conflict-of-interest disclosure generally; enhance the discussion about the value of proxy advisors and shareholder proposals; and expand the economic cost-benefit analysis. *See* U.S. Securities & Exchange Commission Investor Advisory Committee, Recommendation of the SEC Investor Advisory Committee Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals (Jan. 24, 2020) ("IAC Recommendation"), *available at https://www.sec.gov/spotlight/investor-advisory-committee-2012/sec-guidance-and-rule-proposals-on-proxy-advisors-and-shareholder-proposals.pdf.* These recommendations were not unanimously approved by the members of the Investor Advisory Committee; *see* letters from Stephen Holmes (Jan. 27, 2020) ("S. Holmes"); Paul G. Mahoney and J.W. Verret (Jan. 30, 2020) ("P. Mahoney and J.W. Verret"); Heidi Stam (Jan. 27, 2020). We address the substance of the IAC Recommendation, together with related public comments, in the discussion that follows. Finally, the 2019 Small Business Forum Report included a recommendation that the Commission provide "for effective oversight of proxy advisory firms under Rule 14a-2(b), with a focus on conflicts of interest, accuracy, transparency, and issuer-specific decision making." This recommendation was tied for first place in the priority ranking assigned by the participants of the breakout group session. *See* Final Report of the 2019 SEC Government-Business Forum on Small Business Capital Formation (December 2019) ("2019 Small Business Forum"), *available at https://www.sec.gov/files/small-business-forum-report-2019.pdf.*

[24] *See infra* Section II.A.3.

[25] Proxy voting advice businesses have typically relied upon the exemptions in Rule 14a–2(b)(1) and (b)(3) to provide advice without complying with the filing and information requirements of the proxy rules. *See* Proposing Release at 66525 and n.68.

[26] *See* Proposing Release at 66525.

[27] *See infra* notes 55–60 and accompanying text for a discussion of the multifaceted nature of the Federal securities laws' security holder voting and ownership disclosure regulatory framework.

[28] 17 CFR 240.14a–3; 17 CFR 240.14a–101.

[29] 17 CFR 240.14a–6(b).

[30] 17 CFR 240.14a–2(b)(1); 17 CFR 240.14a–6(g).

[31] 17 CFR 240.14a–2(b). Rules 14a–2(a) and (b) set forth a number of activities that fall within the definition of a solicitation but for which the requirement to file a definitive proxy statement does not apply. This includes, for example, the delivery of registrants' proxy materials by securities intermediaries to their clients and the securities intermediaries' request for voting instructions from their clients (Rule 14a–1(a)(1)), solicitations by or on behalf of a person who does not seek proxy authority (Rule 14a–2(b)(1)), solicitations of no more than ten persons (Rule 14a–2(b)(2)), the

2

been entirely exempt from the proxy rules, including Rule 14a–9.[32]

The Commission has periodically adjusted the proxy rules in response to market developments, including to provide shareholders with additional sources of information.[33] In calibrating the rules and exemptions, the Commission has generally sought to avoid unnecessary burdens that may deter the expression of views on matters presented for a vote while ensuring that shareholders have transparent, accurate, and materially complete information upon which to make their voting decisions.[34] In this regard, the Commission has been guided by the "fundamental conclusion that the interests of shareholders are best served by more, and not less, discussion of matters presented for a vote." [35] This same principle guides us again as we update the Commission's rules in light of current market practices and circumstances.

As explained in the Proposing Release, proxy voting advice businesses have become an increasingly important and prominent part of the proxy voting process as institutional investors, who own a majority of the outstanding shares in today's market,[36] often retain proxy voting advice businesses to assist them in making their voting determinations and voting their shares on behalf of clients. In recent years, registrants, investors, and others have expressed concerns about the role of proxy voting advice businesses. These concerns include the accuracy and soundness of

the information, and the transparency of the methodologies, used to formulate proxy voting advice businesses' recommendations. Concerns have also focused on potential conflicts of interest that may affect the recommendations made by the proxy voting advice businesses.[37] In addition, questions have been raised about whether registrants have an adequate opportunity to review and respond to proxy voting advice before votes, informed by such advice, are cast and whether shareholders have an adequate opportunity to review the proxy voting advice, including in the context of any response from the registrant or others, before casting their votes.[38] These concerns and changing market conditions, as discussed above, prompted the Commission to consider amendments to the exemptions commonly used by proxy voting advice businesses, which had been crafted before proxy voting advice businesses played the significant role that they now do in the proxy voting process and in the voting decisions of investment advisers and institutional investors.[39] A number of the comment letters we received in response to the Proposing Release continue to express these concerns.[40]

In updating our rules to facilitate better informed proxy voting, we do not believe that it is necessary to subject proxy voting advice businesses to the

Federal proxy rules' information and filing requirements applicable to registrants and certain others, such as the filing and furnishing of definitive proxy statements, as long as they satisfy certain requirements tailored to their role in the proxy process. In particular, we believe that concerns raised regarding the increase in intermediation and complexity in the market and the increased dependence on proxy voting advice can be addressed, and the goal of ensuring that shareholders receive more transparent, accurate, and complete information can be furthered, without the full set of disclosures that would be required with a definitive proxy statement. We also recognize that a requirement to publicly file proxy voting advice with the Commission and disseminate proxy materials to the shareholders of every registrant covered by the advice could result in the addition of significant substantive and procedural changes in the current operations of proxy voting advice businesses and could adversely impact their business models. For example, such a requirement would effectively allow investment advisers, institutional investors, and other investors who do not subscribe to the services of proxy voting advice businesses to obtain certain proxy voting advice services free of charge.

For these reasons, we believe that as a general matter these businesses should continue to be eligible for the benefits of conditional, tailored exemptions from the information and filing requirements of the Federal proxy rules generally applicable to registrants and others. In light of the significant role proxy voting advice plays in the voting decisions of institutional investors and others, however, we also believe that the exemptions need to be fashioned both to elicit adequate disclosure and to enable proxy voting advice businesses' clients to have reasonable and timely access to transparent, accurate, and complete information material to matters presented for a vote—thereby ensuring that the continued use of the exemptions facilitates informed voting decisions and does not undermine the purposes of the Federal proxy rules.

Some commenters argued that the Investment Advisers Act of 1940 (the "Advisers Act") is the proper regulatory regime for proxy voting advice businesses, and that the Advisers Act and an investment adviser's fiduciary duty already address the stated

---

furnishing of proxy voting advice by advisors to their clients under certain circumstances (Rule 14a–2(b)(3)), the publication or distribution by a broker or a dealer of research reports under specified conditions (Rule 14a–2(b)(5)), and the solicitations through electronic shareholder forums by persons who do not seek proxy voting authority (Rule 14a–2(b)(6)).

[32] 17 CFR 240.14a–2(a).

[33] For example, the Commission has recalibrated the exemptions "to provide shareholders with additional sources of information, opinions and views" to inform their voting decisions, and to remove impediments that it determined "unduly hindered free discussion" among registrants, shareholders, and other interested parties. Communications Among Shareholders Adopting Release; *see also* Concept Release ("The Commission has actively monitored the proxy process since the 1930s and has made changes when the process was not functioning in a manner that adequately protected the interests of investors.").

[34] *See* Communications Among Shareholders Adopting Release (noting concerns about "secret" solicitations, as well as concerns about the burden on shareholders).

[35] *Id.*

[36] *See, e.g.,* A. De La Cruz et al., OECD, Owners of the World's Listed Companies 22 (2019), *available at https://www.oecd.org/corporate/ Owners-of-the-Worlds-Listed-Companies.pdf* ("In the United States, institutional investors hold around 72% of the domestic stock market value.").

[37] *See* Proposing Release at 66525.

[38] *See id.* at 66529.

[39] *See id.* at 66519–21.

[40] *See, e.g.,* letters from Mark A. Bloomfield, President and CEO, American Council for Capital Formation (Jan. 27, 2020) ("ACCF"); Kyle Isakower, Senior Vice Pres. of Reg. & Energy Policy, American Council for Capital Formation (July 7, 2020) ("ACCF II"); Cameron Arterton, Vice President, Biotechnology Innovation Organization (Feb. 3, 2020) ("BIO"); Business Roundtable (Feb. 3, 2020) ("BRT"); Tom Quaadman, Vice President, U.S. Chamber of Commerce Center for Capital Markets Competitiveness (Jan. 31, 2020) ("CCMC"); Henry D. Eickelberg, Chief Operating Officer, Center on Executive Compensation (Feb. 3, 2020) ("CEC"); Corporate Governance Coalition for Investor Value (Feb. 3, 2020) ("CGC"); Neil A. Hanson, Vice President, Investor Relations and Secretary, Exxon Mobil Corporation (Feb. 3, 2020) ("Exxon Mobil"); Rick E. Hansen, Assistant General Counsel and Corporate Secretary, General Motors Company (Feb. 25, 2020) ("GM"); Clifton A. Pemble, President and CEO, Garmin International, Inc. (Jan. 27, 2020) ("Garmin"); Brian S. Roman, Global General Counsel (Feb. 3, 2020) ("Mylan"); Chris Netram, Vice President, Tax & Domestic Economic Policy, National Association of Manufacturers (Feb. 3, 2020) ("NAM"); Tony M. Edwards, Senior Executive Vice President, and Victoria P. Rostow, Senior Vice President & Deputy General Counsel (Feb. 3, 2020) ("Nareit"); John A. Zecca, Executive Vice President, Chief Legal and Regulatory Officer, Nasdaq, Inc. (Feb. 3, 2020) ("Nasdaq"); Gary A. LaBranche, President & CEO, National Investor Relations Institute (Feb. 3, 2020) ("NIRI"); Darla Stuckey, President and CEO, Society for Corporate Governance (Feb. 3, 2020) ("SCG") .

objectives of the proposed rules.[41] We disagree. The Advisers Act and Section 14(a) serve distinct, though overlapping, regulatory purposes. The Advisers Act is a principles-based regulatory framework, at the center of which is a federal fiduciary duty to clients that is based on equitable common law principles.[42] Section 14(a) grants the Commission broad power to adopt rules to control the conditions under which proxies may be solicited in order to address a Congressional concern that the solicitation of proxy voting authority be conducted on a fair, honest, and informed basis.[43]

As a preliminary matter, we note that proxy voting advice businesses differ as to whether they believe they fall within the definition of an investment adviser under the Advisers Act and should be registered as investment advisers. The Commission has stated previously that when proxy voting advice businesses provide certain services, they meet the definition of investment adviser under the Advisers Act and thus are subject to regulation under the Act.[44] Specifically, a person is an "investment adviser" if the person, for compensation, engages in the business of providing advice to others as to the value of securities, whether to invest in, purchase, or sell securities, or issues reports or analyses concerning securities.[45] Proxy voting advice businesses provide analyses of shareholder proposals, director candidacies, or corporate actions and provide advice concerning particular votes in a manner designed to assist their institutional clients to achieve their investment goals with respect to the voting of securities they hold.[46] In other words, proxy voting advice businesses, for compensation, engage in

the business of issuing reports or analyses concerning securities and providing advice to others as to the value of securities and would therefore meet the definition of an investment adviser unless an exclusion applies.[47]

One such exclusion from the definition of an investment adviser under the Advisers Act is the "publisher's exclusion." Specifically, Section 202(a)(11)(D) of the Advisers Act excludes from the definition of an investment adviser a "publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation." [48] At least one large proxy voting advice business has taken the position that if it was deemed to be an investment adviser, it could rely on the exclusion for publishers contained in Section 202(a)(11)(D) of the Advisers Act.[49]

Regardless of the applicability of the Advisers Act, however, we believe the concerns motivating the rules we are adopting are squarely subject to, and appropriately addressed through, regulation under Section 14(a).[50] As we

noted in the Proposing Release, proxy voting advice businesses provide voting advice to clients that exercise voting authority over a sizable number of shares that are voted annually, and these businesses are uniquely situated in today's market to influence investors' voting decisions.[51] This advice also implicates interests beyond those of the clients who utilize it when voting. Because these clients vote shares they hold on behalf of thousands of retail investors, this advice affects the interests of these underlying investors. Further, in light of proxy voting advice businesses' clients' ability to affect the outcome of the vote on a particular matter through their voting power, the proxy voting advice guiding the clients' votes potentially affects the interests of all shareholders[52] of the registrant, the registrant, and the proxy system in general.[53]

In the areas of proxy voting, proxy solicitation, and related activities, the Advisers Act, Section 14(a), and various other statutes and Commission rules do not operate independently from each other and are not mutually exclusive. Rather, depending on the activity and status of the person involved, more than one statutory provision and related rules may apply, with the various provisions complementing each other. For example, Section 13(d) of the Exchange Act and the related rules[54] are designed to ensure that market participants are informed when any shareholder (or group of shareholders) acquires more than five percent of a class of equity securities registered under Exchange Act Section 12.[55] Section 13(d) and the related rules generally require these holders to disclose publicly their ownership and other information mandated by the Commission, such as any plans that the holders may have to change the board of directors or management or to engage in

---

[41] *See, e.g.,* letter from Gary Retelny, CEO, Institutional Shareholder Services, Inc. (Jan. 31, 2020) ("ISS").

[42] *See* Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Release No. IA–5248 at 6 (June 5, 2019), 84 FR 33669, 33670 (July 12, 2019) ("Standard of Conduct for Investment Advisers"); *SEC* v. *Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194 (1963) (noting that the Advisers Act "reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship,' as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested").

[43] *See* Communications Among Shareholders Adopting Release at 48277; Proposing Release at n.3.

[44] *See* Concept Release at 43010.

[45] Advisers Act Section 202(a)(11) [15 U.S.C. 80b–2(a)(11)]. Sections 202(a)(11)(A) through (G) of the Advisers Act address exclusions to the definition of the term "investment adviser." [15 U.S.C. 80b–2(a)(11)(A) through (G)].

[46] See Concept Release at 43010.

[47] *Id.*

[48] *Lowe* v. *SEC,* 472 U.S. 181 (1985). The U.S. Supreme Court has interpreted the "publisher's exclusion" to include publications that offer impersonal investment advice to the general public on a regular basis. To qualify for the section 202(a)(11)(D) exclusion, the publication must be: (1) Of a general and impersonal nature, in that the advice provided is not adapted to any specific portfolio or any client's particular needs; (2) "bona fide" or genuine, in that it contains disinterested commentary and analysis as opposed to promotional material; and (3) of general and regular circulation, in that it is not timed to specific market activity or to events affecting, or having the ability to affect, the securities industry.

[49] *See* letter from Katherine Rabin, CEO, Glass Lewis & Co., LLC (Nov. 14, 2018), *available at https://www.glasslewis.com/wp-content/uploads/2018/11/GL-SEC-Roundtable-Statement-111418.pdf.* The Government Accountability Office in its Report about proxy advisory firms to the Committee on Banking, Housing, and Urban Affairs of the U.S. Senate in 2016 also took note of the differences in registration status of proxy advisory firms. The Report observed that one large proxy voting advice business is not registered with the SEC as an investment adviser, while another is, and a third is registered as a nationally recognized statistical rating organization. *See* Report to the Chairman, Subcommittee on Economic Policy, Committee on Banking, Housing, and Urban Affairs, U.S. Senate, Corporate Shareholder Meetings, Proxy Advisory Firms' Role in Voting and Corporate Governance Practices from the U.S. Government Accountability Office (Nov. 2016), *available at https://www.gao.gov/assets/690/681050.pdf.*

[50] Whether an entity meets the definition of an investment adviser or is eligible for an exclusion does not impact the analysis of whether it is engaged in "solicitation" for purposes of Section 14(a). Relatedly, the retention of a proxy voting advice business does not relieve an investment adviser of its obligations under the Advisers Act to its clients. *See* Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers, Release No. IA–5325, pp. 5–6 (Aug. 21, 2019) [84 FR 47420, 42421 (Sept. 10, 2019)] ("Commission Guidance on Proxy Voting

Responsibilities"), Question No. 2 at 12, 84 FR 47423 (discussing steps that an investment adviser that has assumed the authority to vote proxies on behalf of clients could take to demonstrate that it is making voting determinations in a client's best interest); *see also Supplement to Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers,* Release No. IA–5547 (July 22, 2020) ("Supplemental Proxy Voting Guidance").

[51] *See* Proposing Release at 66520.

[52] *See supra* note 18.

[53] *Cf. J. I. Case Co.* v. *Borak,* 377 U.S. 426, 432 (1964) ("The injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done the corporation, rather than from the damage inflicted directly upon the stockholder. The damage suffered results not from the deceit practiced on him alone but rather from the deceit practiced on the stockholders as a group.").

[54] 17 CFR 240.13d–1 through 13d–102 ("Rules 13d–1 through 13d–102").

[55] 15 U.S.C. 78m(d).

extraordinary transactions (such as mergers or material asset sales), for so long as the holdings exceed the five percent threshold as well as any material changes to these disclosures.[56] These mandated disclosures, which are provided in Schedule 13D, along with the short-form Schedule 13G adopted pursuant to Exchange Act Section 13(g),[57] have proven important to investor protection by providing public notice of significant accumulations of securities by a person that may affect the control of the company and, ultimately, the interests of all security holders in the company, including in the context of proxy voting.

Yet, the obligation for a shareholder to file Schedules 13D or 13G does not obviate the shareholder's obligation to comply with Section 14(a) and the Federal proxy rules to the extent that the shareholder engages in activities that constitute a proxy solicitation. For example, a dissident shareholder seeking to solicit proxy authority to elect its own director nominees to a registrant's board in a contested election must still file and furnish a definitive proxy statement even though the dissident shareholder may have previously disclosed in its Schedule 13D the plan to change the board of directors. This is the result of Congress establishing these two separate statutory provisions with different purposes, with Section 13(d) focused on providing notice about concentration of voting power and the use of that power, including to change or influence the control of the issuer, and Section 14(a) focused on providing information needed for informed shareholder voting, and the fact that a shareholder may engage in an activity that triggers obligations under both provisions.

The two statutory obligations often complement each other. For example, Exchange Act Rule 13d–1 provides certain shareholders, including many classes of institutional shareholders, with a tailored, conditional exemption from the general requirements of Section 13(d) if the shareholder has acquired the securities "in the ordinary course of business and not with the purpose nor with the effect of changing or influencing the control of the issuer." [58] In various circumstances where shareholders are voting by proxy, and solicitation activity is ongoing—for example, the election of directors or the approval of an extraordinary corporate transaction—the information required to be disclosed publicly by Section 13(d)

may be material to a voting decision and, accordingly, important to the regulation of the proxy voting process. Similarly, the Commission—noting that Section 13(d) already sets forth the circumstances for when public disclosures of such plans, proposals, or agreements are needed—adopted the Rule 14a–2(b)(1) exemption despite concerns from some commenters that proxy filings are needed for disclosure of a shareholder's plans or proposals regarding the registrant or shareholders' voting agreements on a particular matter.[59] At the same time, the exemption is not available for solicitations by any person who, while not seeking proxy authority, is nevertheless required to file a Schedule 13D or has disclosed in the Schedule 13D an intent (or reserved the right) to engage in a change of control transaction or a contested director election, given the heightened need for the proxy disclosures from a person contemplating such transformative transactions or contests.

Other statutes that often play an important and complementary role in furthering all aspects of the Commission's mission in the context of proxy voting and proxy solicitation include Sections 5, 11, and 12 of the Securities Act of 1933 (the "Securities Act"), in particular in circumstances where the vote being solicited is in connection with a significant transaction, such as a merger, in which

new securities may be issued to the shareholders who are voting on the transaction. In such a situation, both the registration and prospectus requirements of Securities Act Section 5 and the proxy solicitation requirements of Exchange Act Section 14(a) apply, with public companies often filing a joint proxy statement/prospectus to fulfill both statutory obligations.

This framework—complementary and overlapping statutes and rules that are based on principles, facts and circumstances, and each participant's actions as well as status—applies similarly in other key areas of the Commission's mandate, including the offer and sale of securities in both the public and private markets, securities trading, and the provision of investment advice to retail and institutional investors. Moreover, this framework is consistent with Congressional intent as reflected in the enactment of the Securities Act, the Exchange Act, the Advisers Act, and various other key statutes, including Section 14(a), and has proven to be an effective and efficient means to regulate an important, multi-faceted and ever-evolving aspect of commerce. Accordingly, given the importance of a properly functioning proxy system to investors and the capital markets, even if other provisions of the federal securities laws may apply to certain of their activities, it is appropriate for voting advice furnished by proxy voting advice businesses to be subject to the rules under Section 14(a), which are designed specifically to enhance the transparency and integrity of the proxy voting process, with the ultimate aim of facilitating informed voting decisions.[60]

## II. Discussion of Final Amendments

### A. Codification of the Commission's Interpretation of "Solicitation" Under Rule 14a–1(l) and Section 14(a)

Exchange Act Section 14(a)[61] makes it unlawful for any person to "solicit" any proxy with respect to any security registered under Exchange Act Section 12 in contravention of such rules and regulations prescribed by the Commission.[62] The purpose of Section 14(a) is to prevent "deceptive or inadequate disclosure" from being made to shareholders in a proxy solicitation.[63]

---

[56] 17 CFR 240.13d–101.

[57] 15 U.S.C. 78m(g).

[58] 17 CFR 240.13d–1(b)(1)(i).

[59] *See* Communications Among Shareholders Adopting Release at 48278 ("When and under what circumstances a large shareholder, or group of shareholders acting together, must reveal to the SEC, the company, other shareholders, and the market its plans and proposals regarding the company has been addressed by Congress, but not through the provisions governing proxy solicitations. Section 13(d) of the Exchange Act, as implemented by the Commission in its regulations adopted thereunder, sets forth the circumstances when public disclosure of plans and proposals by significant shareholders, as well as agreements among shareholders to act together with respect to voting matters, must be disclosed to the market."). *See also* Release No. 34–39538 (Jan. 12, 1998) [63 FR 2854 (Jan. 16, 1998)] (stating the Commission's views on when a significant shareholder's proxy soliciting activities and communications could be viewed as having the purpose or effect of changing or influencing control of the company and thereby triggering the obligation to file a Schedule 13D). Under Section 13(d) and Section 13(g), a "group" is formed when two or more persons act together for the purpose of acquiring, holding, voting or disposing of the securities. Congress created the "group" concept to prevent persons who seek to pool their voting or other interests in the securities of an issuer from evading the Section 13(d) or 13(g) obligations because no one person owns more than five percent of the securities. Use of a proxy voting advice business by investors as a vehicle for the purpose of coordinating their voting decisions regarding an issuer's securities without complying with the filing obligations of Section 13(d) or 13(g) would raise compliance concerns under the beneficial ownership reporting requirements.

[60] *See* Proposing Release at 66520.

[61] 15 U.S.C. 78n(a).

[62] Registrants only reporting pursuant to Exchange Act Section 15(d) are not subject to the federal proxy rules, while foreign private issuers are exempt from the requirements of Section 14(a). 17 CFR 240.3a12–3(b).

[63] *Borak,* 377 U.S. at 432; *see* S. Rep. No. 1455, 73d Cong., 2d Sess., 74 (1934) ("In order that the
Continued

Section 14(a) grants the Commission broad authority to establish rules and regulations to govern proxy solicitations "as necessary or appropriate in the public interest or for the protection of investors." [64]

The Exchange Act does not define what constitutes a "solicitation" for purposes of Section 14(a) and the Commission's proxy rules. Accordingly, the Commission has exercised its rulemaking authority over the years to define what communications are solicitations and to prescribe rules and regulations when necessary and appropriate in the public interest and to protect investors in the proxy voting process.[65] The Commission first promulgated rules in 1935 to define a solicitation to include any request for a proxy, consent, or authorization or the furnishing of a proxy, consent, or authorization to security holders.[66] Since then, the Commission has amended the definition as needed to respond to new and changing market practices that have raised the concerns underlying Section 14(a).[67]

In particular, the Commission expanded the definition of a solicitation in 1956 to include not only requests for proxies, but also any "communication to security holders under circumstances reasonably calculated to result in the procurement, execution, or revocation of a proxy." [68] This expanded definition was prompted by recognition that some market participants were distributing

written communications designed to affect shareholders' voting decisions well in advance of any formal request for a proxy that would have triggered the filing and information requirements of the federal proxy rules.[69]

Since 1956, the Commission has recognized that its definition of a solicitation was broad and applicable regardless of whether persons communicating with shareholders were seeking proxy authority for themselves.[70] In light of the breadth of this definition, the Commission adopted an exemption from the information and filing requirements of the Federal proxy rules for communications by persons not seeking proxy authority, but continued to include such communications within the definition of a "solicitation." [71] The Commission also adopted another exemption from the information and filing requirements for proxy voting advice given by advisors to their clients under certain circumstances, but likewise continued to include such advice within the definition of "solicitation," subject to an exception discussed below.[72] By adopting these tailored exemptions, the Commission removed certain filing and other requirements that were considered unnecessary for such solicitations in order to facilitate shareholder access to more sources of information when voting, though the antifraud provisions of the proxy rules continued to apply.

The Commission has previously observed that the definition of a solicitation for purposes of Section 14(a) may result in proxy voting advice businesses being subject to the Federal proxy rules because they provide recommendations that are reasonably calculated to result in the procurement, withholding, or revocation of a proxy and thus, as a general matter, the furnishing of proxy voting advice constitutes a solicitation.[73] In 2019, the Commission issued an interpretative release regarding the application of the Federal proxy rules to proxy voting advice.[74] As the Commission explained

in that release, the determination of whether a communication is a solicitation for purposes of Section 14(a) depends upon both the specific nature, content, and timing of the communication and the circumstances under which the communication is transmitted.[75] The Commission noted several factors that indicate proxy voting advice businesses generally engage in solicitations when they provide proxy voting advice to their clients, including:

• The proxy voting advice generally describes the specific proposals that will be presented at the registrant's upcoming meeting and presents a "vote recommendation" for each proposal that indicates how the client should vote;

• Proxy voting advice businesses market their expertise in researching and analyzing matters that are subject to a proxy vote for the purpose of assisting their clients in making voting decisions;

• Many clients of proxy voting advice businesses retain and pay a fee to these firms to provide detailed analyses of various issues, including advice regarding how the clients should vote through their proxies on the proposals to be considered at the registrant's upcoming meeting or on matters for which shareholder approval is sought; and

• Proxy voting advice businesses typically provide their recommendations shortly before a shareholder meeting or authorization vote,[76] enhancing the likelihood that their recommendations will influence their clients' voting determinations.[77]

The Commission observed that where these or other significant factors (or a significant subset of these or other factors) are present,[78] the proxy voting advice businesses' voting advice

---

[64] 15 U.S.C. 78n(a); see Borak, 377 U.S. at 432 (noting the "broad remedial purposes" evidenced by the language of Section 14(a)).

[65] See 15 U.S.C. 78n(a); 78c(b); 78w.

[66] See Order Execution Obligations, Release No. 34–378 (Sept. 24, 1935) 1935 WL 29270.

[67] The Commission revised the definition in 1938 to include any request for a proxy, regardless of whether the request is accompanied by or included in a written form of proxy. See Release No. 34–1823 (Aug. 11, 1938) [3 FR 1991 (Aug. 13, 1938)], at 1992. It subsequently revised the definition in 1942 to include "any request to revoke or not execute a proxy." See Release No. 34–3347 (Dec. 18, 1942) [7 FR 10653 (Dec. 22, 1942)], at 10656. Courts have also taken a broad view of solicitation. See infra notes 141–146 and accompanying text.

[68] 17 CFR 240.14a–1(l)(1)(iii); see Adoption of Amendments to Proxy Rules, Release No. 34–5276 (Jan. 17, 1956) [21 FR 577 (Jan. 26, 1956)], at 577; see also Broker-Dealer Participation in Proxy Solicitations, Release No. 34–7208 (Jan. 7, 1964) [29 FR 341 (Jan. 15, 1964)] ("Broker-Dealer Release"), at 341 ("Section 14 and the proxy rules apply to any person—not just management, or the opposition. This coverage is necessary in order to assure that all materials specifically directed to stockholders and which are related to, and influence their voting will meet the standards of the rules.").

---

stockholder may have adequate knowledge as to the manner in which his interests are being served, it is essential that he be enlightened not only as to the financial condition of the corporation, but also as to the major questions of policy, which are decided at stockholders' meetings."); Communications Among Shareholders Adopting Release at 48277.

---

[69] See generally Communications Among Shareholders Adopting Release.

[70] Id. at 48276 (adopting Exchange Act Rule 14a–2(b)(1)).

[71] See id.

[72] See Shareholder Communications, Shareholder Participation in Corporate Electoral Process and Corporate Governance Generally, Release No. 34–16356 (Nov. 21, 1979) [44 FR 68764 (Nov. 29, 1979)] ("1979 Adopting Release"), at 68766.

[73] See Concept Release at 43009. See also Proposing Release at 66522; Broker-Dealer Release at 341.

[74] Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice, Release No. 34–86721 (Aug. 21, 2019) [84 FR 47416 (Sept. 10, 2019)]

---

("Commission Interpretation on Proxy Voting Advice").

[75] See Commission Interpretation on Proxy Voting Advice at 47417. See also Proposing Release at 66522; Concept Release at 43009 n.244.

[76] See, e.g., letter from Maria Ghazal, Senior Vice President and Counsel, Business Roundtable (June 3, 2019) at 9 ("[R]ecent survey results support the contention that a spike in voting follows adverse voting recommendations by ISS during the three-business day period immediately after the release of the recommendation."); Transcript of Roundtable on the Proxy Process, at 242 (Nov. 15, 2018), available at https://www.sec.gov/files/proxy-round-table-transcript-111518.pdf; Frank Placenti, Are Proxy Advisors Really A Problem?, American Council for Capital Formation 3 (Oct. 2018), available at http://accfcorpgov.org/wp-content/uploads/2018/10/ACCF_ProxyProblemReport_FINAL.pdf.

[77] Commission Interpretation on Proxy Voting Advice at 47418. See also Proposing Release at 66522.

[78] Such other factors may include the fact that many proxy voting advice businesses' recommendations are typically distributed broadly.

generally would constitute a solicitation subject to the Commission's proxy rules because such advice would be "a communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."[79] Furthermore, the Commission explained that such advice generally would be a solicitation even if the proxy voting advice business is providing recommendations based on the client's own custom policies, and even if the client chooses not to follow the advice.[80] In addition, the fact that proxy voting advice businesses may provide additional services, such as consulting services to investment advisers and issuers and general market commentary, does not diminish their role in the proxy solicitation process.

### 1. Proposed Amendments

In the Proposing Release, the Commission proposed to amend 17 CFR 240.14a–1(l)(1)(iii) ("Rule 14a–1(l)(1)(iii)") to add paragraph (A) to make clear that the terms "solicit" and "solicitation" include any proxy voting advice that makes a recommendation to a shareholder as to its vote, consent, or authorization on a specific matter for which shareholder approval is solicited, and that is furnished by a person who markets its expertise as a provider of such advice, separately from other forms of investment advice, and sells such advice for a fee.[81] The proposed amendment would codify the long-held Commission view that the furnishing of proxy voting advice generally constitutes a solicitation governed by the federal proxy rules.

In connection with the proposed amendment to Rule 14a–1(l)(1)(iii), the Commission recognized that the major proxy voting advice businesses may use more than one voting policy or set of guidelines in formulating their voting recommendations on a particular matter to be voted at a shareholder meeting (or for which written consents or authorizations are sought in lieu of a meeting). For example, a proxy voting advice business may offer differing voting recommendations on a matter based on the application of its benchmark policy or various specialty policies. Under the proposal, the voting recommendations formulated under the benchmark policy and each of the specialty policies would be considered

to be a separate communication of proxy voting advice under proposed Rule 14a–1(l)(1)(iii)(A). In addition to voting recommendations formulated pursuant to a proxy voting advice business's benchmark and specialty policies, the Commission also proposed to include voting recommendations formulated pursuant to a proxy voting advice business's client's own custom policies within the scope of the term "solicitation," consistent with its prior interpretation.[82]

Lastly, the Commission proposed to amend Rule 14a–1(l)(2), which currently lists activities and communications that do not constitute a solicitation, to add paragraph (v) to make clear that the terms "solicit" and "solicitation" exclude any proxy voting advice furnished by a person who furnishes such advice only in response to an unprompted request.[83] Doing so would codify the Commission's historical view that such a communication should not be regarded as a solicitation subject to the proxy rules.[84]

### 2. Comments Received

Commenters expressed a mix of views on the Commission's proposed amendments to the definitions of "solicit" and "solicitation" in 17 CFR 240.14a–1(l)(1) ("Rule 14a–1(l)(1)"). A number of commenters supported codifying the Commission's interpretation of these definitions as proposed.[85] Some of these commenters described the proposed amendments as consistent with the Commission's existing interpretation of the term "solicitation"[86] and noted that the advice provided by proxy voting advice

businesses is the kind of information that Congress intended Section 14(a) to address.[87] Two commenters agreed with the Commission's position that the definition of "solicitation" should not be limited to a request to obtain proxy authority or to obtain shareholder support for a preferred outcome.[88] Those two commenters also agreed with the Commission's view that each voting recommendation formulated pursuant to a benchmark policy or a specialty policy should be considered a separate "solicitation."[89] Other commenters added that the analysis of what constitutes a "solicitation" should not turn on whether the proxy voting advice business's voting recommendations are based on an investor's custom policy or the proxy voting advice business's benchmark policy.[90] Finally, a few commenters that supported the proposed amendments recommended that the Commission include in the definition of "solicitation" any reports and ratings by environmental, social, and governance ratings firms or environmental and sustainability rating firms.[91]

Other commenters opposed codifying the Commission's interpretation of "solicit" and "solicitation."[92] Some

---

[79] See Commission Interpretation on Proxy Voting Advice at 47418. See also Proposing Release at 66522.

[80] See Commission Interpretation on Proxy Voting Advice at 47418. See also Proposing Release at 66522.

[81] Proposing Release at 66522, 66557.

[82] Proposing Release at 66522.

[83] Id. at 66523, 66557.

[84] Commission Interpretation on Proxy Voting Advice at 47419 ("We view these services provided by proxy advisory firms as distinct from advice prompted by unsolicited inquiries from clients to their financial advisors or brokers on how they should vote their proxies, which remains outside the definition of solicitation."); 1979 Adopting Release at 68766. See also Broker-Dealer Release at 341 (setting forth the opinion of the SEC's General Counsel that a broker is not engaging in a "solicitation" if it is merely responding to his customer's request for advice and "not actively initiating the communication").

[85] See letters from BIO; BRT; CCMC; CEC; CGC; Michael McCormick, Executive Vice President, General Counsel Secretary, Ecolab Inc. (Feb. 3, 2020) ("Ecolab"); Exxon Mobil; Dennis E. Nixon, President, International Bancshares Corporation (Jan. 23, 2020) ("IBC"); NAM; Nareit; Nasdaq; David Dixon, President, and David L. Dragics, Advocacy Ambassador, NIRI Capital Area Chapter (Feb. 6, 2020) ("NIRI-Capital"); Phil Gramm (Feb. 3, 2020) ("P. Gramm"); Niels Holch, Executive Director, Shareholder Communications Coalition (Feb. 3, 2020) ("SCC I"); SCG; Stakeholders Empowerment Service (Jan. 31, 2020) ("SES").

[86] See letters from BRT; CCMC; NAM; Nasdaq; NIRI-Capital.

[87] See letters from BRT; CCMC; Exxon Mobil; NAM; Nareit; SCC I.

[88] See letters from NAM; SCG.

[89] See letters from NAM; SCG.

[90] See letters from Exxon Mobil; NAM; SCG.

[91] See letters from Exxon Mobil; Garmin; NAM.

[92] See letters from Anat Admati, George G.C. Parker Professor of Finance and Economics, Stanford Graduate School of Business, et al. (Jan. 15, 2020) ("62 Professors"); Brandon Rees, Deputy Director, Corporations at Capital Markets, AFL–CIO (Feb. 3, 2020) ("AFL–CIO II"); Robert Arnold and Matthew Aquiline, Trustees, Bricklayers & Trowel Trades International Pension Fund (Jan. 31, 2020) ("Bricklayers"); Marcie Frost, Chief Executive Officer, CalPERS (Feb. 3, 2020) ("CalPERS"); Aeisha Mastagni, Portfolio Manager, California State Teachers' Retirement System (Feb. 3, 2020) ("CalSTRS"); Marcia Moffat, Board Chair, Canadian Coalition for Good Governance (Feb. 3, 2020) ("Canadian Governance Coalition"); James Allen, Head, and Matt Orsagh, Senior Director, Capital Markets Policy, CFA Institute (Feb. 3, 2020) ("CFA Institute I"); Kenneth A. Bertsch, Executive Director, and Jeffrey P. Mahoney, General Counsel, Council of Institutional Investors (Jan. 30, 2020) ("CII IV"); Rob Collins, Council for Investor Rights and Corporate Accountability (Feb. 3, 2020) ("CIRCA"); Ron Baker, Executive Director, Colorado Public Employees' Retirement Association (Feb. 3, 2020) ("Colorado Retirement"); Duane Roberts, Director of Equities, Dana Investment Advisors (Dec. 5, 2019) ("Dana"); Richard B. Zabel, General Counsel and Chief Legal Officer, Elliott Management Corporation (Jan. 31, 2020) ("Elliott I"); Hans-Christoph Hirt, Executive Director and Head, Hermes Equity Ownership Services Limited (Feb. 3, 2020) ("Hermes"); ISS, Josh Zinner, CEO, Interfait Center on Corporate Responsibility (Feb. 3, 2020) ("Interfaith Center II"); Kevin Cameron, Executive Chair, Glass Lewis (Feb. 3, 2020) ("Glass Lewis II"); Jonathan Grabel, Chief Investment Officer, LACERA (Feb. 3, 2020) ("LA Retirement"), Continued

commenters asserted that the Commission does not have the authority to regulate proxy voting advice businesses under Section 14(a) [93] or other provisions of the Exchange Act.[94] Some described the proposal as inconsistent with the Commission's historical treatment of Section 14(a).[95] Some commenters added that proxy voting advice differs from proxy solicitation and should not be treated as such under the proxy rules.[96] Specifically, these commenters asserted that proxy solicitation differs from proxy advice in that proxy solicitors play an advocacy role on behalf of an interested party, whereas proxy voting advice businesses are independent third parties, hired by shareholders to provide objective advice that the recipients are not required to follow.[97] One commenter also asserted that the proposal incorrectly equates proxy voting advice with the right to vote on another's behalf and in a manner that would benefit a particular party.[98] Two other commenters, which were identified as proxy voting advice businesses in the Proposing Release,[99] asserted that even if the Commission amends the definition of "solicitation" as proposed, their activities will not constitute "solicitations" under the

revised definition because they vote on behalf of their clients rather than providing them with research reports and voting recommendations.[100]

In addition, some commenters stated that the proposed codification of "solicitation" would increase proxy voting advice businesses' costs [101] or interfere with their ability to provide services to their clients.[102] Specifically, these commenters asserted that the proposed amendments would increase litigation risks facing proxy voting advice businesses [103] and interfere with the relationship between investors and proxy voting advice businesses in a way that would increase costs and complexity and bias voting recommendations in favor of corporate management.[104] Two commenters further expressed concern that treating proxy advice as a solicitation could have a chilling effect on shareholder communication.[105]

Some commenters asserted that the Commission has not provided reliable evidence that existing communications between proxy voting advice businesses and their institutional investor clients present a significant risk to investor protection to justify the proposed amendment.[106] Several commenters expressed concern that the Commission disregarded the findings and views of its 2018 Roundtable on the Proxy Process, the Office of Investor Advocate, and the Investor Advisory Committee and called into question the legitimacy of other comment letters.[107] One commenter requested that the Commission clarify the benefits of treating proxy advice as

a solicitation.[108] Two commenters also expressed concern that the proposal would overlap with regulations that proxy voting advice businesses are already subject to, including as "investment advisers" under the Advisers Act and as fiduciaries under the Employee Retirement Income Security Act of 1974.[109]

Finally, some commenters that generally opposed the proposal recommended that, if the Commission ultimately decides to amend Rule 14a–1(l), it should make the following revisions to narrow the scope of the proposals: [110]

• Clarify whether "proxy voting advice" under Rule 14a–1(l)(1)(iii)(A) would include data and research that may inform a proxy analysis or be described in a proxy research report but that is marketed separately to investors; [111]

• Exclude advice based on investors' custom policies from the definition of "solicitation"; [112]

• Modify the proposal to recognize the difference between proxy voting advice businesses and proxy voting agent businesses, the latter of which "vote solely on behalf of clients, in accordance with such clients' preset voting guidelines, based upon third-party research" and should not be subject to regulation as a proxy voting advice business; [113] and

• Clarify that the reference to "other forms of investment advice" in Proposed Rule 14a–1(l)(1)(iii)(A) is not intended to exclude only advice from an "investment adviser" and thereby sweep into the scope of the term "solicitation" communications made in the normal course of business by other professionals (e.g., management-consulting firms, lawyers, accountants, broker-dealers, etc.).[114]

With respect to the proposed amendment to Rule 14a–1(l)(2), some commenters supported the proposal to exclude from the definition of a "solicitation" any proxy voting advice furnished by a person only in response to an unprompted request.[115] Another

Sarah Wilson, CEO, Minerva Analytics (Jan. 2, 2020) ("Minerva I"); Thomas P. DiNapoli, New York State Comptroller (Feb. 3, 2020) ("New York Comptroller II"); Karen Carraher, Executive Director, and Patti Brammer, Corporate Governance Officer, Ohio Public Employees Retirement System (Feb. 3, 2020) ("Ohio Public Retirement"); PIRC, on behalf of Local Authority Pension Fund Form (LAPFF) (Feb. 3, 2020) ("PIRC"); Fiona Reynolds, Chief Executive Officer, Principles for Responsible Investment (Feb. 3, 2020) ("PRI II"); Konstantinos Sergakis, Professor of Capital Markets Law and Corporate Governance, University of Glasgow (Dec. 26, 2019) ("Prof. Sergakis"); Craig M. Rosenberg, President, ProxyVote Plus, LLC (Feb. 3, 2020) ("ProxyVote II"); Hank Kim, Executive Director & Counsel, National Conference of Public Employee Retirement Systems (Feb. 3, 2020) ("Public Retirement Systems"); Maureen O'Brien, Vice President, Corporate Governance Director, Segal Margo Advisors (Feb. 3, 2020) ("Segal Marco II"); Andrew E. Oster, CFP, AIF, President & CCO, Triton Wealth Advisors LLC (Feb. 22, 2020) ("Triton"); Nell Minow, Vice Chair, ValueEdge (Jan. 31, 2020) ("ValueEdge I"); Theresa Whitmarsh, Executive Director, Washington State Investment Board (Jan. 22, 2020) ("Washington State Investment").

[93] See letters from AFL–CIO II; CII IV; Elliott I; Glass Lewis II; ISS; Richard A. Kirby and Beth-ann Roth, RK Invest Law, PBC (Feb. 3, 2020) ("RK Invest Law"); ProxyVote II.

[94] See letter from ISS.

[95] See letters from CalPERS; CII IV; Elliott I; Glass Lewis II; ISS; ProxyVote II.

[96] See letters from Bricklayers; CalPERS; CII IV; CIRCA; Elliott I; Glass Lewis II; ISS; New York Comptroller II; Segal Marco II.

[97] See letters from Bricklayers; CalPERS; CII IV; CIRCA; Glass Lewis II; ISS; New York Comptroller II; Segal Marco II.

[98] See letter from CalPERS.

[99] See Proposing Release at 66542, n.190.

[100] See letters from ProxyVote II; Segal Marco II. Similarly, another commenter noted that it executes votes directly on behalf of—but does not provide voting recommendations to—its clients. See letter from Mary Beth Gallagher, Executive Director, Investor Advocates for Social Justice (Feb. 3, 2020) ("IASJ"). See also letters from Sean P. Bannon, Chief Financial Officer, Felician Sisters of North America (Feb. 3, 2020) ("Felician Sisters II"); Toni Palamar, Province Business Administrator, Sisters of the Good Shepherd (Feb. 3, 2020) ("Good Shepherd"); Interfaith Center II; Patricia A. Daly, Corporate Responsibility Representative, Sisters of St. Dominic of Caldwell (Feb. 3, 2020) ("St. Dominic of Caldwell").

[101] See letters from 62 Professors; CalSTRS; Elliott I; Interfaith Center II; New York Comptroller II; Public Retirement Systems; Washington State Investment.

[102] See letters from CalSTRS; CIRCA; Elliott I; Interfaith Center II; New York Comptroller II; Ohio Public Retirement; Prof. Sergakis; Public Retirement Systems.

[103] See letters from CIRCA; Elliott I; New York Comptroller II; Ohio Public Retirement; PRI II.

[104] See letters from New York Comptroller II; PRI II.

[105] See letters from CalPERS; Washington State Investment.

[106] See letters from CII IV; Elliott I.

[107] See letters from CII IV; Elliott I; Glass Lewis II; ISS.

[108] See letter from CalPERS.

[109] See letters from ISS; ProxyVote II.

[110] See letters from CII IV; ISS; New York Comptroller II; PRI II; ProxyVote II; Segal Marco II.

[111] See letter from ISS. The commenter further opined that the inclusion of such data and research in the scope of "proxy voting advice" would be "highly inappropriate." Id.

[112] See letters from ISS; New York Comptroller II; Matthew DiGiuseppe, Head of Asset Stewardship, Americas, and Benjamin Colton, Head of Asset Stewardship, Asia Pacific, State Street Global Advisors (Feb. 3, 2020) ("State Street").

[113] See letter from Segal Marco II.

[114] See letter from Hermes.

[115] See letters from Andrew Cave, Head of Governance and Sustainability, Baillie Gifford & Co

commenter, however, opposed the proposal, asserting that it would be unworkable because investment advisers and broker-dealers may be hesitant to announce a willingness to provide voting advice out of concern that the Commission would determine they had "invited and encouraged" their clients to ask for advice.[116] This commenter added that the proposed amendment would be counterproductive to investor protection goals because the Commission would be regulating experts with proxy advice-related skills and resources (*i.e.,* proxy voting advice businesses), but would not regulate parties with no relevant expertise who engage in the same activities (*i.e.,* any person that furnishes proxy voting advice in response to an unprompted request).[117] Finally, one commenter recommended that the Commission narrow the proposed exclusion to cover only proxy voting advice provided pursuant to an unprompted request "and not for compensation." [118]

### 3. Final Amendments

We are adopting the amendments to Rule 14a–1(l)(1)(iii) and 17 CFR 240.14a–1(l)(2) ("Rule 14a–1(l)(2)") as proposed, with some minor changes to the proposed amendment to Rule 14a–1(l)(1)(iii).

With respect to Rule 14a–1(l)(1)(iii), consistent with the Proposing Release, we are adding paragraph (A) [119] to make clear that the terms "solicit" and "solicitation" include any proxy voting advice [120] that makes a recommendation to a shareholder as to its vote, consent, or authorization on a specific matter for which shareholder approval is solicited, and that is furnished by a person who markets its expertise as a provider of such advice, separately from other forms of investment advice, and sells such advice for a fee.

As noted above, the determination of whether a communication is a

solicitation ultimately depends on the specific nature, content, and timing of the communication and the circumstances under which the communication is transmitted.[121] A number of factors illuminate that determination, and, as set forth above, application of those factors indicate that the advice that proxy voting advice businesses provide to their clients generally constitutes a "solicitation." [122] This amendment, therefore, codifies the Commission's interpretation that proxy voting advice generally constitutes a "solicitation" under Rule 14a–1(l).[123] As we noted in the Proposing Release, we believe the furnishing of proxy voting advice by a person who has decided to offer such advice, separately from other forms of investment advice, to shareholders for a fee, with the expectation that its advice will be part of the shareholders' voting decision-making process, is conducting the type of activity that raises the concerns about inadequate or materially misleading disclosures that Section 14(a) and the Commission's proxy rules are intended to address.[124] We also believe that the

regulatory framework of Section 14(a) and the Commission's proxy rules, with their focus on the information received by shareholders as part of the voting process, are well-suited to enhancing the quality and availability of the information that clients of proxy voting advice businesses are likely to consider as part of their voting determinations.[125]

In addition, we are aware of at least two proxy voting advice businesses, ISS and Egan-Jones, that use more than one proprietary voting policy or set of guidelines—oftentimes, a benchmark policy and one or more specialty policies—in formulating proxy voting advice as to a particular matter to be voted on at a shareholder meeting (or for which written consents or authorizations are sought in lieu of a meeting).[126] Consistent with the Proposing Release, we view the proxy voting advice formulated pursuant to each separate policy or set of guidelines as distinct solicitations under Rule 14a–1(l)(1)(iii)(A). Similarly, as discussed in more detail below,[127] proxy voting advice formulated pursuant to a custom policy constitutes a distinct solicitation under the final rule as well.

We recognize that some commenters opposed our amendments to Rule 14a–

---

(Feb. 3, 2020) ("Baillie Gifford"); BRT; CCMC; Exxon Mobil; IBC.

[116] *See* letter from ISS.

[117] *Id.*

[118] *See* letter from Exxon Mobil.

[119] The amendment is intended to make clear that proxy voting advice provided under the specified circumstances constitutes a solicitation under current Rule 14a–1(l)(1)(iii). It is not intended to amend, limit, or otherwise affect the scope of Rule 14a–1(l)(1)(iii).

[120] As noted above, one commenter requested clarification as to whether the term "proxy voting advice" would include data and research that may inform a proxy analysis or be described in a proxy research report but that is marketed separately to investors. *See supra* note 111 and accompanying text. We have clarified the scope of that term. *Compare supra* note 7, *with* Proposing Release at 66519 & n.11.

[121] *See supra* note 75 and accompanying text.

[122] *See supra* notes 75–79 and accompanying text; *see also infra* note 144.

[123] As noted above, some commenters expressed concern that the amendments are not supported by the relevant evidence and that the Commission may have disregarded the findings and views of more reliable observers, and called into question the legitimacy of other comments. *See supra* notes 106–107 and accompanying text. Very shortly after learning of the concerns raised about these comment letters, the Chairman referred the matter to the SEC's Office of Inspector General to investigate. That investigation is ongoing. We have now learned that some of the commenters who submitted certain of the letters appear to have signed declarations provided to Members of Congress regarding the authenticity of those letters. Our decision to adopt the amendments to Rule 14a–1(l), is not predicated upon the input we received with respect to the quality of the services provided by proxy voting advice businesses or the independence thereof. Rather, these amendments largely codify the Commission's longstanding interpretations of the scope of the terms "solicit" and "solicitation," which, as discussed below, are based on an assessment of the text, structure, history, and purpose of Section 14(a) of the Exchange Act, as well as judicial precedent. *See infra* notes 132–156 and accompanying text. Moreover, although certain members of the Commission may have cited some of the letters described above during the Commission's open meeting at which the amendments discussed herein were proposed, neither the Commission's interpretations of the scope of the terms "solicit" and "solicitation," nor our decision to adopt the other amendments herein, rest on those letters or their validity. Further, as discussed below, the Commission's interpretations of the scope of the terms "solicit" and "solicitation" are longstanding and far predate the cited comment letters. *See infra* notes 150–154 and accompanying text.

[124] We understand that investment advisers may discuss their views on proxy voting with clients or prospective clients as part of their portfolio management services or other common investment advisory services. Such discussions could be

unprompted or prompted (such as in the case of a client or prospective client that has asked the adviser for its views on a particular transaction). For example, a mutual fund board may request that a prospective subadviser discuss its views on proxy voting, including votes on particular types of transactions such as mergers or corporate governance. As noted in the Proposing Release, the amendment is not intended to include these types of communications as solicitations for purposes of Section 14(a). In response to certain comments we received, we also are clarifying the amendment is not intended to include communications made in the normal course of business by other professionals to their clients that may relate to proxy voting. Instead, the amendment is intended to apply to entities that market their proxy voting advice as a service that is separate from other forms of investment advice to clients or prospective clients and sell such advice for a fee.

[125] We understand that a proxy voting advice business might, if applicable requirements are met, be registered as an investment adviser and subject to additional regulation under the Advisers Act, including 17 CFR part 275. However it is not unusual for a registrant under one provision of the securities laws to be subject to other provisions of the securities laws when engaging in conduct that falls within the other provisions. Given the focus of Section 14(a) and the Commission's proxy rules on protecting investors who receive communications regarding their proxy votes, it is appropriate that proxy voting advice businesses be subject to applicable rules under Section 14(a) when they provide proxy voting advice. *See supra* notes 41–60 and accompanying text for a discussion of why we believe Section 14(a), together with the Commission's proxy rules, is an appropriate regulatory regime for such communications by proxy voting advice businesses, regardless of whether they are registered under the Advisers Act.

[126] *See supra* note 11 and accompanying text.

[127] *See infra* notes 165–169 and accompanying text.

1(l)(1). As noted above, some commenters stated that the Commission is not authorized to regulate proxy voting advice as a "solicitation" under the Exchange Act.[128] One commenter specifically asserted that the amendments would be contrary to (1) the legislative history of Section 14(a), (2) the case law that has construed the terms "solicit" and "solicitation" under Section 14(a) and Rule 14a–1(l), and (3) the plain meaning of the term "solicit." [129] According to some opposing commenters, the scope of Section 14(a) is limited to soliciting activities by management, other corporate insiders, dissident shareholders seeking to take control of a company, or parties otherwise having an interest in the outcome of a shareholder vote. These commenters asserted, therefore, that as a matter of statutory interpretation, Section 14(a) cannot extend to communications or activities by persons who do not have an interest in the outcome of the matter being voted upon at the shareholder meeting or who do not seek proxy authority for themselves.[130] These commenters further assert that, as a matter of fact, proxy voting advice businesses satisfy both of these criteria (i.e., no interest in the outcome of a vote and no request for authority to vote).[131]

We reject this narrow interpretation of Section 14(a). The Commission's longstanding view that a "solicitation" includes any communication reasonably calculated to result in the procurement, withholding, or revocation of a proxy—and that this encompasses the furnishing of proxy voting advice—accords with the text, history, and structure of Section 14(a) of the Exchange Act, as well as judicial precedent and our own rules.

The structure of Section 14(a) grants the Commission broad authority. It authorizes the Commission to prescribe rules and regulations to govern proxy solicitations "as necessary or appropriate in the public interest or for the protection of investors," and it makes it unlawful for any person to "solicit any proxy" with respect to any security registered under Section 12 of the Exchange Act in contravention of such rules and regulations.[132]

Furthermore, rather than defining what constitutes a proxy solicitation, the Exchange Act leaves those terms undefined, while at the same time specifically empowering the Commission to define such terms consistent with the Act's "provisions and purposes" [133] and, more broadly, to make rules and regulations, including rules that classify "transactions, statements, applications, reports, and other materials." [134]

In light of that context, the phrase "solicit any proxy" is not as narrow or mechanical as some commenters have claimed. Citing a dictionary definition, one commenter suggested that the ordinary meaning of the term "solicit" is "to endeavor to obtain." [135] Under this definition, what matters is the subjective intent of the person engaging in the solicitation, and thus no person would be soliciting a proxy unless they intend to obtain proxy authority. Some commenters likewise claimed that no person would be soliciting a proxy unless they intend to obtain a shareholder's support for a preferred outcome.[136] However, dictionaries at the time Section 14(a) was enacted indicate that the term "solicit" had other meanings that did not depend on the interest or subjective intent of the person engaging in the solicitation. The term "solicit" also meant "[t]o move to action." [137] Under this definition, what matters is not the subjective intent to obtain a proxy, but rather the effect on a recipient's proxy vote. A person solicits a proxy by influencing a shareholder to act. As between these two meanings, we view the latter as more consistent with Section 14(a)'s provisions and purposes, as any inducement that may move a shareholder to vote a proxy in a certain way implicates the Commission's charge to ensure that necessary and appropriate regulations are in place for the protection of investors. That is why the Commission has recognized since 1956 that persons who do not seek proxy authority themselves nevertheless engage in solicitation when they

communicate with shareholders in a manner reasonably calculated to "result" in a proxy vote.

The context and history of Section 14(a) accord with this conclusion. Congress considered different versions of the Exchange Act that set forth the applicable proxy standards with more specificity in the analog to Section 14(a) and rejected them in favor of the broad authority granted to the Commission in Section 14(a), as enacted.[138] While Congress may have been motivated to enact Section 14(a) in 1934 due to the particular abuses by corporate insiders or dissident shareholders that occurred during that time, nothing in either the text or legislative history of Section 14(a) indicates that Congress intended to limit its scope to solicitations conducted by those parties. Rather, where Congress intended to exempt certain classes of market participants, transactions, or activities from the statutory provisions of the Securities Act and the Exchange Act (as enacted in 1933 and 1934, respectively) or limit the Commission's rulemaking authority with regard to those market participants, transactions or activities, it generally did so by expressly including language in the relevant statutory provision.[139]

<hr/>

[128] See supra notes 93–94 and accompanying text.

[129] See letter from ISS.

[130] See, e.g., supra notes 96–97 and accompanying text.

[131] Id.

[132] See S. Rep. No. 73–792, 2d Sess., at 12 (1934) ("The committee recommends that the solicitation and issuance of proxies be left to regulation by the Commission."); H.R. Rep. No. 1383, 73d Cong., 2d Sess., 14 (1934) (explaining the intention to give the Commission the "power to control the conditions under which proxies may be solicited").

[133] 15 U.S.C. 78c(b).

[134] 15 U.S.C. 78w(a)(1).

[135] See letter from ISS.

[136] See, e.g., supra notes 96–97 and accompanying text. In arguing that the plain meaning of "solicit" supports its view, one commenter relied on the dictionary definition "to endeavor to obtain," even though the commenter elsewhere acknowledged that Section 14(a) has long been understood to encompass communications that do not seek to obtain a proxy—and thus would not meet that narrow definition. See letter from ISS.

[137] See Webster's New International Dictionary (2d ed. 1934) (providing multiple definitions of the term "solicit," including "[t]o move to action" or "[t]o urge" or "insist upon").

[138] See Louis Loss et. al., Securities Regulation, § 6.C.2 (6th ed. 2018) ("In § 14(a) of the Exchange Act, Congress, abandoning the more specific standards of the original bills, left the solicitation of proxies to the SEC under broad public interest standards.") (citing S. 2693, H.R. 7852, 73d Cong., 2d Sess. § 13(a) (1934)).

[139] See, e.g., Securities Exchange Act of 1934, Public Law 73–291, 48 Stat. 881, § 3(a)(4) (1934) ("Exchange Act (as enacted in 1934)") (stating that the definition of the term "broker" "does not include a bank"); Exchange Act (as enacted in 1934) § 3(a)(5) (stating that the definition of the term "dealer" "does not include a bank, or any person insofar as he buys or sells securities for his own account, either individually or in some fiduciary capacity, but not as part of a regular business"); Exchange Act (as enacted in 1934) § 3(a)(10) (defining the term "security" but expressly stating that the term "shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited"); Exchange Act (as enacted in 1934) § 15(l) (restricting broker-dealers' over-the-counter market activity, but expressly exempting from these restrictions certain exempt securities, commercial paper, and other instruments); Exchange Act (as enacted in 1934) § 24(a) (limiting the Commission's authority to require the "revealing of trade secrets or processes in any application, report, or document filed with the Commission under this title"); Securities Act of 1933, Public Law 73–22, 48 Stat. 74, § 2(a)(10) (1933) ("Securities Act (as enacted in 1933)") (defining the term "prospectus" and expressly excluding certain written communications from this definition); Securities Act (as enacted in 1933) § 2(a)(11) (carving out from the statutory definition of "underwriter" any "person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission"); Securities

Indeed, Section 14(a) itself excludes any "exempted security" from its scope, but otherwise facially applies to "any person" without carving out any class of market participants.[140]

Nor does the case law construing Section 14(a) mandate that a party must have an "interest" in the outcome of a shareholder vote in order for a solicitation to occur, as certain commenters contended.[141] Courts have articulated a broad definition of the term "solicit" such that the proxy rules "apply not only to direct requests to furnish, revoke, or withhold proxies, but also to communications which may indirectly accomplish such a result *or* constitute a step in the chain of communications ultimately designed to accomplish such a result." [142] Moreover, relying on the "subjective intent of the person furnishing the communication" to determine whether a particular communication constitutes a solicitation "is at odds with the plain

and unambiguous meaning of the regulation." [143] Instead, the phrase "reasonably calculated to result in the procurement, withholding or revocation of a proxy" in Rule 14a–1(l)(1)(iii) requires an objective inquiry that focuses "on the *manner* in which the communicator attempted to influence a shareholder's proxy decision from the perspective of the shareholder who received the material." [144] Courts also have broadly understood a "solicitation" to encompass "communications which may indirectly [result in a proxy being furnished, revoked or withheld]," [145] an interpretation that does not, by its terms, require inquiry into the speakers' interest or subjective intention. To inject a subjective element into the test of whether a communication is a "solicitation" under Rule 14a–1(l)(1)(iii) as argued by one commenter (*i.e.*, determining whether the speaker is "completely indifferent to the outcome of the matter as to which shareholder approval was sought" [146]) runs counter to this case law.

Relying on its broad rulemaking authority, the Commission has since 1956 defined a solicitation to include any "communication to security holders under circumstances reasonably calculated to result in the procurement, execution, or revocation of a proxy." [147] This definition advances Section 14(a)'s overarching purpose of ensuring that communications to shareholders about their proxy voting decisions contain materially complete and accurate information.[148] It would be inconsistent with that goal if a person whose business is to offer and sell voting advice broadly to large numbers of shareholders, with the expectation that their advice will factor into shareholders' voting decisions, were beyond the reach of Section 14(a). The fact that shareholders may retain providers of proxy voting advice to advance their own interests does not obviate these concerns.

As described above, some commenters also asserted that the proposed amendment to Rule 14a–1(l)(1)(iii) conflicts with well-established practice in the proxy voting advice business industry and the Commission's historical treatment thereof.[149] As an initial matter, and as noted in the Interpretive Release and the Proposing Release, the amendment to Rule 14a–1(l)(1)(iii) is in accordance with, and represents a codification of, the Commission's longstanding view that proxy voting advice generally constitutes a "solicitation." This view was originally set forth in a 1964 release [150] and reiterated by the Commission in 1979 [151] and 2010.[152] The cited releases did not limit the scope of the term "solicitation" so as to

---

[140] *See* 15 U.S.C. 78n(a).

[141] *See, e.g.,* letter from ISS. Although we do not believe that Section 14(a) requires that a party have an interest in the outcome of a vote, we also do not accept commenters' assertion that, as a matter of fact, proxy voting advice businesses necessarily do not have an interest in the outcome of matters being voted upon at shareholder meetings or do not seek proxy authority for themselves. While this may be true in many instances, we do not think this is always the case. *See* U.S. Gov't Accountability Office, GAO–17–47, Report to the Chairman, Subcommittee on Economic Policy, Committee on Banking, Housing, and Urban Affairs, U.S. Senate, Corporate Shareholder Meetings: Proxy Advisory Firms' Role in Voting and Corporate Governance Practices, 18 (2016), *available at https:// www.gao.gov/assets/690/681050.pdf* ("2016 GAO Report") ("Officials from one proxy advisory firm with whom we spoke stated that they agree that proxy advisory firms have influence on corporate governance practices. . . . They noted that such influence is good and ultimately they want to have a positive influence on their clients because they view that as part of their responsibility—to promote good governance."); Kevin E. McManus, *CEO Compensation was a Joke Before Covid–19, Now It is Just Obnoxious,* Egan-Jones Proxy Services (June 11, 2020), *available at https://www.ejproxy.com/ weekly-wreck/36/ceo-compensation-was-joke-covid-19-now-it-just-obnoxious/* (criticizing executive compensation at certain registrants and making policy-based recommendations to regulate executive compensation). *See also infra* Section II.B.1. (noting examples of circumstances where the interests of a proxy voting advice business may diverge materially from the interests of the clients who utilize their advice, including a proxy voting advice business providing advice on a matter in which its affiliates or one of its clients has a material interest, such as a business transaction or a shareholder proposal put forward by or actively supported by that client).

[142] *Long Island Lighting Co.* v. *Barbash,* 779 F.2d 793, 796 (2d Cir. 1985) (emphasis added); *see also Capital Real Estate Inv'rs Tax Exempt Fund Ltd. P'ship* v. *Schwartzberg,* 917 F.Supp. 1050, 1059 (S.D.N.Y. 1996).

[143] *Gas Natural Inc.* v. *Osbourne,* 624 Fed. Appx. 944, 950 (6th Cir. 2015) (unpublished).

[144] *Id.* (citing Broker-Dealer Release at 342 (noting that communications from broker-dealers to shareholders "may constitute a solicitation requiring compliance with the proxy rules" depending "upon the content of the material, upon the conditions under which it is transmitted, and upon surrounding circumstances")). *See also Long Island Lighting Co.,* 779 F.2d at 796 ("Determination of the purpose of the communication depends upon the nature of the communication and the circumstances under which it was distributed."); *Sargent* v. *Genesco, Inc.,* 492 F.2d 750, 767 (5th Cir. 1974) ("Whether or not a particular communication is a solicitation within the meaning of 14(a) is a question of fact dependent upon the nature of the communication and the circumstances under which it is transmitted."); *Dyer* v. *SEC,* 291 F.2d 774, 777–78 (8th Cir. 1961) (indicating that the determination of whether a communication constitutes a solicitation depends on the "nature and circumstances" of a communication and whether it can be rationally inferred that the speaker "knew or could be expected to foresee that the things which he said might on their implication and innuendo affect the action of a stockholder in his granting of proxy authority," regardless of "whatever [the speaker] may have had in his mind"); *Schwartzberg,* 929 F.Supp. at 113–14 (noting that if a statement "presents the transaction in a manner objectively likely to predispose security holders toward or against it . . . it must comply with the proxy rules"). Among the factors relevant to the objective inquiry into whether a communication constitutes a "solicitation" are (1) "the contents of the communication," (2) "the conditions under which the communication is distributed," and (3) "[t]he timing of the communication in relation to the relevant surrounding circumstances." *Gas Natural Inc.,* 624 Fed. Appx. at 950. As described above, the proxy voting advice that proxy voting advice businesses send their clients generally constitutes "solicitations" under each of those three factors. *See supra* notes 75–79 and accompanying text.

[145] *Long Island Lighting Co.,* 779 F.2d at 796.

[146] *See* letter from ISS.

[147] 17 CFR 240.14a–1(l)(1)(iii).

[148] *Borak,* 377 U.S. at 432; *see also* S. Rep. No. 1455, 73d Cong., 2d Sess., 74 (1934) ("In order that the stockholder may have adequate knowledge as to the manner in which his interests are being served, it is essential that he be enlightened not only as to the financial condition of the corporation, but also as to the major questions of policy, which are decided at stockholders' meetings."); H.R. Rep. No. 1383, 73d Cong., 2d Sess., 14 (1934) (explaining the need for "adequate disclosure" and "explanation"); Communications Among Shareholders Adopting Release at 48277.

[149] *See supra* note 95 and accompanying text.

[150] *See* Broker-Dealer Release at 341 ("Material distributed during a period while proxy solicitation is in progress, which comments upon the issues to be voted on or which suggests how the stockholder should vote, would constitute soliciting material.").

[151] *See* 1979 Adopting Release at 68766; Shareholder Communications, Shareholder Participation in the Corporate Electoral Process and Corporate Governance Generally, Release No. 34–16104 (Aug. 13, 1979) [44 FR 48938 (Aug. 20, 1979)], at 48941 n.25.

[152] Concept Release at 43009 ("As a general matter, the furnishing of proxy voting advice constitutes a 'solicitation' subject to the information and filing requirements in the proxy rules.").

exclude proxy voting advice provided by "disinterested persons." Instead, the Commission articulated its view that proxy voting advice generally constitutes a "solicitation," without reference to a particular class of market participants that must be providing such advice.[153] Any suggestion otherwise requires reading into the releases an additional qualification that the Commission did not articulate.[154]

We further note that these commenters' position is inconsistent with the treatment of other disinterested parties under the current proxy regulatory scheme. Shareholders today exercise their voting rights through an intricate proxy process involving numerous intermediaries, such as broker-dealers, that each play an important role. Most shareholders own their securities in "street name," with their broker-dealers and banks generally holding the securities in their name on behalf of their customers and possessing the legal authority to vote those shares. Under the current proxy process and

rules, these broker-dealers and banks must forward a company's proxy materials to their customers and seek voting instructions (often called "voting instruction forms") from the customers on whose behalf they hold those shares. These activities are currently treated as solicitations under the proxy rules, with the Commission generally exempting them from the informational and filing requirements, despite the fact that the broker-dealers and banks have no interest in the outcome of the matters being presented for a vote and no involvement in the preparation of the materials being sent to the customers.[155] Those who have considered the issue, including at least one court, have recognized that the forwarding of a company's proxy materials and requests for voting instructions by broker-dealers constitute a form of soliciting activity subject to the Commission's rules.[156]

In addition, market observers, including proxy voting advice businesses themselves, have long recognized that the provision of proxy voting advice may constitute a "solicitation" subject to the proxy rules.[157] Notably, one proxy voting

advice business that now argues that the Commission lacks authority to regulate proxy voting advice as a "solicitation" submitted a letter to the Division of Corporation Finance in 1988 requesting no-action relief from the Commission's proxy filing rules.[158] The proxy voting advice business did not request relief on the basis that its proxy voting advice should not be considered a "solicitation." Instead, the letter appears to implicitly assume that such advice could be a "solicitation" by requesting relief from the proxy filing rules under the predecessor exemption to current Rule 14a–2(b)(3) on the basis that its proxy voting advice was provided to persons with whom it had a business relationship.[159] Further, as recently as 2016, the CEO of another proxy voting advice business testified that "[p]roxy advisory firms also are subject to the Securities and Exchange Commission's proxy solicitation rules under the [Exchange Act]."[160] The CEO further testified that "proxy voting advisors operating today . . . are generally deemed by the SEC as qualifying for the exemptions based on rules 14a–2(b)(1) and 14a–2(b)(3)."[161] These statements suggest that the proxy voting advice business industry has understood for over 30 years that its proxy voting advice constitutes a "solicitation" under Rule 14a–1(l), or at least that the Commission may consider their proxy voting advice to constitute a "solicitation."

Some commenters also asserted that our amendments to Rule 14a–1(l)(1)(iii) will increase proxy voting advice businesses' costs or interfere with their

---

[153] Although the Commission's view was originally articulated in the context of an opinion by its General Counsel regarding participation by broker-dealer firms in proxy solicitations, nothing in the language of that release indicates that its position could not also be extended to other independent, disinterested parties engaged in the same activity. *See* Broker-Dealer Release.

[154] The commenters also cite the 1979 and 1992 releases as evidence that the Commission intended to narrow the scope of the term "solicitation" so as to avoid including communications by disinterested fiduciaries. *See, e.g.,* letter from ISS (citing Communications Among Shareholders Adopting Release; 1979 Adopting Release). However, those releases reinforced the Commission's view of the breadth of the term by creating additional exemptions from the proxy filing rules. *See* Communications Among Shareholders Adopting Release at 48278 (creating an exemption from the proxy filing rules for solicitations by persons not seeking proxy authority who do not have a substantial interest in the matter subject to a vote); 1979 Adopting Release at 68766–67 (creating an exemption from the proxy filing rules for voting advice provided to persons with whom a financial advisor has a business relationship). In other words, the Commission recognized that certain classes of market participants were conducting activities that constituted "solicitations," but sought to grant them relief from the proxy filing rules by adopting applicable exemptions. Had the Commission interpreted the term "solicitation" as not applying to those market participants' activities, no such exemption from the proxy filing rules would have been necessary in the first place. Also, had the Commission intended to narrow the scope of the term "solicitation" to avoid its application to those classes of market participants, it would have amended the definition thereof in Rule 14a–1(l) appropriately. In fact, in the 1992 release, the Commission acknowledged that even though it considered (but did not ultimately adopt) proposed amendments exempting from the proxy filing rules all communications by "'disinterested' persons who are not seeking proxy authority," such communications under that proposal would still have constituted "solicitations" and "remained subject to antifraud standards." Communications Among Shareholders Adopting Release at 48278.

[155] *See* 17 CFR 240.14a–2(a)(1); *see also* Jill E. Fisch, *Standing Voting Instructions: Empowering the Enfranchised Retail Investor,* 120 Minn. L. Rev. 11, 40–41 (2017) (noting that broker-dealers' requests for voting instructions from their customers "fall[] within the SEC's definition of a proxy solicitation" and that Rule 14a–2(a)(1) "exempts the broker from the filing requirements and the obligation to furnish a proxy statement").

[156] *See, e.g., Walsh & Levine* v. *The Peoria & E. R. Co.,* 222 F.Supp. 516, 518–19 (S.D.N.Y. 1963) ("[I]f brokers transmit some but not all proxy solicitations to those for whose benefit they hold in street name, they are acting in contravention of the Commission rules if they fail to fulfill the duties required of active proxy solicitors."); Broker-Dealer Release at 342 ("It is quite clear . . . that the transmission to customers of proxy material furnished by the issuer or any other person who is soliciting a proxy, is clearly itself the solicitation of a proxy, since the material is transmitted under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."); Fisch, *supra* note 155 at 40; Council of Institutional Investors, *Client Directed Voting: Selected Issues and Design Perspectives* (August 2010) ("Rule 14a–(l) under the Exchange Act defines solicitation to include the 'furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy,' subject to certain exceptions. Communications sent by brokers to encourage participation in a [client directed voting] model would appear to fall within this definition absent an exemption, and the SEC staff agrees with this conclusion. As such, brokers would have to comply with the proxy solicitation rules, including principally the disclosure and SEC filing requirements applicable to proxy materials.").

[157] *See, e.g.,* Sagiv Edelman, *Proxy Advisory Firms: A Guide for Regulatory Reform,* 62 Emory L.J. 1369, 1378 (2013) ("Due to the expansive definition of solicitation, proxy advisory firms would be subject to federal proxy rules if not for the exemption found in Exchange Act Rule 14a–2(b)(3)."); Douglas G. Smith, *A Comparative*

*Analysis of the Proxy Machinery in Germany, Japan, and the United States: Implications for the Political Theory of American Corporate Finance,* 58 U. Pitt. L. Rev. 145, 201 n.284 (1996) ("Furnishing of proxy voting advice by an investment adviser is exempt [from the proxy filing rules] under certain circumstances."); John C. Coffee, Jr., *Liquidity Versus Control: The Institutional Investor as Corporate Monitor,* 91 Colum. L. Rev. 1277, 1358 (1991) ("The legal issue is whether the provision of proxy advice amounts to a proxy 'solicitation' under SEC Rule 14a–1. Clearly, the definition of solicitation reaches this far . . . ."); Bernard S. Black, *Shareholder Passivity Reexamined,* 89 Mich. L. Rev. 520, 530 (1990) ("Nor are the Proxy Rules limited to communications by the contestants. A third party who proffers voting advice is 'soliciting' votes."). *See also infra* notes 158–161 and accompanying text.

[158] Institutional Shareholder Services, Inc., 1991 SEC No-Act. LEXIS 17 (Dec. 15, 1988).

[159] *See id.*

[160] Katherine H. Rabin, Chief Executive Officer, Glass, Lewis & Co., Statement to the U.S. House of Representatives Committee on Financial Services: Markup of H.R. 5983, the "Financial CHOICE Act of 2016," at 3 (September 13, 2016), *available at* https://www.glasslewis.com/wp-content/uploads/2016/09/2016_0912_Glass-Lewis-Statement-re-H.R.-5983_final.pdf.

[161] *Id.*

ability to provide services to their clients. Specifically, commenters indicated that the amendments could increase litigation risks for proxy voting advice businesses or have a chilling effect on shareholder communications.[162] Although we acknowledge that compliance with the new conditions we are adopting to the exemptions in Rules 14a–2(b)(1) and 14a–2(b)(3) may increase the resources that proxy voting advice businesses apply to ensuring compliance with applicable law and regulation,[163] we disagree that our amendments to Rule 14a–1(l)(1)(iii), taken in isolation, will have a material impact on the operation of a proxy voting advice business.[164] To the contrary, the fact that both the Commission and the market generally, including proxy voting advice businesses, have long recognized that proxy voting advice generally constitutes a "solicitation" indicates that any impact from codifying this aspect of the definition of a solicitation likely is already reflected in the manner in which proxy voting advice businesses' provide their services and the pricing thereof.

Finally, in the Interpretive Release, we stated our view that proxy voting advice based on a proxy voting advice business's application of custom policies generally should be considered a "solicitation" under Rule 14a–1(l).[165] We continue to hold that view for the reasons stated in the Interpretive Release. As a result, such proxy voting advice is subject to Rule 14a–9, and persons who provide such advice in reliance on the exemptions in either Rule 14a–2(b)(1) or (b)(3) must comply with the conflicts of interest disclosure requirements set forth in new 17 CFR 240.14a–2(b)(9)(i) ("Rule 14a–2(b)(9)(i)").[166] Some commenters recommended that we amend Rule 14a–1(l) to exclude from the definitions of "solicit" and "solicitation" proxy voting

advice that is based on investors' custom policies.[167] These commenters' concerns, however, focused largely on subjecting investors' custom policies, and the proxy voting advice that is based thereon, to the proposed review and response mechanism outlined in the Proposing Release.[168] As discussed in more detail below, new 17 CFR 240.14a(b)(9)(v) ("Rule 14a–2(b)(9)(v)") excludes from the notice requirement of new 17 CFR 240.14a–2(b)(9)(ii) ("Rule 14a–2(b)(9)(ii)") proxy voting advice to the extent such advice is based on custom policies.[169] As such, notwithstanding the fact that we are not excluding from the definitions of "solicit" and "solicitation" proxy voting advice that is based on custom policies, we believe that we have appropriately taken into account the substance of these commenters' concerns.

As noted above, one commenter asserted that proxy voting *agent* businesses should not be subject to the same regulations as proxy voting advice businesses.[170] The commenter's position that its services differ from a proxy voting advice business's and should not be considered a "solicitation" appears to be based, in part, on the fact that it only votes its clients' shares in accordance with its clients' custom policies.[171] As with any other person, including any proxy voting advice business, to the extent a business is providing proxy voting advice to a client—regardless of whether such advice is based on its proprietary benchmark or specialty policies or its client's custom policies—such advice will constitute a "solicitation" under Rule 14a–1(l)(1)(iii)(A). However, the commenter and another commenter— both of which are investment advisers and were identified as proxy voting advice businesses in the Proposing Release—also asserted that their activities do not constitute "solicitations" because they vote their clients' shares on behalf of their clients rather than providing them with voting recommendations.[172] We agree that to the extent a business that provides proxy voting services is not providing any voting recommendations and is instead exercising delegated voting

authority on behalf of its clients, such services generally will not constitute "proxy voting advice"—and, therefore, not be a "solicitation"—under Rule 14a–1(l)(1)(iii)(A).[173]

With respect to Rule 14a–1(l)(2), we are also amending this provision as proposed to add paragraph (v) to make clear that the terms "solicit" and "solicitation" do not include any proxy voting advice provided by a person who furnishes such advice only in response to an unprompted request. This amendment codifies the Commission's historical view that such a communication should not be regarded as a solicitation subject to the proxy rules.[174] As we explained in the Proposing Release, we believe that a proxy voting advice business providing voting advice to a client where the client's request for the advice has been invited and encouraged by such business's marketing, offering, and selling, such advice should be distinguished from advice provided by a person only in response to an unprompted request from its client. In our view, the information and filing requirements of the proxy rules (including the filing and furnishing of a proxy statement with information about the registrant and proxy cards with means for casting votes) or compliance with the new conditions we are adopting to the exemptions described below, are appropriate for a person who chooses to actively market and sell its proxy voting advice as that person's actions are reasonably designed to result in the procurement, withholding, or revocation of a proxy. Those requirements, however, are ill-suited for a person who receives an unprompted request from a client for its views on an upcoming matter to be presented for shareholder approval. For example, a person who does not sell voting advice as a business and who provides such advice only in response to an unprompted request from its client is unlikely to anticipate the need to establish the internal processes necessary to comply with the new conditions we are adopting to the exemptions in Rules 14a–2(b)(1) and 14a–2(b)(3).

We also believe, based on our understanding of the dynamics of the proxy voting advice market as it currently operates, that a person that provides proxy voting advice only in

---

[162] *See supra* notes 101–105 and accompanying text.

[163] *See infra* Section IV.

[164] To the extent that some proxy voting advice businesses did not previously understand their proxy voting advice to constitute a solicitation and thus subject to Rule 14a–9 liability, it is possible that the codification of the Commission's longstanding view could have some economic effects. See *infra* Section IV.B.

[165] Commission Interpretation on Proxy Voting Advice at 47418. For a description of the services that one major proxy voting advice business offers in connection with its clients' custom policies, *see* ISS, Custom Pol'y & Res., *available at https:// www.issgovernance.com/solutions/governance- advisory-services/custom-policy-research/(last visited Jun. 19 2020).*

[166] See *infra* Section II.D. for a discussion of the amendments we are adopting to Rule 14a–9 and Section II.B *infra* for a discussion of new Rule 14a– 2(b)(9)(i).

[167] *See supra* note 112 and accompanying text.

[168] *See, e.g.,* letter from ISS (expressing concern about disclosing "clients' proprietary custom voting policies and the recommendations based thereon" and doubt as to the "investor protection to be gained by allowing issuers to vet the methodologies and assumptions institutional investors choose to implement for their own portfolios").

[169] *See infra* Section II.C.3.c.i.

[170] *See supra* note 113 and accompanying text.

[171] *See* letter from Segal Marco II.

[172] *See supra* notes 99–100 and accompanying text.

[173] Separately, we note that the Commission has provided guidance to investment advisers which discusses how the fiduciary duty and rule 206(4)– 6 under the Advisers Act relate to an investment adviser's exercise of voting authority. *See infra* note 400.

[174] *See supra* note 84.

response to unprompted requests and does not market its expertise in such services is less likely to present an investor protection or market integrity concern. For example, we believe such one-off advice to individual clients lacks the system-wide significance of advice provided by proxy voting advice businesses who, as described above, have come to occupy a unique and important position in that process.[175] Although one commenter recommended that 17 CFR 240.14a–1(l)(2)(v) (''Rule 14a–1(l)(2)(v)'') be narrowed to exclude only proxy voting advice furnished pursuant to an unprompted request if such advice is also provided ''not for compensation,'' [176] we consider that amendment unnecessary. In our view, any compensation that may be received for such unprompted proxy voting advice does not present the same investor protection or regulatory concerns because such persons are less likely to engage in widespread marketing of their expertise in providing proxy voting advice.

As noted above, one commenter opposed the amendment to Rule 14a– 1(l)(2) on the basis that investment advisers and broker-dealers may avoid announcing their willingness to provide voting advice on Forms ADV and CRS out of concern that they would fall outside the scope of new Rule 14a– 1(l)(2)(v) and be deemed to be prompting a request for proxy voting advice.[177] We believe, however, that the text of new Rule 14a–1(l)(1)(iii)(A) is sufficiently precise to avoid this concern. Where an investment adviser or broker-dealer is describing the services it provides to its clients or customers, which may include proxy voting advice, we believe that such investment adviser or broker-dealer should not be deemed to be ''market[ing] its expertise as a provider of such proxy voting advice, separately from other forms of investment advice, and sell[ing] such proxy voting advice for a fee.'' [178] This same commenter also expressed concern that the amendment to Rule 14a–1(l)(2) could be counterproductive from an investor protection standpoint as the proxy rules would apply to experts with proxy advice-related skills and resources but not to individuals with less relevant expertise who engage in the same activities.[179] We disagree. As we noted

in the Proposing Release,[180] we believe that those persons providing voting advice in response to unprompted requests likely will be furnishing such advice to a client with whom there is an existing business relationship. As noted above, proxy voting advice provided under these circumstances does not present the same investor protection or regulatory concerns as proxy voting advice businesses engaged in widespread marketing and sale of proxy voting advice to large numbers of investment advisers and institutional investors who are often voting on behalf of other investors.[181]

*B. Amendments to Rule 14a–2(b): Conflicts of Interest*

1. Proposed Amendments

Over the years, many observers have noted that some proxy voting advice businesses engage in activities or have relationships that could reasonably be expected to affect the objectivity or reliability of their advice.[182] Examples of circumstances where the interests of a proxy voting advice business may diverge materially from the interests of the clients who utilize their advice include:

• A proxy voting advice business providing voting advice to its clients on proposals to be considered at the annual meeting of a registrant while the proxy voting advice business also earns fees (or is seeking to earn fees) from that registrant for providing advice on corporate governance and compensation policies;[183]

• A proxy voting advice business providing voting advice on a matter in which its affiliates or one or more of its clients has a material interest, such as a business transaction or a shareholder proposal put forward by or actively supported by that client or group of clients;

• A proxy voting advice business providing ratings to institutional investors of registrants' corporate governance practices while at the same time consulting for, or seeking to consult with, registrants that are the subject of the ratings for a fee to help increase their corporate governance scores;

• A proxy voting advice business providing voting advice with respect to a registrant's shareholder meeting while affiliates of the proxy voting advice business hold a significant ownership interest in the registrant, sit on the registrant's board of directors, or have

relationships with a shareholder presenting a proposal covered by the proxy voting advice; and

• A proxy voting advice business providing voting advice on a matter on which it or its affiliates have provided advice to a registrant, a proponent, or other party regarding how to structure or present the matter or the business terms to be offered in such matter.

These and similar types of circumstances create a risk that the proxy voting advice business's voting advice could be influenced by the business's own interests, which may call into question the objectivity and independence of its advice.[184] The clients of the proxy voting advice business would generally need to be informed of such activities and relationships in order to be in a position to reasonably assess the impact and materiality of any actual or potential conflicts of interest with respect to the proxy voting advice they receive.[185] If they do not have access to sufficiently detailed disclosure about the full extent and nature of any conflicts that are relevant to the voting advice, and any measures taken to mitigate such conflicts, these clients may not have sufficient information to reasonably understand and adequately assess these potential conflicts and remedial measures when they evaluate the voting advice and make their voting determinations.[186] A range of proxy voting advice business clients may find it important to have sufficient information to support their understanding and assessment, including, for example, investment advisers that undertake proxy voting duties on a client's behalf.[187]

In light of these concerns, the Commission proposed amendments to further ensure that sufficient information about material conflicts of interest would be provided consistently across proxy voting advice businesses and in a manner readily accessible to the clients of the proxy voting advice businesses. Accordingly, the proposed amendments included a requirement that persons who provide proxy voting advice,[188] in order to rely on the

---

[175] *See supra* notes 6–10 and accompanying text.

[176] *See* letter from Exxon Mobil.

[177] *See* letter from ISS.

[178] 17 CFR 240.14a–1(l)(1)(iii)(A); *see also supra* notes 124–125.

[179] *See supra* note 117 and accompanying text.

[180] *See* Proposing Release at 66523.

[181] *See supra* text accompanying note 176.

[182] *See* Proposing Release at 66525 n.73.

[183] *See id.* at n.74.

[184] *See id.* at n.75.

[185] *See id.* at n.72.

[186] *See id.* at 66526 n.78 and *infra* note 193.

[187] Commission Guidance on Proxy Voting Responsibilities at 47425 (''[A]n investment adviser's decision regarding whether to retain a proxy advisory firm should also include a reasonable review of the proxy advisory firm's policies and procedures regarding how it identifies and addresses conflicts of interest.'').

[188] Consistent with the Commission's proposed amendments to the definition of solicitation under the proxy rules, the requirement would apply only to proxy voting advice falling within the scope of

exemptions contained in Rule 14a–2(b)(1) and (b)(3), must include in such advice (and in any electronic medium used to deliver the advice) the following disclosures specifically tailored to proxy voting advice businesses and the nature of their conflicts of interest:

• Any material interests, direct or indirect, of the proxy voting advice business (or its affiliates [189]) in the matter or parties concerning which it is providing the advice;

• Any material transaction or relationship between the proxy voting advice business (or its affiliates) and (i) the registrant (or any of the registrant's affiliates [190]), (ii) another soliciting person (or its affiliates), or (iii) a shareholder proponent (or its affiliates), in connection with the matter covered by the proxy voting advice;

• Any other information regarding the interest, transaction, or relationship of the proxy voting advice business (or its affiliates) that is material to assessing the objectivity of the proxy voting advice in light of the circumstances of the particular interest, transaction, or relationship; and

• Any policies and procedures used to identify, as well as the steps taken to address, any such material conflicts of interest arising from such interest, transaction, or relationship. [191]

In the Proposing Release, the Commission stated that the disclosures provided under these provisions should be sufficiently detailed so that clients of proxy voting advice businesses could understand the nature and scope of the interest, transaction, or relationship to appropriately assess the objectivity and reliability of the proxy voting advice they receive. [192] This might include, for example, the identities of the parties or affiliates involved in the interest, transaction, or relationship triggering the proposed disclosure requirement

and, when necessary for the client to adequately assess the potential effects of the conflict of interest, the approximate dollar amount involved in the interest, transaction, or relationship. Boilerplate language, including language stating that "such relationships or interests may or may not exist," would be insufficient for purposes of satisfying this condition to the exemptions.

### 2. Comments Received

Many commenters agreed with the general principle that providing clients of proxy voting advice businesses with adequate conflicts of interest disclosure helps to ensure transparency and fairness in the voting process and is vital to the clients' ability to make informed voting decisions. [193] Some commenters expressed the view that proxy voting advice businesses currently do not satisfactorily mitigate the risk that conflicts of interest may impair their objectivity and, consequently, that their ability to provide impartial voting advice is often undermined by the prevalence of conflicts. [194]

Some commenters opposed the proposed amendments, [195] asserting that additional conflict disclosure requirements were not justified [196] and, therefore, would impose unnecessary additional costs and burdens on proxy voting advice businesses and their clients. [197] These commenters challenged, among other things, the claims that proxy voting advice businesses' conflicts of interest disclosures were materially deficient, [198] and contended that the businesses' existing policies and procedures (such as their disclosure practices and maintenance of internal firewalls to guard against conflicts) adequately addressed the risk of conflicts. [199] In support of this view, commenters noted that the predominant opinion among the

---

[189] The term "affiliate," as used in proposed Rule 14a–2(b)(9)(i), would have the meaning specified in Exchange Act Rule 12b–2.

[190] The Commission recognized that proxy voting advice businesses may not necessarily have access to the information needed to determine whether an entity is an affiliate of a registrant, another soliciting person, or the shareholder proponent. Therefore, as proposed, proxy voting advice businesses would only be required to use publicly-available information to determine whether an entity is an affiliate of registrants, other soliciting persons, or shareholder proponents.

[191] This would include a description of the material features of the policies and procedures that are necessary to understand and evaluate them. Examples include the types of transactions or relationships covered by the policies and procedures and the persons responsible for administering these policies and procedures.

[192] Proposing Release at 66526.

[193] *See* letters from commenters generally opposed to the proposals, *e.g.*, CalSTRS ("We agree that conflict of interest disclosure is important for a well-functioning and unbiased proxy voting system. Investors should be informed when there may be potential conflicts of interest that could affect proxy advisor recommendations. Investors need confidence that the research being considered when voting is unbiased and fact based . . . ."); CFA Institute I; CII IV; ISS; and the IAC Recommendation. *See also* letters from commenters generally supporting the proposals, *e.g.*, ACCF ("Investors need to be fully informed of the biases and conflicts inherent in [the] powerful vote recommendations [of proxy voting advice businesses]."); BRT (". . . conflicts of interest that may arise for proxy advisors should be disclosed in order for their clients to assess for themselves the effect and materiality of any actual or potential conflicts of interest with respect to a voting recommendation . . . We agree with the Commission's assessment that institutional investors and investment advisers who rely on proxy advisors for voting guidance cannot identify potential risks if they do not have access to sufficiently detailed disclosure about the full extent and nature of any conflicts that are relevant to the voting advice they receive."); Exxon Mobil Corp., (Feb. 3, 2020) ("ExxonMobil"); Tao Li, Ph.D., Assistant Professor of Finance, University of Florida (Jan. 30, 2020) ("Prof. Li") (". . . it remains imperative that market participants are aware of any potential conflicts of interest within the industry and whether those conflicts are impeding the role of proxy advisors as independent providers of information and recommendations."); NAM; Nareit; Nasdaq; SCG; CCMC.

[194] *See, e.g.*, letters from ACCF (citing its May 2018 research paper: "The Conflicted Role of Proxy Advisors"); BIO; BRT; CEC; CCMC; ExxonMobil; Jason Ward, Managing Partner, Amrop Industrial Search LLC (Feb. 3, 2020) ("J. Ward"); NAM; Nareit; Nasdaq; SCG. To substantiate their claims that conflicts of interest are pervasive in proxy voting advice, several commenters pointed to the results of various opinion surveys of selected companies and individuals reflecting significant concerns about conflicts of interest. *See, e.g.*, letters from

CCMC; Ashley Baker, Director of Public Policy, The Committee for Justice, (Feb. 3, 2020) ("Committee for Justice"); J. Ward; Nareit; Nasdaq; P. Mahoney and J.W. Verret; SCG; Seven Corners Capital Management, LLC (Apr. 8, 2020) ("Seven Corners").

[195] *See, e.g.*, letters from CalPERS; Canadian Governance Coalition; CII IV; JoAnn Hanson, President and CEO, Church Investment Group (Jan. 29, 2020) ("Church Investment Group"); Colorado PERA; Henry Beck, Maine State Treasurer, et al., Democratic Treasurers Association (Jan. 30, 2020) ("DTA"); Holly A. Testa, Director, Shareowner Engagement, First Affirmative Financial Network (Jan. 3, 2020) ("First Affirmative"); Jeffery W. Perkins, Executive Director, Friends Fiduciary Corporation (Feb. 2, 2020) ("Friends"); Glass Lewis II; ISS; Interfaith Center II; J. Coates, Professor of Law and Economics, Harvard Law School, and Barbara Roper, Consumer Federation of America (Jan. 30, 2020) ("Prof. Coates"); New York Comptroller II; PIAC II; Public Retirement Systems; ValueEdge I.

[196] *See, e.g.*, letters from Colorado PERA ("PERA utilizes research reports from Glass Lewis and ISS to assist with its evaluation of items on a proxy ballot. PERA has analyzed each firm's disclosures and management of conflicts of interest. We concluded that the potential conflicts are harmless to the independence of the research, would not sway an investor's opinion, and the existing firewalls to prevent contamination of objectivity—where applicable to specific proxy advisors—are sufficient"); CalSTRS; Glass Lewis II; ISS.

[197] *See, e.g.*, letters from CalPERS; Canadian Governance Coalition; CII IV; Church Investment Group; DTA; First Affirmative; Friends; Glass Lewis II; ISS; Interfaith Center II; New York Comptroller II; Colorado PERA; PIAC II; Prof. Coates; Public Retirement Systems; ValueEdge I.

[198] *See, e.g.*, letters from CalPERS ("We see no evidence that conflicts of interest with proxy advisors have led to voting advice that conflicts with our voting policies . . . It is not clear to what extent the SEC has reviewed all of the disclosures that proxy voting advice businesses already provide."); CalSTRS; CII IV; Glass Lewis II; ISS; New York Comptroller II; Colorado PERA; PIAC II; ValueEdge I.

[199] *See, e.g.*, letters from CalSTRS (stating that while it is generally supportive of conflict of interest disclosure, it does "not believe the SEC needs to create a new regulatory structure to enforce such [conflict of interest] disclosure" and its general belief "that proxy advisors are currently providing adequate disclosures that meet the needs of investors, and any modifications to disclosures can be enforced through existing SEC authority."); ISS; Glass Lewis II; CalPERS; New York Comptroller II.

---

amended Rule 14a–1(l)(1)(iii)(A). *See supra* Section II.A., "Codification of Commission's Interpretation of Solicitation."

businesses' own clients was that the measures taken to mitigate conflicts of interest were satisfactory.[200] Moreover, commenters argued that adding new disclosure requirements to the proxy rules was unnecessary in light of existing provisions in the Advisers Act and in Rule 14a–2(b) under the Exchange Act that already address conflicts of interest, as well as inappropriate because the Advisers Act generally governs the activities of investment advisers, including proxy voting advice businesses.[201] In addition, some commenters believed that the proposed conflicts disclosure requirements would likely compromise the internal firewalls designed by proxy voting advice businesses to mitigate their risk of conflicts,[202] and could have a detrimental effect on competition in an industry that is already cost-prohibitive for new entrants.[203]

Both those supporting and those opposing the proposed Rule 14a–2(b)(9)(i) recommended modifications to the proposed new disclosure requirements,[204] ranging from very specific suggestions intended to standardize the presentation of conflicts disclosures,[205] expand the breadth of required disclosure,[206] and capture certain detailed information,[207] to those that were less prescriptive and leaned toward a more principles-based approach,[208] with an emphasis on materiality.[209] Other commenters recommended certain substantive changes that would have widened the scope of the proposed amendments beyond conflicts disclosure.[210]

### 3. Final Amendments

We are adopting amendments to Rule 14a–2(b) to require that persons who provide proxy voting advice in reliance on the exemptions in either Rule 14a–2(b)(1) or (b)(3) must include in their voting advice to clients the conflicts of interest disclosure specified in new Rule 14a–2(b)(9)(i). The Commission is adopting these amendments substantially as proposed, but with certain modifications as discussed below, to clarify and streamline the rule in response to commenters' concerns and suggestions.

As adopted, Rule 14a–2(b)(9)(i) establishes a principles-based requirement, based on a standard of materiality, that will apply to all proxy voting advice that is provided in reliance on the exemptions in Rules 14a–2(b)(1) and (b)(3). Contrary to the views of some commenters, we do not see this requirement as imposing an entirely new regulatory regime or structure.[211] Rather, we view Rule 14a–2(b)(9)(i) as enhancing the existing conflicts of interest disclosures that proxy voting advice businesses currently provide in order to rely on the exemptions from the proxy rules' information and filing requirements. By articulating a standard for disclosure that focuses on information that would be material to assessing the objectivity of the proxy voting advice, the new rule is expected to result in disclosure that is more tailored and comprehensive than would be required under either Rule 14a–2(b)(1) or (b)(3).[212] Given the significant role played by proxy voting advice businesses in the voting process, we believe that the articulation of clear minimum disclosure standards is appropriate to better ensure transparency, accuracy, and completeness in the information provided, as well as the integrity of the proxy voting process. Rule 14a–2(b)(9)(i)

---

[200] See, e.g., letters from ISS (". . . the fact that the most vocal critics of ISS in this area [regarding conflicts of interest] are those who speak on behalf of corporate management, and not the investors who rely on ISS' research and vote recommendations, indicates that ISS is managing this potential conflict extremely well."); CalPERS; CalSTRS; Glass Lewis II; New York Comptroller II.

[201] See, e.g., letter from ISS (asserting that "the proposal ignores the relevance of the Advisers Act regime and makes no attempt to explain why this framework is inadequate to address the Commission's purported concerns about proxy advice"). As noted above, it is not unusual for a registrant under one provision of the securities laws to be subject to other provisions of the securities laws when engaging in conduct that falls within the other provisions. See supra notes 41 through 60 and accompanying text for a discussion of why we believe it is appropriate that proxy voting advice businesses be subject to applicable rules under Section 14(a) when they provide proxy voting advice, regardless of whether they are registered under the Advisers Act.

[202] For example, according to ISS, it maintains a firewall between ISS Global Research, its core institutional business, and ISS Corporate Solutions, Inc. ("ICS"), a subsidiary which provides governance tools and services to corporate issuer clients. In its comment letter, ISS states that "a key goal of the firewall is to keep the ISS Global Research team from knowing the identity of ICS' clients," which could be jeopardized by disclosure of the details of ICS' business and potentially result in vote recommendations that are biased in favor of corporate management. As part of its conflicts of interest policies, Glass Lewis blocks its research analysts from any access to the holdings, custom policies and/or voting activity of its two co-owners, the Ontario Teachers' Pension Plan Board and Alberta Investment Management Corp. See e.g., letters from CII IV; Glass Lewis II; ISS. See also IAC Recommendation.

[203] See, e.g., letters from CalPERS; CII IV; ISS; PERA ("This disclosure of . . . anything that may potentially be deemed a conflict of interest could result in advisors losing their competitive advantage."); and the IAC Recommendation. See also letter from CFA Institute I ("We do not object to such increased transparency so long as these further disclosures do not compromise the competitiveness of a proxy adviser by forcing them to divulge trade secrets or other proprietary information, the disclosure of which would be deleterious to the specific adviser").

[204] See, e.g., letters from Lynette C. Fallon, EVP HR/Legal and General Counsel, Axcelis Technologies, Inc. (Jan. 20, 2020) ("Axcelis"); Baillie Gifford; BRT; CEC; CII IV; CIRCA; Exxon Mobil; Garmin; Glass Lewis II; ISS; Jonathan Chanis, New Tide Asset Management, LLC (Jan. 30, 2020) ("J. Chanis"); Mylan; Ann McGinnis, Co-President et al., Los Angeles Chapter, National Investor Relations Institute, Los Angeles Chapter (Feb. 3, 2020) ("NIRI–LA"); David Erickson, President, et. al., National Investor Relations Institute, Orange County Chapter (Feb. 4, 2020) ("NIRI–OC"); June M. Vecellio, President, and James B. Bragg, Advocacy Ambassador, National Investor Relations Institute, Connecticut/Westchester County Chapter (Feb. 6, 2020) ("NIRI–Westchester"); Nasdaq; Prof. Li; SCG; Seven Corners; SES; Linda Moore, President and CEO, TechNet, (Feb. 3, 2020) ("TechNet").

[205] See, e.g., letters from Nasdaq; NIRI–LA; NIRI–OC; NIRI–WC; TechNet (calling for conflicts of interest to be disclosed on the front page of proxy voting advice).

[206] See, e.g., letters from ExxonMobil (supporting a requirement for specific disclosures about proxy voting advice businesses' specialty reports that are driven by goals other than maximizing shareholder value); SCG (recommending that proxy voting advice businesses be required to disclose "any interest, transaction or relationship that may present a conflict of interest, and the dollar amount thereof").

[207] See, e.g., letters from ExxonMobil (recommending that required conflict disclosures cover details similar to the requirements of Item 404(a) of Regulation S–K and enumerating a list of specific items that should be addressed by disclosure); PIRC (suggesting that disclosure of specific amounts of compensation received from various clients could be helpful).

[208] See, e.g., letters from Baillie Gifford (cautioning that requiring disclosure of policies and procedures would lead to boilerplate disclosure); CII IV (asserting that allowing proxy voting advice businesses to choose the vehicle by which they disclose conflicts of interest would mitigate the widespread distribution of information that could affect competitive or other concerns); CIRCA (stating that a principles-based approach "would prevent proxy advisors from giving boilerplate disclosures . . . without creating unprecedented and excessive burdens."); ISS (stating that "there is no reason to treat conflict disclosure by proxy advisers any differently from the way conflict disclosure by portfolio managers or any other type of investment adviser is treated."); S. Holmes.

[209] See, e.g., letter from Baillie Gifford.

[210] See, e.g., letters from Garmin (recommending that the Commission require proxy voting advice businesses to separate their proxy advisory businesses from their consulting businesses); J.

Chanis (recommending that the Commission prohibit proxy voting advice businesses from also providing consulting services to companies that are the subject of their proxy voting advice).

[211] See, e.g., letters from CalSTRS ([W]e do not believe the SEC needs to create a new regulatory structure to enforce such disclosure."); Glass Lewis II ("Accordingly, this issue [of conflicts of interest disclosure] does not present a basis for a wholesale new and burdensome regulatory regime . . . .").

[212] The exemption in Rule 14a–2(b)(1) does not currently require conflicts of interest disclosure, while Rule 14a–2(b)(3)(ii) requires disclosure of "any significant relationship with the registrant or any of its affiliates, or a security holder proponent of the matter on which advice is given, as well as any material interests in such matter." 17 CFR 240.14a–2(b)(3)(ii). It should be noted that both exemptions were adopted by the Commission before proxy voting advice businesses played the significant role that they now do in the proxy voting process and in the voting decisions of investment advisers and institutional investors.

is intended to harmonize the conflicts of interest disclosure that proxy voting advice businesses provide to their clients, helping to ensure that sufficient information about material conflicts of interest is disclosed more consistently across proxy voting advice businesses and in a manner readily accessible to the clients of such businesses. As a consequence, we believe the rule will enable clients of proxy voting advice businesses to make more informed voting decisions, including with regard to how proxy voting advice businesses identify and address conflicts of interest on a business-specific and relative basis and help in Commission oversight of the proxy voting process.[213]

Although some proxy voting advice businesses and others have asserted that the businesses' existing practices and procedures adequately address conflicts of interest concerns,[214] we believe that the absence of a disclosure requirement specifically contemplating the conflicts of interest that can arise for proxy voting advice businesses in relation to proxy voting advice means that there has not been a sufficient standard against which clients may assess the quality of the conflicts disclosures they receive. Conditioning the exemptions in Rules 14a–2(b)(1) and (3) for proxy voting advice on the proxy voting advice business's adherence to a set of minimum, principles-based disclosure standards will make clear what constitutes basic information regarding conflicts of interest that all parties can expect when receiving voting advice and will bolster the completeness and consistency of such disclosure by making it a regulatory requirement. This should in turn foster greater confidence in the services proxy voting advice businesses offer to their clients and provide greater assurance to market participants that shareholders' interests are being properly considered through a well-functioning proxy system.[215]

To that end, Rule 14a–2(b)(9)(i) sets forth a concise framework that applies to any person providing proxy voting advice within the scope of proposed Rule 14a–1(l)(1)(iii)(A) who wishes to utilize the exemption in either Rule 14a–2(b)(1) or (b)(3). Such persons must include in their voting advice (or in any electronic medium used to deliver the advice) prominent disclosure of:

• Any information regarding an interest, transaction, or relationship[216] of the proxy voting advice business (or its affiliates) that is material to assessing the objectivity of the proxy voting advice in light of the circumstances of the particular interest, transaction, or relationship;[217] and

• Any policies and procedures used to identify, as well as the steps taken to address, any such material conflicts of interest arising from such interest, transaction, or relationship.[218]

The rule, as adopted, reflects our intent to avoid an overly prescriptive disclosure requirement with specific monetary thresholds, in favor of a more principles-based rule that is sufficiently flexible to encompass a wide variety of circumstances that may not fall within pre-determined parameters but nevertheless could materially impact a client's assessment of the proxy voting advice business's objectivity. This approach also is consistent with the views of several commenters who favored a principles-based disclosure requirement that could more easily accommodate a variety of different facts and circumstances.[219] As such, Rule 14a–2(b)(9)(i) establishes a general standard for conflicts of interest disclosure, but allows the proxy voting advice business to apply its judgment and unique knowledge of the facts to determine the materiality of conflicts that might pose a risk to the objectivity of its advice.

The final rule also gives the proxy voting advice business flexibility to determine the precise level of detail needed about any identified conflicts of interest,[220] or whether a relationship or interest that has been terminated should nevertheless be disclosed.[221] In each particular case, the rule gives the proxy voting advice business the discretion to determine which situations merit disclosure and the specific details to provide to its clients about any conflicts of interest identified. The key determinant will be whether the information is material to an evaluation of the proxy voting advice business's objectivity.

A more prescriptive disclosure requirement, while relying less on the proxy voting advice business's judgment, risks being either under- or over-inclusive. For instance, there may be scenarios or relationships of which we are not aware or that, at this point in time, do not exist that present or would present material conflicts.[222]

---

[213] Currently, proxy voting advice businesses differ in how they disclose their conflicts of interest. For example, ISS discloses the details of its potential conflicts of interest, such as the identities of the parties and the amounts involved, through its ProxyExchange platform, while Glass Lewis states that its disclosures appear on the front cover of the report with its proxy voting advice. *See* ISS, FAQs Regarding Recent Guidance from the U.S. Securities and Exchange Commission Regarding Proxy Voting Responsibilities of Investment Advisers (2019) ("ISS FAQs"), *available at https://www.issgovernance.com/file/faq/ISS_ Guidance_FAQ_Document.pdf. See also* Proposing Release at 66527, n. 90; letter from Glass Lewis II.

[214] *See supra* note 200 and Proposing Release at 66544 n.226.

[215] *See infra* Section IV.A.

[216] Such information may include disclosure about certain business practices in which the proxy voting advice business engages that might reasonably be expected to call into question its objectivity and the independence of its advice. For example, it may be appropriate in some circumstances under the rule for a proxy voting advice business to disclose its practice of selectively consulting with certain clients before issuing its benchmark voting recommendation on a specific matter (*e.g.,* a contested director election or merger). This may particularly be the case in situations in which the clients with whom the proxy voting advice business consults are not directly involved as a party to the specific matter but are expected to receive proxy voting advice on the matter. Such a practice could allow for those consulted clients' voting preferences to influence recommendations given to other clients that were not consulted and importantly, without the knowledge of those clients not consulted.

[217] Rule 14a–2(b)(9)(i)(A).

[218] Rule 14a–2(b)(9)(i)(B).

[219] *See, e.g.,* letters from Baillie Gifford; CII IV; CIRCA, Glass Lewis II; ISS ("Proxy advisers should be governed by a principles-based regulatory regime. For this reason, the Commission should not require such firms to disclose specific qualitative or quantitative information or impose prescriptive standards regarding the method of conflict disclosure.").

[220] For example, the proxy voting advice business would have the discretion, on a case-by-case basis, to determine whether specific monetary amounts related to any potential and/or actual conflicts identified should be disclosed. *See* letter from CII IV ("We do not believe that proxy voting advice businesses should be required to disclose the specific amounts that they receive from the relationships or interests covered by the proposed conflicts of interest disclosures . . . there is no reliable evidence indicating that institutional investor clients believe that level of detail is necessary in all circumstances. To the extent that investors want this information, they are at liberty to seek it from the proxy advisory firm(s) they hire, and make it a condition for hiring a proxy advisor."). We note, however, that Rule 14a–2(b)(9)(i) should not be interpreted to mean that disclosure of specific amounts would never be necessary. There may be situations, depending on the particular facts and circumstances, in which this information would be material to assessing the objectivity of the proxy voting advice and therefore should be disclosed. Similarly, the proxy voting advice business would have the discretion to determine whether the number of instances of substantive engagement it has had with existing clients as well as any other third parties providing substantive input to the proxy voting advice business as it develops its advice may have created a material conflict of interest that should be disclosed.

[221] *See, e.g.,* letter from Baillie Gifford ("A more principles-based requirement is preferable because whether a matter is material to the proxy advice will depend on the facts and circumstances. For example, in some situations it may be relevant that a proxy advisor had an historical relationship with a registrant, albeit that the relationship is no longer live, if the relationship were very significant in terms of duration or value. In other cases, less significant relationships will cease to be relevant as soon as they come to an end. It should be for the proxy advisors to make the assessment and for their clients to understand how the advisor makes this determination as part of regular due diligence.").

[222] *See* discussion *supra* pp. 51–52.

Instead, by adopting a rule with materiality as its focus, we have opted for an approach that is more adaptable to varied circumstances. The concept of materiality is at the core of our disclosure framework and has served our markets and investors well. Therefore, we believe that requiring proxy voting advice businesses to base their conflicts of interest disclosures on assessments of materiality is a more effective way to ensure that their clients have sufficient information to weigh the voting advice they are given.

Substantively, Rule 14a–2(b)(9)(i) is consistent with the Commission's proposal, but we have modified the wording in an effort to further simplify the requirement. We agree with a commenter who suggested that the proposed regulatory text could be streamlined to both capture the full scope of conflicts-related disclosure and retain the focus on principles of materiality.[223] Therefore, consistent with the suggestions of these commenters, the rule condenses proposed subsections (A), (B), and (C) of paragraph (b)(9)(i) into a single subsection (A) that requires disclosure of ''any information regarding an interest, transaction, or relationship of the proxy voting advice business (or its affiliates) that is material to assessing the objectivity of the proxy voting advice in light of the circumstances of the particular interest, transaction, or relationship.''[224]

We note that some commenters recommended ways to improve the proposal by including additional substantive requirements or specific parameters designed to more clearly indicate the disclosure obligations of proxy voting advice businesses under the rule.[225] For example, one

commenter suggested that more guidance was needed regarding the timeframe for which the disclosure of conflicts should be provided.[226] As discussed above, however, we believe that a more principles-based approach will best serve to provide the clients of proxy voting advice businesses with adequate disclosure regarding conflicts while balancing the varied and unique circumstances of such businesses. We are therefore not persuaded that more prescriptive modifications are necessary or preferable to the rule, as adopted, which describes a general principle rather than delineating particular disclosure items.

Because our concern is with ensuring that proxy voting advice business clients have the ability to assess the objectivity, and ultimately the reliability, of proxy voting advice, we believe it would not serve the interests of those who depend on voting advice to place precise limits on what would be considered material information. For example, if a proxy voting advice business has been retained by a shareholder to provide voting advice regarding a registrant for which the business once provided consulting services, and if it has had no business relationship with the registrant for some years and is not seeking a business relationship with the registrant, it may be unlikely that the nature of its relationships with the registrant would be deemed material to an assessment of the business's ability to objectively advise its client. In that circumstance, the proxy voting advice business, which is in the best position to make such a judgment, would need to consider, based on the relevant facts and circumstances, whether that prior engagement is currently material and should be disclosed to clients.

Another benefit of the principles-based nature of Rule 14a–2(b)(9)(i) is that it will provide proxy voting advice businesses significant flexibility over the manner in which conflicts information is disclosed, so long as the basic requirements are met. The rule requires that prominent disclosure of

material conflicts of interest be included in the voting advice to ensure that this information is readily accessible to clients and facilitates their ability to consider such disclosure together with the proxy voting advice at the time they make their voting decisions.[227] It does not, however, dictate the particular location or presentation of the disclosure in the advice or the manner of its conveyance as some commenters recommended.[228] Doing so would undermine our intent to give latitude to proxy voting businesses to fashion their disclosure as they judge best, in recognition of the varied circumstances in which they provide their services.

Along these lines, the final rule differs from the proposal regarding the conveyance of conflicts disclosure. As proposed, the rule would have required a proxy voting advice business to include conflicts of interest disclosure ''in its proxy voting advice *and* in any electronic medium used to deliver the advice,''[229] to ensure that the information is prominently disclosed regardless of the means by which the advice is disseminated. However, some commenters were concerned that this was overly prescriptive and would interfere with proxy voting advice businesses' existing conflict management policies and procedures designed to safeguard information and prevent it from undermining the objectivity and independence of the businesses' voting advice.[230] These commenters pointed out that displaying conflict disclosures in every piece of proxy advice, including written proxy research reports, would compromise the ability of proxy voting advice businesses

---

[223] *See* letter from ISS.

[224] Rule 14a–2(b)(9)(i)(A), as adopted, substantially resembles proposed subsection (C) that was designed as a catch-all to elicit disclosure of any information not otherwise captured by the other provisions of the rule regarding an interest, transaction, or relationship that would be material to a reasonable investor's assessment of the objectivity of the proxy voting advice. In addition, we note that the final amendment does not retain the concept from proposed subsection (B) providing that required disclosures would be determined using publicly available information. Although this provision was intended to limit the scope of a proxy voting advice business's disclosure obligation, we agree with commenters that any interest, transaction or relationship of which a proxy voting advice business is not already aware logically could not bias the business's proxy advice. *See* letter from ISS (''If such a search [of publicly available information] uncovers a possible affiliation ISS was not otherwise aware of, there would be no benefit to offset the cost and delay because any such relationship could not have compromised the integrity of the proxy advice in the first place.'').

[225] *See, e.g.,* letters from CEC (recommending that the rule include examples of *per se* conflicts of

interest and illustrations of compliant disclosures); Mylan (recommending that disclosure be required for ''every instance of substantive engagement'' between a proxy voting advice business and existing clients, as well as any other third party providing substantive input regarding the proxy voting advice business's recommendations); PIRC; Prof. Li; SCG (recommending that disclosure of the dollar amount of any interest, transaction, or relationship that may present a conflict of interest for the proxy voting advice business should be required and asking for clarification of what constitutes a ''material'' interest, transaction, or relationship (*e.g.,* revenue, terms of the contracts, etc.)).

[226] *See, e.g.,* letter from Prof. Li.

[227] A proxy voting advice business that only provides such disclosures upon request from the client would not be in compliance with the required disclosure in Rule 14a–2(b)(9)(i) and, therefore, would not satisfy the conditions of the exemptions in Rules 14a–2(b)(1) or (b)(3). We believe that imposing an affirmative duty on proxy voting advice businesses to provide the required disclosures of material conflicts of interest is consistent with obligations to disclose potential conflicts of interest in other contexts. *See* Proposing Release at 66527, n. 88.

[228] *See, e.g.,* letters from BRT; Exxon Mobil; Nasdaq; NIRI–LA; NIRI–OC; SCG; SES; TechNet.

[229] Proposed Rule 14a–2(b)(9)(i).

[230] *See, e.g.,* letters from Glass Lewis II (discussing the restrictions in place to prevent its analysts from accessing information about the interests and voting activities of Glass Lewis' owners); ISS (discussing the firewall that it maintains between its core institutional proxy advisory business and its subsidiary that provides governance tools and services to corporate issuer clients and stating that ''ISS has implemented a comprehensive and robust set of conflict controls . . . which would be compromised if conflict information were required to be publicly disclosed, or if disclosure were required to be displayed in or on a research report, instead of 'around' the report as is currently the case'').

to mitigate their risk of conflicts and expressed concern that the proposal would increase compliance costs for proxy voting advice businesses.[231]

We agree that proxy voting advice businesses should have the latitude to convey their conflict disclosures to clients in a manner that does not run afoul of the businesses' own mechanisms for mitigating the risk of biased advice, such as establishing internal firewalls to maintain the objectivity of the advice, so long as their conflict disclosures are readily accessible to their clients and provided as part of the proxy voting advice they receive. Accordingly, the rule we are adopting gives a proxy voting advice business the option to include the required disclosure either in its proxy voting advice *or* in an electronic medium used to deliver the proxy voting advice, such as a client voting platform, which allows the business to segregate the information, as necessary, to limit access exclusively to the parties for which it is intended.[232]

Similarly, 17 CFR 240.14a– 2(b)(9)(i)(B) (''Rule 14a– 2(b)(9)(i)(B)''),[233] which requires proxy voting advice businesses to disclose ''any policies and procedures used to identify, as well as the steps taken to address,'' any material conflicts of interest identified pursuant to subsection (A), does not specify the extent to or manner in which the required disclosure must be presented. As with the disclosures required by subsection (A), proxy voting advice businesses are given wide latitude to determine what information would best serve their clients' interests. Moreover, Rule 14a–2(b)(9)(i) is not intended to supplant or interfere with a business's course of practice and standard operating procedures if it is already providing disclosure to its clients sufficient to enable them to understand the business's processes and methodology for identifying and addressing material conflicts, as well as any measures taken in light of specific

conflicts identified. In addition, by giving proxy voting advice businesses the flexibility to satisfy the principle-based requirement with their existing methods of disclosure, we believe the costs of implementation should not be unduly burdensome.[234] Similarly, while the adoption of Rule 14a–2(b)(9)(i) will create an expanded compliance obligation, we do not believe it will have a detrimental effect on competition as the flexibility afforded under the final rule should allow new businesses to adapt the required disclosures to their specific business models and thus avoid imposing a significant new barrier to entry for the proxy voting advice business market.[235]

Contrary to the concerns expressed by some commenters about certain implications of the proposed amendments,[236] we note that Rule 14a– 2(b)(9)(i)(B) does not require proxy voting advice businesses to include detailed compliance manuals in their proxy advice [237] or duplicative disclosures in both their proxy voting advice and in the electronic medium used to deliver such advice regarding the businesses' policies and procedures describing how they identify and address conflicts.[238] Provided the disclosure is conveyed either in its proxy voting advice or in an electronic medium used to deliver the proxy voting advice (such as a client voting platform), such that its client is able to readily access the information as it reviews and considers the voting advice, a proxy voting advice business has the discretion under the rule to choose the solution it deems suitable for each particular client. This may include, for example, a proxy voting advice business providing an active hyperlink or ''click-through'' feature on its platform allowing clients to quickly refer from the voting advice to a more comprehensive description of the business's general policies and procedures governing conflicts of interest.[239]

More generally, we believe that increased transparency regarding a proxy voting advice business's conflicts of interest may prompt a more informed dialogue between such businesses and their clients. For example, as a result of the increased transparency of a proxy voting advice business's conflicts of interest, clients of the business, including investment advisers, would be in a better position to understand these conflicts and how they may affect the business's proxy voting advice and other services. If this information improves the ability of the proxy voting advice business's clients to identify the kinds of information and details that would be valuable to them in assessing the business's conflicts, this dialogue may also result in a proxy voting advice business enhancing its approach to disclosure of conflicts of interest in response. Such a dynamic regarding conflict disclosure among investors (those who ultimately bear the costs and benefits of voting), clients of proxy voting advice businesses, and proxy voting advice businesses, each of which have different incentives, may increase the benefits of the rule to the shareholder voting process more generally.

### C. Amendments to Rule 14a–2(b): Notice of Proxy Voting Advice and Response

The ability of investors to make informed decisions, on the basis of disclosure of material information, is a bedrock tenet on which the federal securities laws were founded. This principle informs not only our consideration of this rulemaking, but also, more broadly, the proxy rules we administer [240] and, as a more general matter, the Commission's interest in the continued vitality, fairness, and efficiency of our capital markets.[241] Given the importance of the shareholder proxy in today's markets,[242] it is imperative that proxy solicitations be conducted on a fair, honest, and informed basis. Consistent with these

---

[231] *See id.*

[232] Rule 14a–2(b)(9)(i). This approach also accords with the views of commenters who requested that the Commission permit the proxy voting advice businesses flexibility over the manner in which they convey their proxy advice to clients. *See, e.g.,* CII IV: (''[W]e would not object to the SEC permitting the proxy voting advice businesses flexibility in the vehicle used to disseminate the disclosures to clients if the Commission believes such flexibility is appropriate to limit the competitive or other concerns that could accompany the widespread distribution of the information.'').

[233] Subsection (B) of Rule 14a–2(b)(9)(i) was proposed as subsection (D), but has been re-designated in the final rule and is otherwise adopted as proposed.

[234] *See supra* note 197.

[235] *See supra* note 203 and accompanying text.

[236] *See, e.g.,* letters from CII (''We believe such a provision is overly broad and may in fact detract from the more important conflict information currently provided by proxy advisors.''); Glass Lewis. *See also* IAC Recommendation.

[237] *See, e.g.,* IAC Recommendation.

[238] *See, e.g.,* letter from Glass Lewis (expressing concern that ''including a 'discussion' of Glass Lewis' conflict policies and procedures twice with each conflict disclosure,'' once in the proxy voting advice report and again in the electronic medium used to deliver such advice, ''would be wasteful and potentially obscure the important information investors expect and would want to focus on'').

[239] Such hyperlinked description of the proxy voting advice business's general policies and procedures governing conflicts of interest could, for

example, be maintained on the business's publicly available website. *See id.* (''Glass Lewis has one set of policies and procedures that describes how it identifies and addresses conflicts, which it makes available on its website.'').

[240] *See, e.g., Regulation of Communications Among Shareholders,* Release No. 34–31326 (Oct. 16, 1992) [57 FR 48276 (Oct. 22, 1992)] (''Communications Among Shareholders Adopting Release''), at 48277 (''Underlying the adoption of section 14(a) of the Exchange Act was a Congressional concern that the solicitation of proxy voting authority be conducted on a fair, honest and informed basis. Therefore, Congress granted the Commission the broad 'power to control the conditions under which proxies may be solicited' . . . .'').

[241] *See supra* notes 2–5 and accompanying text.

[242] *Id.*

aims, and in light of the unique role played by proxy voting advice businesses in many investors' voting decisions,[243] it is important that clients of these businesses, when making their voting decisions, have access to transparent, accurate, and materially complete information. We believe proxy voting is improved by robust discussion among parties in advance of the voting decision, similar to the vigorous engagement that may occur if all parties attended an annual or special meeting in person.

As the Commission has noted, however, a number of commenters, particularly within the registrant community, have expressed concern about the current system for providing proxy voting advice under the Commission's rules, and the resulting effect on the mix of information available to shareholders, including the ability of shareholders to benefit from robust discussion. While proxy voting advice businesses can play an influential role in shareholders' proxy voting decisions, the present proxy rules exempt them from the requirement to publicly file their recommendations with the Commission, as registrants and certain other soliciting parties must do for their own solicitations. As a result, some commenters have expressed concern that registrants lack an adequate opportunity to engage with and respond to influential proxy voting advice before shareholders vote, potentially inhibiting the accuracy, transparency, and completeness of the information available to those making voting determinations.[244] They also highlight what they characterize as the limited ability to address any deficiencies in proxy voting advice such as factual errors, incompleteness, or methodological weaknesses that could materially affect the reliability of proxy voting advice businesses' voting recommendations and adversely impact voting outcomes.[245]

### 1. Proposed Amendments

With the foregoing background in mind, the Commission proposed review and response mechanisms for proxy voting advice, as discussed below, that would apply any time proxy voting advice businesses provide voting advice to their clients in reliance on either the Rule 14a–2(b)(1) or (b)(3) exemptions from the proxy rules. By conditioning the availability of these proposed exemptions in this way, the Commission intended to (1) facilitate

dialogue between proxy voting advice businesses and registrants (and certain other soliciting persons, such as dissident shareholders engaged in a proxy contest) before the dissemination of proxy voting advice to clients of the proxy voting advice business, when most shareholder votes have yet to be cast, and (2) provide a means for registrants and certain other soliciting persons to timely communicate their views about the advice to shareholders, thereby assuring that the proxy voting advice businesses' clients could consider this information along with any other data and analysis they use to make their voting decisions. More generally, these actions were intended to enhance transparency, accuracy, and completeness.

#### a. Review of Proxy Voting Advice by Registrants and Other Soliciting Persons

The Commission proposed new Rule 14a–2(b)(9)(ii) to require, as a condition to the exemptions in Rules 14a–2(b)(1) and (b)(3), that a proxy voting advice business provide registrants and certain other soliciting persons covered by its proxy voting advice a limited amount of time to review and provide feedback on the advice before it is disseminated to the business's clients, with the length of time provided depending on how far in advance of the shareholder meeting the registrant or other soliciting person has filed its definitive proxy statement.[246] This review and feedback period would be followed by a final notice of voting advice, which would include any revisions to such advice made by the proxy voting advice business as a result of the review and feedback period, thereby allowing the registrant and/or soliciting person time to determine whether to respond to the advice before it is delivered to clients of the proxy voting advice business.[247] By providing a standardized opportunity for registrants and certain other soliciting persons to review proxy voting advice before it is finalized and delivered to clients of proxy voting advice businesses, the Commission believed that these proposed amendments had the potential to greatly improve the overall mix of information available to the businesses' clients, who use proxy voting advice as an important, often

critical, element in formulating their voting decisions.[248]

To address concerns that allowing registrants or other soliciting persons advance access to the proxy voting advice could result in premature release of the advice to unauthorized and unintended parties, the proposed rules specified that proxy voting advice businesses could require that registrants and other soliciting persons agree to keep the information confidential, and refrain from commenting publicly on it, as a condition of receiving the proxy voting advice.[249]

#### b. Response to Proxy Voting Advice by Registrants and Other Soliciting Persons

In addition to the review and feedback mechanism, the Commission proposed that registrants and certain other soliciting persons also be given the option to request that proxy voting advice businesses include in their proxy voting advice (and on any electronic medium used to distribute the advice) a hyperlink or other analogous electronic medium directing the recipient of the advice to a written statement prepared by the registrant (or other soliciting person, as applicable) that sets forth its views on the advice.[250] As proposed, registrants and other eligible soliciting persons would be able to exercise this right by notifying the proxy voting advice business no later than the expiration of the minimum two-business day period corresponding to the final notice of voting advice.[251] If so requested, the proxy voting advice business would then be required to include in its proxy voting advice the relevant hyperlink or analogous electronic medium directing the client to the registrant's or other soliciting person's respective statement regarding the voting advice.[252]

In addition to the other proposed amendments to Rule 14a–2, proposed 17 CFR 240.14a–2(b)(9)(iii) ("Rule 14a–2(b)(9)(iii)") was intended to enable those who rely on proxy voting advice,

---

[243] *See* Proposing Release at 10.

[244] *See* Proposing Release at 41–2.

[245] *See* Proposing Release at 39, n. 94.

[246] *See* proposed Rule 14a–2(b)(9)(ii).

[247] *See* proposed Rule 14a–2(b)(9)(ii)(B). Under the proposed rules, this final notice would contain a copy of the proxy voting advice that the proxy voting advice business would deliver to its clients and be provided by the proxy voting advice business no later than two business days prior to delivery of the proxy voting advice to its client.

[248] *See* Proposing Release at 44.

[249] *See* Note 2 to paragraph (ii) of proposed Rule 14a–2(b)(9), providing that the terms of such agreement apply until the proxy voting advice business disseminates its proxy voting advice to one or more clients and could be no more restrictive than similar types of confidentiality agreements the proxy voting advice business uses with its clients.

[250] *See* proposed Rule 14a–2(b)(9)(iii). Consistent with the proposed review and feedback process, the proposed right to request inclusion of a statement would only have extended to registrants and certain other soliciting persons (*i.e.*, persons conducting non-exempt solicitations). *See id.* ("If requested by the registrant or any other person conducting a solicitation (other than a solicitation exempt under § 240.14a–2). . .").

[251] *Id.*

[252] *Id.*

whether for their own interests or on behalf of shareholders who have entrusted them with proxy voting authority, to have information available to them to effectively assess the recommendations provided by proxy voting advice businesses and thereby make more informed voting decisions.

2. Comments Received

a. Comments on Proposed Review of Proxy Voting Advice by Registrants and Other Soliciting Persons

A number of commenters supported the proposed amendments and asserted that the changes would improve the completeness, accuracy, and reliability of the information underlying the voting advice,[253] which in turn would facilitate more informed decision-making by investors and investment advisers.[254] Many of these commenters stated that a review and feedback mechanism was warranted to ameliorate the incidence of errors, mistakes, and deficiencies in voting advice that they believe exists.[255]

Several commenters also expressed the opinion that registrants and other soliciting persons had been disadvantaged under the existing system because very few were afforded the opportunity to review proxy voting advice in advance[256] or were given meaningful opportunities to engage with proxy voting advice businesses to remedy any perceived deficiencies they identified in voting advice.[257] Commenters supporting the proposal also stated that even when registrants do receive draft voting advice from proxy voting advice businesses in advance of its publication, they typically are not given sufficient time for a thorough review and response.[258]

In many cases, commenters who supported the opportunity for advance review provided by proposed Rule 14a–2(b)(9)(ii) disagreed with the suggestion of other commenters that the proposal would compromise the independence of proxy voting advice businesses, with some pointing to the fact that a number of registrants were already participating in advance review programs offered by proxy voting advice businesses.[259]

Several commenters that were in favor of the proposal offered suggested modifications intended to increase the rule's efficacy,[260] such as giving

registrants more time to review reports than was proposed;[261] explicitly including within the scope of the advanced review process proxy voting advice based on custom policies[262] and mandating that proxy voting advice businesses make certain public disclosures to enhance transparency (*e.g.,* publishing proxy voting advice following shareholder meetings).[263]

While many commenters supported the proposed review and feedback provisions, a substantial number of commenters were opposed.[264] Many

---

[253] *See, e.g.,* letters from BIO; BRT; CCMC; CEC; CGC; ExxonMobil; Mark R. Allen, Executive Vice President, FedEx Corporation (Feb. 3, 2020) ("FedEx"); GM; IBC; Nasdaq; SCG.

[254] *See, e.g.,* letters from BRT; CCMC; CEC ("The ability of issuers to review and provided feedback on both draft and final proxy reports prior to publication is an important step in preserving the integrity of the proxy voting process. . . ."); NIRI ("Overall, we believe the proposed rules . . . address and rectify significant issues that have hindered investment advisers in making informed determinations on investors' behalf."); ExxonMobil; Mylan; SCG; Bernard S. Sharfman, Chairman, Advisory Council, Main Street Investors Coalition (Dec. 20, 2019) ("B. Sharfman I") (asserting that the proposed review process "should be a good thing for shareholders because the back and forth between the company and the proxy advisor . . . should make each party better informed, allowing them to make sure that factual errors and inadequate analytics are not tainting their respective voting recommendations.").

[255] *See, e.g.,* letters from ACCF (referring to its 2018 paper exploring the analytical and methodological errors in proxy advisors' recommendations: *Are Proxy Advisors Really a Problem?*); ACCF II (referring to its 2020 paper, *Are Proxy Advisors Still a Problem?*); BIO; BRT ("Business Roundtable has long been concerned that proxy advisors produce reports that frequently include errors, factually inaccurate information and incomplete analysis."); CCMC (citing "frequent and significant errors in analysis and methodology" and a "high incidence of factual and analytical errors in proxy advisor reports."); CEC; CGC ("[The proposal to allow review of proxy voting advice] would help address one of the biggest flaws of the current proxy advice system, which is the tendency of proxy advisory firms to make egregious errors in vote recommendations"); ExxonMobil; Garmin; NAM (asserting that "Proxy firm reports and recommendations feature a profusion of errors and misleading statements"); Nareit; Nasdaq ("Factual errors have . . . been identified by 95% of Business Roundtable members and 'all raise concerns regarding the rigor and integrity of the proxy advisory firms' internal fact-collection and analysis processes' . . . The ability to identify and correct errors is crucial for accuracy and accountability."); NIRI; SCG.

[256] *See, e.g.,* letters from CGC; CEC ("[T]he lack of any reasonable access by all issuers—not just the largest issuers—to draft and final proxy reports and the inability of those issuers to adequately review both reports before publication is highly problematic . . . . Providing all companies with the ability to review the draft proxy report is an important step to ensuring the integrity of the data within the proxy report."); Richard R. Dykhouse, Executive Vice President, General Counsel & Corporate Secretary, Charter Communications, Inc. (Feb. 3, 2020) ("Charter"); Penny Somer-Greif, Chair, and Gregory T. Lawrence, Vice-Chair, Committee on Securities Law, Maryland Bar Association (Feb. 3, 2020) ("MSBA"); Nareit; Nasdaq (describing current opportunities available to registrants for review of draft proxy voting advice as "an uneven playing field"); NIRI.

[257] *See, e.g.,* letters from ACCF; BRT; CCMC; CEC; GM, Mylan; NAM; Nareit; Nasdaq, NIRI; SCG.

[258] *See, e.g.,* letter from BRT (noting the limited window that ISS allows for comment on draft reports that it provides to S&P 500 companies); CCMC; CEC; CGC; Charter; GM; NAM; Nasdaq; NIRI; SCG ("ISS provides its reports to S&P 500 companies in advance and takes comment on any factual errors in a 48-hour timeframe, although companies are sometimes given less response time."). In support of their views on needed improvements to proxy voting advice, several commenters cited the results of various surveys. *See, e.g.,* letters from ACCF; BRT; CCMC; Nareit; Nasdaq; SCG. *But see, e.g.,* letters from CII IV; Elliott I; Glass Lewis II; SWIB (questioning the rigor, and therefore the usefulness, of such surveys).

[259] *See, e.g.,* letters from SCG ("It is difficult to understand how, if ISS' voluntary review and comment processes do not currently compromise the independence of their advice the Proposed Rule's review and comment period for all public companies would do so."); BIO; ExxonMobil.

[260] *See, e.g.,* letters from ExxonMobil; GM; MSBA; Nasdaq; SCC I.

[261] *See, e.g.,* letters from BIO; BRT; Nasdaq.

[262] *See, e.g.,* letter from BRT ("The majority of our member companies surveyed indicated that voting advice formulated under a clients' custom policies should be subject to the proposed review and feedback period. Member companies noted that the same need to correct factual inaccuracies exists with these reports. . . ."). *But see, e.g.,* letters from CII IV; Heidi W. Hardin, Executive Vice President and General Counsel, MFS Investment Management (Feb. 3, 2020) ("MFS Investment") (stating that advice based on custom policies should be excluded from the review framework as any research provided by proxy voting advice businesses under the MFS internal proxy voting is "proprietary and commensurate with [MFS'] overall investment approach"); PIAC II.

[263] *See, e.g.,* letters from BRT (suggesting a requirement that proxy voting advice businesses issue final reports tallying final voting figures and comparing the results to the businesses' voting recommendations to clients); SCC I (asserting that publication would facilitate and encourage more public discussions about corporate governance standards and permit more informed feedback about the analyses and conclusions in company reports prepared by proxy voting advice businesses).

[264] *See, e.g.,* letters from 62 Professors; AFL–CIO II; Sharon Fay, Co-Head Equities, and Linda Giuliano, Head of Responsible Investment, AllianceBernstein (Feb. 3, 2020) ("AllianceBernstein"); Chelsea J. Linsley, Staff Attorney, and Danielle Fugere, President & Chief Counsel, As You Sow (Feb. 3, 2020) ("As You Sow II"); Baillie Gifford; Dennis M. Kelleher, President & CEO, et al., Better Markets, Inc. (Feb.3, 2020) ("Better Markets"), David Sneyd, Vice President, Analyst, Responsible Investment, BMO Global Asset Management (Jan. 31, 2020) ("BMO"); Lauren Compere, Managing Director, Boston Common Asset Management (Feb. 3, 2020) ("Boston Common") (asserting that the proposal would "allow corporations to intercept recommendations critical of the corporation or its management[, undermining] the checks and balances necessary for functioning markets"); Amy D. Augustine, Director of ESG Investing, and Timothy H. Smith, Director of ESG Shareowner Engagement, Boston Trust Walden (Nov. 20, 2019) ("Boston Trust"); Bricklayers; CalPERS ("While the release suggests that the Proposed Rule is necessary to protect investors from potentially incomplete or conflicted advice, the reality is that there has been no investor demand for the Proposed Rule."); CalSTRS; CFA Institute I; CII IV; CIRCA (characterizing the proposed review and feedback process as "an unprecedented intrusion into proxy voting"); Kevin E. McManus, Director of Proxy Services, Egan-Jones Proxy Services (Feb. 3, 2020) ("Egan-Jones"); Glass Lewis II; ICI; ISS; Cynthia M. Ruiz, Board President, Los Angeles City Employees' Retirement System (LACERS) (Feb. 18, 2020) ("LACERS"); MFS Investment; Scott M. Stringer, New York City Comptroller (Nov. 20, 2019) ("NYC Comptroller");
Continued

such commenters argued that there was an absence of compelling evidence of frequent errors or significant deficiencies in proxy voting advice to warrant such a requirement.[265] Moreover, commenters emphasized that the clients of proxy voting advice businesses generally have been satisfied with the quality of the advice they receive.[266] In support of this view, commenters pointed to the absence of complaints from clients of proxy voting advice businesses, as distinguished from the large volume of complaints from registrants and their advocates.[267]

Commenters opposing the proposal also expressed their concern that

requiring advance review of proxy voting advice by registrants would confer an unfair advantage to company management in disputed proxy matters[268] and would compromise the ability of proxy voting advice businesses to provide disinterested, independent advice.[269] Several such commenters stated that giving registrants the priority to review voting advice before the clients of proxy voting advice businesses was incompatible with the Commission's own published views,[270] as well as the principle behind FINRA Rule 2241, which governs conflicts of interest in connection with the publication of equity research reports and public appearances by research analysts.[271]

Some commenters were also concerned that the right of advance review would increase the risk of insider trading of material, non-public information[272] and, more generally, expressed doubts about the effectiveness of the proposal's framework for safeguarding the confidentiality of materials provided by proxy voting advice businesses to registrants.[273]

Along these lines, some commenters asked for clarification about how the proposed confidentiality provision would work in practice,[274] and others suggested ways the provision and its implementation could be improved, including by reconsidering the duration of confidentiality and setting specific standardized terms.[275]

A substantial number of commenters opposed the proposed review and feedback process on the grounds that it would significantly impede the ability of proxy voting advice businesses to deliver timely and high quality advice to their clients[276] and, as a consequence, would weaken the ability of their clients to thoughtfully consider the advice and make informed decisions.[277] Many such commenters were doubtful that the proposed rules governing the advance review and feedback of proxy advice was a viable framework[278] and expressed concern

---

New York Comptroller II; Ohio Public Retirement; Richard Stensrud, Executive Director, School Employees Retirement System of Ohio (Jan. 30, 2020) ("Ohio School Retirement"); Olshan Shareholder Activism Group (Feb. 3, 2020) ("Olshan LLP"); PIAC II; PRI II; Seven Corners; Segal Marco II; Amy M. O'Brien, Senior Managing Director, Head of Responsible Investing, and Yves P. Denize, Senior Managing Director, Division General Counsel, Teachers Insurance and Annuity Association of America (TIAA) (Feb. 3, 2020) ("TIAA"); William J. Stromberg, President and CEO, T. Rowe Price (Jan. 29, 2020) ("TRP"); Third Point LLC (Feb. 3, 2020) ("Third Point LLC"); Jonas D. Kron, Senior Vice President, Trillium Asset Management, LLC (Feb. 3, 2020) ("Trillium"); ValueEdge I. See also IAC Recommendation.

[265] See, e.g., letters from AFL–CIO II ("The Commission has not made any showing of factual errors or methodological weaknesses in proxy voting advice [that] need correction by companies before it is distributed to clients."); AllianceBernstein; As You Sow II ("The Commission has failed to evidence any problem with the current state of affairs. . ."); Better Markets; BMO; Bricklayers; CalPERS; CalSTRS; CFA Institute I; CII IV ("[T]he paucity of evidence of pervasive factual errors by proxy advisors suggests that, in fact, no regulatory intervention is necessary or justified."); CIRCA; Glass Lewis II; Michael W. Frerichs, Illinois State Treasurer (Jan. 16, 2020) ("Illinois Treasurer"); ISS; NYC Comptroller; New York Comptroller II; Ohio Public Retirement; PERA; PRI II; Jeffrey S. Davis, Executive Director, and Jason Malinowski, Chief Investment Officer, Seattle City Employees' Retirement System (SCERS) (Jan. 31, 2020) ("Seattle Retirement System"); Segal Marco II; TIAA; Trillium; TRP; Third Point LLC; ValueEdge I. One commenter also noted that at the Commission's 2018 Roundtable on the Proxy Process, "not one single participant . . . saw a need to impose additional regulation on proxy advisers . . . ." See letter from ISS. See also IAC Recommendation.

[266] See, e.g., letters from Better Markets ("There is little evidence to support [the] claim [that the proposed changes are for the benefit of investors] . . . . To the contrary, institutional investors who manage trillions of dollars of Americans' savings and retirement funds are urging the SEC not to proceed with the misguided policies set forth in the Release."); CalPERS ("It is worth noting that no institutional investors have suggested that [mandatory review periods for registrants] would enhance the quality, quantity, or timeliness of advice.").

[267] See, e.g., letters from CalPERS ("[T]he reality is that there has been no investor demand for the Proposed Rule. The push for reforms in this area is not from investors who are obtaining the advice . . . but instead is from the companies that are subjects of the advice sought." . . . Existing clients have few complaints about the quality of proxy voting advice . . . ."); ValueEdge I.

[268] See, e.g., letters from Olshan LLP; PRI II (asserting that the proposal "biases advice towards favoring managers, reducing the accuracy and independence of proxy voting advice," because it imposes costs only on recommendations that management opposes); SES (expressing concern regarding the possibility that the right of advance review creates information asymmetries favoring registrants).

[269] See, e.g., letters from AFL–CIO II; AllianceBernstein; Baillie Gifford; CalPERS; CFA Institute I.; CII IV (" [W]e believe the proposed requirement will be reasonably perceived as impairing the independence of the proxy advisor research, particularly since the proxy advisor is required to seek review and receive feedback from self-interested companies before sharing the draft report with their own paying client . . . ."); MFS Investment; New York Comptroller I; Ohio Public Retirement; PRI II; TRP.

[270] See, e.g., letters from CII IV; ISS, New York Comptroller II; Sanford Lewis, Director, Shareholder Rights Group (Feb. 3, 2020) ("Shareholder Rights II"), referring to Communications Among Shareholders Adopting Release at 48279. In that release, the Commission stated: "A regulatory scheme that inserted the Commission staff and corporate management into every exchange and conversation among shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment, particularly where no proxy authority is being solicited by such persons. This is especially true where such intrusion is not necessary to achieve the goals of the federal securities laws." [48279]

[271] See, e.g., letters from AFL–CIO II; As You Sow II; BMO; Boston Trust, CII IV; NYC Comptroller; New York Comptroller II; PIAC II; TRP.

[272] See, e.g., letters from CII IV; ISS.

[273] For example, some commenters thought the confidentiality provision in Note 1 to proposed Rule 14a–2(b)(9)(ii) would be unwieldy and exacerbate delays. See, e.g., letters from Baillie Gifford; CalPERS; CCMC; Glass Lewis II; ISS; Olshan LLP (stating that the proposals significantly

[274] See, e.g., letter from Baillie Gifford.

[275] See, e.g., letters from CII IV (suggesting that more consideration be given to the duration of confidentiality over proxy voting advice businesses' proxy advice and the businesses' permitted recourse when the terms of confidentiality are violated); Nasdaq (asserting that "standardizing and streamlining this process would reduce legal costs and time spent negotiating each confidentiality agreement and help ensure that such agreements contain standardized restrictions and disclaimers").

[276] See, e.g., letters from AFL–CIO II; As You Sow II; Baillie Gifford; BMO; Boston Trust; CalPERS; CII IV; Elliott I; NYC Comptroller (stating its view that under the proposed review and feedback framework proxy voting advice businesses "will have less time to collect, verify, analyze and present data and provide their research reports to clients well in advance of the annual meeting"); New York Comptroller II; PIAC II; TIAA; TRP (asserting that the time periods allotted for the review and feedback process "have the very real potential to diminish the time needed for registered investment advisers to fulfill essential fiduciary obligations related to proxy voting").

[277] See, e.g., letters from As You Sow II; BMO; Bricklayers; CalPERS; CII IV; PERA; TRP.

[278] See, e.g., letters from CIRCA; Paul Schott Stevens, President and CEO, Investment Company Institute (Feb. 3, 2020) ("ICI") (stating that the proposed framework "would affect substantially and adversely the timeliness and cost of proxy

underestimate the time and expense of negotiating confidentiality agreements and providing detailed reasons as to why the proposals would be so time consuming and costly); SES (asserting that needing to sign individual confidentiality agreements between every registrant and proxy voting advice business would be cumbersome "without any tangible benefit"). See also letter from ExxonMobil (advocating in favor of a "simple and straightforward confidentiality notice with a consent" and against a "complex or signed contractual agreement [which] could undermine the review process or registrants' other legal rights"). Other commenters were critical of the proposed stipulation that any confidentiality agreements could be "no more restrictive than similar types of confidentiality agreements" the proxy voting advice business uses with its clients." These commenters asserted that it was not feasible to use client agreements as a model for the terms of confidentiality with registrants. See, e.g., letters from Glass Lewis II; ISS.

that it would create numerous logistical and practical challenges that would be highly disruptive to the proxy voting system.[279] Commenters also noted the likelihood of significant costs associated with the proposal that would be incurred by proxy voting advice businesses, which many asserted would ultimately be borne by the businesses' clients.[280]

In addition to addressing practical challenges of the review and feedback process, commenters identified a number of potential unintended consequences that might result,[281] including diminished competition among proxy voting advice businesses,[282] limitation of market choice for consumers of proxy voting advice,[283] reduction in shareholder

voting,[284] and a decline in the utility of proxy voting advice,[285] which some commenters warned might be watered down to lessen the risk of litigation [286] and would be influenced by the self-interested views of registrants before the advice was seen by clients.[287] Some commenters also raised the possibility that the proposal was unconstitutional because it violated the right of free speech under the First Amendment [288]

and the takings clause of the Fifth Amendment.[289]

Many of the commenters who generally opposed the proposals also offered suggested modifications to the extent that the Commission elected to proceed to adoption of final rules.[290] This included shorter mandatory review periods provided to registrants,[291] limiting advance review to the factual information included in proxy voting advice,[292] allowing issuers to opt-in to the review and feedback procedures,[293] adjusting the timeline contemplated by the rule to require that proxy statements be filed a certain number of days in advance of the meeting in advance of what was proposed,[294] concurrent review by registrants and clients rather than advance review by registrants,[295] and other changes designed to make the review and feedback process more cost-effective and efficient.[296] In addition, several commenters asked for more clarification with regard to certain interpretive issues, including a more

---

advisory firms' advice, and thus its overall value to funds and their shareholders''); Interfaith Center II; TRP (stating, among other criticisms, that the review and feedback process would be logistically impracticable and ''unworkable within the current time constraints of the intensely seasonal proxy voting cycle'').

[279] This included the impracticability of applying the rules in the context of proxy contests or M&A transactions. *See, e.g.,* letters from CII IV; Olshan LLP (providing detailed reasons why the proposals would be challenging in proxy contests).

[280] *See, e.g.,* letters from 62 Professors; AFL–CIO II, Baillie Gifford; BMO; Bricklayers; CalPERS; CFA Institute I; CII IV; Egan-Jones; ICI; MFS Investment; NYC Comptroller; New York Comptroller II; Ohio Public Retirement; Ohio School Retirement; Olshan LLP; Segal Marco II; TIAA; Mark D. Epley, Executive Vice-President & Managing Director, General Counsel, Managed Funds Association, and Jiří Król, Deputy CEO, Global Head of Government Affairs, Alternative Investment (Feb. 3, 2020) (''MFA & AIMA'').

[281] *See, e.g.,* letters from 62 Professors; AFL–CIO II, Fran Seegull (Feb. 2, 2020) (''Alliance''), As You Sow II, BMO, Bricklayers; CalPERS, CFA Institute I; CII IV; Shawn T. Wooden, Connecticut State Treasurer (Jan. 31, 2020) (''CT Treasurer''); Egan-Jones; Elliott I; Diandra Soobiah, Head of Responsible Investment, NEST—National Employment Savings Trust (Jan. 27, 2020) (''Employment Savings''); Hermes; ISS; LA Retirement; MFA & AIMA; New York Comptroller II; TIAA.

[282] *See, e.g.,* letters from 62 Professors; Baillie Gifford (''It seems likely that the proposed amendments would be perceived as onerous and deter new entrants to the proxy advisory industry''); AFL–CIO II (''The additional burdens created by the proposed regulations and increase in market concentration if smaller proxy voting providers cannot stay in the business will significantly increase costs for investors. By limiting competition and creating barriers to entry, the Commission's proposed rulemaking is likely to result in an even greater reliance by investors on Institutional Shareholder Services and Glass Lewis''); BMO; Bricklayers; CalPERS, CII IV (arguing that mandatory ''pre-review'' requirements will be prohibitively costly for proxy voting advice businesses and therefore ''likely to preclude new entrants, eliminate one or more incumbents, and potentially lead any survivor to follow a business model that includes providing consulting services to issuers, compounding concerns on influencing of proxy advisor reports''); Prof. Sergakis; TIAA.

[283] *See, e.g.,* letters from CII IV (noting that some of its members switched from ISS to Glass Lewis because they believed ISS's practice of providing

some companies the right to pre-view reports compromised the independence of the ISS analysis); Elliott I.

[284] *See, e.g.,* letters from Alliance, As You Sow II (''The Proposed Rule may increase the liability of proxy advisory services, or the perception of legal liability, causing proxy advisors to decline to issue recommendations where issuers challenge findings, thereby limiting the number of shareholders willing or able to conduct their own research sufficient to vote for a shareholder proposal''); BMO; CII IV.

[285] *See, e.g.,* letters from Bricklayers (stating that the additional burdens imposed by the proposal ''would almost certainly lead to . . . shrinking the overall market for proxy advisory services . . . , the Proposed Amendments thus would burden competition without serving the Exchange Act's purposes''); CalPERS; CII IV; ICI; New York Comptroller II; MFA & AIMA.

[286] *See, e.g.,* letters from BMO (discussing its concern that the proposal would ''significantly increas[e] the regulatory burden on proxy advisers through increasing litigation risk); CalPERS (''We recognize that the proxy advisors are not required to revise advice, but a heavy hammer is placed over their heads by the added emphasis on Rule 14a–9 liability . . . Although the Release states there is no new private right of action created by the new Rule 14a–2(b)(9), the process and greater focus on Rule 14a–9 will make it more likely that proxy voting advice businesses will be sued under the new rules.''); CFA Institute I (noting the possible consequence that commentary from analysts, who might be encouraged to self-censor, would be ''less forthright''); Ohio Public Retirement (questioning whether Rule 14a–9 liability might be used ''to threaten or pressure proxy advisory firms to incorporate issuer feedback or accept revisions to their voting advice''); NYC Comptroller; PRI II.

[287] *See, e.g.,* letters from Baillie Gifford (''In relation to the influence of registrants, allowing registrants to also comment on analysis and dispute methodology and opinion, in conjunction with the proposed anti-fraud amendments, could render proxy advisors vulnerable to litigation if those matters are not incorporated into the advice. This is clearly inappropriate as these matters are necessarily subjective. This could result in the watering down of advice to avoid potential actions, rendering the advice too bland to be of use.''); Bricklayers (''Another potential negative impact of the Proposed Amendments would be to advantage the viewpoints of corporate management.'').

[288] *See, e.g.,* letters from CFA Institute I; CII IV (noting the ''potential implications of the First Amendment on the independence of the research reports of proxy advisors if subject to required company review and feedback''); CIRCA (arguing that establishing a mandatory registrant review process of proxy voting advice would constitute an unconstitutional restraint on the speech of proxy advisory firms''); Elliot; Glass Lewis II; ISS; Interfaith Center II; New York Comptroller II; Mari C. Schwartzer, Director of Shareholder Activism and Engagement, NorthStar Asset Management, Inc. (Feb. 3, 2020) (''NorthStar''); Shareholder Rights II; Nell Minow, Vice Chair, ValueEdge Advisors (Mar. 10, 2020) (''ValueEdge III''); Washington State Investment. We discuss our response to certain Constitutional objections to the proposed amendments in Section II.C.3.d. *infra.*

[289] *See, e.g.,* letters from CalPERS (''Enabling a non-client to review the work product before actual clients . . . arguably violates the Constitution by taking private property for public use without compensation''); ISS. We discuss our response to certain Constitutional objections to the proposed amendments in Section II.C.3.d. *infra.*

[290] *See, e.g.,* letters from AFL–CIO II; AllianceBernstein; Baillie Gifford; BMO; CII IV; CIRCA; Elliott I; Glass Lewis II; ICI; Illinois Treasurer; Interfaith Center II; MFS Investment; Ohio Public Retirement; Olshan LLP; PIAC II; Seven Corners; TIAA. *See also* IAC Recommendation.

[291] *See, e.g.,* letters from IAA; PIRC.

[292] *See, e.g.,* letters from Baillie Gifford; BMO; CII IV; CIRCA; Elliott I; ICI; ISS; MFA & AIMA; Ohio Public Retirement. *See also* IAC Recommendation.

[293] *See, e.g.,* letter from Glass Lewis II (asserting that this would enable proxy voting advice businesses to collect important information before the process begins, potentially reducing some of the burden on the proxy voting advice businesses).

[294] *See, e.g.,* letters from CII IV (suggesting a timeline requiring registrants to file 50 or more days prior to the annual meeting; ICI; Interfaith Center II; ISS; Christopher Gerold, President, North American Securities Administrators Association (NASAA) (Feb. 3, 2020) (''NASAA''); TIAA.

[295] *See, e.g.,* letters from AllianceBernstein; Kevin A. Beaugez (June 3, 2020) (''K. Beaugez''); BMO; James Allen, Head, and Matt Orsagh, Director, Capital Markets Policy, CFA Institute (May 13, 2020) (''CFA Institute II''); CII IV; CIRCA; ICI; MFS Investment; SES (stating that its business model is to provide its voting advice report to clients and companies simultaneously 15 days prior to the meeting, and then provide an addendum should any corrections, changes, etc. be required). *See also* IAC Recommendation. *But see* letter from Niels Holch, Executive Director, Shareholder Communications Coalition (May 1, 2020) (''SCC II'') (''The Coalition strongly opposes the concurrent review recommendation.'').

[296] *See, e.g.,* letters from IAA (recommending that the proposed review and feedback process be replaced with a single review of the facts); ICI (recommending that proxy voting advice businesses be permitted to provide a draft of their reports to registrants and other soliciting persons for comment while simultaneously publishing it for public review).

precise understanding of which persons would be subject to the rule.[297]

As an alternative to the proposed framework for review and feedback, which they viewed as too rigid and prescriptive, some commenters urged the Commission to consider a more flexible, principles-based, and less intrusive solution.[298] One commenter noted that many of the practical concerns it expressed in its letter regarding the proposed review and feedback mechanism "could be addressed by moving to a principles-based rule and using Commission or Staff guidance to ensure that the mechanisms are being administered in a fair and efficient manner." [299] Several commenters also pointed out that there already were existing mechanisms in place sufficient to address the concerns raised in the Proposing Release, including existing proxy voting advice business programs and policies for registrants to provide feedback,[300] antifraud liability under Rule 14a–9,[301] and "counter-speech" measures for registrants (such as filing additional proxy soliciting materials).[302]

b. Comments on Proposed Response to Proxy Voting Advice by Registrants and Other Soliciting Persons

A number of commenters supported the proposal as a means to improve the overall mix of information available to investors.[303] Commenters argued that registrants do not have a timely and effective method for conveying their views and assessments about proxy voting advice to clients of proxy voting advice businesses before many clients vote in reliance on such advice.[304]

Other commenters, however, opposed the proposal.[305] A number of these commenters raised concerns about costs

their views via proxy statements and other communications from management that are easily accessible should they be needed. Giving companies the opportunity for additional participation in the recommendations of proxy advisors would detract from, rather than contribute to, the objectivity of those recommendations."); Segal Marco II; Seven Corners; Shareholder Rights II. *See also* IAC Recommendation.

[303] *See, e.g.,* letters from Baillie Gifford; BIO; Michele Nellenbach, Director of Strategic Initiatives, Bipartisan Policy Center (Feb. 3, 2020) ("BPC") (stating that the hyperlink is a cost-effective way to provide current information to investors), BRT; CEC ("The Commission's proposed changes ensure investors will have a full picture of the information from which they can then make an informed, proposal-specific voting decision."); CCMC; CEC; CGC; ExxonMobil ("Timely access to both of these viewpoints [in the proxy voting advice and the registrant's response to the advice] each proxy season is critical for investors to make informed decisions at minimal cost."); FedEx; GM; NAM; Nareit; Nasdaq (noting its belief that the hyperlink would improve the accuracy of proxy voting advice and the overall mix of information available to investors, especially given the lack of a requirement in the proposed rules that proxy voting advice businesses revise their recommendations based on registrant feedback); NIRI ("Shareholders will be better informed as a result of the inclusion of [the registrant's] response. Doing so will result in greater transparency in the proxy voting advice process, allowing investors to see both sides of the issue . . ."); SCG (asserting that "factual errors have frequently been found after the voting recommendation has been disseminated" and that "the impact of additional proxy materials can be limited"); TechNet.

[304] *See, e.g.,* letters from BRT; CEC ("The problems facing issuers and the wider market occur due to the extreme difficulty in engaging with proxy advisory firms during the proxy season and the immediate and near irrecoverable impact the issuance of the proxy report has on voting results"); Charter; ExxonMobil ("Timely access to both of these viewpoints each proxy season is critical for investors to make informed decisions at minimal cost. Our experience is that supplemental proxy materials filed with the SEC after the release of the proxy advisors' reports, which are intended to supplement such reports, are ineffective.").

[305] *See, e.g.,* letters from AFL–CIO II; CII IV; Elliott I; Glass Lewis II; ISS; Lars Dijkstra, Chief Investment Officer, and Eszter Vitorino, Senior Responsible Investment Advisor, Kempen Capital Management (Jan. 6, 2020) ("Kempen") (asserting that such requirement would be duplicative of the information already filed in company proxy statements and meeting notices, adding burden without additional value); New York Comptroller II; Ohio Public Retirement; PERA; PRI II; Public Retirement Systems; ValueEdge III.

and delays in the timely receipt of advice that they asserted would result from the proposal.[306] Many commenters asserted the proposal is unnecessary given the ability of registrants to conduct investor outreach and file supplemental proxy materials to address any concerns with the voting advice.[307] Some commenters also objected on the grounds that the proposed amendment was unconstitutional under the First Amendment.[308]

Supporters and opponents of the proposal provided a variety of suggested modifications to proposed Rule 14a–2(b)(9)(iii).[309] For example, some supporters recommended allowing registrants more time than the proposed two business days in which to provide their statement of response.[310] Others were in favor of requiring proxy voting advice businesses to include the full written statement of registrants in the proxy advice, rather than just a hyperlink.[311] Other commenters requested that the Commission clarify certain points, such as whether a proxy voting advice business would be subject to Rule 14a–9 liability for omissions of a registrant's response,[312] and whether it would be a violation of an investment adviser's fiduciary duty if it chose not to review a registrant's hyperlinked response.[313] Because of concerns that clients may not take the time to review registrants' hyperlinked statements, commenters also recommended that the Commission require proxy voting advice businesses to disable pre-populated voting mechanisms or the automatic

---

[297] *See, e.g.,* letters from AFL–CIO II; CII IV; Glass Lewis II; ISS.

[298] *See, e.g.,* letters from Baillie Gifford; Canadian Gov. Coal; CII IV; Glass Lewis II; ISS; Prof. Sergakis (describing the treatment of proxy voting advice businesses under the proposal as too "formalistic" and stringent" by comparison to the regulation of such businesses in different parts of the world and recommending a more flexible, principles-based system).

[299] Glass Lewis II ("For example, the exemptive condition could be as concise as a requirement that proxy advisors 'maintain policies and procedures that provide registrants (and certain other soliciting persons) a meaningful opportunity to comment on proxy advice and final notice of any proxy advice,' with Staff or Commission guidance filling in the timing and other elements.").

[300] *See, e.g.,* letters from Better Markets ("Both Glass Lewis and ISS already have systems in place to allow companies to correct factual errors in their reports and recommendations 'and respond to some aspect of their proxy voting advice' before they are sent to their clients."); BMO; CII IV; Glass Lewis II; Ohio Public Retirement; Segal Marco II.

[301] *See, e.g.,* letters from Better Markets; As You Sow II; Better Markets; Elliott I; ISS; Glass Lewis II; CalPERS; CII IV; New York Comptroller II; Segal Marco II; Seven Corners; Shareholder Rights II. *See also* IAC Recommendation.

[302] *See, e.g.,* letters from AllianceBernstein; As You Sow II ("Companies have the ability to make arguments in a variety of ways including in their proxies, by calling investor meetings, or sending out information to shareholders, among others. There is no reason to afford issuers yet another avenue to provide their views, especially when it is likely to dramatically interfere with what is already a time-constrained and difficult process for proxy advisory firms and shareholders"); Better Markets; CalPERS; CFA Institute I (noting that "registrants already have many opportunities to communicate with investors," including the registrant's own proxy materials and "the full array of social media avenues to reiterate and confirm their positions . . ."); CII IV; Elliott I; Glass Lewis II; SS; New York Comptroller II; PIAC II ("Issuers already provide

[306] *See, e.g.,* letter from CII IV (arguing that the proposed requirement would delay the timely receipt of proxy voting advice because proxy voting advice businesses will need to coordinate timing of the filing of supplementary proxy materials with registrants and that it would increase the businesses' direct costs (*e.g.,* costs to include a hyperlink in reports), which would likely be passed on to clients and their beneficiaries).

[307] *See, e.g.,* letters from Glass Lewis II; Public Retirement Systems.

[308] *See, e.g.,* letters from AFL–CIO II; CII IV; CIRCA; Elliott I; Glass Lewis II (characterizing the proposed requirement for a proxy voting advice business to publish a registrant's response to proxy voting advice in the form of a hyperlink as compelled speech and citing to legal precedent for the proposition that compelling a party to publish or otherwise provide access to speech with which the party may disagree violates the First Amendment); ISS ("Supreme Court precedent is clear that the government may not 'co-opt' a person's speech 'to deliver [a] message' from someone else."); New York Comptroller II. We discuss our response to certain Constitutional objections to the proposed amendments in Section II.C.3.d. *infra.*

[309] *See, e.g.,* letters from BIO; ExxonMobil; Nasdaq; CII IV; CFA Institute II; Hermes; ISS.

[310] *See, e.g.,* letter from BIO.

[311] *See, e.g.,* letters from BIO; NAM.

[312] *See* letters from BRT; ExxonMobil.

[313] *See* letter from Nasdaq.

submission of votes in instances where companies respond to a proxy voting advice business's adverse voting recommendation, along the lines of the alternative described in the Proposal.[314]

Some commenters who objected to the proposal nevertheless recommended changes should the Commission adopt a response mechanism. Several such commenters encouraged the Commission to codify the view that a proxy voting advice business will not be held liable for the content of a registrant's response, whether provided as a hyperlink or included in the proxy statement in its entirety.[315] Additional suggestions included setting reasonable guidelines and limitations on the content of a registrant's response,[316] requiring that registrants provide their hyperlink to the proxy voting advice business before the end of the review period (not just request that it be included) to ensure that the hyperlink is provided in a timely manner,[317] requiring that the hyperlink be active when provided,[318] and permitting proxy voting advice businesses to require registrants to indemnify them for any loss or claim arising out of the hyperlinked content, its transmission, or use.[319]

### 3. Final Amendments

#### a. Overview

Based on commenter feedback, we are adopting amendments to Rule 14a–2(b) that we believe achieve the important objectives of the proposal but are modified in a number of respects to do so in a less prescriptive, more principles-based manner. We recognize the practical challenges faced by market participants—investors, registrants, investment advisers, proxy voting advice businesses, and others—to participate in, and fulfill their respective obligations in respect of, the proxy process. To varying extents, market participants must convey, assimilate, and give thoughtful consideration to relevant information

from various parties on a potentially wide range of topics in what is generally viewed as a short time frame. In light of this, we believe a more principles-based approach is appropriate.

As reflected in the large number of public comments received, there is a wide range of opinions and competing views about the most effective way to ensure that market participants, including users of proxy voting advice, have access to adequate information when making their voting decisions. Although some commenters argued that there was insufficient evidence of inaccuracies or other problems with proxy voting advice to justify regulation, and asserted that clients of proxy voting advice businesses are satisfied with the quality of the advice they receive, the proposed amendments were not motivated solely by the Commission's interest in the factual accuracy of proxy voting advice. As we explained in the Proposing Release, even where proxy voting advice is not adverse to the registrant's recommendation or where there are no errors in the advice, facilitating investor access to enhanced discussion of proxy voting matters contributes to more informed proxy voting decisions.[320] Indeed, the principle that more complete and robust information and discussion leads to more informed investor decision-making, and therefore results in choices more closely aligned with investors' interests, has shaped our federal securities laws since their inception and is a principal factor in the Commission's adoption of these amendments. Regardless of the incidence of errors in proxy voting advice, we believe it is appropriate to adopt reasonable measures designed to promote the reliability and completeness of information available to investors and those acting on their behalf at the time they make voting determinations. In particular, we reiterate the far-reaching implications that proxy voting advice can have in the market [321] and accordingly continue to believe that measured changes designed to facilitate more complete and robust dialogue and information sharing among proxy voting advice businesses, their clients, and registrants would improve the proxy voting system, and ultimately lead to more informed decision-making, to the benefit of all participants, including shareholders that do not use proxy voting advice and yet may be affected by the recommendations of proxy voting advice businesses. We also believe that such measured changes, while not an

exact substitution, would more closely approximate the discussion that could occur at a meeting with physical attendance and participation by shareholders and other parties. We therefore believe that ensuring that registrants have timely notice of proxy voting advice and that proxy voting advice businesses provide clients with a mechanism by which they can reasonably be expected to become aware of any written response by registrants to that advice—in a timely manner—will increase confidence across participants in the proxy system that clients of proxy voting advice businesses, whether those clients are investors or are acting on behalf of investors, have timely access to transparent, accurate, and complete information material to their voting decisions.

The Commission is aware of the risk that introducing new rules into a complex system like proxy voting, which has evolved over many years in response to changes in the marketplace as well as the interests and needs of market participants, could inadvertently disrupt the system and impose unnecessary costs if not carefully calibrated. For example, we understand the timing pressures and logistical challenges faced by shareholders, investment advisers, registrants, and, as a result, proxy voting advice businesses and their clients, particularly during the peak of proxy season.[322] We also acknowledge the concerns expressed by a number of commenters that the adoption of an overly prescriptive framework governing aspects of the proxy voting advice system could, depending on various facts and circumstances, impede the ability of proxy voting advice businesses to provide their clients with timely voting advice.[323] Ultimately, we are guided by the principle that informed decision-making by shareholders is the foundation on which the legitimacy of the proxy voting system rests [324] and believe that a well-functioning proxy system benefits from the ability of clients of proxy voting advice businesses to obtain more complete information on which to base their voting decisions.[325]

---

[314] *See, e.g.,* letters from BIO ("Accordingly, [we] support measures that would increase the likelihood that the registrant's statement is taken into account, such as disabling the auto-submission of votes when a registrant has submitted a response, or disabling auto-submission unless the client accesses the registrant's response or otherwise confirms the pre-populated voting choices."); BRT; CGC; ExxonMobil (asserting that the failure to address automatic submissions would render the proposed rules ineffective, with "limited practical impact."); NAM; Nareit; SCC II.

[315] *See, e.g.,* letters from Baillie Gifford; CII IV; Glass Lewis II; ISS.

[316] *See, e.g.,* letter from Glass Lewis II.

[317] *Id.*

[318] *Id.*

[319] *Id.*

[320] *See* Proposing Release at 66530.

[321] *See supra* notes 51–53 and accompanying text.

[322] *See* Proposing Release at 52, n. 134.

[323] *See, e.g.,* letters from Baillie Gifford; Canadian Gov. Coal; CII IV; Glass Lewis II; ISS; Prof. Sergakis.

[324] *See supra* notes 2–5 and accompanying text.

[325] This is consistent with the Commission's views regarding steps an investment adviser could take when it retains a proxy voting advice business and it becomes aware of potential factual errors, potential incompleteness, or potential methodological weaknesses in the proxy voting advice business's analysis that may materially affect one or more of the investment adviser's voting

Continued

As noted above, some commenters asserted that certain existing mechanisms in the proxy system suffice to address the concerns raised in the Proposing Release and obviate the need for the proposed rules.[326] Those mechanisms include proxy voting advice businesses' existing programs and policies for registrants to provide feedback, ''counter-speech'' measures already available to registrants (*e.g.,* filing supplemental proxy materials), and antifraud liability under Rule 14a–9.[327] Contrary to the views of those commenters, however, we do not believe that those mechanisms, as currently implemented, suffice to achieve our goal of ensuring that clients of proxy voting advice businesses have timely access to a more complete mix of relevant information and exchange of views. Although it is encouraging that some proxy voting advice businesses have programs in place pursuant to which some registrants have the opportunity to review and provide feedback on or responses to proxy voting advice, those programs have not been universally adopted by proxy voting advice businesses and do not uniformly provide registrants (and their investors) with the same opportunities for (and benefits of) review, feedback, and response.[328]

As to ''counter-speech'' measures, under current market practices registrants are not systematically informed of proxy voting advice in a timely manner such that they can provide investors a response to such advice, let alone a response sufficiently

in advance of the relevant meeting to allow investors to consider the response prior to casting their vote.[329] In addition, while the potential for liability under Rule 14a–9 helps to ensure that proxy voting advice is not materially false or misleading, it does not address the need for investors to have timely access to transparent, accurate, and complete information—including any written response by the registrant to the advice—that is material to their voting determinations.[330]

As we explained in the Proposing Release, under existing mechanisms, it can be difficult to ensure that those making voting decisions have timely access to materially complete information prior to voting.[331] Without notice of the proxy voting advice business's recommendations, registrants are often unable to provide a response prior to votes being cast. Also, given the high incidence of voting that takes place very shortly after a proxy voting advice business's advice is distributed to its clients, without a mechanism by which clients can reasonably be expected to become aware of any response in a timely manner (as they and other investors would if the discussion were taking place at a meeting where shareholders are physically attending and participating), votes may be cast on less complete information. Because proxy voting advice businesses have control over the timing of the dissemination of their proxy voting advice, we believe they are the best-positioned parties in the proxy system to both (1) make their proxy voting advice available to registrants and (2) provide clients with a mechanism by which they can reasonably be expected to become aware of a registrant's written response to their proxy voting advice in a timely manner.

Although we do not believe the existing voluntary forms of outreach to registrants and other market participants discussed above are alone sufficient, we

have carefully considered the views of a number of commenters, including the two largest proxy voting advice businesses. Those commenters indicated that a more principles-based approach would be appropriate and one of whom specifically indicated that such an approach would achieve the Commission's goals while avoiding many of the complexities and practical concerns arising from the approach taken in the proposal.[332] We agree and are therefore adopting amendments that articulate a set of principles, distilled from the proposed rules, upon which a proxy voting advice business may design its own policies and procedures. We believe this approach will provide proxy voting advice businesses the flexibility to satisfy their compliance obligations in a customized and cost-effective manner and avoid exacerbating the challenges posed by timing and logistical constraints,[333] while achieving the objective of ensuring that proxy voting advice businesses' clients have timely access to more transparent, accurate, and complete information upon which to base voting decisions. We believe such an approach addresses a number of concerns raised by commenters, is better equipped to fit the needs of participants in the proxy voting process, and will be adaptable as circumstances change.

### b. Policies and Procedures To Facilitate Informed Decision-Making by Clients of Proxy Voting Advice Businesses [Rule 14a–2(b)(9)(ii)]

Consistent with the discussion above, we are adopting new Rule 14a–2(b)(9)(ii) to require, as a separate condition to the availability of the exemptions in Rules 14a–2(b)(1) and (b)(3), that a proxy voting advice business [334] adopt and publicly disclose

---

determinations. *See* Commission Guidance on Proxy Voting Responsibilities at 21–22 (''In reviewing its use of a proxy advisory firm, an investment adviser should also consider the effectiveness of the proxy advisory firm's policies and procedures for obtaining current and accurate information relevant to matters included in its research and on which it makes voting recommendations . . . As part of this assessment, investment advisers should consider . . . [t]he proxy advisory firm's engagement with issuers, including the firm's process for ensuring that it has complete and accurate information about the issuer and each particular matter, and the firm's process, if any, for investment advisers to access the issuer's views about the firm's voting recommendations in a timely and efficient manner. . . .'').

[326] *See supra* notes 300–302 and accompanying text.

[327] *See, e.g.,* letters from AllianceBernstein; As You Sow II; Better Markets; Elliott I; ISS; Glass Lewis II; CalPERS; CII IV; New York Comptroller II; Segal Marco II; Seven Corners; Shareholder Rights II. *See also* IAC Recommendation.

[328] *See supra* notes 256–258 and accompanying text; Proposing Release at 66529–30 (''[S]ome proxy voting advice businesses do not provide registrants with an opportunity to review their reports containing voting advice in advance of distribution to their clients. Even those proxy voting advice businesses that provide such review opportunities do not provide all registrants with an advance copy of their reports containing their voting advice.'').

[329] *See* Proposing Release at 66533 (''Although registrants are able, under the existing proxy rules, to file supplemental proxy materials to respond to negative proxy voting recommendations and to alert investors to any disagreements they have identified with a proxy voting advice business's voting advice, the efficacy of these responses may be limited, particularly given the high incidence of voting that takes place very shortly after a proxy voting advice business's voting advice is released to clients and before such supplemental proxy materials can be filed.'').

[330] *Id.* at 66530 (noting that ''[t]he registrant . . . may have disagreements that extend beyond the accuracy of the data used, such as differing views about the proxy advisor's methodological approach or other differences of opinion,'' the communication of which ''could improve the overall mix of information available when the clients make their voting decisions'').

[331] *Id.* at 66528–30.

[332] *See supra* notes 298–299 and accompanying text.

[333] *See* Proposing Release at 52, n. 135.

[334] As adopted, Rule 14a–2(b)(9) defines ''proxy voting advice business'' as ''a person furnishing proxy voting advice covered by § 240.14a–1(l)(1)(iii)(A).'' Some commenters opposed the use of this term. *See* letters from ISS (stating generally with respect to proposed Rule 14a–9 that the Commission should refer to entities subject to the rules as ''proxy advisers'' or ''proxy advisory firms,'' rather than creating a new term (''proxy voting advice business'')); CII IV (asserting that there is no evidence that the current terminology is inadequate). While we acknowledge commenters' concern about introducing a new term to the proxy rules, we believe that it is appropriate to clarify the type of proxy voting advice that the new rules are intended to address and accordingly scope in businesses that provide such advice, rather than basing application of the rules on the types of businesses that currently provide such services. We believe this avoids inadvertently scoping in other services that such businesses may provide, and also provides flexibility for the rule to address future

written policies and procedures reasonably designed to ensure that:

(A) Registrants that are the subject of proxy voting advice have such advice made available to them at or prior to the time when such advice is disseminated to the proxy voting advice business's clients; [335] and

(B) The proxy voting advice business provides its clients with a mechanism by which they can reasonably be expected to become aware of any written statements regarding its proxy voting advice by registrants that are the subject of such advice, in a timely manner before the shareholder meeting (or, if no meeting, before the votes, consents, or authorizations may be used to effect the proposed action).[336]

While we appreciate the input of commenters that recommended we adopt the more prescriptive requirements of the proposed rule with modifications,[337] we believe that the objectives of the rule are better achieved through a principles-based requirement that is firmly rooted in our historic and proven disclosure framework and will provide proxy voting advice businesses with the ability to tailor their policies and procedures to ensure compliance with the requirements on a basis that is efficient and best serves the evolving needs of their clients and the practical realities of their individual business models.

i. Notice to Registrants and Safe Harbor

Paragraph (A) of Rule 14a–2(b)(9)(ii) reflects the Commission's judgment that effective engagement between proxy voting advice businesses and registrants, in which registrants are timely informed of proxy voting advice that bears on the solicitation of their shareholders, will further the goal of ensuring that proxy voting advice businesses' clients have more complete, accurate, and transparent information to consider when making their voting decisions. This will, by extension, benefit the shareholders on whose behalf those clients may be voting.

As adopted, 17 CFR 240.a–2(b)(9)(ii)(A) ("Rule 14a–2(b)(9)(ii)(A)") does not dictate the manner or specific timing in which proxy voting advice

businesses interact with registrants, and instead leaves it within the discretion of the proxy voting advice business to choose how best to implement the principles embodied in the rule and incorporate them into the business's policies and procedures. The rule does not require that proxy voting advice businesses provide registrants or other soliciting persons [338] with the opportunity to review proxy voting advice in advance of its dissemination to the businesses' clients, although providing registrants with the opportunity to review their proxy voting advice in advance would satisfy the principle and is encouraged to the extent feasible.[339] The rule requires that proxy voting advice businesses must

have adopted and publicly [340] disclosed policies and procedures reasonably designed to ensure that proxy voting advice [341] is made available to registrants "at or prior to the time when such advice is disseminated to the proxy voting advice business's clients." [342] The rule does not, however, require proxy voting advice businesses to ensure that proxy voting advice be made available to registrants after being initially provided to clients, if it is later revised or updated in light of subsequent events, as we recognize that

---

[335] Rule 14a–2(b)(9)(ii)(A).

[336] Rule 14a–2(b)(9)(ii)(B). *See infra* Section II.C.3.c. for a discussion of Rules 14a–2(b)(9)(v) and (vi), which exclude certain types of proxy voting advice from the application of Rule 14a–2(b)(9)(ii).

[337] *See, e.g.,* letters from BRT; Exxon Mobil; GM; MFA & AIMA; MSBA; Nasdaq; Scott Hirst, Assoc. Prof., Boston University Law School (Feb. 3, 2020) ("Prof. Hirst"); Representatives Bryan Steil, et al., U.S. House of Representatives (Jan. 6, 2020) ("Rep. Steil"); SCC I.

[338] We believe that it could have been unduly burdensome on proxy voting advice businesses to extend the requirements of Rule 14a–2(b)(9)(ii)(A) to other soliciting persons (in addition to the relevant registrants). We are mindful of the costs and potential logistical complications that could arise if a proxy voting advice business were required to ensure that multiple soliciting persons were informed of its proxy voting advice in a timely manner. Notwithstanding such costs and potential complications, proxy voting advice businesses may structure their policies and procedures to inform other soliciting persons of their proxy voting advice if they wish to do so. Further, as we noted in the Proposing Release at 66532. Because such disclosure documents and public statements generally contain substantive information that likely would form the basis of proxy voting advice businesses' analyses, there may be an information asymmetry as to proxy voting advice provided with respect to registrants' solicitations as compared to shareholder proponents' or exempt solicitations. Consistent therewith, we stated in the Proposing Release that proxy voting advice businesses would be required to extend the proposed review and feedback and final notice opportunities to parties other than the registrant only in those instances in which the registrant's solicitation is contested by soliciting persons who intend to deliver their own proxy statements and proxy cards to shareholders. *Id.* However, as discussed below *(see infra* Section II.C.3.c.ii.), we are adopting Rule 14a–2(b)(9)(vi) that, in part, excludes from the requirements of Rule 14a–2(b)(9)(ii) the portions of the proxy voting advice that relate to solicitations regarding contested matters, regardless of who is making such solicitation. *See* Rule 14a–2(b)(9)(vi).

[339] As noted above, we understand that certain proxy voting advice businesses currently provide at least some issuers with the opportunity to review and respond to their proxy voting advice in advance of its dissemination to their clients. *See* Proposing Release at 66529 ("In the United States, ISS offers the constituent companies of the Standard and Poor's 500 Index the opportunity to review a draft of ISS' voting advice before it is delivered to clients. Glass Lewis has a program that allows registrants who participate to receive a data-only version of its voting advice before publication to clients."). Although such advance review opportunity is not required by Rule 14a–2(b)(ii), we encourage proxy voting advice businesses that are currently providing registrants with this opportunity to continue doing so as it furthers the objectives of this rule.

[340] The requirement that such policies and procedures be "publicly" disclosed would be satisfied if, for example, they were publicly available on a proxy voting advice business's website. This is consistent with the approach that at least some proxy voting advice businesses are currently taking with respect to the opportunities they provide registrants to review their proxy voting advice. *See, e.g.,* Glass Lewis, Report Feedback Statement (last visited June 11, 2020), *available at* https://www.glasslewis.com/report-feedback-statement/; ISS, ISS Draft Review Process for U.S. Issuers (last visited June 11, 2020), *available at* https://www.issgovernance.com/iss-draft-review-process-u-s-issuers/. Given the flexibility that proxy voting advice businesses have with respect to the method by which they satisfy the principle set forth in Rule 14a–2(b)(9)(ii)(A), we believe that the public disclosure of such policies and procedures is critical to ensuring that registrants understand how they can become informed of the relevant proxy voting advice. We also believe that the transparency created by such public disclosure may yield ancillary benefits, including increased assurance of compliance by proxy voting advice businesses with Rule 14a–2(b)(9)(ii).

[341] *See supra* note 7 for the definition of "proxy voting advice" as used in this release.

[342] Rule 14a–2(b)(9)(ii)(A). The goal of the principle is to provide registrants with enough time to respond to the proxy voting advice, should they choose to, sufficiently in advance of investors casting their final votes. Practically speaking, the most efficient way for proxy voting advice businesses to achieve this goal is to disseminate the reports containing their proxy voting advice to registrants (or otherwise provide registrants with access to such reports) either at the same time or before they disseminate such reports to their clients. We recognize that some commenters that supported the proposed rules indicated that even when registrants do have the opportunity to review proxy voting advice in advance, they do not have sufficient time for a thorough review and response. *See supra* note 258 and accompanying text. Although the proposed advanced review and feedback process likely would have afforded registrants more lead time to review and respond to proxy voting advice, we are conscious of the corresponding costs that other commenters identified. *See infra* notes 351–355 and accompanying text. We further note that even if some clients of proxy voting advice businesses make their voting decision after receiving such businesses' recommendations but before the registrant has had the opportunity to respond thereto, those clients retain the ability to change their vote prior to the meeting date. Under the final rules, therefore, registrants should have the opportunity to respond to proxy voting advice sufficiently in advance of the meeting date. Accordingly, clients of proxy voting advice businesses are more likely to become aware of a registrant's response pursuant to Rule 14a–2(b)(9)(ii)(B) and should have the opportunity to consider whether to adjust their votes based thereon. *See infra* note 387 and accompanying text.

such a requirement could be unduly burdensome given the timing constraints of the proxy process. We believe the final rules continue to advance the Commission's interest in improving the mix of information available to shareholders in a manner that is compatible with the complex and time-sensitive proxy voting advice infrastructure that currently exists and, in particular, the proxy voting advice businesses that many shareholders or those acting on their behalf use in connection with proxy voting, including meeting their voting obligations to investors.

In addition, paragraph (iii) of Rule 14a–2(b)(9) includes a non-exclusive safe harbor provision that, if followed, will give assurance to a proxy voting advice business that it has met the principles-based requirement of new Rule 14a–2(b)(9)(ii)(A). In accordance with this safe harbor, a proxy voting advice business will be deemed to satisfy Rule 14a–2(b)(9)(ii)(A) if it has written policies and procedures that are reasonably designed to provide registrants with a copy of its proxy voting advice, at no charge, no later than the time it is disseminated to the business's clients.[343] Such policies and procedures may include conditions requiring that such registrants have:

(A) Filed their definitive proxy statement at least 40 calendar days before the shareholder meeting; [344] and

(B) Expressly acknowledged that they will only use the proxy voting advice for their internal purposes and/or in connection with the solicitation and it will not be published or otherwise shared except with the registrant's employees or advisers.[345]

Under this safe harbor, the proxy voting advice business may structure its written policy however it wishes so long as the policy has been reasonably designed to provide [346] any registrant that meets the conditions of (A) and (B) above with a copy of the business's proxy voting advice with respect to that

registrant at least concurrently with the delivery of such advice to its clients.[347]

We believe the 40 calendar-day aspect of the safe harbor [348] affords the proxy voting advice business a reasonable amount of time to provide the advisory materials to registrants, without adversely affecting the business's ability to provide timely voting advice to its clients. Proxy voting advice businesses perform much of the work related to their voting advice only after the filing of the definitive proxy statements describing the matters presented for a proxy vote and are subject to time pressure to deliver their research and analysis to their clients sufficiently in advance of the shareholder meeting.[349] Accordingly, we do not believe that it would be practicable to impose additional administrative and logistical burdens on proxy voting advice businesses in cases in which registrants' definitive proxy statements are filed closer to the date of the shareholder meeting.[350] However, if they wish to do

so, proxy voting advice businesses may structure their policies to accommodate registrants that may file less than 40 calendar days before the shareholder meeting and remain within the safe harbor.

The concurrent dissemination of proxy voting advice to clients and registrants specified in the safe harbor addresses concerns expressed by commenters that the proposed review mechanism, which would have allowed registrants to review and provide feedback on voting advice before distribution to the clients of proxy voting advice businesses, could have undermined the ability of proxy voting advice businesses to provide impartial advice to their clients,[351] increased the risk of insider trading of material non-public information,[352] and impinged on proxy voting advice businesses' rights of free speech.[353] As discussed above, several commenters objected on the grounds that permitting registrants to review and comment on draft proxy voting advice in advance of a proxy voting advice business's clients would interfere in shareholders' communications with their advisors on matters subject to a vote.[354] In particular, some commenters argued that the review process, as proposed, gave preferential treatment to registrants over a proxy voting advice business's

---

[343] Rule 14a–2(b)(9)(iii).

[344] Rule 14a–2(b)(9)(iii)(A). Where the registrant is soliciting written consents or authorizations from shareholders for an action in lieu of a meeting, a proxy voting advice business's written policies and procedures may require that the registrant must file its definitive soliciting materials at least 40 calendar days before the action is effective in order to receive a copy of its proxy voting advice.

[345] Rule 14a–2(b)(9)(iii)(B).

[346] In terms of the method by which a proxy voting advice business provides a copy of its advice to a registrant, it could do so by, for example, sending the registrant an email either attaching an electronic copy of the relevant report or including an active hyperlink to the report.

[347] Under the terms of the safe harbor, registrants are not required to reimburse proxy voting advice businesses for the cost of providing a copy of the proxy voting advice. *See* Rule 14a–2(b)(9)(iii). While some commenters favored a requirement that registrants reimburse proxy voting advice businesses for reasonable expenses associated with the proposed review and feedback period (*see* letters from CII IV; New York Comptroller II), others asserted that proxy voting advice businesses should not be able to seek reimbursement from registrants for the costs to provide their reports (*see* letters from Exxon Mobil; GM; NAM; SCG). For purposes of the safe harbor, we believe that the benefit to investors of more timely, complete, and reliable information upon which to make informed voting decisions should not be lessened by making a registrant's ability to receive proxy voting advice dependent on the registrant's willingness to pay for it. See *infra* note 412 for our discussion of how the final rules address certain comments we received on the proposed rules expressing concern regarding the takings clause of the Fifth Amendment.

[348] Rule 14a–2(b)(9)(iii)(A).

[349] *See e.g.,* letters from CII IV; Glass Lewis II; ISS (describing the timing and processes involved in the preparation and delivery of their proxy voting advice to clients). *See also* Proposing Release at 66531, n. 119.

[350] Based on the information we received from commenters, it is our understanding that 40 calendar days prior to the shareholder meeting is well within the customary range when definitive proxy statements are filed. *See e.g.,* letters from CII IV; Glass Lewis II. By comparison, we note that the Commission's proposal would have required proxy voting advice businesses to provide registrants with an opportunity for advance review and feedback of the proxy voting advice if the registrant filed its definitive proxy statement at least 25 calendar days before the shareholder meeting. *See* proposed Rule 14a–2(b)(2)(9)(ii); Proposing Release at 66531. We also note that such 40 calendar day-period exceeds the minimum number of days that some proxy voting advice businesses currently require that registrants file their definitive proxy statements prior to the shareholder meeting in order to review at least a portion of their proxy voting advice in advance of its dissemination. *See, e.g.,* Glass Lewis, Issuer Data Report (last visited June 11, 2020), *available at https://www.glasslewis.com/issuer-*

*data-report/* (noting that in order for a registrant to review an issuer data report in advance of the proxy voting advice being disseminated to clients, registrants must "disclose their meeting documents at least 30 days in advance of their meeting date"); ISS, ISS Draft Review Process for U.S. Issuers (last visited June 11, 2020), *available at https:// www.issgovernance.com/iss-draft-review-process-u-s-issuers/* ("To ensure timely delivery of our analyses to our clients, we cannot provide a draft to any company that files its definitive proxy less than 30 days before its meeting.").

[351] *See supra* note 269. We believe that the concurrent dissemination of proxy voting advice to clients and registrants pursuant to the safe harbor will achieve the objectives of this rulemaking and address commenters' concerns regarding a registrant's practical ability to review, consider, and respond to proxy voting advice. *See supra* note 342.

[352] *See supra* note 272. Proxy voting advice may, depending on the facts and circumstances, constitute material, non-public information. We expect proxy voting advice businesses, their clients, and registrants receiving non-public information in this process to take reasonable measures to safeguard any material, non-public information in their possession by, for example, adopting and implementing effective policies and procedures to ensure that its use and dissemination is consistent with applicable law. *See also infra* note 400; *Institutional S'holder Servs. Inc.,* Release No. IA–3611, 106 SEC. Docket 1681, 2013 WL 11113059, at *5 (May 23, 2013) ("In this case, ISS violated Section 204A [of the Advisers Act] because it failed to establish and enforce policies and procedures reasonably designed to prevent the misuse of ISS' shareholder advisory clients' material, nonpublic proxy voting information.").

[353] *See supra* note 288.

[354] *See supra* notes 276–277.

own clients and would tend to promote management's interests because it allowed registrants to influence the content of advice at a critical stage of its production without granting similar access to shareholders.[355]

Several commenters who were opposed to the concept of advance review suggested concurrent review as a preferable alternative.[356] In the view of such commenters, a concurrent review would provide registrants with access to proxy voting advice, but it would be on an equal footing with the clients of proxy voting advice businesses and therefore would avoid many of the potential adverse consequences that commenters associated with mandating an opportunity for registrants' advance review.[357] We agree with this approach and believe that, for example, the receipt of a copy of proxy voting advice by a registrant who is the subject of such advice no later than the date upon which it is distributed to the proxy voting advice business's clients would bring about many of the same benefits for which the proposed registrant review was intended, particularly in conjunction with (1) a registrant's ability to file additional soliciting materials to communicate their views regarding the advice to shareholders and (2) the new requirement, described below,[358] that proxy voting advice businesses adopt written policies and procedures reasonably designed to ensure that they provide clients with a mechanism by which they can become aware of a registrant's statements of its views about such advice in a timely manner.

Under the proposed rules, a proxy voting advice business would have been able to require registrants to enter into confidentiality agreements for materials provided during the proposed review and feedback period as a condition of receiving the proxy voting advice on terms "no more restrictive" than similar types of confidentiality agreements the business has with its clients, which would cease to apply once the business released its proxy reports to clients.[359] Some commenters suggested this formulation would be unworkable in practice because the confidentiality agreements used with clients were not comparable and therefore would not be a suitable template.[360] In addition,

commenters objected to the mandated cessation of the registrant's confidentiality agreement, as the risk of harm that would be suffered by the proxy voting advice business due to misuse of its confidential information could continue well into the future.[361] Moreover, a number of commenters expressed concern that requiring confidentiality agreements between proxy voting advice businesses and registrants would necessitate the parties' negotiation over contractual terms, an additional complication that could mire the proposed review and feedback process, and therefore the timely provision of voting advice to shareholders, in unmanageable delays.[362] Some commenters also noted that such negotiation would be costly.[363]

We believe that shifting to a principles-based requirement, which allows the report to be provided to registrants at the same time it is provided to clients, should eliminate or mitigate many of the concerns expressed. In light of these changes, we believe that negotiating a formal confidentiality agreement may not be necessary in all circumstances. We therefore believe it is appropriate to make clear that a proxy voting advice business may receive assurances from a registrant regarding the use of the proxy voting advice through less prescriptive means. Accordingly, paragraph (B) of the safe harbor in Rule 14a–2(b)(9)(iii) permits proxy voting advice businesses to include in their policies and procedures conditions requiring registrants to limit their use of the advice in order to receive a copy of the proxy voting advice. Such written policies and procedures may, but are not required to, specify that registrants must first acknowledge that their use of the proxy voting advice is restricted to the registrant's own internal purposes and/or in connection with the solicitation and will not be published or otherwise shared except with the registrants' employees or advisers.[364] Such acknowledgement could take a

variety of forms at the discretion of the proxy voting advice business, including with respect to the duration of the acknowledgment. For example, a policy under the safe harbor could specify that the acknowledgement can or must be in the form of a written representation or an oral acknowledgement, or the policy could prescribe that a registrant must check a box or provide another electronic means of confirming that the registrant agrees to standardized terms of service before the materials could be accessed. To qualify for the safe harbor, the terms of the acknowledgement could not be more restrictive than those set forth in paragraph (B); however, if a proxy voting advice business wishes to impose more tailored or restrictive conditions, it could do so outside of the safe harbor, provided the policies and procedures do not unreasonably inhibit timely notice to the registrant consistent with the principles-based requirements of 14a–2(b)(9)(ii)(A).

We also note that, unlike the proposal, the safe harbor does not mandate the provision of draft proxy voting advice to registrants before dissemination to clients of the proxy voting advice business, which, as commenters noted, poses a higher risk of unintentional or unauthorized release of the information and its potential misuse.[365] Instead, compliance with the safe harbor requires only that the proxy voting advice business provide its voting advice to registrants no later than the time it is released to the business's clients.

A proxy voting advice business that has a policy in place that satisfies the principles-based requirements of Rule 14a–2(b)(9)(ii)(A), such as a policy elucidated in, or that is consistent with, the safe-harbor in Rule 14a–2(b)(9)(iii), will be under no obligation to provide its proxy voting advice to registrants that fail to file a definitive proxy statement early enough to meet the 40-day stipulation, or fail to acknowledge the limitations on its use of the voting advice. Moreover, in order to qualify for

---

[355] *See supra* note 268.

[356] *See supra* note 295.

[357] *Id.*

[358] *See infra* Section II.C.3.b.ii.

[359] *See* Note 2 to paragraph (b)(9)(ii) of proposed Rule 14a–2(b)(9); Proposing Release at 66532.

[360] *See, e.g.,* letter from SES (asserting that needing to sign individual confidentiality agreements between every issuer and proxy voting

advice business would be cumbersome "without any tangible benefit").

[361] *See, e.g.,* letter from Glass Lewis II (recommending that the Commission remove the statement in the proposal that any confidentiality agreement "shall cease to apply once the proxy voting advice business provides its advice to one or more recipients").

[362] *See, e.g.,* letter from Olshan LLP (stating that the proposal significantly underestimates the time and expense of negotiating confidentiality agreements and providing detailed reasons as to why the proposal would be so time consuming and costly).

[363] *See infra* note 613.

[364] A registrant's advisers would include, for example, its attorneys and proxy solicitors.

[365] *See, e.g.,* letters from Clem Geraghty, Ardevora Asset Management LLP (Nov. 27, 2020) ("Ardevora"); CII IV; Elliott I; ISS (expressing concern that the proposal would require a proxy voting advice business to disclose material non-public information to any registrant or eligible soliciting person who signs a confidentiality agreement, even if that party is a known insider trader, and stating that such an outcome would interfere with the proxy voting advice business's obligations under the Investment Advisers Act to establish, maintain, and enforce policies and procedures reasonably designed to ensure compliance with insider trading laws); SES (noting that the proposal could result in certain company statements and information being made available to proxy voting advice businesses and their clients, but not to other shareholders).

the safe harbor, the proxy voting advice business's policy is not required to contemplate that the business repeat the process of providing a copy of its proxy voting advice to registrants if its advice is later revised or updated in light of subsequent events. The safe harbor does not impose any obligation on the proxy voting advice business to provide registrants with additional opportunities to review its proxy voting advice with respect to the same shareholder meeting. In response to concerns raised by commenters, in order to limit the logistical and other burdens imposed on proxy voting advice businesses, as well as to lessen potential uncertainty over questions of compliance,[366] proxy voting advice businesses may, but will not be required to, provide the registrant with additional materials that update or supplement proxy voting advice previously provided.

So long as the proxy voting advice business meets the conditions of the safe harbor in Rule 14a–2(b)(9)(iii), it will be deemed to satisfy Rule 14a–2(b)(9)(ii)(A). Assuming it also satisfies the principles-based requirement in new 17 CFR 240.14a–2(b)(9)(ii)(B) (''Rule 14a–2(b)(9)(ii)(B)''); discussed below and otherwise meets the requirements of Rule 14a–2(b)(9), the proxy voting advice business would be eligible to rely on the exemptions in Rules 14a–2(b)(1) or (3) (subject to the satisfaction of the other conditions of those exemptions).

By adopting this approach, as discussed above, we believe we have addressed the concerns raised by commenters regarding the potential unintended consequences of requiring a proxy voting advice business to engage with a registrant in connection with its proxy voting advice, including those related to timing[367] and the risk of affecting the independence of the advice[368] or diminishing competition in the proxy voting advice business industry.[369] Specifically, because Rule 14a–2(b)(9)(ii) does not require proxy voting advice businesses to adopt policies that would provide registrants with the opportunity to review and provide feedback on their proxy voting advice before such advice is disseminated to clients, the rule does not create the risk that such advice would be delayed or that the independence thereof would be tainted as a result of a registrant's pre-dissemination involvement.[370] Similarly, because proxy voting advice businesses are not required to adopt policies that would provide notice to, or otherwise require interaction with, registrants until they disseminate advice to their clients, any concerns that commenters had regarding increased marginal costs—and, correspondingly, diminished competition—associated with preparing proxy voting advice as a result of the proposed advance review and feedback process should be alleviated. Commenters also identified potential unintended consequences that could result from a heightened litigation risk that proxy voting advice businesses could face as a result of the proposed rules,[371] which may have been viewed as more significant in circumstances where differing views persisted following engagement with the registrant. As with the other unintended consequences discussed above, this concern is mitigated by the fact that under the principles-based approach we are adopting, proxy voting advice businesses will not be required to give registrants the opportunity to provide feedback on their proxy voting advice before it is disseminated to clients.

It is not a condition of this safe harbor, nor the principles-based requirement, that the proxy voting advice business negotiate or otherwise engage in a dialogue with the registrant, or revise its voting advice in response to any feedback. The proxy voting advice business is free to interact with the registrant to whatever extent and in whatever manner it deems appropriate, provided it has a written policy that satisfies its obligations. Although the Commission encourages cooperation and an open dialogue between the parties to the extent that it facilitates productive efforts to improve the quality of proxy voting advice for the benefit of shareholders, the rule that we are adopting does not prescribe the manner in which the parties conduct themselves in this regard, and leaves the content of proxy voting advice, as well as the specific methods and processes used to produce it, within the proxy voting advice business's discretion.

As noted above, the safe harbor is intended to provide a proxy voting advice business with a non-exclusive means to meet the requirements of Rule 14a–2(b)(9)(ii)(A). Proxy voting advice businesses may nonetheless choose to structure a policy that, though not within the parameters of the safe harbor, is reasonably designed to ensure that proxy voting advice is made available to registrants at or prior to the time when the advice is disseminated to clients. We acknowledge that there are different ways that a proxy voting advice business could structure such a policy consistent with the rule, and the safe harbor is not intended to become the *de facto* means by which the requirement of Rule 14a–2(b)(9)(ii)(A) may be met.

### ii. Mechanism To Become Aware of Registrant's Response and Safe Harbor

The Commission's proposal to require that proxy voting advice businesses, at the request of a registrant, include in their voting advice a hyperlink (or other analogous electronic medium) to the registrant's statement about the voting advice was intended as an efficient and timely means of providing the businesses' clients with additional information that would assist them in assessing and contextualizing the voting advice.[372] In particular, the inclusion of the hyperlink with the proxy voting advice would have permitted clients, including investment advisers voting shares on behalf of other shareholders, to consider the registrants' views at the same time as the proxy voting advice

---

[366] For example, if proxy voting advice businesses were required under the safe harbor to redistribute proxy voting advice to registrants as a result of any updates or addenda to the advice, in many cases it might pose a difficult logistical challenge for the businesses to meet their production deadlines, satisfy rapid turn-around times and fulfill their delivery obligations to clients, thereby exacerbating the businesses' difficulty in meeting an already aggressive timeline so close to the date of the shareholder meeting. In addition, the determination of which kinds of materials would be covered by such a rule could lead to confusion and make administration of the rule unnecessarily complex and time-consuming.

[367] *See supra* notes 276–279 and accompanying text.

[368] *See supra* note 287 and accompanying text. A number of commenters expressed concerns that the proposed advance review and feedback process would conflict with FINRA Rule 2241, which prohibits review of an analyst's research report by a subject company for purposes other than factual verification. *See* letters from AFL–CIO II; As You

Sow II; BMO; Boston Trust; CII IV; NYC Comptroller; New York Comptroller II; PIAC II; TRP. The final rules address these concerns, as neither Rule 14a–2(b)(9)(ii)(A) nor Rule 14a–2(b)(9)(iii) requires that registrants be given the opportunity to review or provide feedback on proxy voting advice before proxy voting advice businesses provide such advice to their clients.

[369] The competition-based unintended consequences that commenters identified included diminished competition among proxy voting advice businesses, a limitation in the market choice for consumers of proxy voting advice, and a decline in the utility of proxy voting advice. *See supra* notes 282, 283, 285 and accompanying text.

[370] Some commenters challenged the proposition that proxy voting advice businesses currently provide disinterested, independent advice. *See, e.g.,* letters from BIO; BRT; CEC; CCMC; J. Ward; NAM; Nareit; Nasdaq; SCG. As to commenters' concerns that the proposed advance review mechanism could compromise the ability of proxy voting advice businesses to provide disinterested, independent advice, we note that according to its current procedures governing registrants' advance review of its draft proxy analysis, rating, or other research report, ISS states that it retains sole discretion whether to accept any change recommended by the registrant. *See infra* note 530 and accompanying text.

[371] *See supra* notes 284, 286 and accompanying text.

[372] Proposing Release at 66533.

and before making their voting determinations. As the Commission has noted, although registrants are able under the existing proxy rules to file supplemental proxy materials to respond to proxy voting recommendations that they may know about and to alert investors to any disagreements with such proxy voting advice, the efficacy of these responses may be limited, particularly given the high incidence of voting that takes place very shortly after a proxy voting advice business's voting advice is released to clients and before such supplemental proxy materials can be filed.[373]

As with the Commission's proposed review and response mechanism, however, commenters have raised practical challenges and limitations that the parties would face in implementing processes and systems necessary to comply with the proposed rule's prescriptive requirements.[374] Accordingly, we believe that our objectives are better addressed by a principles-based requirement, particularly in light of the complexities and time pressures inherent in the proxy system. By broadly outlining the overarching principles and allowing the proxy voting advice businesses themselves to design a system of compliance best suited to their operations, our aim is to promote adherence to these principles in a flexible and minimally intrusive manner.

Consequently, paragraph (B) of Rule 14a–2(b)(9)(ii) sets forth an additional principle that a proxy voting advice business must observe in order to avail itself of the exemptions found in Rules 14a–2(b)(1) and (3). Specifically, a proxy voting advice business must adopt and publicly[375] disclose written policies

and procedures reasonably designed to ensure that it provides clients with a mechanism by which they can reasonably be expected to become aware of a registrant's written statements about the proxy voting advice in a timely manner[376] before the shareholder meeting (or, if no meeting, before the vote, consent, or authorization may be used to effect the proposed action).

By shifting to a principles-based requirement, the rule allows the proxy voting advice business to determine its specific manner of compliance, while preserving the Commission's objective to facilitate the ability of the business's clients to benefit from more complete information when considering how to vote their proxies. As such, it reflects the Commission's view that shareholders should have ready access to a more complete mix of information to make informed voting decisions. Rule 14a–2(b)(9)(ii)(B) is thus intended to help ensure that proxy voting advice businesses provide clients with a mechanism by which they can reasonably be expected to become aware of and access more complete information, including the input and views of registrants on proxy voting advice, in the compressed time period between when they receive the advice and vote their proxies.

We believe access to the registrant's views on proxy advice may benefit a proxy voting advice business's clients regardless of whether the voting recommendation is adverse to the registrant's recommendation. The registrant may have disagreements that extend beyond the voting recommendation itself, such as noting factual errors in the advice, differing views about the proxy voting advice business's methodological approach or other perspectives that it believes are relevant to the voting advice.[377] Or the registrant may wish to emphasize a particular point that the proxy voting

advice business may have noted or may not have noted in its advice. In circumstances where the registrant largely or entirely agrees with the proxy voting advice business's methodology or conclusions, that fact would likely be relevant to and enhance a client's decision-making.

A number of commenters argued that registrants' ability to file supplemental proxy materials is sufficient to facilitate informed shareholder voting decisions.[378] Commenters have indicated, however, that the clients of proxy voting advice businesses often cast their votes before registrants can file such materials.[379] Rule 14a–2(b)(9)(ii)(B) requires that proxy voting advice businesses provide clients with a mechanism by which they can reasonably be expected to become aware that a registrant has filed such materials about the proxy voting advice in time to consider the materials before they cast their final vote. Due to the existing time constraints that proxy voting advice business clients have identified in their comments to the proposed rule,[380] the rule will ensure that such clients have an efficient means by which they can reasonably be expected to become aware of additional information that may affect their analysis of the proxy voting advice, and thereby their voting decisions, in the manner that each proxy voting advice business determines is most cost-efficient and best serves its clients.

As with Rule 14a–2(b)(9)(ii)(A), we recognize that proxy voting advice businesses may benefit from greater legal certainty about how to satisfy this general principle. We are therefore providing a non-exclusive safe harbor in new 17 CFR 240.14a–2(b)(9)(iv) ("Rule 14a–2(b)(9)(iv)") pursuant to which proxy voting advice businesses will be deemed to satisfy the principle-based requirement of paragraph (ii)(B). To satisfy this safe harbor, a proxy voting advice business must have written policies and procedures reasonably designed to inform clients who have received proxy voting advice about a particular registrant in the event that such registrant notifies the proxy voting advice business that the registrant either intends to file or has filed additional soliciting materials with the Commission setting forth its views

---

[373] *Id.* at n.136. As we noted in the Proposing Release, although shareholders have the ability to change their vote at any time prior to a meeting—including as a result of supplemental proxy materials filed by registrants in response to proxy voting advice—to our knowledge, this seldom occurs. *Id.* at 66530 n.107. It is possible, however, that under the final amendments, as a result of proxy voting advice businesses' compliance with Rule 14a–2(b)(9)(ii)(B), clients of proxy voting advice businesses will be made aware of a registrant's response to proxy voting advice and, therefore, more likely to change votes that were cast after receiving such advice.

[374] *See, e.g.,* letters from CII IV; Glass Lewis II.

[375] *See supra* note 340 for an example of how proxy voting advice businesses may satisfy the requirement that such policies and procedures be "publicly" disclosed and a discussion of the reasons why we believe such requirement is important in the context of paragraph (A) of Rule 14a–2(b)(9)(ii). With respect to paragraph (B), it is likely that the clients of proxy voting advice businesses would be provided with such policies and procedures even absent a requirement that they be publicly disclosed. That said, in addition to the ancillary transparency-based benefits discussed

*supra* note 340, we believe that the public disclosure of such policies and procedures will assist potential clients of proxy voting advice businesses in evaluating the service offerings that the various providers make available. Similarly, such public disclosure may assist the investors on whose behalf such clients act in evaluating whether any proxy voting decisions made on their behalf are informed by both the relevant proxy voting advice and any registrant response thereto.

[376] In this context, a proxy voting advice business will have become aware of a registrant's response to the proxy voting advice in a "timely manner" if such client has sufficient time to consider such response in connection with its vote.

[377] *See, e.g.,* IAC Recommendation ("The very differences in such judgments [between corporate managers and proxy advisors] are part of the value that independent advisors add to the proxy system . . . . By advancing their views . . . proxy advisors create meaningful public discussion of such topics. . . .").

[378] *See, e.g.,* letters from Public Retirement System; AFL–CIO 2; CII IV; Glass Lewis II; ISS; New York Comptroller I. *See also* note 373.

[379] *See, e.g.,* letters from NAREIT; NAM, Exxon Mobil. *See also* Proposing Release at 53, n. 136.

[380] *See, e.g.,* letters from ACSI; BMO; CII VI; Florida Board; Glass Lewis II; Hermes; ICI; New York Comptroller II; Ohio Public Retirement; Olshan LLP; PRI II; Stewart; TIAA; TRP.

regarding such advice.[381] The safe harbor sets forth two methods by which the proxy voting advice business may provide such notice to its clients. It may either:

(A) Provide notice on its electronic client platform that the registrant has filed, or has informed the proxy voting advice business that it intends to file, additional soliciting materials (and include an active hyperlink to those materials on EDGAR when available);[382] or

(B) Provide notice through email or other electronic means that the registrant has filed, or has informed the proxy voting advice business that it intends to file, additional soliciting materials (and include an active hyperlink to those materials on EDGAR when available).[383]

The safe harbor in Rule 14a–2(b)(9)(iv) establishes a convenient mechanism by which the clients of a proxy voting advice business can stay informed of, and timely consider, additional information with respect to the proxy voting advice that the registrant believes is material to the shareholders' voting determination. The safe harbor provides a direct and simple means of alerting clients to the availability of the views of the registrant as they consider the voting advice.

The inclusion of the hyperlink required under Rule 14a–2(b)(9)(iv) would not, by itself, make the proxy voting advice business liable for the content of the hyperlinked registrant's statement. The Commission has previously stated a person's responsibility for hyperlinked information depends on whether the person has involved itself in the preparation of the information or explicitly or implicitly endorsed or approved the information.[384] As we explained in the Proposing Release, we believe our view is consistent with this framework as a proxy voting advice business likely would not be involved in the preparation of the hyperlinked statement and likely would be including the hyperlink to comply with the requirements of the Rule 14a–2(b)(9)(iv) safe harbor, and not to endorse or approve the content of the statement. Our view also extends to a proxy voting advice business that chooses to satisfy the principle-based requirement of Rule 14a–(b)(9)(ii)(B) outside of the Rule 14a–2(b)(9)(iv) safe harbor by adopting written policies and procedures that contemplate the delivery of a hyperlink to the registrant's statement to its clients.

We note that proxy voting advice businesses will retain a significant amount of discretion to formulate their own policies and procedures and dictate the mechanics of notification in ways they believe are most suitable to meet their clients' needs and compatible with their operations, including specifying the preferred channel by which registrants must notify the proxy voting advice business of supplemental proxy filings, provided they comply with the broad outlines of the safe harbor.

As discussed above, although proxy voting advice businesses may prefer the legal certainty afforded by the safe harbor in Rule 14a–2(b)(9)(iv), these provisions are not the exclusive means by which such businesses may satisfy the principle-based requirement set forth in Rule 14a–2(b)(9)(ii)(B). Proxy voting advice businesses may instead develop their own policies and procedures outside of the safe harbor that are reasonably designed to ensure that they provide clients with a mechanism by which they can reasonably be expected to become aware of a registrant's written response to the proxy voting advice in a timely manner. We acknowledge that there are different ways that a proxy voting advice business could structure such a policy consistent with the rule, and the safe harbor is not intended to become the *de facto* means by which the requirement of Rule 14a–2(b)(9)(ii)(B) may be met.

The proposed rules included a provision that would have excused immaterial or unintentional failures to comply with the conditions of Rule 14a–2(b)(9).[385] This provision was motivated by our recognition of a potentially significant adverse result for a proxy voting advice business if it were to lose the ability to rely on the exemptions set forth in Rules 14a–2(b)(1) or (b)(3) and be required to comply with the federal proxy rules' information and filing requirements.[386] Although we recognize those potentially adverse results, we no longer view that provision as necessary in light of the principles-based approach of the final rules. Rule 14a–2(b)(9)(ii), as adopted, requires proxy voting advice businesses to adopt written policies and procedures that are reasonably designed to ensure satisfaction of paragraphs (A) and (B) thereof. We believe the framework we are adopting is sufficiently flexible to accomplish the Commission's objectives in ensuring shareholders have available to them more transparent, accurate, and complete information on which to base their voting determinations and thereby promote informed decision-making, without unnecessarily interfering with or burdening the complex infrastructure that is important to the proper functioning of the proxy system. We also believe that the principle of ensuring that proxy voting advice businesses provide clients with a mechanism by which they can reasonably be expected to become aware of registrants' written statements regarding the proxy voting advice in a timely manner will facilitate in particular the use and review of such advice by investment advisers.[387]

---

[381] If a registrant notifies a proxy voting advice business that the registrant intends to file additional soliciting materials setting forth its views regarding the proxy voting advice business's advice, then proxy voting advice business should consider whether, for purposes of complying with this safe harbor requirement, it needs to send two separate notices to the business's clients: (1) One notice regarding the registrant's intent to file and (2) another notice regarding the registrant's actual filing. Depending on the particular facts and circumstances, the first notice may be needed to inform clients of the fact that the registrant may be providing views that could be material to their voting decisions and to allow the clients to determine whether they wish to await these views before submitting their votes, and with the second notice providing the clients with the hyperlink to the registrant's soliciting material once it is filed on EDGAR. We note that Rule 14a–2(b)(9)(ii)(B), which is a principles-based requirement, gives proxy voting advice businesses the option of formulating alternatives to this approach as long as those alternatives achieve the principle set forth in the rule.

[382] Rule 14a–2(b)(9)(iv)(A).

[383] Rule 14a–2(b)(9)(iv)(B).

[384] See Use of Electronic Media, Release No. 34–42728 (Apr. 28, 2000) [65 FR 25843 (May 4, 2000)].

[385] Proposing Release at 66535 ("[T]he proposed amendments provide that such failure will not result in the loss of the exemptions in Rules 14a–2(b)(1) or 14a–2(b)(3) so long as (A) the proxy voting advice business made a good faith and reasonable effort to comply and (B) to the extent that it is feasible to do so, the proxy voting advice business uses reasonable efforts to substantially comply with the condition as soon as practicable after it becomes aware of its noncompliance.").

[386] *Id.* at n.146 ("[W]ithout such an exception, a proxy voting advice business that failed to give a registrant the full number of days for review of the proxy voting advice due to technical complications beyond its control, even if only a few hours shy of the requirement, would be unable to rely on the exemptions in Rule 14a–2(b)(1) and (b)(3). Without an applicable exemption on which to rely, the proxy voting advice business likely would be subject to the proxy filing requirements found in Regulation 14A and its proxy voting advice required to be publicly filed.").

[387] The Commission previously issued guidance discussing how the fiduciary and rule 206(4)–6 under the Advisers Act relate to an investment adviser's exercise of voting authority on behalf of clients and also provided examples to help facilitate investment advisers' compliance with their proxy voting responsibilities. See Commission Guidance on Proxy Voting Responsibilities. We expect that Rule 14a–2(b)(9)(ii)(A) will result in registrants being made aware of recommendations by proxy voting advice businesses in a timeframe that will permit those registrants to make any views regarding those recommendations available in a more timely manner than was previously the case. We therefore are concurrently supplementing that guidance to investment advisers in a separate Commission release. See Supplemental Proxy Voting Guidance.

We wish to emphasize that the principles-based approach we are adopting in Rule 14a–2(b)(9)(ii) is intended to be adaptable to a variety of circumstances and business models. Various policies and procedures, beyond those in the safe harbors set forth in Rules 14a–2(b)(9)(iii) and (iv), may be used to satisfy these principles. Whether a proxy voting advice business has complied with the principles-based requirements will be determined by the particular facts and circumstances of the business's adopted written policies and procedures and whether such facts and circumstances support the conclusion that the particular policies and procedures are reasonably designed to ensure that (1) registrants that are the subject of the proxy voting advice have such advice made available to them at or prior to the time when such advice is disseminated to the proxy voting advice business's clients and (2) the proxy voting advice business provides its clients with a mechanism by which they can reasonably be expected to become aware that registrants have filed additional proxy materials that are responsive to the proxy voting advice in a timely manner before the shareholder meeting. Some relevant factors to be used in the analysis include:

• The degree to which a registrant has time to respond and whether the policy ensures prompt conveyance of information to the registrant.

• The extent to which the mechanism provided to clients is an efficient means by which they can reasonably be expected to become aware of the registrant's written response, once it is filed, such that the client has sufficient time to consider such response in connection with a vote.

• The reasonableness, based on facts and circumstances, of any fees charged by a proxy voting advice business to a registrant as a condition to receiving a copy of its proxy voting advice and the extent to which such fees may dissuade a registrant from seeking to review and provide a response to such proxy voting advice.

We reiterate that these factors are not exclusive and no single factor or combination of factors will control the determination of whether a proxy voting advice business has complied with the principles-based requirements.

c. Exclusions From Rule 14a–2(b)(9)(ii) [Rules 14a–2(b)(9)(v) and (vi)]

Notwithstanding the benefits that we expect will accrue to clients of proxy voting advice businesses, as well as the proxy voting system as a whole, we recognize that the requirements of Rule 14a–2(b)(9)(ii) may not be appropriate in all contexts. As such, pursuant to new Rules 14a–2(b)(9)(v) and (vi), respectively, proxy voting advice businesses need not comply with Rule 14a–2(b)(9)(ii) in order to rely on either the Rule 14a–2(b)(1) or (b)(3) exemption (1) to the extent that their proxy voting advice is based on a custom policy [388] or (2) if they provide proxy voting advice as to non-exempt solicitations regarding certain mergers and acquisitions or contested matters.[389]

i. Custom Policies

As noted above,[390] some commenters recommended—in the context of our proposed amendments to Rule 14a–1(l)—that we amend the definitions of "solicit" and "solicitation" to exclude proxy voting advice based on custom policies.[391] Specifically, one commenter that is a proxy voting advice business noted that it "does not own, and is prohibited from disclosing, clients' custom policies and the recommendations based thereon." [392] That commenter also expressed doubt as to the efficacy, from an investor protection standpoint, of "allowing issuers to vet the methodologies and assumptions institutional investors choose to implement for their own portfolios." [393] Although we reaffirm our prior interpretation of the scope of the terms "solicit" and "solicitation" and decline to amend their definitions as those commenters suggested, we find these points to be compelling with respect to the application of certain requirements of Rule 14a–2(b)(9). We also understand these commenters' concerns regarding the potential costs that would be imposed upon investors, as well as their doubts regarding the corresponding investor protection-based benefits, if the requirements of Rule 14a–2(b)(9)(ii) were to be applied to proxy voting advice based on a custom policy.

In light of these concerns, we are adopting new Rule 14a–2(b)(9)(v), which excludes from the scope of Rule 14a–2(b)(9)(ii) proxy voting advice to the extent that such advice is based on custom policies that are proprietary to a proxy voting advice business's client.[394]

Our adoption of new Rule 14a–2(b)(9)(v) is not only motivated by the potential costs that commenters identified, it also reflects our belief that many of the goals of this rulemaking will still be achieved with respect to proxy voting advice that is based on a custom policy, notwithstanding the fact that such advice will not be subject to Rule 14a–2(b)(9)(ii). For example, as noted above and consistent with prior Commission statements,[395] such proxy voting advice will constitute a "solicitation" subject to Rule 14a–9, and persons who provide such advice in reliance on the exemptions in either Rule 14a–2(b)(1) or (b)(3) must comply with the conflicts of interest disclosure requirements set forth in new Rule 14a–2(b)(9)(i). We further note that proxy voting advice businesses generally use substantially the same data to produce most of their voting advice (including reports containing proxy voting advice based on benchmark, specialty, or custom policies).[396] In addition, it is our understanding of the proxy voting advice market as it currently operates that proxy voting advice businesses' clients that receive proxy voting advice pursuant to their custom policies generally also receive the businesses' voting advice based on the businesses' benchmark policies. Such benchmark policy proxy voting advice contains the bulk of the data, research, and analysis underlying custom policy proxy voting advice. Thus, because the proxy voting advice based on the benchmark policies—including the data, research, and analysis therein—would be subject to Rule 14a–2(b)(9)(ii), clients that receive proxy voting advice pursuant to their custom policies generally will

---

[388] *See* Rule 14a–2(b)(9)(v).

[389] *See* Rule 14a–2(b)(9)(vi).

[390] *See supra* note 112 and accompanying text.

[391] *See* letters from ISS; New York Comptroller II; State Street. *See also supra* note 165 for a link to a description of the services that one major proxy voting advice business offers in connection with its clients' custom policies.

[392] Letter from ISS. *See also* letter from Glass Lewis II ("Mandating that custom voting recommendations go through the issuer review and feedback mechanisms would expose these investors' confidential, proprietary information and force Glass Lewis to breach its commitments to these clients.").

[393] Letter from ISS.

[394] Rule 14a–2(b)(9)(v). The term "custom policies" for purposes of Rule 14a–2(b)(9)(v) would not include a proxy voting advice business's benchmark or specialty policies, even if those benchmark or specialty policies were to be adopted by a proxy voting advice business's client as its own policy. *See supra* note 12. If, however, a proxy voting advice business's client adopts a benchmark or specialty policy as its own policy, then the proxy voting advice business would have to satisfy the requirements of Rule 14a–2(b)(9)(ii) only with respect to the proxy voting advice that is based on the benchmark or specialty policy. For the avoidance of doubt, Rule 14a–2(b)(9)(ii)(A) does not require that the proxy voting advice business make available to the registrant multiple copies of the same voting advice, and for purposes of Rule 14a–2(b)(9)(ii)(B), the proxy voting advice business's policies and procedures should be reasonably designed to provide such client with a mechanism by which the client could reasonably be expected to become aware of any written statement regarding the benchmark or specialty policy.

[395] *See supra* text accompanying note 166.

[396] *See* letter from ISS ("Because substantially the same data are used to produce all ISS voting reports . . . .").

benefit from an awareness of any responses that the registrants may file thereto.

ii. Merger and Acquisition Transactions and Contested Solicitations

Solicitations involving merger and acquisition ("M&A") transactions or contested matters, such as contested director elections where a dissident soliciting party proposes its own slate of director-nominees, are generally fast-moving and can be subject to frequent changes and short time windows.[397] This often results in proxy voting advice businesses having to deliver their advice to clients on a tighter deadline, and with less lead time before the applicable meeting, than they would under normal circumstances.[398] As noted above, some commenters expressed concerns regarding the practical challenges and potential disruptions that the proposed review and feedback mechanism, with its specified time frames for each step of the process, would have caused in the context of M&A transactions or contested solicitations.[399] Commenters also expressed concerns about the heightened risk that the proposed review and feedback mechanism, which would involve reviews of proxy voting advice before it is disseminated to clients, could pose regarding the disclosure of market-moving or material, non-public information in the context of M&A transactions or contested solicitations.[400] We expect that these

concerns will be significantly alleviated, if not eliminated entirely, by the fact that Rule 14a–2(b)(9)(ii), as adopted, does not include the proposed advance review and feedback mechanism and, with its principles-based requirements, provides proxy voting advice businesses with added flexibility. For example, absent the proposed advanced review and feedback mechanism, Rule 14a–2(b)(9)(ii)(A) does not increase the risk that proxy voting advice businesses will disseminate potentially market-moving or material, non-public information selectively to registrants (or any other soliciting persons) before they otherwise would disseminate such information to their clients.

To further address concerns raised by commenters, we are also adopting new 17 CFR 240.14a–2(b)(9)(vi) ("Rule 14a–2(b)(9)(vi)"), which excludes from the requirements of Rule 14a–2(b)(9)(ii) any portion of the proxy voting advice that makes a recommendation, as well as any analysis and research underlying such recommendation that is furnished along therewith, as to a solicitation subject to Rule 14a–3(a)[401]:

(A) To approve any transaction specified in Rule 145(a) of the Securities Act;[402] or

(B) By any person or group of persons for the purpose of opposing a solicitation subject to Regulation 14A by any other person or group of persons.[403]

As a result of new Rule 14a–2(b)(9)(vi), proxy voting advice

businesses would be permitted (but not required) to adopt written policies and procedures pursuant to which the businesses would not make available to registrants any portion of the proxy voting advice relating to M&A transactions and contested matters at or prior to the time such advice is disseminated to clients and to exclude the registrant's response to such advice from the requirement of Rule 14a–2(b)(9)(ii)(B). To be eligible to rely on Rule 14a–2(b)(9)(vi), a proxy voting advice business must be providing advice with respect to a solicitation subject to Rule 14a–3(a). This requirement is intended to limit the scope of Rule 14a–2(b)(9)(vi) to proxy voting advice with respect to solicitations that are subject to the Federal proxy rules' information and filing requirements, including the requirement to file and furnish a definitive proxy statement. By contrast, proxy voting advice businesses providing advice with respect to any exempt solicitations (including solicitations as to M&A transactions or contested matters) would be ineligible to rely on the exception in Rule 14a–2(b)(9)(vi).

For the avoidance of doubt, this exception from the requirements of Rule 14a–2(b)(9)(ii) applies only to the portions of the proxy voting advice relating to the applicable M&A transaction[404] or contested matters and not to proxy voting advice regarding other matters presented at the relevant meeting. If, therefore, there is a shareholder meeting at which the only items presented for approval are the applicable M&A transaction or contested matters, a proxy voting advice business could have written policies and procedures that permit the entirety of the proxy voting advice provided with respect to that meeting to be

---

[397] See, e.g., letter from Glass Lewis II ("[O]ur experience is that contested situations are often much more fluid with both sides making supplemental filings on a continuing basis as the meeting date approaches.").

[398] See, e.g., id. ("Glass Lewis' data shows that report preparation and delivery timing varies significantly for mergers and acquisitions and other special situations. On average, proxy research reports were delivered to clients 14 days before the meeting date [in] M&A transactions and 13 days in contested situations.").

[399] See supra note 279 and accompanying text. See also letters from ISS (stating that the proposal would hinder "the ability of proxy advice to be appropriately responsive to important and often fast-moving situations such as proxy fights and contested mergers and acquisitions"); Glass Lewis II ("[I]t is important for a proxy advisor, when appropriate to best meet its clients' needs, to be able to defer providing its advice until near-final information is available and to be able to quickly amend already-provided advice, as needed.").

[400] See letters from CII I ("It is not clear whether the PA Proposal creates the potential for insider trading on certain market-moving recommendations and related analysis, particularly in connection with mergers and acquisitions (M&A), and how the SEC staff thought about such a risk in proposing the five-day review and 'final notice' periods."); Elliott I ("The risks of insider trading and leaks involving proxy voting advice are also higher when a shareholder vote involves a material event. The Proposal would put the draft proxy voting advice—potentially market-moving information—in the hands of issuers before it is provided to the investors who will act on it. This selective

disclosure would necessarily increase the risk that the information will be misused or leaked, whether accidentally or deliberately."); ISS (noting that it currently "safeguard[s] [material, non-public information] by not pre-releasing potentially market-moving draft reports and vote recommendations" and allowing "selected issuers a limited review right of draft reports only for annual meetings, not special meetings" and asserting that the proposal "rais[es] significant concerns about confidentiality" and "selective disclosure of material non-public information"); Glass Lewis II ("We note that commenters have raised significant questions about how the advance knowledge gained in the review processes could be misused in contested situations that should be addressed and resolved before adopting any rule mandating review in this context."). As they likely are already aware (based on the concerns expressed in the foregoing comment letters), we remind proxy voting advice businesses that they have a responsibility to safeguard any material, non-public information in their possession. Although that responsibility is heightened in the context of shareholder meetings regarding M&A transactions or contested matters, when such information is particularly sensitive and potentially market-moving, we expect proxy voting advice businesses to discharge that responsibility in all situations.

[401] 17 CFR 240.14a–3(a).

[402] Rule 14a–2(b)(9)(vi)(A). Rule 145(a) lists and describes certain M&A transactions that are broadly categorized as reclassifications, mergers of consolidation, and transfers of assets. See 17 CFR 230.145(a).

[403] Rule 14a–2(b)(9)(vi)(B).

[404] We recognize that a registrant or other soliciting person may present at the shareholder meeting other matters that, while not directly approving an M&A transaction or a contested matter, are nevertheless closely related to such transaction or contested matter. For example, a registrant's definitive proxy statement may seek approval of a proposed M&A transaction, approval of the issuance of the registrant's securities to finance the M&A transaction, and an advisory vote on the "golden parachute" payments to be made in connection with the M&A transaction. In such a situation, the latter two matters may be sufficiently integral to the M&A transaction such that redaction of the proxy voting advice on the M&A transaction alone would render the proxy voting advice on the remaining matters to be confusing for a registrant reading such advice. In such a case, the Rule 14a–2(b)(9)(vi) exception would be available for all three matters. The determination of whether a matter is sufficiently integral to an M&A transaction or contested matter to fall within the Rule 14a–2(b)(9)(vi) exception will depend on the particular facts and circumstances.

excluded from the requirements set forth in Rule 14a–2(b)(9)(ii). If, however, additional matters are presented for shareholder approval at such meeting, then only the portion of the proxy voting advice provided with respect to the applicable M&A transaction or contested matters could be excluded from the requirements set forth in Rule 14a–2(b)(9)(ii).

We understand that proxy voting advice businesses often provide their proxy voting advice on all matters for which security holders are solicited at a particular meeting (*e.g.*, contested and uncontested matters, M&A- and non-M&A-related matters, etc.) together in a single report.[405] If a proxy voting advice business takes this approach but wishes to avail itself of the exception set forth in Rule 14a–2(b)(9)(vi), it can do so, for example, by redacting the portion of the report that contains proxy voting advice as to the applicable M&A transaction or contested matters in the version of such report that is provided to a registrant pursuant to Rule 14a–2(b)(9)(ii)(A). We further understand that at least one proxy voting advice business currently provides its clients with a separate, standalone report that provides recommendations only with respect to the M&A transactions or contested matters presented at the meeting.[406] If a proxy voting advice business adopts this approach with respect to M&A transactions and contested matters, then, under Rule 14a–2(b)(9)(vi), the requirements of Rule 14a–2(b)(9)(ii) would not be applicable to such standalone report. Finally, to the extent that a proxy voting advice business finds it too burdensome to either redact or bifurcate its reports, it is not required to avail itself of the exception set forth in Rule 14a–2(b)(9)(vi). Instead, the proxy voting advice business can choose to subject all of its proxy voting advice—including its advice as to the applicable M&A transaction and contested matters—to the requirements of Rule 14a–2(b)(9)(ii), subject to the proxy voting advice business's obligation to safeguard material, non-public information in its possession.[407]

As with proxy voting advice that is based on a custom policy, proxy voting advice that is excluded from the scope of Rule 14a–2(b)(9)(ii) pursuant to new paragraph (vi) will constitute a "solicitation" subject to Rule 14a–9. Similarly, persons who provide such advice in reliance on the exemptions in either Rule 14a–2(b)(1) or (b)(3) must comply with the conflicts of interest disclosure requirements set forth in new Rule 14a–2(b)(9)(i).

d. Response to Constitutional Objections

Some commenters raised First Amendment objections to the proposed amendments.[408] Their concerns focused primarily on the proposed registrant review and feedback provisions and the requirement that proxy voting advice businesses include in their advice a hyperlink to the registrant's response. The final amendments incorporate substantial modifications that address these concerns.

As discussed above, the proposed amendments requiring that proxy voting advice businesses give registrants an opportunity to review and provide feedback on their advice before the advice is disseminated to clients have not been included in the final amendments. Under the final amendments, proxy voting advice businesses can satisfy Rule 14a–2(b)(9)(ii)(A) by ensuring that their advice is made available to registrants at or prior to the time when such advice is disseminated to the proxy voting advice business's clients.[409]

Commenters also argued that requiring proxy voting advice businesses to share with registrants proxy voting advice that is based on custom policies would unconstitutionally compel them to disclose confidential client information.[410] Our decision to exclude such advice from Rule 14a–2(b)(9)(ii) should eliminate that concern.[411] Moreover, under the safe harbor in Rule 14a–2(b)(9)(iii), a proxy voting advice business has no obligation to provide a copy of its advice to a registrant unless such registrant acknowledges certain limits on its use of the advice.[412] Nor must a proxy voting advice business that avails itself of such safe harbor share its proxy voting advice if the registrant files its definitive proxy statement less than 40 calendar days before the shareholder meeting.

In addition, we have replaced the proposed requirement that proxy voting advice businesses include in their proxy voting advice a hyperlink to the registrant's response with a principles-based obligation to adopt policies and procedures reasonably designed to ensure that proxy voting advice businesses provide clients with a mechanism by which they can reasonably be expected to become aware of the registrant's written response in a timely manner. Rule 14a–2(b)(9)(ii)(B) gives proxy voting advice businesses flexibility in determining how to achieve compliance with this requirement in the manner best suited to their business. They also have the option of relying on the safe harbor set forth in Rule 14a–2(b)(9)(iv), which involves adopting policies and procedures to provide clients a hyperlink to the registrant's written response once the registrant gives notice that a response has been filed. However, Rule 14a–2(b)(9)(ii)(B) does not mandate that specific approach as a condition of the exemption.[413]

---

[405] Proposing Release at n.112 ("It is also common for a proxy voting advice business to present in a single, integrated written report its voting recommendations on all matters to be voted at the registrant's meeting . . . .").

[406] *See* ISS, Special Situations Research, *available at https://www.issgovernance.com/solutions/governance-advisory-services/special-situations-research/* (last visited on May 28, 2020).

[407] If a proxy voting advice business decides not to avail itself of the exception set forth in Rule 14a–2(b)(9)(vi) and subjects its advice as to the applicable M&A transaction or contested matter to Rule 14a–2(b)(9)(ii), we believe that many of the concerns commenters expressed will be mitigated

by the changes we made from the proposal. For example, to the extent that proxy voting advice businesses generally deliver their advice with respect to M&A transactions or contested matters to clients with less lead time before the applicable meeting, the principles-based requirements of Rule 14a–2(b)(9)(ii)(A) allows proxy voting advice businesses to design and implement policies and procedures that work best for their clients' needs and timing concerns. In addition, to the extent that proxy voting advice businesses amend their advice with respect to M&A transactions or contested matters in light of subsequent events, Rule 14a–2(b)(9)(ii)(A) does not require that proxy voting advice businesses make available to registrants such amended advice.

[408] *See, e.g.,* letters from CFA Institute I; CII IV; CIRCA; Elliott I; Glass Lewis II; ISS; Interfaith Center II; New York Comptroller II; NorthStar; Shareholder Rights II; Washington State Investment; ValueEdge III (stating that it has contacted the Department of Justice to review this proposal and recommends the Commission do the same). Most of these commenters generally opposed the proposed amendments on Constitutional grounds. Further, to the extent such commenters suggested potential alternative regulatory solutions, no commenters offered a more tailored solution that we believe would still achieve the objectives of this rulemaking.

[409] Rule 14a–2(b)(ii)(A). *See also supra* note 342 and accompanying text. We note that at least one proxy voting advice business already makes its proxy reports available for purchase by registrants

upon their release to client. *See* Glass Lewis: Purchase a Proxy Paper, *available at https://www.glasslewis.com/request-a-proxy-paper-or-alert/* (last visited on May 26, 2020).

[410] *See supra* note 408.

[411] *See* Rule 14a–2(b)(9)(v).

[412] We also believe that these modifications from the proposal—among others, the fact that proxy voting advice businesses are not required to give registrants an opportunity to review proxy advice before its dissemination to clients and need not share the advice at all unless registrants acknowledge restrictions on its use—address the concerns raised by some commenters under the takings clause of the Fifth Amendment. *See* letters from CalPERS; ISS.

[413] For example, we understand that some proxy voting advice businesses already provide access to the registrant's proxy filings, including any supplemental proxy materials, automatically through their electronic platform. This kind of

Continued

We believe that the amendments, as modified from the proposal, are consistent with the First Amendment. In today's market, the proxy process represents the primary means by which registrants and their shareholders communicate to determine how the registrant governs itself. They exchange their respective views about the registrants' business operations and other registrant matters, and generally engage in discussions integral to the exercise of the shareholder franchise.[414] The Commission has a strong interest in ensuring that investors are able to obtain and evaluate information pertinent to proxy voting decisions before the vote is held.[415] The amendments are intended to facilitate the kind of robust discussion on which informed shareholder voting decisions depend in light of changing market conditions. Specifically, as discussed above, proxy voting advice businesses today are uniquely situated to influence the voting decisions of institutional investors, which hold an increasingly significant portion of shares in U.S. public companies.[416] The provision of proxy voting advice by these businesses therefore implicates a fundamental concern of our proxy rules.[417] Yet, because a significant percentage of proxy votes are typically cast shortly after a proxy voting advice business delivers its advice, and because currently proxy voting advice is not required to be publicly filed, many voting decisions are made before registrants have a meaningful opportunity to engage with that advice—for example, to address any material factual errors or omissions, or to offer views with respect to the proxy voting advice business's methodologies or conclusions—and to make investors aware of their views in time for investors to benefit from such an exchange.[418]

As previously discussed, the Commission has occasionally adjusted the proxy rules based on market developments to promote informed

proxy voting decision-making.[419] The developments described above have convinced us of the need to update the application of the proxy rules to proxy voting advice businesses to facilitate the kind of robust discussion that would be possible at a meeting before a vote occurs. But at this time we do not believe it is necessary to subject proxy voting advice businesses to the full panoply of information and filing requirements that apply to registrants when seeking proxy authority. While registrants must publicly file soliciting materials and disseminate them to all shareholders, the Commission believes its objectives with respect to proxy voting advice businesses can be achieved by more tailored and far less burdensome and intrusive means.

We are therefore adopting amendments that allow proxy voting advice businesses to continue to be exempt from the filing and information requirements of the proxy rules, conditioned on their inclusion in the proxy voting advice of the conflicts of interest disclosure specified in Rule 14a–2(b)(9)(i) and their adoption and public disclosure of policies and procedures specified in Rule 14a–2(b)(9)(ii).[420] These principles-based requirements are tailored to minimize the burden on proxy voting advice businesses, while still directly advancing the Commission's regulatory objectives.

Although some commenters argued that the proposed amendments discriminated based on viewpoint,[421] our decision to impose exemption conditions on proxy voting advice businesses is unrelated to their viewpoint or message. The conditions apply regardless of the position a proxy voting advice business takes on any particular matter, and regardless of whether voting advice is supportive or adverse to registrants or to others. Proxy voting advice is subject to our proxy rules because it constitutes a

"solicitation" under the Exchange Act. We have tailored the application of those rules to accommodate the unique business model of proxy voting advice businesses while also accounting for the consequential role those businesses have come to play in the proxy process.[422] The amendments to the proxy rules that we adopt in this document—like the rules that apply to registrants and other interested parties under the comprehensive regulatory scheme governing the proxy solicitation process—are intended to facilitate investor access, in a timely manner, to more accurate, complete, and transparent information and robust debate, as would occur at a meeting where shareholders are physically attending and participating. Indeed, the exemption conditions for proxy voting advice apply regardless of the content of the advice on any matter, and far from disapproving of the speech of proxy voting advice businesses, the Commission has recognized the important function proxy voting advice businesses serve in today's markets to some investors.[423]

### D. Amendments to Rule 14a–9

#### 1. Proposed Amendments

Rule 14a–9 prohibits any proxy solicitation from containing false or misleading statements with respect to any material fact at the time and in light of the circumstances under which the statements are made.[424] In addition, such solicitation must not omit to state any material fact necessary in order to make the statements therein not false or misleading.[425] Even solicitations that are exempt from the federal proxy rules' information and filing requirements are subject to this prohibition, as "a necessary means of assuring that communications which may influence shareholder voting decisions are not

---

[414] *Pac. Gas & Elec. Co.* v. *Pub. Utils. Comm'n of Ca.,* 475 U.S. 1, 14 n.10 (1986).

[415] Communications Among Shareholders Adopting Release at 48277; Concept Release at 42983; *see also Business Roundtable,* 905 F.2d at 410 ("The goal of federal proxy regulation was to improve [communications with potential absentee voters] and thereby to enable proxy voters to control the corporation as effectively as they might have by attending a shareholder meeting.").

[416] *See supra* note 18.

[417] *See supra* notes 6 through 17 and accompanying text.

[418] *See supra* note 373 and accompanying text.

[419] *See supra* notes 33–35 and accompanying text. Contrary to the suggestion of some commenters, the Commission's measured pursuit of a similar objective in the amendments adopted in this document does not contradict our past recognition that applying governmental filing requirements to every communication among shareholders and other parties on matters subject to a proxy vote would raise First Amendment concerns. *See supra* note 270 and accompanying text.

[420] *See supra* Sections II.B.3; II.C.3.

[421] *See, e.g.,* letters from Better Markets (expressing concern that apprehensions regarding the accuracy of proxy voting advice businesses' advice have been driven by potentially self-interested corporate management that view proxy voting advice businesses as adversarial); CalPERS; Florida Board; Glass Lewis II; ISS; NYC Comptroller; New York Comptroller II; Public Citizen; Segal Marco II; TRP.

[422] *See SEC* v. *Wall Street Publishing Inst., Inc.,* 851 F.2d 365, 372 (D.C. Cir. 1988) ("Where the federal government extensively regulates a field of economic activity, communication of the regulated parties often bears directly on the particular economic objectives sought by the government, . . . and regulation of such communications has been upheld [as consistent with the First Amendment]."); *cf. Full Value Advisors, LLC* v. *SEC,* 633 F.3d 1101, 1109 (D.C. Cir. 2011) ("Securities regulation involves a different balance of concerns and calls for different applications of First Amendment principles.") (internal quotation marks omitted).

[423] *See supra* Section II.A.3.

[424] 17 CFR 240.14a–9. *See also* Exchange Act Release No. 34–1350, 1937 WL 29099 (Aug. 13, 1937) ("The purpose of [the Commission's proxy] rules is to prevent the dissemination to the security holders and to the general public of untruths, half-truths, and otherwise misleading information which would stand in the way of a fair appraisal of a plan upon its merits by the security holders.").

[425] 17 CFR 240.14a–9.

---

approach would generally be consistent with the principle.

materially false or misleading.'' [426] This includes proxy voting advice that is exempt under Rules 14a–2(b)(1) and (b)(3). The Commission has previously stated that the furnishing of proxy voting advice, while exempt from the information and filing requirements, remains subject to the prohibition on false and misleading statements in Rule 14a–9.[427] We continue to believe that subjecting proxy voting advice businesses to the same antifraud standard as registrants and other persons engaged in soliciting activities, including those engaged in exempt solicitations, is appropriate in the public interest and for the protection of investors. Indeed, the Commission recently issued guidance specifically addressing the application of Rule 14a–9 to proxy voting advice,[428] stating that ''any person engaged in a solicitation through proxy voting advice must not make materially false or misleading statements or omit material facts, such as information underlying the basis of advice or which would affect its analysis and judgments, that would be required to make the advice not misleading.'' [429] To illustrate this point, the Commission gave a list of examples of types of information that a provider of proxy voting advice should consider disclosing in order to avoid a potential violation of Rule 14a–9.[430] This included the methodology used to formulate proxy voting advice, sources of information on which the advice is based, and material conflicts of interest that arise in connection with providing proxy voting advice, without which the advice could be misleading, depending on the specific statements at issue.[431]

Currently, the text of Rule 14a–9 provides four examples of things that may be misleading within the meaning of the rule, depending upon particular facts and circumstances.[432] These are:

- Predictions as to specific future market values;
- Material which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation;
- Failure to so identify a proxy statement, form of proxy and other soliciting material as to clearly distinguish it from the soliciting material of any other person or persons soliciting for the same meeting or subject matter; and
- Claims made prior to a meeting regarding the results of a solicitation.

The Commission proposed to amend this list of examples in Rule 14a–9 to include certain additional types of information that a proxy voting advice business may, depending on the particular facts and circumstances, need to disclose to avoid potentially violating the rule. As proposed, and consistent with the Commission's recent guidance, this included the proxy advice business's methodology, sources of information and/or conflicts of interest to the extent that, under the particular facts and circumstances, the omission of such information would be materially misleading.

In addition, the Commission proposed to amend Rule 14a–9 to address concerns that have arisen when proxy voting advice businesses make negative voting recommendations based on their evaluation that a registrant's conduct or disclosure is inadequate, notwithstanding that the conduct or disclosure meets applicable Commission requirements.[433] The Commission explained that, without additional context or clarification, some clients may mistakenly infer that the negative voting recommendation is based on a registrant's failure to comply with the applicable Commission requirements when, in fact, the negative recommendation is based on the proxy voting advice business's determination that the registrant did not satisfy the specific criteria used by the proxy voting advice business. If the use of the criteria and the material differences between the criteria and the applicable Commission requirements are not clearly conveyed to proxy voting advice businesses' clients, there is a risk that some clients may make their voting decisions based on a misapprehension that a registrant is not in compliance with the Commission's standards or requirements. Similar concerns exist if, due to the lack of clear disclosure,

clients are led to mistakenly believe that the unique criteria used by the proxy voting advice businesses were approved or set by the Commission.

Accordingly, the Commission proposed to add as an example in Rule 14a–9 of what may be misleading within the meaning of the rule, depending upon the particular facts and circumstances, the failure to disclose the use of standards or requirements in proxy voting advice that materially differ from relevant standards or requirements that the Commission sets or approves.[434]

2. Comments Received

Commenters were divided in their views about the proposed amendment.[435] Those in favor of the proposal thought it would have a beneficial impact, reasoning that it would tend to improve the quality of voting advice by making proxy voting advice businesses more accountable for any misleading statements in their advice [436] and incentivizing them to provide more robust information about their methods and sources so that their clients would be in a better position to assess the businesses' recommendations and make informed voting decisions.[437]

---

[426] *See* 1979 Adopting Release at 48942.

[427] *See* Concept Release at 43010.

[428] *See* Question and Response 2 of *Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice,* Release No. 34–86721 (Aug. 21, 2019) [84 FR 47416 (Sept. 10, 2019)] (''Commission Interpretation and Guidance'').

[429] *Id.* at 12.

[430] *Id.* The Commission also noted that some proxy voting advice businesses currently may be providing some of the disclosures described in the list of examples. *Id.* at n. 33.

[431] *Id.*

[432] Rule 14a–9 provides a note preceding the list of examples that reads: ''The following are some examples of what, depending upon particular facts and circumstances, may be misleading within the meaning of this section.'' This note and the examples provided were adopted in their current form by the Commission in 1956. *See* Release No. 34–5276 (Jan. 17, 1956) [21 FR 577 (Jan. 26, 1956)], 1956 WL 7757.

[433] *See* Proposing Release at 66538 n.160.

[434] *See* note (e) to proposed Rule 14a–9. Examples of standards or requirements that the Commission approves are the listing standards of the national securities exchanges, such as the New York Stock Exchange (NYSE). The Commission supervises, and is authorized to approve rules promulgated by, the NYSE and other national securities exchanges pursuant to Section 19 of the Exchange Act.

[435] *See* letters from commenters supporting the proposal, *e.g.,* ACCF (asserting that the proposals will increase accountability); Axcelis; John D. Campbell, Vice President, Government Relations, Ball Corporation (Jan. 31, 2020) (''Ball Corp.''); BIO; BRT; CCMC; CGC; Charter; Ecolab; ExxonMobil; FedEx; GM; IBC; NAM; Nareit; Nasdaq; SCG; James L. Setterlund, Executive Director, Shareholder Advocacy Forum (Feb. 3, 2020) (''Shareholder Advocacy''); TechNet. *But see* letters from commenters opposing the proposal, *e.g.,* Baillie Gifford; CalPERS; CII IV; CIRCA; Elliott I; Glass Lewis II; ISS; MFA & AIMA; PIAC II (although it agreed that proxy voting advice businesses should disclose material information relating to their methodology, sources of information, and conflicts of interest, the commenter indicated that it was satisfied with the disclosures currently provided and did not believe specific regulation on this point was necessary).

[436] *See, e.g.,* letters from ExxonMobil (supporting the proposal's clarification that Rule 14a–9 applies to material information concerning a proxy voting advice business's methodology, sources of information, and conflicts of interest); GM.

[437] *See, e.g.,* letters from BRT (''[I]t is important that proxy advisors not omit the disclosure of information underlying the basis of their advice or which would affect its analysis and judgment''); ExxonMobil; Nasdaq (''We agree with the Commission that the amendments are in the public interest, promote investor protection, and help ensure that investors are provided the information they need to make fully informed voting decisions.''); SCG.

Several such commenters voiced concerns that proxy voting advice businesses were not sufficiently transparent about their methodologies, models, and formulas used to generate their recommendations.[438] Some commenters also believed that proxy voting advice businesses do not adequately adjust their methodologies to take into account the unique circumstances of different companies and therefore more transparent disclosure of methodologies would help investors discern the extent to which voting advice may be based on a "one-size-fits-all" approach.[439]

Other commenters specifically approved of the proposed amendment's reference to a proxy voting advice business's use of standards that materially differ from relevant Commission standards or requirements.[440] These commenters were concerned that not all investors were fully aware when proxy voting advice businesses applied their own analytical standards that differed from the Commission's or other applicable regulatory standards.[441]

On the other hand, some commenters contended that, in general, the proposed amendment to Rule 14a–9 would heighten legal uncertainty and litigation risk for proxy voting advice businesses because it would broaden the concept of materiality and create a new source of liability for proxy voting advice businesses, the scope of which is not sufficiently clear.[442] Two commenters also suggested that the proposed amendment may be prohibited by the First Amendment.[443]

Commenters that opposed the proposed amendment's reference to a proxy voting advice business's use of standards that materially differ from relevant Commission standards or requirements argued that it was unnecessary and based on the flawed premise that clients are either unaware of, or lack the sophistication necessary to appreciate, the distinction between a company's failure to satisfy the particular analytical standards employed by a proxy voting advice business and a company's failure to comply with relevant regulatory standards.[444] Commenters made the point that most clients are well aware of such differences and often maintain custom policies that are more rigorous than relevant regulatory standards and require the proxy voting advice business to apply such policies when preparing their proxy voting advice.[445] Moreover, commenters stated that in many cases

clients hire proxy voting advice businesses precisely because they are aware and approve of these businesses using certain standards that exceed applicable regulations.[446] In addition, other commenters asserted that the proxy voting advice businesses' disclosures about the use of differing standards were already sufficiently clear.[447]

Finally, some commenters recommended modifications to the proposal that would have added a number of specific examples to the list in Rule 14a–9 of information that may be material and needs to be disclosed in certain circumstances.[448] Others requested further clarification on questions related to the scope and application of the proposed amendment[449] or suggested that Rule 14a–9 be modified to exclude the content of recommendations or differences of opinion between management and proxy voting advice businesses.[450]

---

[438] *See, e.g.,* letters from BRT ("Proxy advisors offer little transparency into their internal standards, procedures, and methodologies. Neither ISS nor Glass Lewis fully discloses the methodologies used to develop their voting recommendations"); CEC; FedEx; GM; NAM; Nasdaq; TechNet.

[439] *See, e.g.,* letters from CCMC (noting that proxy voting advice businesses have been criticized for "a one-size-fits-all approach of voting recommendations that ignores the unique characteristics and operations of individual companies and industries"); FedEx; Nasdaq; NAM; Nareit; TechNet (further noting that "one-size-fits-all" methodologies across different subject areas often fail to account for unique differences between companies).

[440] *See, e.g.,* letters from BRT; CCMC; GM ("[N]egative voting recommendations from a proxy advisor may not align with the Commission's requirements, which can mislead or cause confusion among proxy voters. We therefore believe that proxy voters should have the benefit of this additional context to ensure that they are fully informed and understand the standards employed by a proxy advisor when reviewing their voting recommendations."); Nareit; Nasdaq ("In Nasdaq's own experience, ISS has determined that a director was not independent under its criteria even though the director was independent under Nasdaq and SEC rules."); SCG.

[441] *See, e.g.,* letters from BIO (stating "that it is important for proxy voting advice businesses to clarify when a negative voting recommendation is based on the proxy voting advice business's own determination that a registrant's conduct or disclosure is inadequate, notwithstanding that the conduct or disclosure meets applicable SEC requirements"); BRT ("Business Roundtable member companies are concerned that, when making recommendations, proxy advisors rely upon information not included in the company's public SEC filings or on factors other than the actual regulatory requirements to which companies are subject. For instance, proxy advisors have their own guidelines for determining the independence of directors. This has resulted in situations where a proxy advisor recommends against a director's

election because it decided that the director is not independent under its standards, despite the fact that the company's board of directors—carrying out its fiduciary duties— determined that the director in question was independent under the Commission's requirements, the company's stock exchange listing rules and its corporate governance guidelines."); Charter; SCG (asserting that proxy voting advice businesses "apply standards or policies that differ from SEC and/or stock exchange listing requirements frequently enough that it strains credulity to believe that the reasonable investor always understands whether a voting recommendation reflects (non)compliance with existing rules/regulations/standards or simply proxy advisor judgment").

[442] *See, e.g.,* letters from Carl C. Icahn (Feb. 7, 2020) ("C. Icahn"); CalPERS; CIRCA; Elliott I; Glass Lewis II (asserting that the Commission does not adequately explain how, for example, a failure to disclose information regarding "use of standards that materially differ from relevant standards or requirements that the Commission sets or approves" could mislead shareholders); MFA & AIMA.

[443] *See* letters from CII IV; ISS. Our clarification below that differences of opinion are not actionable under the final amendment to Rule 14a–9 resolves these constitutional concerns.

[444] *See, e.g.,* letters from CalPERS ("We think it would be rare for the professionals that actually use proxy voting advice to make such a mistaken inference."); CII IV; Glass Lewis II.

[445] *See, e.g.,* letters from CalPERS ("Existing clients . . . already know when proxy voting advice businesses produce their own guidance as opposed to report on the minimal requirements of the SEC."); CII IV; Glass Lewis II.

[446] *See, e.g.,* letter from PIAC II ("Proxy advisors are paid to make recommendations based on governance best practices rather than legal or regulatory minimums and PIAC members expect the standards of proxy advisors to exceed those minimums.").

[447] *See, e.g.,* letters from CalPERS ("[The Proposing Release] provides examples highlighting a problem that does not exist in reality because proxy voting advice businesses already distinguish their advice from SEC guidance . . . Competent lay people doing a minimal amount of research will find that proxy advisors routinely inform clients about where the standards come from because clients want to know."); CII IV (noting that the Commission did not produce examples of research reports to support its assertions in the Proposing Release).

[448] *See, e.g.,* letters from BRT; CCMC ("[W]e would expand the 'relevant standards or requirements' to also include those set by any relevant stock exchange. As another example, we would also list a proxy advisor's failure to disclose whether a registrant disputes any findings in the proxy advisor's report or whether a proxy advisor diverges from its own publicly disclosed guidelines."); Exxon Mobil (suggesting that the rules should also address proxy voting advice that is "not designed to maximize shareholder value, like SRI specialty reports" and require "risk factor" style disclosures about the value of an investment when a proxy voting advice businesses applies a standard other than shareholder value); Nareit (requesting the Commission to expand the list to require disclosure "when voting is predicated on an advisory firm's standard that materially differs from relevant statutory requirements of the state in which the issuer is chartered"); Nasdaq; TechNet.

[449] *See, e.g.,* letters from Baillie Gifford (inquiring, among other things, whether failure to disclose conflicts of interest would be a breach of Rule 14a–9); K. Beaugez; BRT ("Additionally, the Commission should specifically make clear whether these anti-fraud provisions [of Rule 14a–9] apply when proxy advisors' voting reports include information, statements or opinions that have not been included in material filed with the Commission"); Exxon Mobil; CIRCA.

[450] *See* letter from PRI II.

## 3. Final Amendments

We are adopting amendments to Rule 14a–9 that will add to the examples of what may be misleading within the meaning of the rule, largely as proposed, but with one modification in response to comments received. Consistent with the Commission's guidance on proxy voting advice,[451] the Note to Rule 14a–9 will include new paragraph (e) to provide that the failure to disclose material information regarding proxy voting advice, "such as the proxy voting advice business's methodology, sources of information, or conflicts of interest" could, depending upon particular facts and circumstances, be misleading within the meaning of the rule. However, for the reasons given in the discussion that follows, new paragraph (e) will not include the proposed clause "or use of standards that materially differ from relevant standards or requirements that the Commission sets or approves."

The ability of a client of a proxy voting advice business to make voting decisions is affected by the adequacy of the information it uses to formulate such decisions. Consistent with the Commission Interpretation on Proxy Voting Advice, the final amendments are designed to further clarify the potential implications of Rule 14a–9 for proxy voting advice specifically, and to help ensure that proxy voting advice businesses' clients are provided with the material information they need to make fully informed decisions.

Although we acknowledge commenters' concerns around the potential for heightened litigation risk associated with the proposed changes to Rule 14a–9,[452] we reiterate that Rule 14a–9 is grounded in materiality, and amending the rule to include updated examples of potentially misleading disclosure, depending on the facts and circumstances, in no way changes its application or scope. The amendment to Rule 14a–9 does not broaden the concept of materiality [453] or create a new cause of action, as some have suggested. As discussed above, the Commission has long taken the view that proxy voting advice generally constitutes a "solicitation." [454] Because Rule 14a–9 applies to all solicitations, even those made in reliance on an exemption from the information and

filing requirements of the federal proxy rules, proxy voting advice businesses and other market participants should have been on notice that Rule 14a–9 applies to proxy voting advice. The amendment also does not make "mere differences of opinion" actionable under Rule 14a–9.[455] Rather, it further clarifies what has long been true about the application of Rule 14a–9 to proxy voting advice and, more generally, proxy solicitations as a whole: No solicitation may contain any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.[456] The addition of paragraph (e) to the Note to Rule 14a–9, the substance of which has not been updated for over six decades, to account for contemporary market practices (including the prevalent use of proxy voting advice by institutional investors and others),[457] further clarifies that proxy voting advice is subject to Rule 14a–9. The addition of paragraph (e) also underscores that the examples are among the types of information that may provide material context without which, depending on the facts and circumstances, the proxy voting advice may run afoul of the rule. The examples are illustrative only, and are not intended to be exhaustive or absolute, or supersede the materiality principle or the facts and circumstances analysis required in each particular case.

As noted above, however, we have determined not to adopt the proposed example related to the use of standards that materially differ from relevant standards or requirements that the Commission sets or approves. To the extent that a proxy voting advice business does not make clear to its clients that it is making a negative voting recommendation based on its own criteria, notwithstanding that the registrant has complied with the applicable standards established or approved by the Commission, there is a risk that the proxy voting advice business's clients may misunderstand the basis for the proxy voting advice business's recommendation. The proposed amendment regarding use of standards or requirements in proxy

voting advice that materially differ from relevant standards or requirements that the Commission sets or approves was designed to help ensure that proxy voting advice businesses' clients are provided the information they need to make a "fair appraisal" [458] of the recommendation and to clarify the potential implications of Rule 14a–9.

Nevertheless, we understand the concerns expressed by some commenters who asserted that the perceived lack of clarity regarding the scope of the proposed clause "or use of standards that materially differ from relevant standards or requirements that the Commission sets or approves," which was not discussed in the earlier guidance, may increase legal uncertainty and litigation risks to both proxy voting advice businesses and registrants, and that the lack of legal certainty could affect the quality of analyses provided by proxy voting advice businesses.[459] We continue to believe that there could well be occasions where, for example, the omission or distortion of essential context from a proxy voting advice business's explanation of its methodologies may be misleading under a materiality principle and the particular facts and circumstances, such that a shareholder's ability to make an informed voting decision is subverted. However, we also believe that the existing principles of Rule 14a–9 are sufficiently robust to encompass such a situation, which ultimately will come down to a question of facts and circumstances. For that reason, we do not think it is necessary to memorialize this potentially nuanced situation with an illustrative example that, because it is by definition a generalization, could create more confusion than clarity.

Therefore, we are adopting the amendment to Rule 14a–9 without this example. However, this does not negate the fact that Rule 14a–9's prohibition against materially misleading solicitations applies to proxy voting advice where the disclosures are so materially deficient that the investor could not be reasonably expected to understand that the proxy voting advice business is applying a different standard to its analysis, and therefore may vote based on such misapprehension. For similar reasons, we are also not electing to expand the list of examples beyond

---

[451] *See supra* notes 428 through 431 and accompanying text.

[452] *See, e.g.,* letters from C. Icahn; CalPERS; CIRCA; Elliott I; Glass Lewis II; MFA & AIMA; Minerva I.

[453] *See* letter from CalPERS.

[454] *See supra* notes 149 through 154 and accompanying text.

[455] *See, e.g.,* letter from PRI II ("[The Commission] . . . should . . . narrow the scope of the Proposed Rule to avoid chilling litigation over proxy advice, for example, by ensuring that Rule 14a–9 does not cover the content on recommendations or mere differences of opinion between management and proxy firms.").

[456] *See* Rule 14a–9.

[457] *See supra* note 432.

[458] *See supra* note 424.

[459] *See, e.g.,* letters from C. Icahn; CalPERS; Glass Lewis II; MFA & AIMA.

what was proposed, as suggested by some commenters.[460]

*E. Compliance Dates*

The Commission proposed a one-year transition period after the publication of the final rule in the **Federal Register** to give affected parties sufficient time to comply with the proposed new requirements, including the development of any necessary processes and systems.[461]

Some commenters, however, thought that a longer transition period would be necessary given their expectation that affected parties, particularly proxy voting advice businesses, would need to devote significant time and resources in order to bring their systems and processes into compliance.[462] As an alternative, two commenters suggested extending the transition period to eighteen months.[463] Other commenters recommended that small entities be given an extended timeframe for compliance.[464] One commenter also suggested that the Commission consider a phased implementation schedule that would not interfere with the peak of proxy season that typically occurs during the spring each year.[465]

We continue to believe that a transition period for compliance with new Rule 14a–2(b)(9) is appropriate. Based on commenter feedback, as well as the Commission's interest in limiting unnecessary disruptions during the peak proxy season, proxy voting advice businesses subject to the final rules will not be required to comply with the amendments to Rule 14a–2(b)(9) until December 1, 2021. We believe that the length of the transition period will accommodate the need of affected parties to have sufficient time to prepare for compliance with Rule 14a–2(b)(9) while also recognizing that our adoption of a principles-based framework should allow proxy voting advice businesses and other parties the flexibility to leverage their existing practices and mechanisms to more efficiently integrate their operations with the new requirements. The compliance date for

Rule 14a–2(b)(9) is intended to sufficiently precede the typical commencement of the proxy season for 2022, so as to minimize disruption to the normal functioning of the proxy system. However, we welcome early compliance with the amendment. We note that the transition period only applies with respect to the amendments to Rule 14a–2(b)(9) and does not extend to the amendments to Rule 14a–1(l) and Rule 14a–9. Because these other amendments codify existing Commission interpretations and guidance, and do not impose new obligations that necessitate significant time for preparation, we do not believe the same rationale for a transition period exists.

**III. Other Matters**

If any of the provisions of these rules, or the application thereof to any person or circumstance, is held to be invalid, such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application. For example, the amendments to Rule 14a–2(b)(9)(i) operate independently from the amendments to Rule 14a–2(b)(9)(ii), and both provisions operate independently from the amendments to Rules 14a–1(1) and 14a–9.

Pursuant to the Congressional Review Act, the Office of Information and Regulatory Affairs has designated these rules a ''major rule,'' as defined by 5 U.S.C. 804(2).

**IV. Economic Analysis**

The discussion below addresses the economic effects of the amendments, including their anticipated costs and benefits, as well as the likely effects of the amendments on efficiency, competition, and capital formation.[466] We also analyze the potential costs and benefits of reasonable alternatives to the amendments. Where practicable, we have attempted to quantify the economic effects of the amendments; however, in certain cases, we are unable

to do so because either the necessary data are unavailable or certain effects are not quantifiable. In the Proposing Release, we requested comment on our analysis of these effects. A few commenters provided quantitative estimates, and we have addressed and incorporated, where appropriate, those estimates into our analysis below. We also provide qualitative economic assessments for effects for which we are unable to provide quantitative estimates.

*A. Introduction*

We are adopting amendments to Exchange Act Rule 14a–2(b) to condition the availability of existing exemptions from the information and filing requirements of the proxy rules on proxy voting advice businesses satisfying certain additional disclosure and procedural requirements. These conditions will require proxy voting advice businesses to provide enhanced conflicts of interest disclosure. They will also separately require proxy voting advice businesses to: (i) Adopt and publicly disclose written policies and procedures reasonably designed to ensure that the proxy voting advice business's proxy voting advice is made available to registrants at or prior to the time when such advice is disseminated to the proxy voting advice business's clients; and (ii) adopt and publicly disclose written policies and procedures reasonably designed to ensure that the proxy voting advice business provides clients with a mechanism by which they can reasonably be expected to become aware of a registrant's written statements about the proxy voting advice in a timely manner before the shareholder meeting. We also are codifying the Commission's interpretation that, as a general matter, proxy voting advice constitutes a solicitation within the meaning of Exchange Act Rule 14a–1(l). Finally, we are amending Exchange Act Rule 14a–9 to add as an example of a potentially material misstatement or omission within the meaning of the rule, depending upon particular facts and circumstances, the failure to disclose material information related to the proxy voting advice business's methodology, sources of information, or conflicts of interest.

We have considered the economic effects of the final amendments, including their effects on competition, efficiency, and capital formation. The purpose of the final amendments is to help ensure that investors who use proxy voting advice have access to more complete, accurate, and transparent information and are able to benefit from

---

[460] *See, e.g.,* letters from BRT; CCMC; CII IV; Exxon Mobil; NAM; Nareit; Nasdaq; TechNet.

[461] *See* Proposing Release at 66539.

[462] *See* letters from CalPERS; CII IV; Felician Sisters II; Glass Lewis II; Good Shepherd; IASJ; Interfaith Center II; New York Comptroller II; St. Dominic of Caldwell.

[463] *See* letters from CII IV; Glass Lewis II (additionally recommending that the effectiveness of final rules be delayed pending resolution of ongoing litigation that could impact the statutory and constitutional bases for the rulemaking).

[464] *See* letters from Felician Sisters II; Good Shepherd; IASJ; Interfaith Center II; St. Dominic of Caldwell.

[465] *See* letter from Glass Lewis II.

[466] Section 3(f) of the Exchange Act [17 U.S.C. 78c(f)] directs the Commission, when engaging in rulemaking where it is required to consider or determine whether an action is necessary or appropriate in the public interest, to consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation. Further, Section 23(a)(2) of the Exchange Act [17 U.S.C. 78w(a)(2)] requires the Commission, when making rules under the Exchange Act, to consider the impact that the rules would have on competition, and prohibits the Commission from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.

a robust discussion of views—similar to what is possible at a meeting where shareholders and other parties are physically attending and participating—when making their voting decisions. We generally expect the final amendments to reduce information asymmetries between proxy voting advice businesses and their clients by eliciting more tailored and comprehensive disclosure of conflicts of interest and by facilitating client access to more complete information on matters that are the subject of proxy voting advice. We also believe that the final amendments may mitigate certain agency costs associated with the clients' use of proxy advice voting businesses and thereby facilitate more efficient use of the services provided by such businesses while preserving their economies of scale.[467]

As a threshold matter, the relationship between a proxy voting advice business client and a proxy voting advice business is an example of an agency relationship. As in any principal-agent relationship, the agent (the proxy voting advice business) may not always act in the best interests of the principal (the client).[468] The conditions imposed on proxy voting advice businesses by the final amendments may reduce the costs that arise from this divergence of interests. For example, by requiring proxy voting advice businesses to provide clients with more tailored and comprehensive conflict of interest disclosure than is currently required, the amendments may make it possible for proxy voting advice businesses to more credibly reassure their clients that relevant conflicts have been disclosed, and potentially addressed (by reducing the ability of proxy voting advice businesses to obfuscate information about conflicts or selectively disclose conflicts), than is otherwise achieved by the current system of conflict disclosure. In addition, to the extent that relevant conflicts are better understood by a

client as a result of the more tailored and comprehensive disclosure, the client will be better able to assess the objectivity of proxy voting advice against the influence of potentially competing interests and thus to monitor proxy voting advice business services. Moreover, by separately ensuring that registrants receive notice of proxy voting advice and a proxy voting advice business provides clients with a mechanism by which they can become more readily aware of registrant responses to that advice, the final amendments may reduce the costs clients might otherwise incur to acquire information relevant to assessing proxy voting advice and increase the efficiency of this segment of the proxy system. At the same time, the final amendments will likely impose certain additional direct costs on proxy voting advice businesses which may offset this reduction in agency costs. However, as we detail in later sections, we expect the flexibility afforded by the final amendments and current practices of at least the three major proxy voting advice businesses in the United States will serve to limit those direct costs.

As explained in more detail below, many of the economic effects of the amendments cannot be reliably quantified. Consequently, while we have attempted to quantify the economic effects expected from the amendments wherever practicable, much of the discussion remains qualitative in nature. Where we are unable to quantify the potential economic effects of the final amendments, we provide a qualitative assessment of these effects as well as the potential impacts of the amendments on efficiency, competition, and capital formation.

### 1. Overview of Proxy Voting Advice Businesses' Role in the Proxy Process

Every year, retail investors, institutional investors, and investment advisers face decisions on whether and how to vote on a significant number of matters that are subject to a proxy vote.[469] These matters range from the election of directors and the approval of

equity compensation plans to shareholder proposals submitted under Exchange Act Rule 14a–8. In addition to matters presented at a company's annual shareholder meeting, investors and investment advisers also make voting determinations when a matter is presented to shareholders for approval at a special meeting, such as a merger or acquisition or a sale of all or substantially all of the assets of the company. As described above, investment advisers and institutional investors play a large role in proxy voting for various reasons, including because institutional investors and clients of investment advisers individually or collectively own a large aggregate fraction of many U.S. public companies.[470] We understand that voting can be resource intensive for investors that hold or investment advisers that manage diversified portfolios. It involves organizing proxy materials, performing due diligence on portfolio companies and matters to be voted on, determining whether and how votes should be cast, and submitting proxy cards to be counted. Proxy voting advice businesses offer to perform a variety of tasks related to voting, including the following:

• Analyze and make voting recommendations on the matters presented for shareholder vote and included in the registrants' proxy statements;

• Execute proxy votes (or voting instruction forms) in accordance with their benchmark policy, a specialty policy, or a custom policy;[471]

• Assist with the administrative tasks associated with voting and keep track of the large number of voting determinations; and

• Provide research and identify potential risk factors related to corporate governance.

We also understand that, in the absence of the services offered by proxy voting advice businesses, investment advisers and other clients of these businesses may expend considerable resources to independently conduct the work necessary to analyze, recommend, and make voting determinations. As a consequence, we understand that some

---

[467] Researchers define a contract under which one or more persons (the principals) engage another person (the agent) to perform some service on their behalf as an agency relationship. ''Agency costs'' in the principal-agent relationship consist of: The cost to the principal of monitoring the agent to limit aberrant activities; ''bonding'' costs to the agent to reassure the client that the agent will not take certain actions that would harm the principal or that the principal will be compensated if the agent takes such actions; and the ''residual loss,'' or the loss of welfare to the principal from the divergence of activities by the agent from the interests of the principal. See Michael C. Jensen & William H. Meckling, Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure, 3 J. Fin. Econ. 305 (1976).

[468] For example, agents may benefit by enhancing revenues, decreasing costs, both, or by taking actions other than those that are in the principals' best interest. Id.

[469] 17 CFR 240.14a–8; see, e.g., letters from Barbara Novick, Vice Chairman, BlackRock, Inc. (Feb. 3, 2020) (''BlackRock'') (''BlackRock acts as a fiduciary for its clients. In this capacity, we engage with thousands of companies globally and we vote in proxies at over 16,000 company meetings annually.''); NYC Comptroller (''For the year ending June 30, 2019, my office voted on 126,775 individual ballot items at 13,122 shareowner meetings in 86 markets around the world. . . .''); see also letter in response to the SEC Staff Roundtable on the Proxy Process from Ohio Public Retirement (Dec. 18, 2018) (''OPERS receives in excess of 10,000 proxies in any given proxy season.'').

[470] See supra note 10 and accompanying text. See also Broadridge & PwC, 2019 Proxy Season Review, ProxyPulse (2019), at 1, available at https://www.broadridge.com/_assets/pdf/broadridge-proxypulse-2019-review.pdf (estimating that institutions own 70% of public company shares) (''Broadridge PwC 2019 Report''); Charles McGrath, 80% of Equity Market Cap Held by Institutions, Pensions & Investments (Apr. 25, 2017), available at https://www.pionline.com/article/20170425/INTERACTIVE/170429926/80-of-equity-market-cap-held-by-institutions.

[471] See letter from ISS.

investment advisers and institutional investors find it efficient to hire proxy voting advice businesses to perform various voting and voting-related services, rather than performing them in-house.[472] Proxy voting advice businesses generally are able to capture significant economies of scale that are not available to many investment advisers and institutional investors on an individual basis.[473]

In 2007, the U.S. Government Accountability Office ("GAO") found that among 31 institutions, including mutual funds, pension funds, and asset managers, large institutions relied less than small institutions on the research and recommendations offered by proxy voting advice businesses. Large institutions indicated that their reliance on proxy voting advice businesses was limited because they: (i) Conduct their own research and analyses to make voting determinations and use the research and recommendations offered by proxy voting advice businesses only to supplement such analyses; (ii) develop their own voting policies, which the proxy voting advice businesses are responsible for executing; and (iii) contract with more than one proxy voting advice business to gain a broader range of information on proxy issues.[474] In contrast, small institutions said they had limited resources to conduct their own research and tended to rely more heavily on the research and recommendations offered by proxy voting advice businesses.[475] The

findings of a 2016 GAO study that surveyed 13 institutional investors were similar.[476]

As discussed in Section I above, proxy voting advice businesses have the potential to influence many investors' voting decisions and, as a result, the overall vote. Clients of proxy voting advice businesses number in the thousands, and they exercise voting authority or influence over a sizable number of shares that are voted annually. Commenters described the informational benefits that clients derive from proxy voting advice[477] and how proxy voting advice businesses enable them to make informed voting determinations on behalf of investors and beneficiaries.[478]

To the extent that proxy voting advice businesses influence voting decisions, they also may indirectly impose certain costs on shareholders. Recent theoretical research on the role of proxy voting advice suggests that the presence of proxy voting advice businesses may induce investors to over-rely on information produced by these businesses to make voting decisions. This over-reliance arises because shareholders do not internalize the benefits for other shareholders of their own independent research of matters put to a vote. Instead shareholders find it privately efficient to outsource the analysis of voting decisions to proxy voting advice businesses.[479] Additionally, if proxy voting advice

businesses significantly influence voting,[480] registrants and other market participants may seek to engage with proxy voting advice businesses rather than engaging directly with investors or registrants. Thus, the presence of proxy voting advice businesses may negatively affect the ability of certain investors to engage with and influence registrants and other investors. On the other hand, from a transactions cost perspective, being able to engage with a few large and important intermediaries, compared to engaging bi-laterally with multiple shareholders, may be more efficient for registrants and investors.

Although the economic incentives to concentrate voting power and influence in proxy voting advice businesses are strong, research on the role of proxy voting advice businesses in influencing voting, however, has produced a wide range of results. For example, a number of studies suggest that proxy voting advice has substantial influence on proxy votes,[481] while others suggest a more limited influence.[482] We note that existing academic studies examine the relationship between proxy votes and proxy voting advice businesses' recommendations based on benchmark policies. The relationship between proxy votes cast and voting recommendations provided to clients using clients' custom policies has not, to date, been the subject of academic study.[483]

[472] See Concept Release at 42983.

[473] See Chester S. Spatt, Proxy Advisory Firms, Governance, Market Failure, and Regulation 7 (2019), available at https://www.milkeninstitute.org/sites/default/files/reports-pdf/Proxy%20Advisory%20Firms%20FINAL.pdf ("Spatt (2019)"). Commenters also suggest that proxy voting advice businesses are an economically efficient means of collecting information and analyzing voting issues. See, e.g., letter from CEC.

[474] See U.S. Gov't Accountability Office, GAO–07–765, Report to Congressional Requesters, Corporate Shareholder Meetings: Issues Relating to the Firms that Advise Institutional Investors on Proxy Voting, 17–18 (2007), available at https://www.gao.gov/new.items/d07765.pdf ("2007 GAO Report"); see also Letters in response to the SEC Staff Roundtable on the Proxy Process from BlackRock (Nov. 16, 2018) ("BlackRock's Investment Stewardship team has more than 40 professionals responsible for developing independent views on how we should vote proxies on behalf of our clients."); NYC Comptroller (Jan. 2, 2019) ("We have five full-time staff dedicated to proxy voting during peak season, and our least-tenured investment analyst has 12 years' experience applying the NYC Funds' domestic proxy voting guidelines."); Transcript of the Roundtable on the Proxy Process at 194 (comments of Mr. Scot Draeger) ("If you've ever actually reviewed the benchmarks, whether it's ISS or anybody else, they're very extensive and much more detailed than small firm[s] like ours could ever develop with our own independent research.").

[475] 2007 GAO Report, supra note 474, at 17–18.

[476] See 2016 GAO Report, supra note 141, at 2.

[477] See letter from Kenneth A. Bertsch, Executive Director, and Jeffrey P. Mahoney, General Counsel, Council of Inst. Investors (Feb. 20, 2020) ("CII VIII").

[478] See, e.g., letters from MFA & AIMA; New York Comptroller II.

[479] See generally Andrey Malenko & Nadya Malenko, Proxy Advisory Firms: The Economics of Selling Information to Voters, 74 J. Fin. 2441 (2019). In their theoretical model, the authors assume shareholders have perfectly aligned incentives, with all shareholders agreeing on share value maximization as the singular goal of the firm so the applicability of their results is limited by the extent to which investors have goals other than, or in addition to, share value maximization. The authors further assume that proxy advice is provided by a single monopolistic proxy advisory firm, and that shareholders follow proxy advisory firm advice without exception. Additionally, the authors assume that when deciding whether to invest in their own independent research, shareholders believe that their votes will be pivotal to the vote outcome. The ownership structure of the company is key to the reported findings: The paper shows that proxy advisory services are valuable when ownership is sufficiently dispersed. In contrast, proxy advisory services are likely to have negative effects for companies with more concentrated ownership because they discourage independent information acquisition by shareholders. However, their results also imply that when ownership is very concentrated shareholders again find proxy advisory services to be valuable because each shareholder's vote is more likely to be pivotal.

[480] See infra notes 481 and 482.

[481] See, e.g., Cindy R. Alexander et al., Interim News and the Role of Proxy Voting Advice, 23 Rev. Fin. Stud. 4419, 4422 (2010); Alon Brav et al., Picking Friends Before Picking (Proxy) Fights: How Mutual Fund Voting Shapes Proxy Contests (Columbia Bus. Sch., Research Paper No. 18–16, 2019) at 4, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3101473 ("Brav et al. (2019)"); James R. Copland, David F. Larcker, & Brian Tayan, The Big Thumb on the Scale: An Overview of the Proxy Advisory Industry (Stanford Bus. Sch. Closer Look Series, May 30, 2018) at 3, available at https://www.gsb.stanford.edu/sites/gsb/files/publication-pdf/cgri-closer-look-72-big-thumb-proxy-advisory.pdf; James R. Copland, David F. Larcker, & Brian Tayan, Proxy Advisory Firms: Empirical Evidence and the Case for Reform, Manhattan Institute (May 2018) at 6, available at https://media4.manhattan-institute.org/sites/default/files/R-JC-0518-v2.pdf ("Copland et al. (2018)"); Albert Verdam, An Exploration of the Role of Proxy Advisors in Proxy Voting (Working Paper, 2006) at 23, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=978835 ("Verdam (2006)"); See letter from Chong Shu, University of Southern California, Marshall School of Business (Jun. 22, 2020).

[482] See Stephen Choi, Jill Fisch, & Marcel Kahan, The Power of Proxy Advisors: Myth or Reality?, 59 Emory L.J. 869, 905–06 (2010). See also Brav et al. (2019), supra note 481, at 35. The authors find that larger mutual fund families cast votes "in ways completely independent from what are recommended by the advisors."

[483] Commenters stated that a large majority of proxy votes are cast by proxy advice business clients who provide custom policies to proxy voting

Research on the role of proxy voting advice businesses in proxy voting has also produced inconclusive results with respect to the quality of voting advice. For example, proxy voting advice businesses have been the subject of criticism for potentially being influenced by conflicts of interest,[484] producing reports that contain inaccuracies, and utilizing one-size-fits-all methodologies when evaluating a diverse array of registrants or when providing services to a diverse array of clients.[485]

To assess the quality of voting advice, studies have sought to examine stock market reactions to registrants' announcements that they will adopt policies consistent with proxy voting advice businesses' recommendations.[486] These studies hypothesize that the value of such policies should be impounded in stock prices, and if investors expect adoption of a particular policy to increase the value of a registrant, an announcement that the registrant plans to adopt the policy should be associated with a positive stock price reaction. This reasoning assumes clients aim to increase a registrant's share price and that proxy voting advice businesses tailor voting recommendations to achieve this aim. Proxy voting advice businesses and certain of their clients,

however, may have goals other than, or in addition to, maximizing the current value of a registrant's shares. Furthermore, the attribution of stock price reactions to the adoption of policies by a registrant may be challenging due to multiple announcements and other information about the registrant that may be released concurrently. Together, these limitations make it difficult for researchers to conclusively infer recommendation quality from stock market reactions to implementation of proxy voting advice business recommendations.[487]

## 2. Commenter Concerns Regarding the Rule's Economic Justification

In response to the Proposing Release, commenters expressed a range of views regarding the rule's economic justification. Some commenters asserted that there are failures in the market for proxy advice that justify the final rule.[488] In addition to a variety of anecdotal evidence, some commenters provided surveys of registrants,[489] corporate governance professionals,[490] and retail investors[491] that indicated concerns about factual inaccuracies and conflicts of interest in the proxy voting process.

Other commenters stated, generally, that there is no principal-agent problem or other market failure and that the proposed rule's economic analysis failed to describe or provide demonstrable evidence of a problem in

the market for proxy advice that cannot be solved via contractual arrangements in the private sector, other market based mechanisms, or existing Commission rules (*e.g.,* Rule 206(4)–6 under the Investment Advisers Act).[492] For example, one commenter disputed the claims cited in the Proposing Release that proxy voting advice contains inaccuracies or errors significant enough to require regulatory intervention, stating that proxy voting advice businesses "have every incentive to conduct credible research and provide accurate recommendations."[493] Another commenter provided analysis showing that two proxy voting advice businesses are more likely to recommend their clients vote with management than a typical investor is to vote with management, casting doubt on claims that proxy voting advice businesses tend to encourage shareholders to oppose management proposals.[494] Another commenter provided independent analysis of the dynamics of proxy vote recommendations, showing that they change over time in response to events

---

advice businesses and, in return, receive customized voting recommendations based on those policies. *See* letter from ISS. To our knowledge, however, no academic study examines the relation between proxy votes and the voting recommendations provided under the client's custom policies. It is our understanding that clients who receive voting recommendations based on custom policies also receive the proxy voting advice business's benchmark reports.

[484] For example, some proxy voting advice businesses provide consulting services to registrants on corporate governance or executive compensation matters, such as assistance in developing proposals to be submitted for shareholder vote. *See* Concept Release at 42889. As a result, some proxy voting advice businesses provide advice regarding a registrant to their institutional investor clients on matters for which they may also provide consulting services to the registrant. One commenter submitted research that attempts to identify and quantify the impact of conflicts of interest on recommendations and the effect of competition between proxy voting advice businesses on the likelihood of biased recommendations. The research finds that competition reduces recommendations in favor of management, and that biased recommendations have negative effects on registrants. The ability to identify the provision of consulting services and to measure biases in recommendations, however, represents a significant data challenge for the estimation of the purported effects. *See* letter from Prof. Li.

[485] *See* letter from CCMC.

[486] *See generally* David F. Larcker, Allan L. McCall, & Gaizka Ormazabal, *Outsourcing Shareholder Voting to Proxy Advisory Firms,* 58 J.L. & Econ. 173 (2015) (finding that when registrants adjust their compensation program to be more consistent with recommendations of proxy voting advice businesses, the stock market reaction is statistically negative).

[487] Proxy voting advice business clients may have goals other than, or in addition to, maximizing the value of a registrant's shares, or these clients may have investment objectives that would not be achieved solely on the basis of a positive market reaction. *See* Spatt (2019), *supra* note 473, at 4; Patrick Bolton et al., *Investor Ideology* (Nat'l Bureau of Econ. Research, Working Paper No. 25717, 2019), *available at https://www.nber.org/papers/ w25717.pdf*; Gregor Matvos & Michael Ostrovsky, *Heterogeneity and Peer Effects in Mutual Fund Proxy Voting,* 98 J. Fin. Econ. 90 (2010); Copland et al. (2018), *supra* note 481, at 6; Verdam (2006), *supra* note 481, at 12.

[488] *See, e.g.,* letters from CEC; BPC; Mylan; Exxon Mobil; Nareit; ACCF; BRT; Timothy M. Doyle (Feb. 3, 2020) ("T. Doyle"); CGC; State Street; Nasdaq; SCG; Charter; NAM; J. Ward; BIO; Christopher A. Iacovella, Chief Executive Officer, American Securities Association (Feb. 3, 2020) ("ASA"); Shareholder Advocacy; Michael Hietpas (Feb. 3, 2020) ("M. Hietpas"); John Endean, President, American Business Conference (Feb. 19, 2020) ("ABC").

[489] *See* letter from Nasdaq.

[490] *See* letter from SCG.

[491] *See* letter from J.W. Verret, Associate Professor of Law, George Mason University Antonin Scalia School of Law (Jan. 22, 2020) ("Prof. Verret") (updating prior Spectrem survey results). One commenter disputed the methodology used in the survey of retail investors, claiming it used leading questions and ultimately showed that retail investors are generally uninformed about the proxy voting advice market. *See* letter from Prof. Coates.

[492] *See, e.g.,* letters from Segal Marco II; TRP; PRI II; ProxyVote II; Laura Chappel, Chief Executive, Brunel Pension Partnership Limited (Feb. 3, 2020) ("Brunel"); Michael J. Clark, Founder and Director, Ario Advisory (Feb. 3, 2020) ("Ario"); CII IV; Prof. Coates; Kevin Thomas, Chief Executive Officer, Shareholder Association for Research and Education (Jan. 30, 2020) ("SHARE II"); Louise Davidson, Chief Executive Officer, Australian Council of Superannuation Investors (Jan. 31, 2020) ("ACSI"); BMO; Proxy Insight (Jan. 31, 2020) ("Proxy Insight"); Elliott I; Better Markets; New York Comptroller II; AFL–CIO II; Joel Schneider, Chair, Corporate Governance Committee, Dimensional Fund Advisors (Feb. 3, 2020) ("Dimensional"); Ron Baker, Executive Director, Colorado Public Employees' Retirement Association (Feb. 3, 2020) ("Colorado PERA"); Ashbel C. Williams, Executive Director & CIO, State Board of Administration of Florida (Feb. 3, 2020) ("Florida Board"); David Villa, Executive Director & Chief Investment Officer, et al., State of Wisconsin Investment Board (Feb. 3, 2020) ("SWIB"); CFA Institute I; CIRCA; AllianceBernstein; LA Retirement; Glass Lewis II (noting that no market failure is identified in the release and that other jurisdictions' regulators, including ESMA, have concluded that there is no market failure in the proxy voting advice business industry); ISS; Michael Passoff, CEO, Proxy Impact (Feb. 3, 2020) ("Proxy Impact"); Kenneth A. Bertsch, Executive Director, and Jeffrey P. Mahoney, General Counsel, Council of Inst. Investors (Feb. 4, 2020) ("CII V"); C. Icahn; ValueEdge I; CII VIII. *See also* IAC Recommendation (stating that, rather than citing reliable evidence of material problems with proxy voting advice businesses, the SEC asserts that problems "may" or "could" exist, based on claims from private interests (who are biased in favor of issuers) that problems exist).

[493] *See* letter from New York Comptroller II. *See also* letter in response to the SEC Staff Roundtable on the Proxy Process from CII (stating that "[p]roxy advisers' business model depends on factual accuracy and their incentives are thus aligned with issuers and institutional investors alike.").

[494] *See* letter from Proxy Insight.

and new information, suggesting they are not "monolithic." [495]

One commenter suggested that there is a different source of market failure inherent to the proxy voting process and proxy voting advice businesses stemming from the collective action problem inherent in shareholder voting.[496] According to the commenter, investors do not value expending resources to determine their position on a given proxy vote because, on the margin, their vote does not matter and they do not fully internalize all of the benefits associated with any resources they do expend.[497] The commenter further asserts that proxy voting advice businesses, in turn, can therefore only charge modest fees for their services, which leads them to be resource constrained in performing their own research. Thus, according to the commenter, this arrangement leads to voting recommendations that are not adequately informed or precise, and thus imposes negative externalities on shareholders. The commenter argues that, because market forces are unable to improve the quality of voting recommendations and reduce these externalities, there is a need for regulatory action.[498] Another commenter offered a different perspective, arguing instead that proxy voting advice businesses represented a private market solution to shareholders' collective action problem, rendering regulatory intervention unnecessary.[499] Other commenters posited that the underlying concentration among proxy voting advice businesses and conflicts of interest are the result of past regulatory action that created demand for the services of proxy voting advice businesses.[500]

We believe that the important role proxy voting advice businesses currently play in facilitating clients' participation in the proxy process, as well as the importance of ensuring that

clients have access to more complete information regarding matters to be voted on, and the material conflicts of interest proxy voting advice businesses may have, support the final amendments. As discussed in Section I above, the purpose of the amendments is to help ensure that investors who use proxy voting advice have access to more transparent, accurate, and complete information and benefit from a robust discussion of views—similar to what is possible at a meeting where shareholders are physically attending and participating—when making their voting decisions, while minimizing costs or delays that could adversely affect the timely provision of proxy voting advice. The amendments are expected to reduce the costs incurred by clients of proxy voting advice businesses in monitoring for conflicts of interest or acquiring information relevant to assessing proxy voting advice. In this way, the amendments should improve the overall efficiency associated with this segment of the proxy system. Proxy voting advice businesses often act as the intermediary for their clients' participation in the proxy system, and the requirements of the rule will facilitate clients' timely access to, and awareness of, more complete information prior to voting. This has the potential to benefit not just those clients and the immediate shareholders they serve but also investors in our public markets more generally.

*B. Economic Baseline*

The baseline against which the costs, benefits, and the impact on efficiency, competition, and capital formation of the final amendments are measured consists of the current regulatory requirements applicable to registrants, proxy voting advice businesses, investment advisers, and other clients of these businesses, as well as current industry practices used by these entities in connection with the preparation, distribution, and use of proxy voting advice.

1. Affected Parties and Current Market Practices

a. Proxy Voting Advice Businesses

Proxy voting advice businesses will be affected by the final amendments. As the Commission has previously stated, voting advice provided by a firm such as a proxy voting advice business that markets its expertise in researching and analyzing proxy issues for purposes of helping its clients make proxy voting determinations (*i.e.,* not merely performing administrative or ministerial

services) generally constitutes a solicitation subject to Federal proxy rules because it is "a communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." [501]

Several commenters noted that certain firms involved in the proxy process do not supply research, analysis, and recommendations to support the voting decisions of their clients.[502] To the extent such firms are not providing any voting recommendations and are instead exercising delegated voting authority on behalf of their clients, we agree that such services generally will not constitute "proxy voting advice" under Rule 14a–1(l)(1)(iii)(A) and have adjusted our baseline accordingly.[503]

As of July 22, 2020, to our knowledge, the proxy voting advice industry in the United States consists of three major firms: ISS, Glass Lewis, and Egan-Jones.

• ISS, founded in 1985, is a privately-held company that provides research and analysis of proxy issues, custom policy implementation, vote recommendations, vote execution, governance data, and related products and services.[504] ISS also provides advisory/consulting services, analytical tools, and other products and services to corporate registrants through ISS Corporate Solutions, Inc. (a wholly owned subsidiary).[505] As of April 2020, ISS had nearly 2,000 employees in 30 locations, and covered approximately 44,000 shareholder meetings in 115 countries, annually.[506] ISS states that it executes about 10.2 million ballots annually on behalf of those clients representing 4.2 trillion shares.[507] ISS is registered with the Commission as an investment adviser and identifies its

[495] *See* letter from PRI II.

[496] *See* letter from B. Sharfman I. *See also* letter from Bryce C. Tingle, N. Murray Edwards Chair in Business Law, Faculty of Law, University of Calgary (Jan. 31, 2020) ("Prof. Tingle") (similarly asserting that both fund managers and proxy voting advice business are not incentivized to expend significant resources in producing and evaluating voting advice, but without attributing this lack of incentives to a collective action problem on the part of shareholders.).

[497] Academic research has shown, theoretically, that the inability of shareholders to fully internalize the benefits of developing an informed position on matters put to a shareholder vote can cause shareholders to over-rely on proxy voting advice under certain conditions. *See supra* note 479.

[498] *See* letter from B. Sharfman I.

[499] *See* letter from Glass Lewis II.

[500] *See, e.g.,* letter from P. Mahoney and J.W. Verret.

[501] *See* Commission Interpretation on Proxy Voting Advice at 47417.

[502] Specifically, commenters indicated that two additional firms included in the set of affected proxy voting advice businesses in the Proposing Release, ProxyVote Plus and Marco Consulting Group did not advise investment advisers and institutional investors on their voting determinations and would therefore not be affected by the proposed amendments. *See supra* note 100 and accompanying text. *See also* letters from Segal Marco II; ProxyVote II; CII IV.

[503] *See supra* notes 170–173 and accompanying text.

[504] *See* 2016 GAO Report, *supra* note 141, at 6.

[505] *Id.*

[506] *See* About ISS, *available at https:// www.issgovernance.com/about/about-iss/* (last visited May 22, 2020). *See also supra* note 10.

[507] *See* About ISS, *available at https:// www.issgovernance.com/about/about-iss/* (last visited May 22, 2020).

work as pension consultant as the basis for registering as an adviser.[508]

• Glass Lewis, established in 2003, is a privately-held company that provides research and analysis of proxy issues, custom policy implementation, vote recommendations, vote execution, and reporting and regulatory disclosure services to institutional investors.[509] As of April 2020, Glass Lewis had more than 380 employees worldwide that provide services to more than 1,300 clients that collectively manage more than $35 trillion in assets.[510] Glass Lewis states that it covers more than 20,000 shareholder meetings across approximately 100 global markets annually.[511] Glass Lewis is not registered with the Commission in any capacity.

• Egan-Jones was established in 2002 as a division of Egan-Jones Ratings Company.[512] Egan-Jones is a privately-held company that provides proxy services, such as notification of meetings, research and recommendations on selected matters to be voted on, voting guidelines, execution of votes, and regulatory disclosure.[513] As of September 2016, Egan-Jones' proxy research or voting clients mostly consisted of mid- to large-sized mutual funds,[514] and the firm covered approximately 40,000 companies.[515] Egan-Jones Ratings Company (Egan-Jones' parent company) is registered with the Commission as a Nationally Recognized Statistical Ratings Organization.[516]

Of the three proxy voting advice businesses identified, ISS and Glass Lewis are the largest and most often used for proxy voting advice.[517] We do

not have access to general financial information for ISS, Glass Lewis, and Egan-Jones such as annual revenues, earnings before interest, taxes, depreciation, and amortization, and net income. We also do not have access to client-specific financial information or more general or aggregate information regarding the economics of the proxy voting advice business.

Several commenters stated that the economic analysis in the Proposing Release failed to consider effects of the proposal on smaller firms that provide proxy voting services, such as Investor Advocates for Social Justice ("IASJ").[518] Further, commenters stated that the final amendments could affect the propensity of non-U.S. firms to compete with U.S. proxy voting advice businesses.[519] Based on the information available to the Commission,[520] including comments on the Proposing Release, we are not aware of smaller firms that currently supply research, analysis, and recommendations in the United States to support the voting decisions of their clients that would fall within the definition of "solicitation." We acknowledge that any smaller firms or non-U.S. proxy voting advice businesses could be affected by the final amendments to the extent they provide proxy voting advice on registrants who have filed proxy materials with the Commission, or if the final amendments affect their willingness to enter the

market to supply proxy voting advice in the United States.

In a principal-agent relationship, such as the relationship between a proxy voting advice business and a client, to the extent that the principals' and agents' interests are not perfectly aligned, agents can expend resources to assure principals that they will act in the principals' best interest. When agents operate in a competitive market soliciting business from principals, they have an incentive to expend resources to assure principals that they will act in the principals' best interest, or risk putting themselves at a competitive disadvantage.[521] Where the agent's interest and the principal's interest diverge, there can be a strong counterweight to this incentive and where a relationship is multifaceted the agent may emphasize areas of alignment and de-emphasize areas of conflict. In the proxy voting advice market, certain practices by proxy voting advice businesses serve as mechanisms to assure their clients that proxy voting advice businesses will take actions that are in clients' best interest. All three major proxy voting advice businesses have policies, procedures, and disclosures in place that are intended to reduce clients' costs of monitoring the businesses' behavior.[522]

Proxy voting advice businesses' reliance on information available to all shareholders is one example of how current market practices may mitigate agency costs. One commenter noted that facing the prospect of having their work checked by clients can discipline proxy voting advice businesses that might otherwise act based on conflicts of interest when developing proxy advice.[523] The same commenter included use of publicly available information as a step it has taken to "ensure quality and minimize error in its published research." [524] The three major proxy voting advice businesses state that they base their recommendations exclusively on information that is publicly available. Relying on publicly available information to develop proxy advice enables clients to validate the inputs that proxy voting advice businesses provide, rather than expending effort to obtain proprietary, and potentially commercially sensitive, information

---

[508] See Form ADV filing for ISS, available at https://adviserinfo.sec.gov/IAPD/content/ViewForm/crd_iapd_stream_pdf.aspx?ORG_PK=111940 (last accessed April 23, 2020). See also 2016 GAO Report, supra note 141, at 9.

[509] Id. at 7.

[510] See Glass Lewis Company Overview, available at https://www.glasslewis.com/company-overview/ (last visited Apr. 26, 2020).

[511] Id.

[512] See 2016 GAO Report, supra note 141, at 7.

[513] Id.

[514] Id.

[515] Id. While ISS and Glass Lewis have published updated coverage statistics on their websites, the most recent data available for Egan-Jones was compiled in the 2016 GAO Report.

[516] See Order Granting Registration of Egan-Jones Rating Company as a Nationally Recognized Statistical Rating Organization, Exchange Act Release No. 34–57031 (Dec. 21, 2007), available at https://www.sec.gov/ocr/ocr-current-nrsros.html#egan-jones.

[517] 2016 GAO Report, supra note 141, at 8, 41 ("In some instances, we focused our review on Institutional Shareholder Services (ISS) and Glass Lewis and Co. (Glass Lewis) because they have the largest number of clients in the proxy advisory firm

market in the United States."); see also letters in response to the SEC Staff Roundtable on the Proxy Process from Center on Executive Compensation (Mar. 7, 2019) (noting that there are "two firms controlling roughly 97% of the market share for such services"); Society for Corporate Governance (Nov. 9, 2018) ("While there are five primary proxy advisory firms in the U.S., today the market is essentially a duopoly consisting of Institutional Shareholder Services . . . and Glass Lewis & Co. . . . .").

[518] See letter from IASJ. We understand that this firm typically does not make voting recommendations to its institutional investor clients but rather assists those "who seek a partner to carry out their proxy voting." Id. To the extent a firm does not make voting recommendations to its clients and is instead exercising delegated authority on their behalf, it would not be engaged in a "solicitation" within the meaning of Rule 14a–1(l)(1)(iii)(A). See supra notes 170–173 and accompanying text. Therefore, based on our understanding of its current activities, this commenter (and others engaged in similar conduct) would not appear to be subject to compliance with Rule 14a–2(b)(9). See also letters from Felician Sisters II; Good Shepherd; Interfaith Center II; ProxyVote II; Segal Marco II; St. Dominic of Caldwell.

[519] See letters from Minerva I; PIRC.

[520] Our awareness of providers of proxy voting services may be limited because firms that provide proxy voting services, including proxy voting advice businesses, do not always engage in activities that would require them to register with the Commission. See supra Section I.

[521] Agents have an incentive to expend resources to assure principals that they will act in the principals' best interest as long as the cost of providing the assurance is less than the value of the assurance to principals.

[522] See, e.g., letter from Glass Lewis II.

[523] See letter from ISS.

[524] See id.

directly from registrants or other sources.

As part of our consideration of the baseline for the final rules, we focus on two industry practices that are particularly relevant for the new conditions in Rule 14a–2(b): Conflicts of interest disclosure and procedures for engagement with registrants.

i. Conflict of Interest Disclosures

While the nature of potential conflicts related to revenues might be different among the three proxy voting advice businesses, all three proxy voting advice businesses have conflicts of interest policies and make disclosures to clients disclosing the nature of potential conflicts and the steps that they have taken to address them.[525] These existing policies and disclosures are part of the economic baseline for the amendments.

For example, we understand that ISS has implemented policies and procedures designed to prevent and manage conflicts that could arise from the work of ISS' research and analytics teams ("Global Research") and the work of ISS Corporate Solutions ("ICS") for public companies.[526] More specifically, Global Research prepares proxy voting governance research, analyzes proxy issues, and provides ratings on, and other assessments of, public companies for the benefit of institutional investors. ICS provides advisory services, analytical tools, and publications to registrants to enable registrants to improve shareholder value and reduce risk. According to ISS, one of the primary steps the firm has taken to prevent and manage this potential conflict of interest is implementing a firewall with the goal of separating ICS from ISS. ISS notes that it makes available to its institutional clients information about the relationships between ICS and its clients in a way that is intended not to alert Global Research analysts to the possible existence of such relationships. ISS also notes that it adds a legend to each global or domestic proxy analysis advising the reader of the existence of ICS and offering ISS' clients the ability to learn more about ICS and its clients. In addition, ISS indicates that it has implemented a policy on the disclosure of significant relationships, under which ISS provides clients with "proactive visibility" regarding a range of significant relationships within the client-facing side of the ProxyExchange platform.[527] ICS also discloses in all of its contracts that ISS' status as a registered investment adviser (as well as its internal policies and procedures) may require ISS to disclose to ISS institutional clients ICS' relationship with the registrant.

We understand the other two major proxy voting advice businesses also provide disclosure of potential conflicts of interest. Glass Lewis notes that it provides disclosure of potential conflicts on the cover of the relevant research report.[528] This is intended to enable clients and any other parties with access to a Glass Lewis report (*e.g.,* the media) to review potential conflicts at the same time they review the research, analysis, and voting recommendations contained therein. Egan-Jones also discloses its management of three categories of potential conflicts—revenue, cost, and structural—to the public.[529]

Thus, it appears that all three major proxy voting advice businesses have some level of conflict of interest disclosure policies in place and provide such disclosure to affected parties. These disclosures, which are intended to support the objectivity of voting advice and the integrity of the voting process, may overlap to a certain degree with the requirements in the final amendments. These disclosure policies, however, vary in terms of structure and coverage as well as the manner in which the information is conveyed.

ii. Engagement With Registrants

The following section discusses existing proxy voting advice business engagement with the subjects of proxy voting advice—one avenue by which such businesses may signal to their clients that the information underlying proxy voting advice is accurate, transparent, and complete.

We understand that all three major proxy voting advice businesses have certain policies, procedures, and disclosures in place intended to assure clients that the voting advice they receive will be based on accurate, transparent, and complete information. In some cases, proxy voting advice businesses seek input from registrants to further these objectives. All three of these proxy voting advice businesses offer certain registrants some form of pre-release review of at least some of their proxy voting advice reports, or the data used in their reports. Also, all three such proxy voting advice businesses offer some registrants access to proxy voting reports and offer mechanisms by which registrants can provide feedback on those reports, in some cases for a fee.

For example, ISS states that it may, in some circumstances, give registrants, whether or not they are ICS clients, the right to review draft research analyses, ratings, or other advisory research reports so that ISS may correct factual inaccuracies before delivering final voting advice. ISS acknowledges that review of draft analyses may provide an opportunity for registrants to unduly influence those analyses and reports. To avoid the appearance of impropriety, ISS states that it generally offers registrants an opportunity to review a draft proxy analysis, rating, or other research report only for the purposes of verifying the factual accuracy of information. ISS further states that it retains sole discretion whether to accept any change recommended by the registrant. ISS's policies also govern changes to analyses based on registrant feedback. According to ISS's Code of Ethics, if the analyst changes the proposed voting recommendation or other proposed conclusion, the proposed change must be reviewed by a senior analyst and ISS will retain in its files the documents supplied by the registrant detailing the factual inaccuracies.[530]

Glass Lewis introduced a "Report Feedback Statement" service in 2019 that has allowed companies to submit feedback on Glass Lewis reports and have that feedback be transmitted directly to Glass Lewis clients in the proxy research papers they receive.[531] In addition to these services, beginning in 2015, Glass Lewis started providing the subjects of its research with its

---

[525] *See, e.g.,* letters from ISS; Glass Lewis II. *See also* Egan-Jones Proxy Services Conflict of Interest Statement (Sept. 2019), *available at https:// www.ejproxy.com/ media/documents/Egan-Jones_ Proxy_Conflict-of-Interest_Sep-2019.pdf.*

[526] *See* ISS, Best Practice Principles for Providers of Shareholder Voting Research & Analysis: ISS Compliance Statement (2017), *available at https:// www.issgovernance.com/file/duediligence/best-practices-principles-iss-compliance-statement-april-2017-update.pdf.*

[527] *See* ISS Policy Regarding Disclosure of Significant Relationships, *available at https:// www.issgovernance.com/file/duediligence/ Disclosure-of-Significant-Relationships.pdf* (last visited Apr. 27, 2020).

[528] *See* Glass Lewis' Policies and Procedures for Managing and Disclosing Conflicts of Interest (2019), *available at https://www.glasslewis.com/wp-content/uploads/2019/11/GL-Policies-and-Procedures-for-Managing-and-Disclosing-Conflicts-of-Interest-050819-FINAL.pdf.*

[529] *See* Egan-Jones Proxy Services Conflict of Interest Statement, available at *https://ejproxy.com/ media/documents/Egan-Jones_Proxy_Conflict-of-Interest_Sep-2019.pdf* (last visited Apr. 27, 2020).

[530] *See* ISS Code of Ethics 7 (2020), *available at https://www.issgovernance.com/file/duediligence/ code-of-ethics-mar-2020.pdf.*

[531] *See* Press Release, Glass Lewis, Glass Lewis Announces that Company Opinions are Now Included With Research and Voting Recommendations (Apr. 2, 2020), *available at https://glasslewis.com/report-feedback-statement-included-with-research. See also* Press Release, Glass Lewis, Glass Lewis Launches Report Feedback Statement Service (Mar. 14, 2020), *available at https://glasslewis.com/glass-lewis-launches-report-feedback-statement-service.*

Issuer Data Report, which details the key facts underlying the relevant report for their review before the report is finalized. According to Glass Lewis, materials provided are deliberately limited. Glass Lewis has indicated that by providing the facts underlying the report, it can benefit from registrant review without inviting debates about Glass Lewis' methodology or what result that methodology should lead to in the context of a particular recommendation. This service has been available without a fee for several years and more than 1,400 companies currently participate in it on an annual basis.[532]

Egan-Jones provides several avenues for registrants to review and correct any material errors found in its reports. Registrants may obtain a "draft," or pre-publication copy, of a report pertaining to them in order to review it. If a registrant believes there is a material error in an Egan-Jones report, the registrant may contact Egan-Jones directly. In addition, major U.S. third-party proxy solicitors participate in Egan-Jones' Research Preview program. Through that program, proxy solicitors can supply draft copies of the research regarding the registrant to the registrant, and convey appropriate documentation to Egan-Jones to correct any errors found in the research on behalf of the registrant.[533]

Although the three major proxy voting advice businesses offer registrants opportunities to review proxy voting advice, existing policies and procedures limit review in some respects. ISS, for example, offers only "eligible" registrants an opportunity to review draft proxy analyses and generally uses the S&P 500 constituent list to determine eligibility. Moreover, even for eligible companies, ISS provides an opportunity to review solely on a "best-efforts" basis.[534] As noted above, Glass Lewis indicates that the registrant review process is limited to pre-publication review of only the key facts underlying each relevant report.[535]

Additionally, it is our understanding that some proxy voting advice businesses currently include links to filings by registrants that are the subject of proxy advice in their online platforms. These links provide a means by which clients may access additional definitive proxy materials that

registrants may file in response to proxy voting advice.

Non-U.S. proxy voting advice businesses that are signatories to the Best Practice Principles for Shareholder Voting Research have provided information about their engagement with registrants.[536] Based on these public disclosures, we understand that levels of registrant engagement vary across non-U.S. proxy voting advice businesses. For example, the U.K.-based firm PIRC states that it provides pre-publication drafts of proxy voting advice to registrants for some jurisdictions as a courtesy, while France-based firm Proxinvest does not.[537] While acknowledging the practices of these non-U.S. proxy voting advice businesses, this section focuses on the three major proxy voting advice businesses that operate in the United States.[538]

### b. Clients of Proxy Voting Advice Businesses as Well as Underlying Investors

Clients that use proxy voting advice businesses for voting advice will be affected by the final rule amendments. In turn, investors and other groups on whose behalf these clients make voting determinations will be affected. One of the three major proxy voting advice businesses—ISS—is registered with the Commission as an investment adviser and as such, provides annually updated disclosure with respect to its types of clients on Form ADV. Table 1 below reports client types as disclosed by ISS.[539]

#### TABLE 1—NUMBER OF CLIENTS BY CLIENT TYPE

[as of March 28, 2020]

| Type of client [a] | Number of clients [b] |
|---|---|
| Banking or thrift institutions .. | 195 |
| Pooled investment vehicles .. | 300 |
| Pension and profit sharing plans .................................. | 170 |
| Charitable organizations ....... | 110 |
| State or municipal government entities ......................... | 10 |
| Other investment advisers .... | 960 |

#### TABLE 1—NUMBER OF CLIENTS BY CLIENT TYPE—Continued

[as of March 28, 2020]

| Type of client [a] | Number of clients [b] |
|---|---|
| Insurance companies ........... | 40 |
| Sovereign wealth funds and foreign official institutions .. | 10 |
| Corporations or other businesses not listed above .... | 70 |
| Other ...................................... | 225 |
| Total ................................. | 2,095 |

[a] The table excludes client types for which ISS indicated either zero clients or less than five clients.

[b] Form ADV filers indicate the approximate number of clients attributable to each type of client. If the filer has fewer than five clients in a particular category (other than investment companies, business development companies, and pooled investment vehicles), it may indicate that it has fewer than five clients rather than reporting the number of clients.

Table 1 illustrates the types of clients that utilize the services of one of the largest proxy voting advice businesses. For example, while investment advisers ("Other investment advisers" in Table 1) constitute a 46 percent plurality of clients for ISS, other types of clients include pooled investment vehicles (14 percent) and pension and profit sharing plans (eight percent). Other users of the services offered by ISS include corporations, charitable organizations, and insurance companies.[540] Certain of these users of proxy voting advice business services make voting determinations that affect the interests of a wide array of individual investors, beneficiaries, and other constituents.[541]

#### c. Registrants

Registrants also will be affected by the final amendments. Registrants that have a class of equity securities registered under Section 12 of the Exchange Act as well as non-registrant parties that conduct proxy solicitations with respect to those registrants are subject to the

---

[532] See letter from Glass Lewis II.

[533] See Egan-Jones Issuer Engagement, available at https://eganjones.com/issuers (last visited Apr. 28, 2020).

[534] See ISS Draft Review Process for U.S. Issuers, available at https://issgovernance.com/iss-draft-review-process-u-s-issuers/ (last visited Apr. 28 2020).

[535] See supra note 532.

[536] See BPP Group Signatory Statements, available at https://bppgrp.info/signatory-statements (last visited Apr. 29, 2020).

[537] Id.

[538] As noted in above, we are not aware of smaller firms that currently supply research, analysis, and recommendations to support the voting decisions of their clients that would fall within the definition of "solicitation." Thus we do not speculate as to how smaller firms might engage with registrants.

[539] See ISS Form ADV filing, supra note 508. ISS describes clients classified as "Other" as "Academic, vendor, other companies not able to identify as above."

[540] Id.

[541] One commenter argued that the economic analysis should include more data and data analysis related to senior citizens since they make up a large portion of the mainstream investor community. In particular, the commenter suggested we include more data on the proportion of total investors that are senior citizens and some demographic analysis. We are sympathetic to the commenter's suggestion regarding the importance of senior citizens as investors, but we do not have data to perform the analysis the commenter requested and none was provided by commenters. See letter from Jim Martin, Chairman, et al., 60 Plus Association (Feb. 3, 2020) ("60 Plus"). We note that, to the extent the final rules improve the mix of information available to shareholders when voting decisions are made, they will benefit the investor community generally, including senior citizen investors.

federal proxy rules.[542] In addition, there are certain other companies that do not have a class of equity securities registered under Section 12 of the Exchange Act that file proxy materials with the Commission. Finally, Rule 20a–1 under the Investment Company Act subjects all registered management investment companies to the federal proxy rules.[543]

As of December 31, 2018, we estimate that 5,758 registrants had a class of securities registered under Section 12 of the Exchange Act.[544] As of the same date, there were approximately 20 companies that did not have a class of securities registered under Section 12 of the Exchange Act that filed proxy materials.[545] As of August 31, 2019

there were 12,718 registered management investment companies that were subject to the proxy rules: (i) 12,040 open-end funds, out of which 1,910 were Exchange Traded Funds ("ETFs") registered as open-end funds or open-end funds that had an ETF share class; (ii) 664 closed-end funds; and (iii) 14 variable annuity separate accounts registered as management investment companies.[546] As of December 2018, we identified 98 Business Development Companies ("BDCs") that could be subject to the final amendments.[547] The summation of these estimates yields 18,594 companies that may be affected to a greater or lesser extent by the final amendments.[548]

The above estimates are an upper bound of the number of potentially affected companies because not all of these registrants may file proxy materials related to a meeting for which a proxy voting advice business issues proxy voting advice in a given year. Out of the 18,594 potentially affected registrants mentioned above, 5,690 filed proxy materials with the Commission during calendar year 2018.[549] Out of the 5,690 registrants, 4,758 (84 percent) were Section 12 or Section 15(d) registrants and the remaining 932 (16 percent) were registered management investment companies.[550]

Whether or not proxy voting advice businesses permit registrants to review draft proxy voting advice, all registrants are able to respond to final proxy voting advice by filing additional definitive proxy materials. However, as discussed in the Proposing Release, some registrants have asserted that a large percentage of proxies are voted within 24 to 48 hours of proxy voting advice being issued [551] and that it can be difficult for registrants to access and analyze the proxy voting advice, formulate a response, and file the necessary materials with the Commission within that time period.[552] This is consistent with feedback received from commenters, who also indicated that registrants face time pressure in their efforts to communicate their responses to proxy voting advice to shareholders prior to votes.[553] The Proposing Release included an analysis that estimated the number of additional definitive proxy material filings in 2016, 2017, and 2018,[554] and Commission staff subsequently refined the process for identifying relevant filings and published a list of the filings it identified in a memorandum to the public comment file.[555] This list shows approximately 105, 93, and 90 filings in 2016, 2017, and 2018, respectively. Further, in the Proposing Release, the staff identified in a subset of additional definitive proxy material filings in 2018, where data were available, the number of business days between when a proxy voting advice business delivered proxy voting advice and when the registrant filed additional definitive proxy

---

[542] Foreign private registrants are exempt from the Federal proxy rules under Rule 3a12–3(b) of the Exchange Act. *See* 17 CFR 240.3a12–3. We are not aware of any asset-backed registrants that have a class of equity securities registered under Section 12 of the Exchange Act. Most asset-backed registrants are registered under Section 15(d) of the Exchange Act and thus are not subject to the federal proxy rules. Nine asset-backed registrants had a class of debt securities registered under Section 12 of the Exchange Act as of December 2018. As a result, these asset-backed registrants are not subject to the federal proxy rules.

[543] Rule 20a–1 under the Investment Company Act requires registered management investment companies to comply with regulations adopted pursuant to Section 14(a) of the Exchange Act that would be applicable to a proxy solicitation if it were made in respect of a security registered pursuant to Section 12 of the Exchange Act. *See* 17 CFR 270.20a–1. "Registered management investment company" means any investment company other than a face-amount certificate company or a unit investment trust. *See* 15 U.S.C. 80a–4.

[544] We estimate the number of registrants with a class of securities registered under Section 12 of the Exchange Act by reviewing all Forms 10–K filed during calendar year 2018 with the Commission and counting the number of unique registrants that identify themselves as having a class of securities registered under Section 12(b) or Section 12(g) of the Exchange Act. Foreign private registrants that filed Forms 20–F and 40–F and asset-backed registrants that filed Forms 10–D and 10–D/A during calendar year 2018 with the Commission are excluded from this estimate. This estimate excludes BDCs that filed Form 10–K in 2018.

[545] We identify these issuers as those (1) subject to the reporting obligations of Exchange Act Section 15(d) but that do not have a class of equity securities registered under Exchange Act Section 12(b) or 12(g) and (2) that filed any proxy materials during calendar year 2018 with the Commission. The proxy materials we consider in our analysis are DEF14A; DEF14C; DEFA14A; DEFC14A; DEFM14A; DEFM14C; DEFR14A; DEFR14C; DFAN14A; N–14; PRE 14A; PRE 14C; PREC14A; PREM14A; PREM14C; PRER14A; PRER14C. Form N–14 can be a registration statement and/or proxy statement. We manually review all Forms N–14 filed during calendar year 2018 with the Commission and we exclude from our estimates Forms N–14 that are exclusively registration statements. To identify registrants reporting pursuant to Section 15(d) but not registered under Section 12(b) or Section 12(g), we review all Forms 10–K filed in calendar year 2018 with the Commission and count the number of unique registrants that identify themselves as subject to Section 15(d) reporting obligations but

with no class of equity securities registered under Section 12(b) or Section 12(g).

[546] We estimate the number of unique registered management investment companies based on Forms N–CEN filed between June 2018 and August 2019 with the Commission. Open-end funds are registered on Form N–1A. Closed-end funds are registered on Form N–2. Variable annuity separate accounts registered as management investment companies are trusts registered on Form N–3. The number of potentially affected Section 12 and Section 15(d) registrants is estimated over a different time period (*i.e.*, January 2018 to December 2018) than the number of potentially affected registered management investment companies (*i.e.*, June 2018 to August 2019) because there is no complete N–CEN data for the most recent full calendar year (*i.e.*, 2018). Registered management investment companies started submitting Form N–CEN in September 2018 for the period ended on June 30, 2018 with the Commission.

[547] BDCs are entities that have been issued an 814- reporting number. Our estimate includes 88 BDCs that filed Form 10–K in 2018 as well as BDCs that may be delinquent or have filed extensions for their filings. Our estimate excludes six wholly-owned subsidiaries of other BDCs.

[548] The 18,594 potentially affected registrants is the sum of: (a) 5,758 registrants with a class of securities registered under Section 12 of the Exchange Act; (b) 20 registrants without a class of securities registered under Section 12 of the Exchange Act that filed proxy materials; (c) 12,718 registered management investment companies; and (d) 98 BDCs.

[549] For details on the estimation of companies that filed proxy materials with the Commission during calendar year 2018, *see supra* note 544.

[550] According to data from Forms N–CEN filed with the Commission between June 2018 and

August 2019, there were 965 registered management investment companies that submitted matters for its security holders' vote during the reporting period: (i) 729 open-end funds, out of which 86 were ETFs registered as open-end funds or open-end funds that had an ETF share class; (ii) 235 closed-end funds; and (iii) one variable annuity separate account. *See* Form N–CEN Item B.10. The discrepancy in the estimated number of registered management investment companies submitting proxy filings (*i.e.*, 932) and Form N–CEN data (*i.e.*, 965) likely is attributable to the different time periods over which the two statistics are estimated.

[551] *See* Proposing Release at 66545, n.235.

[552] *See id.* at 66545, n.236. As we noted above, shareholders have the ability to change their vote at any time prior to a meeting, including as a result of a registrant filing supplemental proxy materials in response to proxy voting advice. *See supra* note 373.

[553] *See, e.g.,* letters from Nareit; NAM; Exxon Mobil. *See also* Proposing Release at 66533, n.136.

[554] *See* Proposing Release at 66546, Table 2.

[555] *See* Memorandum from the U.S. Securities and Exchange Commission, Division of Economic Risk and Analysis, Regarding Data Analysis of Additional Definitive Proxy Materials Filed by Registrants in Response to Proxy Voting Advice (Jan. 16, 2020), *available at https://www.sec.gov/comments/s7-22-19/s72219-6660914-203861.pdf* ("Data Analysis of Additional Definitive Proxy Materials").

materials, and the number of business days until the planned shareholder meeting. Based on this sample, staff estimated a median value of three business days and an average value of 3.8 business days between when a proxy voting advice business issues proxy voting advice and when a registrant responds. Further, the median (average) number of days between the registrant response and the shareholder meeting based on the sample was 9.5 (10.3) business days.[556]

A number of commenters interpreted our analysis in Table 2 of the Proposing Release to indicate that the Commission took the view that the "concerns" raised by registrants about errors or inaccuracies reflected actual factual errors.[557] One commenter questioned whether Commission staff evaluated the merits of registrant claims presented in the Proposing Release [558] and supplied its own estimates of actual error rates in proxy voting advice business research report based on its own research,[559] as well as on supplementary information made available in the comment file.[560]

In contrast, another commenter had a different critique of Table 2, arguing that estimating error rates based on filings of additional definitive proxy materials might actually underestimate the true error rate because registrants who submit filings subject themselves to potential liability under SEC Rule 14a–9.[561]

The method for identifying filings that contained registrant concerns and classifying those concerns was detailed in the Proposing Release and in the subsequent staff memorandum.[562] Importantly, the analysis set forth in the Proposing Release took no position on the merits of responses. The analysis was intended to present how registrants currently respond to proxy voting advice and the frequency and timing of those responses and made no judgment

as to whether the concerns raised by registrants in their supplemental filings were valid. Nor was the analysis intended to provide an "error rate." Although we agree that reasonable readers might disagree in their classification of registrant concerns, lack of agreement on classification of specific responses does not change our assessment, discussed below, that the final rules would benefit clients of proxy voting advice businesses, and the proxy process as a whole, by improving client access to registrant information and analysis. Indeed, the fact that reviewers of additional definitive proxy materials may differ both in how they identify registrant concerns and how they classify those concerns supports the idea that clients would benefit from having a mechanism available by which they can reasonably be expected to become aware of registrant responses so they might form their own view of the merits of those responses.

## 2. Current Regulatory Framework

The economic baseline includes the current regulatory framework that applies to proxy voting advice businesses. As explained in the Proposing Release, under the Commission's proxy rules, any person engaging in a proxy solicitation, unless exempt, is generally subject to filing and information requirements designed to ensure that materially complete and accurate information is furnished to shareholders solicited by the person.[563] Over the years, the Commission has recognized that these filing and information requirements may, in certain circumstances, impose burdens that deter communications useful to shareholders, and in such circumstances, may not be necessary to protect investors in the proxy voting process.[564] Accordingly, the Commission has exempted certain kinds of solicitations from the filing and information requirements of the proxy rules, subject to various conditions, where such requirements are not necessary for investor protection.[565]

Notwithstanding the exemptions, these solicitations remain subject to Rule 14a–9, the antifraud provisions of the federal proxy rules.[566]

Proxy voting advice businesses typically rely upon the exemptions in Rule 14a–2(b)(1) and (b)(3) to provide advice without complying with the filing and information requirements of the proxy rules.[567] The existing conditions to these exemptions are designed to ensure that investors are protected where the Commission's filing and information requirements do not apply. For example, any person who wishes to rely on the Rule 14a–2(b)(3) exemption may not receive special commissions or remuneration from anyone other than the recipient of the advice and must disclose any significant relationship or material interest bearing on the voting advice.[568] By contrast, the exemption in Rule 14a–2(b)(1) does not currently require conflicts of interest disclosure. Both exemptions were adopted by the Commission before proxy voting advice businesses played the significant role that they now do in the proxy voting process and in the voting decisions of investment advisers and institutional investors.

Several commenters stated that the analysis in the Proposing Release did not reflect requirements to address conflicts of interest under existing law, including the regulatory scheme under the Investment Advisers Act, as well as proxy voting advice business best practices under the baseline.[569] We recognize that, in addition to the rules governing proxy solicitation, some proxy voting advice businesses may be subject to other regulatory regimes.[570]

---

[556] *See* Proposing Release at 66546.

[557] *Id.* at Table 2.

[558] *See* letter from CII I.

[559] *See* letter from CII IV.

[560] *See* letter from CII V. This commenter suggested that the error rate implied by the Commission's classification in Table 2 of the Proposing Release was 0.5% and that after correcting for registrant assertions that appear to be in error, the rate is reduced to 0.3%. The same commenter performed a case-by-case analysis of claims they believed may have been classified as errors in the Proposing Release's analysis, casting doubt on whether many of them were actually related to factual errors, and concluded that, after excluding analytical errors, which may just represent differences of opinion, the actual error rate is only 0.06%.

[561] *See* letter from ACCF.

[562] *See* Proposing Release at n.239. *See also* Data Analysis of Additional Definitive Proxy Materials, *supra* note 555.

[563] *See* Proposing Release at 66524.

[564] *See, e.g.,* Communications Among Shareholders Adopting Release at 49278 ("[S]hareholders can be deterred from discussing management and corporate performance by the prospect of being found after the fact to have engaged in a proxy solicitation. The costs of complying with [the proxy] rules also has meant that . . . shareholders and other interested persons may effectively be cut out of the debate regarding proposals . . . .").

[565] For example, Rule 14a–2(b)(1) generally exempts solicitations by persons who do not seek the power to act as proxy for a shareholder and do not have a substantial interest in the subject matter of the communication beyond their interest as a shareholder. Another exemption, Rule 14a–2(b)(3),

generally exempts proxy voting advice furnished by an advisor to any other person with whom the advisor has a business relationship.

[566] 17 CFR 240.14a–9.

[567] *See* Commission Interpretation on Proxy Voting Advice at 47416 (discussing the "two exemptions to the federal proxy rules that are often relied upon by proxy advisory firms").

[568] The conditions to Rule 14a–2(b)(3) are: (i) The advisor renders financial advice in the ordinary course of his business; (ii) the advisor discloses to the recipient of the advice any significant relationship with the registrant or any of its affiliates, or a security holder proponent of the matter on which advice is given, as well as any material interests of the advisor in such matter; (iii) the advisor receives no special commission or remuneration for furnishing the proxy voting advice from any person other than a recipient of the advice and other persons who receive similar advice under this subsection; and (iv) the proxy voting advice is not furnished on behalf of any person soliciting proxies or on behalf of a participant in an election subject to the provisions of § 240.14a–12(c). 17 CFR 240.14a–2(b)(3).

[569] *See* letters from ISS; Glass Lewis II. *See also* IAC Recommendation.

[570] *See* Proposing Release at 66527, n.88; 66529, n.99.

For example, one of the major proxy voting advice businesses, ISS, is also a registered investment adviser, and as such, must eliminate or make full and fair disclosure of all conflicts of interest to its clients that might cause ISS to render proxy voting advice that is not disinterested such that a client can provide informed consent to the conflict.[571] In addition, ISS has noted that, as a registered investment adviser, it has a fiduciary duty of care to make a reasonable investigation to determine that it is not basing vote recommendations on materially inaccurate or incomplete information.[572] Similarly, Egan-Jones is registered with the Commission as a Nationally Recognized Statistical Rating Organization (NRSRO). Registered NRSROs are required under Rule 17g–5 to disclose conflicts of interest relating to maintenance or issuance of a credit rating. However, these regulatory regimes serve distinct, though overlapping, regulatory purposes.[573]

One commenter also stated that the final rule's economic effects should be measured relative to a baseline that consists of regulation in effect prior to the Commission Interpretation on Proxy Voting Advice,[574] noting that no cost-benefit analysis was performed in connection with that interpretation.[575] Consistent with its past practice, the Commission continues to believe that the appropriate baseline for its economic analysis consists of all existing regulatory requirements that apply to the affected parties, including the Commission Interpretation on Proxy Voting Advice, as well as industry practice in response to those requirements. Moreover, the Commission Interpretation on Proxy Voting Advice did not create any new legal obligations under the securities laws but rather articulated the Commission's longstanding views on what constitutes "solicitation." Indeed, as noted above, there is evidence that the proxy voting advice business industry has understood for over 30 years that its proxy voting advice

constitutes a "solicitation" under Rule 14a–1(l) or at least that the Commission may consider such advice to constitute a "solicitation." [576]

Even if a proxy voting advice business had believed it was not engaged in a "solicitation" prior to the interpretation, and thus newly realized it was engaged in a "solicitation" upon issuance of the interpretation, the impact of this change would have been minimal given the existing exemptions from the filing and information requirements of the proxy rules available to proxy voting advice businesses. The only thing that potentially would have changed for proxy voting advice businesses would have been heightened awareness of the application of Rule 14a–9 liability, including the examples of specific circumstances that could result in a violation of that rule. To the extent that some proxy voting advice businesses did not previously understand their voting advice to constitute solicitations and thus be subject to Rule 14a–9 liability, it is possible that this heightened awareness could cause those businesses to take more care in preparing their recommendations. It is also possible that this heightened awareness could expose proxy voting advice businesses to greater risk of litigation under Rule 14a–9. However, the Commission is not aware of evidence—including any specific information provided by commenters— that the interpretation has resulted or would result in substantial changes in proxy voting advice businesses' practices. In any event, even if we were to consider Rule 14a–9 as though it were to apply to proxy voting advice businesses for the first time, we believe the benefits to investors of this antifraud rule insofar as it would deter proxy voting advice businesses from making materially false or misleading statements or omissions supports its application to proxy voting advice notwithstanding the costs associated with any increased risk of litigation. For all of these reasons, we do not expect that using a baseline prior to the Commission Interpretation on Proxy Voting Advice would have significantly altered our assessment of the economic effects of the proposed amendments.

Finally, we note that—beyond the codification of our interpretation of solicitation—the conflicts disclosure requirements and principles-based engagement requirements in the final amendments will be new for all proxy voting advice businesses. The economic effects of these amendments are thus analyzed as new requirements for each

of these businesses, regardless of whether they understood their proxy voting advice to constitute a "solicitation" prior to the interpretation. Accordingly, we believe that our economic analysis appropriately captures the anticipated economic effects of the final amendments.

## C. Benefits and Costs

We discuss the economic effects of the final amendments below. For both the benefits and the costs, we consider each piece of the final amendments in turn. The final amendments include: (1) Amendments to the definition of solicitation in Rule 14a–1(l); (2) conditioning availability of the exemptions in Rules 14a–2(b)(1) and (b)(3) on (a) proxy voting advice businesses providing disclosure regarding conflicts of interest and (b) proxy voting advice businesses adopting and publicly disclosing written policies and procedures reasonably designed to ensure that the proxy voting advice is made available to registrants at or prior to the time when such advice is disseminated to the proxy voting advice business's clients and that the proxy voting advice business provides clients with a mechanism by which they can reasonably be expected to become aware of a registrant's written statement about the proxy voting advice in a timely manner; and (3) an amendment to the examples in Rule 14a–9 of disclosure that, if omitted from a proxy solicitation and depending upon the particular facts and circumstances, may be misleading.

### 1. Overview of Benefits and Costs and Comments Received

#### a. Benefits

As discussed in further detail below, we expect the rule to generate benefits compared to the baseline for clients of proxy voting advice businesses and investors, and, albeit to a lesser extent, for proxy voting advice businesses and registrants. We expect that the largest benefits will come from conditioning availability of the exemptions in Rules 14a–2(b)(1) and (b)(3) on proxy voting advice businesses providing certain disclosures and maintaining certain policies and procedures. In contrast, amendments to the definition of solicitation in Rule 14a–1(l) and to Rule 14a–9 represent less significant changes from the existing baseline and will likely result in more modest benefits for proxy voting advice businesses and their clients.

Two commenters expressed support for the general benefits that the

---

[571] *See* letter from ISS; *see also* Standard of Conduct for Investment Advisers.

[572] *See* letter from ISS.

[573] *See supra* notes 41 through 53 and accompanying text.

[574] *See supra* note 74.

[575] *See* letter from ISS. Another commenter argued that under that baseline, proxy voting advice businesses were governed by the fiduciary standard of the Advisers Act, which already required proxy voting advice businesses to disclose conflicts of interest. *See* letter from Glass Lewis II. As noted above, the Commission acknowledges that some, but not all, proxy voting advice businesses may be subject to other regulatory regimes, including the Advisers Act.

[576] *See supra* Section II.A.3.

proposed rules would generate.[577] Both commenters argued that the shareholder proxy voting process is beset with collective-action problems, whereby both institutional and retail investors are not motivated to incur large expenses to collect information to become better informed about a company, particularly when the company is just one of a portfolio. According to the commenters, this results in resource-constrained proxy voting advice businesses that produce voting recommendations that are not adequately informed or precise. Such voting recommendations could lead to suboptimal voting decisions by clients of the proxy voting advice businesses. As we mention above, the purpose of the final amendments is to improve the information available to shareholders when making voting decisions, which could ultimately result in more efficient investment outcomes.

In contrast, several commenters generally disputed the benefits to proxy voting advice businesses' clients and investors resulting from the proposed amendments.[578] One commenter argued that the general benefits of the rule are speculative at best,[579] while two other commenters characterized them as "illusory."[580] One of these commenters asserted that none of the amendments would create any benefits for proxy voting advice businesses and their clients and that the only beneficiaries would be self-interested corporate insiders.[581] Another commenter argued that the proposed rules would not improve the quality of proxy advice, asserting that the benefits are small and uncertain.[582]

We do not agree with these assessments. While the extent of the benefits will depend on the existing practices of proxy voting advice businesses and how they choose to implement the required disclosures and procedures (as well as the existing practices of their clients and how they, in turn, adjust), we believe that the improved transparency that the final rules will generate will be beneficial for proxy voting advice businesses' clients and will likely improve the overall proxy voting process. Indeed, the fact that in certain circumstances, and to varying extents, proxy voting advice

businesses already incorporate practices similar to the final amendments belies the notion that these expected benefits are speculative or illusory. For example, if proxy voting advice businesses saw no benefit to providing conflicts of interest disclosure to their clients, they would not provide such disclosure currently, absent a regulatory requirement. We also note that the final amendments reflect significant changes from the proposal in light of commenter input and concerns, and we believe these changes focus on improvements to the proxy process most likely to yield benefits and result in final amendments that are less costly, when measured against the baseline, as compared to the costs of the proposal.

b. Costs

We expect that proxy voting advice businesses as well as registrants will incur direct costs as a result of the final amendments. In the following sections, we analyze the costs of the final amendments due to changes in proxy voting advice business disclosure and engagement practices relative to the baseline. Further, to the extent that any of the final amendments impose direct costs on proxy voting advice businesses that are passed along to clients, the final amendments could impose indirect costs on clients of proxy voting advice businesses, including investment advisers and institutional investors, and the underlying investors they serve, if applicable.

Some commenters expressed concern that the economic analysis in the Proposing Release was not thorough enough or that it understated the costs and other negative effects that the proposed rules would have on proxy voting advice businesses and investors.[583] Some of these commenters also commented on the costs of specific proposed amendments, which we discuss below. One commenter stated that, with respect to the quantitative cost estimates in the Commission's Paperwork Reduction Act ("PRA") analysis, it believed the actual compliance costs would be 240 times those estimated in the Proposing

Release.[584] One commenter urged a more thorough cost-benefit analysis or other investigation to gather data from which reasonable cost estimates can be extrapolated.[585]

We acknowledge, as we did in the Proposing Release, that the final amendments will likely generate direct and indirect costs for proxy voting advice businesses and potentially their clients. To the extent that a large driver of the costs discussed by commenters would have been the proposed amendment regarding registrant review and response to proxy voting advice, the flexibility afforded by the principles-based approach reflected in the final rules, particularly as it accommodates practices similar to current practices, should result in lower costs for proxy voting advice businesses and their clients as compared to the more prescriptive approach we proposed.

In the following sections, we discuss the specific costs and benefits for each aspect of the final amendments.

2. Codification of the Commission's Interpretation of "Solicitation" Under Rule 14a–1(l) and Section 14(a)

We are codifying the Commission's interpretation that, as a general matter, proxy voting advice constitutes a solicitation within the meaning of the Exchange Act Rule 14a–1(l). Overall, we do not expect this amendment to have a significant economic impact because it codifies an already-existing Commission interpretation. This interpretation itself did not modify existing law or reflect a change in the Commission's position and is distinct from the amendments conditioning availability of the exemptions in Rules 14a–2(b)(1) and (b)(3) on proxy voting advice businesses providing certain disclosures and maintaining certain policies and procedures, which we acknowledge would alter the costs and benefits associated with being subject to the federal proxy rule regime and which we discuss in detail below.[586] Nonetheless, the final amendment to Rule 14a–1 codifying this interpretation in the Commission's proxy rules may provide more clear notice that Section 14(a) and the proxy rules apply to proxy voting advice. Parties receiving proxy voting advice may benefit from such notice to the extent that it informs them that the

---

[577] See letters from James R. Copland, Senior Fellow and Director, Legal Policy, Manhattan Institute for Policy Research (Feb. 3, 2020) ("Manhattan Institute"); B. Sharfman I.

[578] See letters from Bricklayers; ISS; New York Comptroller II; ProxyVote II.

[579] See letter from ProxyVote II.

[580] See letters from CFA Institute I; ISS.

[581] See letter from ISS.

[582] See letter from Bricklayers.

[583] See letters from Bricklayers; CalPERS; CFA Institute I; Kathryn McCloskey, Director, Social Responsibility, United Church Funds (Feb. 3, 2020) ("Church Funds"); CII IV; Glass Lewis II; Karen L. Barr, President and CEO, Investment Adviser Association, (Feb. 3, 2020) ("IAA"); ICI; ISS; New York Comptroller II; Ohio Public Retirement; Lucian Arye Bebchuk, James Barr Ames Professor of Law, Economics, and Finance, Harvard Law School (Feb. 3, 2020) ("Prof. Bebchuk"); ProxyVote II; IASJ; Segal Marco II. See also IAC Recommendation.

[584] See letter from Nichol Garzon-Mitchell, Senior Vice President, General Counsel, Glass Lewis (Jan. 7, 2020) ("Glass Lewis I").

[585] See letter from Ohio Public Retirement.

[586] Several commenters suggested that the Commission should use a baseline that does not include the August 19 interpretation. See, e.g., letters from Glass Lewis II; ISS. We respond to these comments in supra Section IV.B.2.

communication they receive from proxy voting advice businesses is subject to the protections (*e.g.,* antifraud protections) that come from the fact that such communication is a solicitation. As discussed above, even if a proxy voting advice business had believed it was not engaged in a ''solicitation'' prior to the interpretation, we believe the impact of this change would be minimal given the existing exemptions from the filing and information requirements of the proxy rules available to proxy voting advice businesses. The Commission is unaware of specific evidence that the interpretation has resulted or would result in a substantial increase in costs due to the application of Rule 14a–9 to proxy voting advice.[587]

We also are amending Rule 14a–1(l)(2) to clarify that the furnishing of proxy voting advice by certain persons will not be deemed a solicitation. Specifically, voting advice from a person who furnishes such advice only in response to an unprompted request for the advice or a person who does not market its expertise as a provider of proxy voting advice, separately from other forms of investment advice, will not be deemed a solicitation. Again, we do not expect this adopted amendment to have a significant economic impact because it codifies the Commission's longstanding view that such a communication should not be regarded as a solicitation subject to the proxy rules.

### 3. Amendments to Rule 14a–2(b)

#### a. Conflicts of Interest—New Rule 14a–2(b)(9)(i)

#### i. Benefits

We are amending Rule 14a–2(b) to make the availability of the exemptions in Rules 14a–2(b)(1) and (b)(3) for proxy voting advice businesses contingent on providing enhanced disclosure of conflicts of interest specifically tailored to proxy voting advice businesses and the nature of their services.[588] These conflicts of interest disclosures are intended to augment existing requirements by eliciting information that may not be captured by the current requirements of either Rule 14a–2(b)(1) and (b)(3) and that is more tailored to proxy voting advice businesses and the nature of their conflicts. The final amendments require disclosure of conflicts that is sufficiently detailed such that clients of proxy voting advice businesses can understand the nature and scope of the interest, transaction, or relationship and assess the objectivity

and reliability of the proxy voting advice they receive. In addition, proxy voting advice businesses availing themselves of an exemption will be required to disclose any policies and procedures used to identify, as well as the steps taken to address, any material conflicts of interest, whether actual or potential, arising from such relationships and transactions. The final amendments also will specify that the enhanced conflicts disclosures must be provided in the proxy voting advice and in any electronic medium used to deliver the advice.

We believe the final amendments will benefit the clients of proxy voting advice businesses by enabling them to better assess the objectivity of the proxy voting advice businesses' advice against potentially competing interests. Under Rule 14a–2(b)(9)(i), disclosure of conflicts will be more comprehensive regardless of which exemption the proxy voting advice business relies upon for its proxy voting advice.[589] Furthermore, we believe the requirement that conflicts of interest disclosures be included in the voting advice will benefit clients of proxy voting advice businesses by making more standard the time and manner in which such principles-based information is disclosed and ensuring that the required disclosures receive due prominence and can be considered together with proxy voting advice at the time clients are making voting determinations. We believe this will, in turn, make it easier or more efficient for such clients to review and analyze the conflicts disclosure, thus reducing the agency costs associated with utilizing the services of proxy voting advice businesses.

Disclosure of material conflicts of interest can lead to more informed decision-making, and we anticipate that institutional investors and investment advisers will use information from disclosures of material conflicts of interest to make more informed voting decisions.[590] Thus, to the extent they enable the clients of proxy voting advice businesses to make more informed voting decisions on investors' behalf, these disclosure requirements will also benefit investors. Further, we believe these disclosures will make it easier and more efficient for clients that are investment advisers to conduct a reasonable review of a proxy voting advice business's policies and

procedures regarding how the proxy voting advice business identifies and addresses conflicts of interest.[591]

One commenter that is a proxy voting advice business and a registered investment adviser suggested that the benefits associated with Rule 14a–2(b)(9)(i) will be marginal because of proxy voting advice businesses' existing fiduciary duty to their clients and the disclosures they already provide.[592] Relatedly, several institutional clients of proxy voting advice businesses stated that they believe existing practices provide sufficient disclosure of conflicts of interest under the baseline.[593] As an initial matter, not all proxy voting advice businesses have registered as investment advisers and hence may not have the same fiduciary duty as the commenter. Moreover, even where certain proxy voting advice businesses provide detailed disclosure about conflicts of interest under existing practices or regulatory regimes, requiring tailored disclosure as a condition to the proxy rule exemptions will help to ensure that the disclosure is more consistently provided to consumers of proxy voting advice across the industry. As noted in Section IV.B.1 above, existing conflict of interest disclosure by proxy voting advice businesses differs across firms, including in structure, coverage, and manner of conveyance.

Importantly, the final rule will provide users of proxy voting advice with timely access to such disclosure in the proxy voting advice and in any electronic medium used to deliver the advice. As a result, we believe the final rule will allow clients of proxy voting advice businesses to more efficiently access the conflicts disclosure and assess a proxy voting advice business's potential conflicts of interest. However, we acknowledge that, to the extent that proxy voting advice businesses currently provide information that meets or exceeds the adopted disclosure requirements, and to the extent that clients of proxy voting advice businesses find current disclosure practices under the baseline to be sufficient, the benefits described above will be more limited.[594]

---

[587] See discussion in *supra* Section IV.B.2.
[588] *See supra* Section II.B.3.

[589] As noted above, Rule 14a–2(b)(3) requires disclosure of significant relationships with the registrant or relevant shareholder proponent, whereas Rule 14a–2(b)(1) does not currently require conflict of interest disclosures.
[590] *See* letter from CEC.

[591] *See supra* Section II.B.3.
[592] *See* letter from ISS.
[593] *See supra* notes 195–197.
[594] For example, ISS and Glass Lewis are signatories to a set of voluntary industry-developed practices which state that, as a matter of principle, signatories should have processes in place to identify and disclose conflicts of interest to their clients. *See* BPP Group Best Practice Principles for Shareholder Voting Research, *available at https://bppgrp.info* (last visited May 21, 2020).

iii. Costs

The new conflicts of interest disclosure requirements will impose a direct cost on proxy voting advice businesses to the extent proxy voting advice businesses are not already providing information that meets the adopted materiality-based disclosure requirements.[595] Specifically, proxy voting advice businesses will bear direct costs associated with: (i) Reviewing and preparing disclosures describing their conflicts; (ii) developing and maintaining methods for tracking their conflicts; (iii) seeking legal or other advice; and (iv) updating their voting platforms. Proxy voting advice businesses that are investment advisers are already required to identify conflicts and to eliminate or make full and fair disclosure of those conflicts.[596] Further, proxy voting advice businesses that are retained by investment advisers to assist them with proxy voting may already provide such conflicts disclosure in connection with the investment advisers' evaluation of the capacity and competency of the proxy voting advice business. Additionally, as discussed above, proxy voting advice businesses who currently rely on the Rule 14a–2(b)(3) exemption already must disclose any significant relationship or material interest bearing on the voting advice.

We are unable to provide quantitative estimates of these direct costs on proxy voting advice businesses because the facts and circumstances unique to each proxy voting advice business, including the disclosures it currently provides to its clients as well as the nature of its material interests, transactions, and relationships, will dictate the additional disclosure, if any, it must provide under the final rule. As discussed in Section II.B.1 above, boilerplate language will not be sufficient to satisfy new Rule 14a–2(b)(9)(i). Under the rule, a proxy voting advice business will be required to provide conflicts disclosure with enough specificity to enable its clients to adequately assess the objectivity and reliability of the proxy voting advice. As a result, the disclosure provided by the proxy voting advice business could differ depending on the circumstances (*e.g.,* depending on the scope of services it provides its clients and the subject registrant) and may need to be updated periodically as both the business's and its clients' interests change. Additionally, proxy voting advice businesses' direct costs will depend on the extent to which their current practices and procedures already meet

or exceed the new disclosure requirements.[597]

A number of commenters asserted that the amendments regarding enhanced conflict of interest disclosure would impose compliance costs.[598] One commenter stated that the proposed additional disclosures of conflicts of interest would generate additional paperwork burdens but no additional benefits.[599] Another commenter that addressed the PRA burdens of the new conflicts of interest disclosure estimated that identifying and disclosing conflicts in the manner specified in the proposal would result in an additional one hour to identify conflicts at 5,565 registrants and 0.5 hours to disclose conflicts at 807 issuers, for a total of 5,969 additional hours per year.[600] As noted in Section V.C.1.a below, in response to that commenter's feedback, we have increased our PRA burden estimates of the enhanced conflict of interest disclosure. For PRA purposes, we estimate that the cost of the enhanced conflict of interest disclosure will be 6,000 burden hours per proxy voting advice business.

One commenter stated that the proposed amendments would compromise the firewall between its proxy voting advice business and corporate services business,[601] presumably by revealing the clients of the corporate services arm to the research arm. We note, however, that the rule we are adopting gives a proxy voting advice business the option to include the required disclosure either in its proxy voting advice *or* in an electronic medium used to deliver the proxy voting advice, such as a client voting platform, which allows the business to segregate the information, as necessary, to limit access exclusively to the parties for which it is intended.

Another commenter argued that the enhanced conflict of interest disclosure could artificially and significantly inflate the number of conflicts reported.[602] Because proxy voting advice businesses have not been providing the level of enhanced disclosure required by the final rule, compliance with the final rules would, according to the commenter, make it appear as if proxy voting advice businesses have to date been underreporting material conflicts of interest. According to the commenter,

this would result in reputational harm for proxy voting advice businesses. While we agree that an increase in the number of material conflicts reported could affect the reputation of proxy voting advice businesses, we believe it is appropriate for proxy voting advice businesses that have conflicts with the potential to influence the recommendations they provide clients to bear the reputational effects and other costs associated with disclosure of those conflicts.

As discussed in Section II.B.3 above, the final amendments have been revised to streamline the requirements and provide proxy voting advice businesses the flexibility to determine which situations merit disclosure and the specific details to provide to their clients about any conflicts of interest identified. This less prescriptive approach should help alleviate concerns that the new requirement will compel disclosure of information that may compromise existing safeguards, result in unduly lengthy disclosures, or harm proxy advice voting businesses' reputations. In addition, the revised approach may make it easier for businesses to leverage their existing disclosures to satisfy the final rule and mitigate concerns that the rule will result in unnecessary paperwork burdens, while still providing more consistent information about conflicts of interest.

b. Notice of Proxy Voting Advice and Registrant Response—New Rule 14a–2(b)(9)(ii)

i. Benefits

In contrast to the Proposing Release, the final amendments to Rule 14a–2(b)(9) set forth a principles-based approach designed to ensure that proxy voting advice businesses' clients have access to more transparent and complete information and benefit from a robust discussion of views when making voting decisions.[603] The final amendments also provide non-exclusive safe harbors that the proxy voting advice businesses may use to satisfy the principles-based requirements in Rule 14a–2(b)(9)(ii).

We believe the final amendments will benefit clients of proxy voting advice businesses—and thereby ultimately benefit the investors they serve—by enhancing the overall mix of information available to those clients as they assess proxy voting advice and make determinations about how to cast votes. Providing timely notice to registrants of voting advice will allow registrants to more effectively determine

---

[595] *Id.*
[596] *See* Standard of Conduct for Investment Advisers.

[597] *See supra* Section II.B.3.
[598] *See, e.g.,* letters from ISS; IAA; Ohio Public Retirement.
[599] *See* letter from CalPERS.
[600] *See* letter from Glass Lewis I.
[601] *See* letter from ISS.
[602] *See* letter from Ohio Public Retirement.

[603] *See supra* Section II.C.3.

whether they wish to respond to the recommendation by publishing additional soliciting materials and to do so in a timely manner prior to shareholders casting their votes. Registrants may wish to do so for a variety of reasons, including, for example, because they have identified what they perceive to be factual errors or methodological weaknesses in the proxy voting advice businesses' analysis or because they have a different or additional perspective with respect to the recommendation. In either case, clients of proxy voting advice businesses may benefit from the availability of additional information upon which to base their voting decision. Registrants may also wish to respond because they agree with some or all aspects of the analysis. In that case, that fact also would likely be relevant to and enhance a client's decision-making. Further, to the extent that proxy voting advice businesses choose to adopt policies and procedures that permit them to refine their advice based on any feedback they might receive from registrants, users of the advice and the investors they serve (if applicable) could benefit from more reliable and complete voting advice.

Ensuring that a proxy voting advice business provides clients with a mechanism by which they can reasonably be expected to become aware of any written response by a registrant to the proxy voting advice (*i.e.,* additional soliciting materials) will benefit users of the advice—including any underlying investors—by ensuring that they have ready and timely access to the registrant's perspective on such advice when considering how to vote. Clients of proxy voting advice businesses often must make voting decisions in a compressed time period. Timely access to registrant responses to the advice would facilitate clients' evaluation of the voting advice by highlighting disagreement on facts and data, differences of opinion, or additional perspectives before the client casts its votes.

One commenter questioned the benefits to clients of proxy voting advice businesses from the registrants' ability to review the proxy voting advice.[604] According to that commenter, accurate and complete advice is already being provided by proxy voting advice businesses to their clients. As we discuss in Section II.B.2 above, and as noted by several commenters,[605] some proxy voting advice businesses currently have internal policies and

procedures aimed at enabling feedback from certain registrants before they issue voting advice. This suggests that proxy voting advice businesses themselves recognize the potential benefit of such feedback, which could serve as a bonding mechanism for these businesses by demonstrating to clients that the proxy voting advice business believes the advice it provides is based on accurate information. Even where proxy voting advice businesses currently provide opportunities for review and feedback, however, these existing practices may be inadequate to appropriately mitigate the agency costs associated with use of proxy voting advice. Specifically, it does not appear that all proxy voting advice businesses currently provide all registrants with an opportunity to review proxy voting advice.[606] Under Rule 14a–2(b)(9)(ii), proxy voting advice businesses' policies and procedures must be reasonably designed to ensure that proxy voting advice is made available to registrants that are the subject of such advice in a timely manner prior to or at the same time when such advice is disseminated to the proxy voting advice businesses' clients and thus will provide additional registrants with the ability to respond to that advice (if they so choose) in a timely manner, thereby enhancing the total mix of information available to proxy voting advice business clients.

Rule 14a–2(b)(9)(iii) could also yield benefits to the extent that proxy voting advice businesses' policies and procedures encourage registrants to file their definitive proxy statements earlier than they otherwise would. Earlier filing of definitive proxy statements could benefit investors generally, as they will have more time to review the materials. As discussed below, earlier filing of these materials also could help mitigate potential costs for proxy voting advice businesses stemming from Rule 14a–2(b)(9)(iii). Under the safe harbor provided by the final amendments, proxy voting advice businesses may condition dissemination of proxy voting advice to a registrant on the registrant filing its definitive proxy statement at least 40 calendar days before the annual meeting. One commenter submitted data analysis showing that, for 2018, more than 87.8 percent of registrants filed proxy materials at least 40 calendar days before an annual meeting.[607] Based on these estimates, proxy voting advice

businesses that choose to avail themselves of the safe harbor by implementing its terms without modification might affect the timing of up to 12.2 percent of filings.[608] We note, however, that proxy voting advice businesses may structure their policies to accommodate registrants that may file less than 40 calendar days before the shareholder meeting and remain within the safe harbor.

### ii. Costs

With respect to the requirement that proxy voting advice businesses adopt and publicly disclose policies and procedures reasonably designed to ensure that (i) registrants receive in a timely manner the proxy voting advice report, and (ii) proxy voting advice businesses provide clients with a mechanism by which they can reasonably be expected to become aware of a registrant's additional soliciting material in response to the advice in a timely manner, proxy voting advice businesses will bear direct costs. There will also be indirect costs to other parties.

### (a) Direct Costs

For the principle set forth in Rule 14a–2(b)(9)(ii)(A), proxy voting advice businesses will bear direct costs associated with modifying current systems and methods, or developing and maintaining new systems and methods, to ensure the conditions of the exemption are met and with delivering the report to registrants. While some proxy voting advice businesses may already have systems in place to address some or all of these requirements,[609] we do not have data that would allow us to estimate the costs associated with modifying or developing these systems and methods to encompass all registrants. To the extent proxy voting advice businesses already have similar systems in place, any additional direct cost may be limited. In addition, as we

---

[604] *See* letter from ISS.
[605] *See, e.g.,* letters from Glass Lewis II; ISS.

[606] *See supra* Section IV.A.
[607] *See* letter from CII VIII. Calculated as (2,900 + 460)/3,828 = 0.878. The commenter stated that of 3,828 companies, 2,900 filed proxy materials between 40 and 48 calendar days in advance of annual meetings and 460 filed proxy materials 50 or more days in advance of annual meetings.

[608] Under the safe harbor, a registrant may opt to forgo the benefits of receiving notice of proxy voting advice at the same time as clients if it deems accelerating the filing of its proxy materials to meet the 40-day threshold sufficiently costly.
[609] *See, e.g.,* letter in response to the SEC Staff Roundtable on the Proxy Process from Glass Lewis (Nov. 14, 2018) ("Glass Lewis has a resource center on its website designed specifically for the issuer community via which public companies, their directors and advisors can, among other things: (i) Submit company filings or supplementary publicly available information; (ii) participate in Glass Lewis' Issuer Data Report ('IDR') program, prior to Glass Lewis completing and publishing its analysis to its investor clients; and (iii) report a purported factual error or omission in a research report, the receipt of which is acknowledged immediately by Glass Lewis, then reviewed, tracked and dealt with internally prior to responding to the company in a timely manner.").

discuss in more detail below, depending on how proxy voting advice businesses choose to meet the principle, they may incur direct costs associated with executing, obtaining, or modifying acknowledgments or agreements with respect to the use of any information shared with the registrant in the process of delivering the report to the registrant.

A proxy voting advice business may also incur direct costs in satisfying the requirement of Rule 14a–2(b)(9)(ii)(B) that it adopt and publicly disclose written policies and procedures reasonably designed to ensure that the proxy voting advice business provides clients with a mechanism by which they can reasonably be expected to become aware of a registrant's written statements about the proxy voting advice in a timely manner before the shareholder meeting. For example, to be eligible for the safe harbor in the new Rule 14a–2(b)(9)(iv), a proxy voting advice business could provide: (i) Notice on its electronic client platform that the registrant has filed, or has informed the proxy voting advice business that it intends to file, additional soliciting materials (and include an active hyperlink to those materials on EDGAR when available); or (ii) notice through email or other electronic means that the registrant has filed, or has informed the proxy voting advice business that it intends to file, additional soliciting materials (and include an active hyperlink to those materials on EDGAR when available). Both mechanisms for informing clients could involve initial set-up costs as well as ongoing costs.

Since they are not required to rely on the safe harbor, proxy voting advice businesses may also put in place other mechanisms by which their clients may reasonably be expected to become aware of a registrant's written statements about the proxy voting advice in a timely manner, which could be more or less costly than relying on the safe harbor. Under the final amendments, those mechanisms must also ensure that clients obtain the notification in a timely manner. Because the final amendments permit proxy voting advice businesses substantial flexibility in satisfying this condition, we expect proxy voting advice businesses to implement mechanisms differently depending on, among other things, their own facts and circumstances and the nature of their client bases. Thus, the overall costs of satisfying this condition are difficult to quantify. We believe, however, that the costs of implementing a mechanism by which clients may reasonably be expected to become aware of registrants' views could involve (i)

developing systems to gather information about the filing of additional soliciting materials by registrants; and (ii) modifying existing systems so that clients may reasonably be expected to become aware that registrants have filed such additional soliciting materials. To the extent proxy voting advice businesses already have similar systems in place, any additional direct cost may be limited.

Many commenters asserted that allowing registrants to review the proxy voting advice that proxy voting advice businesses have prepared for clients, as would have been required under the proposed rules, would generate significant costs for proxy voting advice businesses and their clients.[610] Some commenters stated that the sheer volume of reports that proxy voting advice businesses would have to send to registrants would generate large compliance costs. For example, one commenter noted that the number of reports it alone would need to send to registrants for review would increase from 450 in 2019 to approximately 6,500 to 25,000 post-adoption, and that it would incur costs of drafting at least 6,000 confidentiality agreements.[611] Another commenter asserted that the compliance costs stemming from this amendment would be disproportionately higher for smaller proxy voting advice businesses.[612] Some commenters indicated that, under the proposed rules, proxy voting advice businesses would have to negotiate and enter into confidentiality agreements with each applicable registrant to avoid the dissemination of sensitive information, and the commenters provided estimates of those burdens.[613]

We recognize the concerns raised by these commenters regarding compliance costs associated with the proposed registrant review and response process.

[610] *See, e.g.,* letters from CalPERS; CFA Institute I; CII IV; IAA; ICI; ISS; New York Comptroller II; Olshan LLP; Ohio Public Retirement; Prof. Bebchuk; ProxyVote II.

[611] *See* letter from ISS.

[612] *See* letter from CII IV.

[613] *See* letters from CalPERS (indicating that proxy voting advice businesses would need to enter into hundreds or possibly thousands of different agreements which would be costly); ISS (stating that it would incur costs of drafting at least 6,000 confidentiality agreements); Glass Lewis I (estimating that it will incur a compliance burden of four hours per registrant to negotiate or secure confidentiality agreements with 4,912 issuers for a total of 19,648 hours); Olshan LLP (suggesting that negotiating such agreements would result in the allocation of significant time and cost by proxy voting advice businesses). Also, one commenter argued that confidentiality agreements would be ineffective at preventing leaks of proxy voting advice due to the large number of registrant employees that would have access to the information. *See* letter from Olshan LLP.

In response, as suggested by several commenters, we are adopting a more principles-based approach intended to achieve many of the same objectives of the proposal without unduly encumbering the ability of proxy voting advice businesses to provide their clients with timely and reliable voting advice. The final amendments will require proxy voting advice businesses to have policies and procedures reasonably designed to ensure that proxy voting advice is made available to registrants at or prior to or at the same time it is disseminated to the proxy voting advice businesses' clients rather than within a specified period of time. Additionally, the final amendments impose only a one-time obligation with respect to notifying registrants of a given proxy voting advice. We are also adopting new Rule 14a–2(b)(9)(v), which will exclude from the scope of Rule 14a–2(b)(9)(ii) proxy voting advice to the extent that such advice is based on custom policies, and new Rule 14a–2(b)(9)(vi), which will exclude from the scope of Rule 14a–2(b)(9)(ii) proxy voting advice as to non-exempt solicitations regarding certain mergers and acquisitions or contested matters.

We believe the significant additional flexibility in the final amendments will enable proxy voting advice businesses to design policies and procedures that satisfy the new conditions of the exemptions but are nonetheless efficiently tailored to their specific business models and practices. This more flexible approach also may permit proxy voting advice businesses to leverage their existing systems and methods to satisfy the conditions. We thus believe, when measured against the baseline, the final amendments will impose lower compliance costs and result in fewer disruptions for proxy voting advice businesses and their clients, than the more prescriptive approach set forth in the proposal.

While a more principles-based approach to regulation provides additional flexibility for affected parties, it also may impose certain costs if the parties are unsure of what measures are needed to satisfy the legal requirement. For example, such an approach can entail additional judgment on the part of management or result in parties doing more than what is required in order to ensure they satisfy the applicable standard. The non-exclusive safe harbors built into the final amendments will provide legal certainty to proxy voting advice businesses that they can rely on the solicitation exemptions in Rules 14a–2(b)(1) and (b)(3) and therefore could further mitigate the compliance burdens associated with the

new conditions. They also may provide some guidance to proxy voting advice businesses about how they can design their own policies and procedures to satisfy the conditions.

As noted in Section V.C.1.a below, we believe that much of the burden of the final amendments would be for the proxy voting advice business to develop policies that satisfy the principles and accordingly modify or develop systems and practices to implement such policies. The principles-based approach we implement should help reduce such compliance costs significantly, which would likely result in a lower PRA burden than the commenter estimates based on the proposal. Also, our revised PRA estimates take into consideration our understanding that some proxy voting advice businesses have systems and practices in place that may complement or overlap with the new requirements, which could substantially reduce compliance costs. For PRA purposes, we estimate that each proxy voting advice business would incur 2,845 burden hours for the notice to registrants under Rule 14a–2(b)(9)(ii)(A) and 2,845 burden hours for the notice to clients under Rule 14a–2(b)(9)(ii)(B).[614]

In addition to these system-related costs, we expect that proxy voting advice businesses would, as a general matter, obtain acknowledgments or agreements with respect to the use of any information shared with a registrant, as we expect that the business would seek to limit disclosure of its report. Several of the changes to the final rule amendments should allow proxy voting advice businesses to take measures to reduce these compliance costs compared with the cost of the confidentiality agreements contemplated under the proposal. For example, under the principles-based approach that we are adopting, in instances where a proxy voting advice business judges the potential impact of the disclosure of information contained in the report to be high it could provide the advice to registrants at the time it is provided to their clients or it may choose to provide draft reports to registrants before making them available to clients while imposing more stringent confidentiality requirements or terms of use on registrants to prevent release of commercially sensitive information. This should reduce the risk that commercially sensitive information

about proxy voting advice may be disseminated more broadly.

Moreover, as adopted, the principles-based approach does not dictate the manner in which proxy voting advice businesses provide the report to registrants, and instead gives the proxy voting advice business discretion to choose how best to implement the principle of the rule and incorporate it into the business's policies and procedures, including by leveraging existing practices. In this regard, we note that some proxy voting advice businesses currently provide reports to registrants without requiring formal confidentiality agreements, instead requiring only an electronic acknowledgment of terms of use.[615] Such an approach is likely to involve less negotiation between proxy voting advice business and registrants than formal confidentiality agreements, and thus lower compliance costs.[616] Further, an acknowledgment of terms of use could be designed to apply prospectively, including for future proxy seasons, making this a one-time cost when a proxy voting advice business initiates coverage of a registrant. Overall, for purposes of our PRA, we estimate that each proxy voting advice business will incur a burden of between 50 and 5,690 hours per year associated with securing an acknowledgment or other assurance that the proxy advice will not be disclosed.[617] Another potential cost for proxy voting advice businesses could result from new Rule 14a–2(b)(9)(vi). When additional matters are presented for shareholder approval at meetings with applicable M&A transaction or contested matters, then the portion of the proxy voting advice provided with respect to the applicable M&A transaction or contested matters will be excluded from the scope of Rule 14a–2(b)(9)(ii). This means that in those situations, proxy voting advice businesses may choose to redact the report that they have to deliver to registrants, which will generate costs for

them. It is also possible, however, that proxy voting advice businesses would choose instead to deliver an un-redacted report, in which case they will not incur the costs of redaction.[618]

A number of commenters raised concerns about the costs associated with the provisions in the proposed rules that would have established a formal process by which the registrant would be given the opportunity to review and provide feedback on draft voting advice.[619] The principles-based approach in the final rules obviates the need for a prescribed process for engagement with the registrant and instead allows proxy voting advice businesses to decide when and how to provide notice of the proxy voting advice businesses' voting advice to registrants. Under this approach, proxy voting advice businesses are not required to, although they may, share pre-publication drafts with registrants for their feedback. Rather, they must provide the registrant with a copy of their advice, which could be at the same time as the advice is shared with clients. Moreover, as with the proposal, nothing in the final amendments will require proxy voting advice businesses to alter their advice in response to registrant feedback. Thus, we believe the final amendments will substantially address, if not eliminate altogether, the concerns raised by commenters related to

---

[614] See discussion in *infra* Section V.B.1 for the assumptions we make when estimating hours and costs associated with maintaining, disclosing, or providing the information required by the amendments that constitute paperwork burdens imposed by a collection of information.

[615] For example, Glass Lewis requires a registrant to click and agree to certain ''terms of use'' before being able to access the notice and recommendations.

[616] We recognize that some proxy voting advice businesses, irrespective of their current practices or what the final amendments envision, may nevertheless choose to enter into formal confidentiality agreements with some registrants. For such proxy voting advice businesses, the compliance costs may be closer to those estimated by the commenters.

[617] See discussion in *infra* Section V.B.1 for the assumptions we make when estimating hours and costs associated with maintaining, disclosing, or providing the information required by the amendments that constitute paperwork burdens imposed by a collection of information.

[618] In choosing not to redact, proxy voting advice businesses potentially increase their exposure to the risk that their recommendations will be revealed to market participants. As a result, we anticipate that proxy voting advice businesses will be less likely to offer pre-publication review to registrants of reports that contain recommendations related to contested matters or M&A transactions.

[619] See, e.g., letters from Prof. Bebchuk; ISS; Kerrie Waring, Chief Executive Officer, International Corporate Governance Network (Nov. 21, 2019) (''ICGN''); Segal Marco II; TIAA; Daniel P. Hanson, Chief Investment Officer, Ivy Investment Management Company (Feb. 3, 2020) (''Ivy Investment''); Olshan LLP; First Affirmative. See also IAC Recommendation. Some commenters expressed a concern that allowing a registrant or other soliciting person to review and provide feedback on the voting advice before the proxy voting advice business provides it to its clients could reduce the diversity of thought in the marketplace for proxy voting advice. See, e.g., letters from Prof. Bebchuk; CalPERS; CFA Institute I. See also, e.g., letter in response to the SEC Staff Roundtable on the Proxy Process from Glass Lewis (''We believe that allowing an issuer to engage with us during the solicitation period may lead to discussions about the registrant's proxy, thereby providing registrants with an opportunity to lobby Glass Lewis for a change in policy or a specific recommendation against management. To ensure our research is always objective, Glass Lewis takes this added precaution and postpones any engagements until after the solicitation period has ended . . . .''). Some commenters noted conflicts between SRO rules that seek to limit issuers' pre-publication review of security analyst research reports and the proposed approach to pre-publication review of proxy voting advice. See, e.g., letter from CII IV.

objectivity and timing pressure associated with the proposed engagement process.

(b) Indirect Costs

The final rule may also impose indirect costs on other parties. Proxy voting advice businesses may pass through a portion of the costs of modifying or developing systems to meet the requirements to their clients through higher fees for proxy advice. Moreover, the policies and procedures proxy voting advice businesses develop under the final rule could cause registrants to incur costs. For example, a proxy voting advice business that chooses to rely on the safe harbor in Rule 14a–2(b)(9)(iii) would adopt policies and procedures that provide a registrant with a copy of the proxy voting advice, at no charge, no later than the time it is disseminated to the business's clients if the registrant has filed its definitive proxy statement at least 40 calendar days before the meeting date. A registrant that wishes to review proxy advice prior to the meeting date may incur costs to accelerate the filing of its definitive proxy statement to meet the 40-day threshold. However, we expect a registrant would incur these costs only if it expected the benefits of review to be sufficiently large.[620]

Proxy voting advice business may also bear indirect costs in the form of lost revenues. While all three major proxy voting advice business currently offer registrants access to proxy voting reports, in some circumstances they may charge a fee to registrants for such access,[621] or make such access available only in connection with the purchase of consulting services from an affiliate of the proxy voting advice businesses. The requirement to share full reports with registrants under Rule 14a–2(b)(9)(ii) may result in a proxy voting advice business providing access to proxy voting reports at no charge to registrants.[622] This would cause such proxy voting advice business to lose fees they otherwise would have earned from selling proxy voting reports to registrants. Without more detailed information about proxy voting advice businesses' fee schedules and information about the revenues they currently generate from selling proxy voting reports to registrants, we are

unable to quantify the magnitude of these revenue losses.

Several commenters expressed concern that the economic analysis in the Proposing Release understated or failed to consider the costs of the proposals on consumers of proxy voting advice.[623] One commenter asserted that costs for customers of proxy voting advice will increase due to both the costs of reduced time to review proxy research reports and a potential increase in fees, as proxy voting advice businesses pass their increased costs on to institutional investor clients, who, in turn, would pass these costs on to their individual investor participants and beneficiaries.[624] Another commenter argued that such costs may lead some institutional investors to forgo the benefits of using a proxy voting advice business, which could ultimately be detrimental to the effectiveness of shareholder voting and oversight.[625] Similarly, one commenter suggested that the proposed rules, by increasing the costs of the proxy advice that opposes management, would impede investors' ability to monitor company management.[626] Another commenter, a proxy voting advice business, stated that the proposed changes could diminish proxy voting advice businesses' willingness to recommend votes against management and that this "would substantially diminish the independent information available to investors and their ability to hold management accountable for their actions." [627] Additionally, several commenters supplied empirical evidence suggesting that the quality of proxy voting advice depends on the time available for proxy voting advice businesses to conduct research.[628] One commenter concluded from this research that the proposed requirements would reduce the quality of voting advice.[629]

The principles-based approach we are adopting should mitigate many of these concerns because it will impose compliance costs on proxy voting advice businesses that are lower than the compliance costs associated with the approach in the Proposing Release, and hence will limit the potential increase in the price of proxy advice services for proxy voting advice

businesses' clients. Further, because the principles-based approach does not include a registrant review and feedback process that requires pre-publication review, it should reduce concerns that registrants will lobby proxy voting advice business for changes to recommendations, and thus should not discourage proxy voting advice business from making recommendations that oppose management or impose additional timing constraints on proxy voting advice businesses.

Registrants also could incur costs associated with coordinating with proxy voting advice businesses to receive the proxy voting advice, reviewing the proxy voting advice, and determining whether to prepare and file additional soliciting materials in response to the proxy voting advice. We expect a registrant would bear these costs only if it anticipated the benefits of such steps would exceed the costs of such a program. Similarly, because more registrants who are the subjects of proxy voting advice will have access to such proxy voting advice in advance of the shareholder vote, more registrants may file additional soliciting materials in response to proxy voting advice as a result of the rule amendments than currently do. Investment advisers, who can reasonably be expected to become aware of additional soliciting materials could incur additional costs in connection with the review of that information. Because these costs will vary depending upon the particular facts and circumstances of the proxy voting advice, any issues identified therein, the resources of the registrant or investment adviser, and in the case of an investment adviser, its policies and procedures with respect to proxy voting, it is difficult to provide a quantifiable estimate of these costs.

4. Amendments to Rule 14a–(9)

a. Benefits

Finally, we are amending Rule 14a–9 to add as an example of what could be misleading, the failure to disclose certain material information about proxy voting advice, specifically information about the proxy voting advice business's methodology, sources of information, and conflicts of interest. We do not expect the amendment to the list of examples in Rule 14a–9 to significantly alter existing disclosure practices, as it will largely codify existing Commission guidance on the applicability of Rule 14a–9 to proxy voting advice.[630] To the extent the

[620] *See supra* note 608.

[621] *See* Section IV.B.1.a.ii.

[622] To rely on the safe harbor in Rule 14a–2(b)(9)(iii), a proxy voting advice business must provide registrants with a copy of the proxy voting advice at no charge.

[623] *See, e.g.,* letters from CII IV; ICI; ISS; New York Comptroller II; PRI II; ProxyVote II; Segal Marco II; Ohio Public Retirement; Prof. Bebchuk.

[624] *See* letter from CII IV.

[625] *See* letter from Prof. Bebchuk.

[626] *See* letter from PRI II.

[627] *See* letter from ISS.

[628] *See* letter from Ana Albuquerque, Boston University, et al. (Feb 3. 2020) ("Prof. Albuquerque et al.").

[629] *See* letter from CII IV.

[630] *See* Commission Interpretation on Proxy Voting Advice at 47419.

amendment prompts some proxy voting advice businesses to provide additional disclosure about the bases for their voting advice, the clients of these businesses—and the investors they serve—may benefit from receiving additional information that could aid in making voting determinations.

b. Costs

The final amendments to Rule 14a–9 will impose direct costs on proxy voting advice businesses to the extent the amended rule prompts some proxy voting advice businesses to provide additional disclosure about the bases for their voting advice. We expect any such costs to be minimal, especially given that the examples being codified were included in prior Commission guidance.[631]

Some commenters asserted that the main cost of the Rule 14a–9 amendments will be an increase in litigation risk for proxy voting advice businesses.[632] Several commenters stated that this increased litigation risk would make it more expensive and burdensome for proxy voting advice businesses to provide their advisory services.[633] One commenter asserted that the proposed changes amount to a new cause of action under Rule 14a–9.[634] Two other commenters argued that the proxy voting advice businesses' response to the threat of litigation under Rule 14a–9 would be to err on the side of caution in complex or contentious matters, thus increasing the likelihood of the proxy voting advice business issuing pro-registrant proxy voting recommendations.[635] We believe several factors will serve to limit this risk. As discussed above, Rule 14a–9 liability is grounded in the concept of materiality and thus would be based on the particular facts and circumstances and assessed from the perspective of the reasonable shareholder.[636] Moreover, neither our proposed amendment to Rule 14a–9 nor the other amendments we are adopting will broaden the concept of materiality or create a new cause of action, as some commenters suggested. Thus, the amendment does not change the scope or application of existing law. Therefore, we do not expect the new amendment to Rule 14a–9 to generate significant new litigation risk for proxy voting advice businesses

or to result in a shift to more pro-registrant proxy voting recommendations.

5. Effect on Smaller Entities

Several commenters specifically stated that the economic analysis failed to consider the effect and cost of the proposal on smaller proxy voting advice businesses.[637] One of these commenters asserted that small entities (defined by the commenter as those with up to $5 million in assets) would face significant resource and capacity burdens when complying with the proposed amendments, without improvements in the quality of voting for clients.[638] Another commenter similarly stated the proposals would be particularly burdensome for small proxy voting advice businesses.[639] One commenter stated that the economic analysis failed to consider the proposal's effect on small and medium-sized investment advisers and stated these entities would be disproportionately affected.[640]

As mentioned in Section IV.B.1 above, the Commission is not aware of smaller firms that currently supply research, analysis, and recommendations to support the voting decisions of their clients that would fall within the definition of "solicitation." We therefore cannot estimate how many small proxy voting advice businesses will be affected. However, we are cognizant that any smaller proxy voting advice businesses that operate now or in the future may incur proportionally higher compliance costs even under the final amendments, especially if some of the potential costs of the amendments are fixed. For example, small proxy voting advice businesses may not have conflicts of interest disclosure policies in place, or may not have mechanisms to inform clients of registrant feedback. We believe that the new principles-based approach we are adopting should help address some of the concerns about the final rule's disparate effect on smaller firms by providing small proxy voting advice businesses with the flexibility to design policies and procedures that are scaled to the scope of their business operations.

Further, we believe that the principles-based approach should afford existing proxy voting advice businesses flexibility to leverage their existing practices and mechanisms to efficiently comply with the new requirements, reducing the compliance burdens that

they might pass through to smaller clients. Finally, we believe that because the final rules promote the availability of more complete and accurate information to proxy voting advice clients, they are responsive to calls for proxy process reform by smaller issuers to "inspire confidence in the voting process, drive shareholder engagement, and bolster long-term value creation."[641] Smaller issuers may also benefit from the final amendments insofar as they will have greater opportunity to receive proxy voting advice and inform their shareholders of their views on such advice, relative to the opportunities proxy voting advice business currently offer registrants under voluntary review programs.[642]

*D. Effects on Efficiency, Competition, and Capital Formation*

1. Efficiency

As discussed in Section IV.B above, proxy voting advice businesses perform a variety of functions for their clients, including analyzing and making voting recommendations on matters presented for shareholder vote and included in registrants' proxy statements. As an alternative to utilizing these services, clients of proxy voting advice businesses could instead conduct their own analysis and execute votes using internal resources.[643]

We believe that, for purposes of general analysis, it is reasonable to assume that the cost of analyzing matters presented for shareholder vote will not vary significantly with the size of the position being voted. Given the costs of analyzing and voting proxies, the services offered by proxy voting advice businesses may offer economies of scale relative to their clients performing those functions themselves. For example, a GAO study found that among 31 institutions, including mutual funds, pension funds, and asset managers, large institutions rely less than small institutions on the research and recommendations offered by proxy voting advice businesses.[644] Small

[631] *See supra* notes 46 and 67 and accompanying text.

[632] *See* letters from IAA; ISS; Glass Lewis II; Minerva I.

[633] *See* letters from IAA; Glass Lewis II; Minerva I.

[634] *See* letter from C. Icahn.

[635] *See* letters from ISS; Elliott I.

[636] *See* discussion in *supra* Section II.D.3.

[637] *See* letters from Felician Sisters II; Good Shepherd; IASJ; Interfaith Center II; St. Dominic of Caldwell.

[638] *See* letter from IASJ.

[639] *See* letter from Interfaith Center II.

[640] *See* letter from IAA.

[641] *See* 2019 Small Business Forum.

[642] *See supra* Section IV.B.1.a.ii.

[643] Clients of proxy voting advice businesses may also rely on some combination of internal and external analysis.

[644] *See* 2007 GAO Report, *supra* note 474, at 2; *see also* letter from BRT (stating since many institutional investors face voting on a large number of corporate matters every year but lack personnel and resources, they outsource tasks to proxy advisors); *see also* letters in response to the SEC Staff Roundtable on the Proxy Process from BlackRock (Nov. 16, 2018) ("BlackRock's Investment Stewardship team has more than 40 professionals responsible for developing independent views on how we should vote proxies on behalf of our clients."); NYC Comptroller (Jan.

institutional investors surveyed in the study indicated they had limited resources to conduct their own research.[645]

By establishing requirements that promote transparency in proxy voting advice, the final amendments could lead to an increased demand for proxy voting advice businesses' voting advice. To the extent proxy voting advice businesses offer economies of scale relative to their clients performing certain functions themselves, increased demand for, and reliance upon, proxy voting advice business services could lead to greater efficiencies in the proxy voting process. At the same time, the final amendments will impose certain additional costs on proxy voting advice businesses, and these costs may be passed on to their clients. To the extent the costs passed on to a client are greater than the related benefits (or vice versa) to the client it could lead to decreased (or increased) demand for proxy voting advice business services by the client. As each client individually decides whether to use proxy voting advice business services, if aggregate demand for proxy voting advice business services increases (decreases), there will be more (or fewer) efficiencies in the proxy voting process.

Some commenters asserted that the ability of registrants to review the advice and the threat of litigation from registrants would result in voting advice from proxy voting advice businesses that is less accurate, useful, and valuable to their clients.[646] If clients

perceive the amendments as affecting proxy voting advice businesses' objectivity and independence, this could lead to a decrease in demand for proxy voting advice and potentially fewer efficiencies in the proxy voting process.[647] However, as discussed above, we have made a number of changes to the proposed amendments that we believe address these concerns and will lead to more accurate, transparent and complete information for proxy voting advice business clients.[648] In addition, as discussed above, we do not expect the new amendment to Rule 14a–9 to generate significant new litigation risk for proxy voting advice businesses.[649]

Several commenters also stated that the proposed amendments could adversely affect the efficiency of how capital is allocated in two ways stemming from the potential threat of litigation by registrants and their ability to influence proxy voting advice under the proposed rule.[650] First, some of these commenters expressed concern that the amendments could reduce the independence of proxy voting advice businesses and the diversity of thought in the market for proxy advice, which in turn could reduce the information investors and investment advisers have, resulting in less efficient investment decisions.[651] Second, some of these commenters stated that the amendments would have a silencing effect on proxy voting advice businesses, resulting in value-destroying decisions by managers of registrants who are held less accountable for their actions.[652]

We believe that the principles-based approach we are adopting helps address commenter concerns about reductions in the reliability and independence of

proxy voting advice. The final amendments neither require proxy voting advice businesses to share draft proxy voting advice with registrants in advance of providing advice to their clients, nor require proxy voting advice businesses to consider feedback from registrants on the proxy voting advice. In this way, the final amendments seek to limit the presence and ameliorate the possible effects of the independence-related concerns raised by commenters while preserving many of the intended benefits of the proposed engagement process, such as enhancing the accuracy, transparency and completeness of information available to clients of proxy voting advice businesses.

Other commenters disputed that the proposed amendments would bring about more accurate or transparent proxy voting advice, asserting that proxy voting advice businesses already provide adequate disclosure regarding conflicts of interest and a means for engagement with registrants because the price and quality of service for proxy advice is determined in a competitive market.[653] In that case, the amendments may not result in an increase in demand for proxy advisory services. As discussed above, while we acknowledge that proxy voting advice businesses currently disclose conflicts of interest to clients and permit certain registrants to review proxy voting advice, the final rules could nevertheless increase demand for proxy voting advice to the extent that: (i) Clients prefer a more standardized time and means of receiving conflict disclosures, and (ii) proxy voting advice businesses expand their existing review procedures as a means of satisfying the new conditions. Overall, given the changes in the final amendments relative to the proposed amendments, we do not expect the final amendments to have a significant effect on the demand for proxy advisory services, and hence efficiency.

2. Competition

The amendments' requirements that promote transparency and more effective evaluation of proxy voting advice could stimulate competition among proxy voting advice businesses with respect to the quality of advice. In particular, clients of proxy voting advice businesses may be better able to assess conflicts of interest (and, more broadly, alignment of interest) and the reliability of proxy voting advice, which could, in turn, cause proxy voting advice businesses to compete more on those dimensions.

---

2, 2019) ("We have five full-time staff dedicated to proxy voting during peak season, and our least-tenured investment analyst has 12 years' experience applying the NYC Funds' domestic proxy voting guidelines.").

[645] See 2007 GAO Report, *supra* note 474, at 2; *see also* letters in response to the SEC Staff Roundtable on the Proxy Process from Ohio Public Retirement (Dec. 13, 2018) ("OPERS also depends heavily on the research reports we receive from our proxy advisory firm. These reports are critical to the internal analyses we perform before any vote is submitted. Without access to the timely and independent research provided by our proxy advisory firm, it would be virtually impossible to meet our obligations to our members."); Transcript of Roundtable on the Proxy Process at 194 (comments of Mr. Scot Draeger) ("If you've ever actually reviewed the benchmarks, whether it's ISS or anybody else, they're very extensive and much more detailed than research[s] like ours could ever develop with our own independent research.").

[646] See, e.g., letters from Prof. Bebchuk; ISS; ICGN; PRI II; Torsten Jochem, Associate Professor of Finance, University of Amsterdam, and Anjana Rajamani, Erasmus University Rotterdam (Dec. 16, 2019) ("Profs. Jochem and Rajamani"); Segal Marco II; TIAA; Ivy Investment; Olshan LLP; First Affirmative; Lisa A. Smith, Vice President, Advocacy and Public Policy, Catholic Health Association of the United States (Feb. 3, 2020) ("Catholic Health"); NorthStar; Rowan Finnegan (Feb. 3, 2020); NASAA; ProxyVote II; Diane Wade,

Head of ESG, CBRE Clarion Securities (Feb. 3, 2020) ("CBRE"); Michael Rowland (Feb. 3, 2020); Dustyn Lanz, CEO, Responsible Investment Association (Feb. 3, 2020) ("RIA"); Graeme Black, Chair, Black Group Australia (Feb. 3, 2020) ("Black Group"); Ario; CII IV; ACSI; BMO; John Starcher, President and CEO, Bon Secours Mercy Health (Feb. 3, 2020) "Bon Secours"); CFA Institute I; Baillie Gifford; CIRCA; Joanie B. (Feb. 3, 2020); Canadian Governance Coalition; AllianceBernstein; LA Retirement; Glass Lewis II; CII V; C. Icahn; CII VI; LACERS; James Elbaor (Feb. 26, 2020); Terrence M. Burgess, Senior Managing Director, Wellington Management Company (Mar. 3, 2020) ("Wellington"). *See also* IAC Recommendation.

[647] As noted above, we do not have financial data about proxy advice voting businesses, including financial data by service provided or by client type, so making these assessments on a quantitative basis is difficult.

[648] See discussion in *supra* Section IV.C.3.b.ii.

[649] See discussion in *supra* Section IV.C.4.b.

[650] See, e.g., letters from Shareholder Rights II; ISS.

[651] See letters from Prof. Bebchuk; CalPERS; CFA Institute I.

[652] See letters from ISS; PRI II; Better Markets.

[653] See, e.g., letter from ISS.

As discussed above, several commenters disagreed that the proposed amendments would increase the quality or transparency of proxy advice, which they thought was sufficient under the baseline, and stated that the proposed amendments could reduce the quality of proxy advice if the rule reduces the independence and diversity of thought amongst proxy voting advice businesses.[654] In that case, the rules may not increase competition in the proxy advice market. However, as noted above, we believe the final amendments' principles-based approach should address many of these concerns because proxy voting advice businesses may, but will no longer be required to, preview their proxy voting advice with registrants.

The final amendments could also have certain adverse effects on competition. The final amendments will cause proxy voting advice businesses to incur certain additional compliance costs as discussed in Section II.C.2 above. How those costs will be shared between proxy voting advice businesses and their clients depends on the ability of proxy voting advice business to exercise market power in the pricing of their services. One commenter noted that, although complaints about pricing feature regularly in oligopolistic markets, proxy voting advice business generally are not criticized for their pricing.[655] The commenter further explained that this might reflect clients' perception that, due to the scale economies involved in proxy research, it is less costly to purchase proxy voting advice than to engage in proxy research themselves.[656] The presence of these scale economies may provide proxy voting advice businesses with substantial market power, including the power to pass compliance costs associated with the final rules on to their clients. If, however, as other commenters argued,[657] clients do not place a large value on proxy voting advice, then proxy voting advice businesses may face limits in their ability to pass compliance costs through to clients. In the Proposing Release, we acknowledged that if costs borne by proxy voting advice businesses are large enough to cause some businesses to exit the market or potential entrants to stay out of the market, the proposed amendments could decrease competition.[658] For the reasons

described below, we do not believe this will be the case with the final amendments.

Many commenters stated that the economic analysis in the Proposing Release did not adequately consider the effects of the rule on competition in the market for proxy advice.[659] Some commenters asserted that the cost burdens of the amendments, particularly those associated with litigation exposure from registrants, would decrease competition in the proxy advice market, raising barriers to entry in the proxy advice market, and potentially forcing the exit of some proxy voting advice businesses from the market.[660] Several other commenters argued that the proposed amendments would reduce competition by creating new barriers to entry in what historically has been an industry with few competitors.[661] One commenter, a proxy voting advice business in the U.K., stated that the Proposed Rule made it highly unlikely it would enter the U.S. proxy voting advice business market.[662] Another commenter, however, stated that increased barriers to entry would not reduce competition because, notwithstanding the rule, entry would not occur because investors place little value on proxy voting advice and financial incentives for entry are correspondingly low.[663] The final amendments reflect a principles-based approach that is intended to limit the increased compliance costs for proxy voting advice businesses and thus should reduce the potential for significant adverse effects on competition.

Additionally, given certain industry practices, the costs associated with the final amendments could affect proxy voting advice businesses differently. For example, we understand that the three existing proxy voting advice businesses that will be affected by the final amendments already have processes in place for sharing certain aspects of their analysis with certain registrants prior to making a recommendation to clients, which they may be able to leverage to comply with the new conditions. In contrast, firms considering entering the

market for proxy voting advice would need to develop such processes and thus may initially experience somewhat higher costs in connection with compliance with the final rules. A differential effect on costs across proxy voting advice businesses could, in turn, affect competition within the proxy voting advice business industry. Similarly, one commenter stated that, if it were subject to the proposed amendments, it likely would have to either significantly increase its fees or sell their firm to one of the two dominant competitors.[664] While that commenter may not be subject to the final amendments,[665] to the extent that the costs associated with the final amendments disproportionately affect proxy voting advice businesses without existing processes that can be adapted to satisfy the new conditions, particularly smaller proxy voting advice businesses that would otherwise consider entering the market for proxy advice, the final amendments could reduce competition in the market for proxy advisory services. We expect the principles-based approach reflected in the final amendments may help to ameliorate concerns about any differential effect of the final amendments by affording proxy voting advice businesses the flexibility to design policies and procedures that are scaled to the scope of their operations and client base.

Overall, we believe the benefits of improving the transparency, accuracy, and completeness of information available to shareholders when making voting decisions and enhancing the overall functioning of the proxy voting process, in furtherance of Section 14 of the Exchange Act would support adoption of the amendments notwithstanding any adverse effect on competition arising therefrom.

### 3. Capital Formation

By facilitating the ability of clients of proxy voting advice businesses to make informed voting determinations, the final amendments could ultimately lead to improved investment outcomes for investors. This in turn could lead to a greater allocation of resources to investment. To the extent that the final amendments lead to more investment, we could expect greater demand for securities, which could, in turn, promote capital formation. Additionally, to the extent the final amendments ameliorate frictions in the market for proxy voting advice that may currently deter private companies from

---

[654] See supra notes 646 and 651.

[655] See letter from C. Spatt.

[656] Id.

[657] See letters from B. Sharfman I and Manhattan Institute.

[658] See Proposing Release at 66550.

[659] See letters from CII IV; Richard B. Zabel, General Counsel & Chief Legal Officer, Elliott Management Corporation (Mar. 30, 2020) ("Elliott II"); Felician Sisters II; Glass Lewis II; Good Shepherd; IASJ; ISS; Interfaith Center II; Minerva I; New York Comptroller II; Prof. Bebchuk; St. Dominic of Caldwell; ProxyVote II. See also IAC Recommendation.

[660] See letters from Prof. Bebchuk; TIAA; 62 Professors; CII IV. See also IAC Recommendation.

[661] See, e.g., letters from ISS; CII IV; Segal Marco II; Prof. Sergakis; 62 Professors.

[662] See letters from Minerva I.

[663] See letter from Manhattan Institute.

[664] See letter from ProxyVote II.

[665] See supra notes 170–173 and accompanying text.

becoming public reporting companies, the amendments could serve to encourage more companies to become public.[666]

Several commenters stated that the proposal to allow registrants to review draft proxy advice could lead to the misuse of material non-public information.[667] This possibility is predicated on an expectation that a proxy voting advice business's recommendation could have an influence on the outcome of a voting matter before shareholders. For example, if a proxy voting advice business's recommendation is likely to influence the outcome of a vote that is expected to generate stock price reactions, then advance knowledge of such a recommendation would be potentially valuable to facilitate insider trading. Any such misuse of material non-public information could reduce investor confidence in the integrity of markets and lead to a reduction in capital formation. However, the final amendments do not mandate that registrants be given prior access to draft proxy voting advice. In addition, as discussed above, some form of registrant pre-review already exists at each of the three major proxy voting advice businesses, and we are not aware of any misuse of such information.

Overall, given the many factors that can influence the rate of capital formation, any effect of the final amendments on capital formation is expected to be small.

*E. Reasonable Alternatives*

1. Use a More Prescriptive Approach in the Final Amendments

Instead of a principles-based approach that allows proxy voting advice businesses the flexibility to design their own measures to ensure that clients have more complete and transparent information on which to base their voting decisions, we could have used a more prescriptive approach, such as the approach we proposed. For example, we could have required proxy voting advice businesses to notify registrants of their advice or provide their clients with registrants' responses to that advice in certain specific ways and time frames. Such a prescriptive approach could have reduced legal

uncertainty for proxy voting advice businesses, but it would have generated greater compliance costs for proxy voting advice businesses, some or all of which could have been passed on to their clients. The principles-based approach we are adopting provides a significant degree of flexibility to proxy voting advice businesses in deciding the best way to ensure that more complete and transparent information is available to their clients, and we expect that it will significantly reduce their compliance costs.

2. Require Proxy Voting Advice Businesses To Include Full Registrant Response in the Businesses' Voting Advice

Rather than requiring proxy voting advice businesses to adopt and publicly disclose written policies and procedures reasonably designed to ensure that such businesses provide clients with a mechanism by which the clients can reasonably be expected to become aware of registrant responses to proxy voting advice, we could require proxy voting advice businesses to include the registrant's full response in the proxy voting advice itself. Including the registrant's full response in the proxy voting advice would benefit clients of proxy voting advice businesses by allowing them to avoid the additional step of accessing the response. Including a full response in the voting advice provided by proxy voting advice businesses also could benefit registrants by having their responses more prominently displayed, depending on where in the advice the response is included. Two commenters suggested this as an appropriate alternative to the proposed amendments.[668]

However, requiring inclusion of the registrant's full response in the proxy voting advice provided by proxy voting advice businesses could disrupt the ability of such businesses to effectively design and prepare their reports in the manner that they and their clients prefer. Also, registrants would lose the flexibility to present their views in the manner they deem most appropriate or effective.

3. Public Disclosure of Conflicts of Interest

The final amendments require that proxy voting advice businesses include in their advice (and in any electronic medium used to deliver the advice) certain conflicts of interest disclosures. We could require that those conflicts of interest disclosures be made publicly rather than just to clients. Public

disclosure of proxy voting advice businesses' conflicts of interest could allow beneficial owners to assess the conflicts for themselves. While there may be some benefit to beneficial owners from having access to this information, this benefit may be limited given that many beneficial owners have delegated investment management functions to others in the first place and thus would not be receiving the advice. In addition, one commenter noted that publicly disclosing conflicts could undermine the information barriers put in place between the consulting and proxy advice side of a proxy voting advice business's operations.[669]

4. Require Additional or Alternative Mandatory Disclosures in Proxy Voting Advice

In addition to requiring the adopted conflicts of interest disclosures, we could amend Rule 14a–2(b)(9) to require that proxy voting advice businesses include in their proxy voting advice additional disclosures, such as disclosure regarding the proxy voting advice business's methodology, sources of information, or disclosures regarding the use of standards that materially differ from relevant standards or requirements that the Commission sets or approves. Proxy voting advice businesses' clients may benefit from having consistent disclosure on such matters as they assess the voting advice and make decisions regarding their utilization of the voting advice. However, such disclosures may not be material or necessary to assess proxy voting advice in all instances, and would result in increased costs to proxy voting advice businesses. Certain information may also comprise proprietary information, disclosure of which, depending on the specificity required, may result in competitive consequences to proxy voting advice businesses. In light of these considerations, the adopted rules will not require such disclosures in all instances.

One commenter noted a suggestion from the 2010 Concept Release that "proxy advisory firms could provide increased disclosure regarding the extent of research involved with a particular recommendation and the extent and/or effectiveness of its controls and procedures in ensuring the accuracy of registrant data." [670] The commenter also highlighted another suggestion from the Concept Release noting that the Commission's rules that govern NRSROs "may be useful

---

[666] *See* letters from Prof. Tingle (asserting that public capital markets have become less attractive to companies that would otherwise consider going public and that proxy voting advice businesses have been singled out as possibly complicit in this trend); TechNet (supporting the Proposed Rule as part of a commitment to ". . . make the U.S. the most attractive place in the world for anyone to start a company, grow it here, and take it public.").

[667] *See* letters from CII IV; Glass Lewis II; ISS.

[668] *See* letters from NAM; BIO.

[669] *See* letter from ISS.

[670] *See* letter from Glass Lewis II.

templates for developing a regulatory program addressing conflicts of interest and other issues with respect to the accuracy and transparency of voting recommendations provided by proxy advisory firms.'' The commenter stated that these two approaches should have been considered as alternatives to the rule. We have considered the alternative of requiring additional disclosure regarding the methods and procedures used to develop proxy voting advice, but believe it is preferable to avoid being overly prescriptive about the content of the report for a particular registrant/recommendation. Instead, for the reasons discussed throughout this release, we believe it is more appropriate to focus on principles that will allow the clients of proxy voting advice businesses to have access to more complete and transparent information upon which to make a voting decision, while providing flexibility to proxy voting advice businesses to determine the best means to satisfy those principles. Moreover, while we recognize that other regulatory regimes may take different approaches to similar issues, we note that the role of NRSROs and proxy voting advice businesses differ from one another and that following a similar regulatory approach might not be appropriate. We also recognize that the costs and benefits of NRSRO regulation differ from the costs and benefits of potential additional regulation of proxy voting advice businesses. The principles-based approach reflected in the final amendments is tailored to the unique role played by proxy voting advice businesses in the proxy process and is intended to be adaptable to existing market practices.

## 5. Require Disabling or Suspension of Pre-Populated and Automatic Submission of Votes

The final amendments do not condition the availability of the Rules 14a–2(b)(1) and 14a–2(b)(3) exemptions on a proxy voting advice business structuring its electronic voting platform to disable or suspend the automatic submission of votes in instances where a registrant indicates that it intends to file (or has filed) a response to the voting advice as additional soliciting materials. Alternatively, we could require such a condition. Another alternative would be to require that the proxy voting advice business refrain from pre-populating a client's voting choices once a registrant indicates it intends to file a response, indefinitely or for a period of time, and subject to conditions. Several commenters supported an alternative that would

generally limit or disable the automatic submission of votes, claiming it would lead to more informed proxy voting, though these commenters did not necessarily condition such limitations on the filing of a registrant response.[671]

We recognize that these pre-population and automatic submission functions may enable proxy voting advice business clients to vote their proxies prior to registrants being able to provide a response to the proxy voting advice. We also recognize that disabling or suspending these functions when registrants have indicated they intend to file responses to voting advice could benefit the clients of proxy voting advice businesses to the extent that it increases the likelihood that the clients of the proxy voting advice businesses would review the registrants' responses, and take them into consideration, before voting their proxies. At the same time, depending on how such a measure is implemented and conditioned, such an alternative could give rise to timing pressures and other logistical challenges. For example, disabling these functions permanently under certain circumstances could increase costs for clients if they need to devote greater resources to managing the voting process as a result, which may in turn also reduce the value of the services of the proxy voting advice businesses.

We have declined to adopt such a prescriptive approach at this time, but rather have focused on an incremental principles-based approach in order to see how practice develops in light of the changes being adopted. The amendments we are adopting are intended to make clients of proxy voting advice businesses aware of a registrant's views about proxy voting advice in a timely manner, which could assist these clients in making voting determinations. Further, the Commission has provided investment advisers, who often engage proxy voting advice businesses to provide voting related services, with additional guidance regarding how they could consider their policies and procedures regarding these types of automated voting functions.[672]

## 6. Exempt Smaller Proxy Voting Advice Businesses From the Additional Conditions to the Exemptions

As discussed in Section III.C.2 above, given certain industry practices, the costs associated with the final amendments may be different for certain proxy voting advice businesses. For

example, the three major proxy voting advice businesses have processes in place for sharing certain aspects of their analysis with certain registrants prior to making a recommendation to clients, which they may be able to leverage to comply with the new conditions. However, it is possible that entrants to this market (which could be smaller than the existing three major proxy voting advice businesses) would have to develop new processes to meet the conditions for exemption under the final amendments if they choose to engage in the types of activities that fall within the scope of Rule 14a–1(l)(1)(iii). Some of the costs of developing these new processes are likely fixed, and do not vary with the number of issuers a proxy voting advice business covers or the number of clients it serves. Thus, the costs associated with the final amendments could affect potential entrants into the market for proxy advice that are smaller businesses more than the existing three major proxy voting advice businesses. To the extent the costs associated with the final amendments disproportionately affect smaller proxy voting advice businesses that might consider entering the market in the future, the final amendments could reduce competition among proxy voting advice businesses.

As a means of addressing the potential adverse effect on competition among proxy voting advice businesses, we could exempt smaller proxy voting advice businesses from the additional conditions to the exemptions in Rules 14a–2(b)(1) and 14a–2(b)(3). Several commenters supported such an alternative.[673] Exempting smaller proxy voting advice businesses from the additional conditions would reduce the cost of the final amendments for such businesses, and could thus facilitate the entry of new proxy voting advice businesses. However, we expect the costs associated with the final amendments to be much smaller compared to the initial costs of setting up the business, including building a reputation for providing quality services, which any newcomer will have to incur. Also, such an exemption would mean that clients of these proxy voting advice businesses would not realize the same benefits as clients of incumbent firms in terms of potential improvements in the accuracy, completeness, and transparency of the information available to them when

---

[671] *See* letters from BRT; NAM; BIO. *But see, e.g.,* letters from CII IV; Dan Jamieson (Jan. 16, 2020); IAA; ISS; New York Comptroller II.

[672] *See* Supplemental Proxy Voting Guidance.

[673] *See* letters from SHARE II; CII IV; Manhattan Institute. One commenter more generally argued that the Commission should ''adopt policies that would ease entry and participation in the market.'' *See* letters from Elliott I, Prof. Li.

they make voting decisions.[674] Moreover, as we have discussed in prior sections, we anticipate that the principles-based approach we are adopting is likely to result in more modest costs increases for proxy voting advice businesses than the more prescriptive approach we proposed, which should moderate the impact of the final amendments on smaller potential entrants.

7. Require a Narrower Scope of Registrant Notice

A number of commenters suggested that registrants should only be allowed to review the facts that a proxy voting advice business uses in determining its voting recommendation, particularly if we proceeded with a requirement that registrants review draft proxy voting reports before they are sent to clients.[675] For example, rather than providing a full copy of its voting advice, a proxy voting advice business could provide a summary thereof, setting forth the facts it uses without specifying further details.

We note that while the principles-based approach we are adopting does not dictate precisely how a proxy voting advice business provides notice of proxy voting advice to registrants, the final amendments require that proxy voting advice businesses share the full proxy voting report with registrants. Although we acknowledge that commenters' suggested alternative may be less costly for proxy voting advice businesses to implement, we believe that providing registrants with the full contents of proxy voting reports is necessary to achieve the Commission's objective of facilitating informed proxy voting decisions. Providing registrants with the full contents of the report gives registrants the opportunity to file additional soliciting materials that discuss not only the facts underlying the proxy voting advice business's recommendations, but also the methodology and analysis the proxy voting advice business used to arrive at its recommendations. In deciding how to vote on a proxy matter, clients of proxy voting advice businesses may benefit from that additional discussion. As a result, we anticipate the final amendments will more effectively facilitate clients' assessment of proxy voting advice than this alternative. Moreover, because the final amendments do not require an opportunity for pre-publication review,

we believe that the cost of sharing full reports will be more modest under the final amendments than under the proposed amendments.

## VI. Paperwork Reduction Act

### A. Background

Certain provisions of our rules, schedules, and forms that will be affected by the amendments contain "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995 ("PRA").[676] We published a notice requesting comment on changes to these collection of information requirements in the Proposing Release and submitted these requirements to the Office of Management and Budget ("OMB") for review in accordance with the PRA.[677] The hours and costs associated with maintaining, disclosing, or providing the information required by the amendments constitute paperwork burdens imposed by such collection of information. An agency may not conduct or sponsor, and a person is not required to comply with, a collection of information unless it displays a currently valid OMB control number. The title for the affected collection of information is: "Regulation 14A (Commission Rules 14a–1 through 14a–21 and Schedule 14A)" (OMB Control No. 3235–0059).

The Commission adopted existing Regulation 14A [678] pursuant to the Exchange Act. Regulation 14A and its related schedules set forth the disclosure and other requirements for proxy statements, as well as the exemptions therefrom, filed by registrants and other soliciting persons to help investors make informed voting decisions.[679]

A detailed description of the amendments, including the need for the information and its use, as well as a description of the likely respondents, can be found in Section II above, and a discussion of the expected economic effects of the amendments can be found in Section IV above.

### B. Summary of Comment Letters to PRA Estimates

The Commission received three comment letters in response to its request for comment on the PRA estimates and analysis included in the Proposing Release.[680] These commenters expressed concern that the estimates were not representative of actual impacts and that the analysis failed to properly account for the paperwork burden that would be incurred, in particular, by proxy voting advice businesses.[681] Two of the commenters asserted that the Commission's analysis understated the magnitude of the hourly and cost burdens that the proposed amendments would impose.[682] One of those commenters provided detailed estimates of its expected annual compliance burden for each of the components of the proposed amendments.[683]

### C. Burden and Cost Estimates for the Amendments

Below we estimate the incremental and aggregate effect on paperwork burden as a result of the amendments. As discussed in Section II above, we have made a number of changes from the proposed amendments, most notably to shift to a principles-based approach in Rule 14a–2(b)(9)(ii), and we have adjusted our estimates accordingly.

The burden estimates were calculated by (i) estimating the number of parties expected to expend time, effort, and/or financial resources to generate, maintain, retain, disclose or provide information required by the amendments, and then (ii) multiplying this number by the estimated amount of time, on average, each of these parties would devote in order to comply with these new requirements over and above their existing compliance burden associated with Regulation 14A. These estimates represent the average burden for all respondents, both large and small. In deriving our estimates, we recognize that the burdens will likely vary among individual respondents based on a number of factors, including the nature and conduct of their business.

1. Impact on Affected Parties

As discussed above in Section IV.B.1., there are a variety of parties that may be affected, directly or indirectly, by the amendments. These include proxy voting advice businesses; the clients to

---

[674] *See* letter from SES.

[675] *See* letters from ISS at 57; MFA & AIMA at 2; State Street at 3; CFA Institute at 2, 8; CIRCA at 22; Glass Lewis II at 22–23; IAC at 8–9.

[676] 44 U.S.C. 3501 *et seq.*

[677] 44 U.S.C. 3507(d); 5 CFR 1320.11.

[678] 17 CFR 240.14a–1 *et seq.*

[679] To the extent that a person or entity incurs a burden imposed by Regulation 14A, it is encompassed within the collection of information estimates for Regulation 14A. This includes registrants and other soliciting persons preparing, filing, processing and circulating their definitive proxy and information statements and additional soliciting materials, as well as the efforts of third parties such as proxy voting advice businesses whose voting advice falls within the ambit of the federal rules and regulations that govern proxy solicitations.

[680] *See* letters from IASJ; Glass Lewis I; ProxyVote I.

[681] *See id.*

[682] *See* letters from Glass Lewis I; ProxyVote I.

[683] *See* letter from Glass Lewis I.

whom these businesses provide voting advice; investors and other groups on whose behalf the clients of proxy voting advice business make voting determinations; registrants who are conducting solicitations and are the subject of proxy voting advice; and the registrants' shareholders, who ultimately bear the costs and benefits to the registrant associated with the outcome of voting matters covered by proxy voting advice.

Of these parties, we expect that proxy voting advice businesses and, to a lesser extent, registrants that are the subject of the proxy voting advice, would incur some additional paperwork burden resulting from the amendments.[684] As discussed further below, we believe that any incremental burden would be attributable primarily to new Rule 14a–2(b)(9). With respect to the amendments to Rule 14a–1(l) and Rule 14a–9, we do not expect the economic impact of these amendments will be significant because they do not change existing law and therefore do not change respondents' legal obligations.[685] Moreover, any

impact arising from these amendments is not expected to materially change the average PRA burden hour estimates associated with Regulation 14A. We therefore have not made any adjustments to our PRA burden estimates in respect of these amendments.

a. Proxy Voting Advice Businesses

In the Proposing Release, the Commission estimated that each proxy voting advice business would incur an aggregate yearly increase in burden of 500 hours due to the proposed amendments.[686] In recognition of the changes from the proposal as well as in consideration of the comments received regarding the paperwork burdens of the proposed amendments,[687] we have adjusted our estimates of the burdens on proxy voting advice businesses.

Proxy voting advice businesses are expected to incur an increased burden as a result of new Rule 14a–2(b)(9), which will apply to anyone relying on the exemptions in Rules 14a–2(b)(1) or (b)(3) who furnishes proxy voting advice covered by Rule 14a–1(l)(1)(iii)(A). The amount of the burden will depend on a number of factors that are firm-specific and highly variable, which makes it difficult to provide reliable quantitative estimates.[688]

There are three components of new Rule 14a–2(b)(9) that we expect to result in an increased burden. First, in accordance with Rule 14a–2(b)(9)(i), proxy voting advice businesses will be required to include in their proxy voting advice (or in an electronic medium used to deliver the advice) disclosure of conflicts of interest specifically tailored to proxy voting advice businesses and the nature of their services.[689] Second, under Rule 14a–2(b)(9)(ii)(A), proxy voting advice businesses will be required to adopt and publicly disclose written policies and procedures reasonably designed to ensure that registrants that are the subject of the proxy voting advice have such advice

made available to them at or prior to the time such advice is disseminated to the proxy voting advice business's clients. Third, under Rule 14a–2(b)(9)(ii)(B), the proxy voting advice business will be required to adopt and publicly disclose written policies and procedures reasonably designed to ensure that the proxy voting advice business provides clients with a mechanism by which they can reasonably be expected to become aware of a registrant's written statements about the proxy voting advice in a timely manner before the shareholder meeting. The amendments also provide non-exclusive safe harbors that the proxy voting advice businesses may use to satisfy the principle-based requirements in Rule 14a–2(b)(9)(ii). We address each of these three components in turn.

With respect to the conflicts of interest disclosure in new Rule 14a–2(b)(9)(i), the facts and circumstances unique to each proxy voting advice business, including the conflicts of interest disclosures it currently provides to its clients as well as the nature of its material interests, transactions, and relationships, will dictate the additional disclosure, if any, it must provide under the final rule. For example, to the extent that proxy voting advice businesses are already providing the kind of conflicts of interest disclosure required by the rule, it would reduce their new compliance burden. Another factor that complicates the calculation of burden is the principles-based nature of the conflicts disclosure requirement, which eschews prescriptive disclosure standards in favor of providing proxy voting advice businesses the flexibility to determine which situations merit disclosure and the specific details to provide to their clients about any conflicts of interest identified. While this flexibility in the rule's application is beneficial for both proxy voting advice business and their clients, it limits our ability to predict the associated paperwork burden. Under the rule, a proxy voting advice business's disclosure could differ for each registrant and be subject to change in the future as both the business's and its clients' circumstances change.

One proxy voting advice business estimated that its burden associated with the identification and disclosure of conflicts of information under the proposed rules would add 5,969 burden hours each year.[690] While we believe

---

[684] The PRA requires that we estimate "the total annual reporting and recordkeeping burden that will result from the collection of information." [5 CFR 1320.5(a)(1)(iv)(B)(5)] A "collection of information" includes any requirement or request for persons to obtain, maintain, retain, report, or publicly disclose information [5 CFR 1320.3(c)]. OMB's current inventory for Regulation 14A, therefore, is an assessment of the paperwork burden associated with such requirements and requests under the regulation, and this PRA is an assessment of changes to such inventory expected to result from adoption of the amendments. While other parties, such as the clients of proxy voting advice businesses, may have costs associated with the amendments (*see supra* Section IV.C.), only proxy voting advice businesses and registrants will incur any additional paperwork burden in order to comply with or respond to the informational requirements of the amendments.

[685] The amendments to Rule 14a–1(l) codify existing Commission interpretations and views about the applicability of the Federal proxy rules to proxy voting advice and are not expected to have a significant economic impact. *See supra* Section IV.C.2.b. The amendments to Rule 14a–9 may impose direct costs on proxy voting advice businesses to the extent the amended rule prompts some proxy voting advice businesses to provide additional disclosure about the bases for their voting advice. However, we expect any such costs to be minimal, especially given that the examples in new paragraph (e) of the Note to Rule 14a–9 were included in prior Commission guidance. *See supra* Section IV.C.4.b. One commenter argued that proxy voting advice businesses and their legal counsel would devote significant time and effort to review and respond to feedback received from registrants so as to protect the business from private litigation claims stemming from Rule 14a–9, as amended. *See* letter from Glass Lewis I. While the commenter mentioned the proposed amendment to Rule 14a–9, we read this comment as primarily relating to the proposed review and feedback proposal, which we are not adopting. We do not believe that the amendment to Rule 14a–9 represents a change to existing law, nor does it broaden the concept of materiality or create a new cause of action, as some commenters have suggested. *See* discussion *supra* Section II.D.3.

[686] *See* Proposing Release, PRA Table 1 "*Calculation of Increase in Burden Hours Resulting from the Proposed Amendments,*" at 66553. The Commission estimated that, for each proxy voting advice business, the burden would be 1,000 hours in the first year following adoption and 250 hours in each of the following years, for a three-year average of 500 burden hours. *Id.* at note d. to Table 1. Given the Commission's assumption at the proposing stage that there were five proxy voting advice businesses, the average of 500 hours was multiplied by five to arrive at a total of 2,500 hours.

[687] *See supra* note 682.

[688] *See generally* the discussion *supra* in Sections IV.C.3.a.ii. and b.ii. concerning the difficulty in providing quantitative estimates of the costs to proxy voting advice businesses imposed by the amendments.

[689] Rule 14a–2(b)(9)(i).

[690] *See* letter from Glass Lewis I. Glass Lewis calculated that it issued 5,565 total proxy research reports on U.S. companies in 2018. Assuming one hour spent for each report to identify any potential conflicts and another .5 hours to prepare conflicts disclosure regarding 807 of the 5,565 registrants for

that the principles-based focus of the adopted requirement, in tandem with a proxy voting advice business's existing conflicts disclosure systems and practices (particularly as to registrants that have been the focus of the business's proxy coverage in prior years), could significantly mitigate any increased paperwork burden corresponding to the new rules, we think it is appropriate to increase our estimates to align more closely with this commenter's input. Accordingly, we estimate the conflicts of interest disclosure in new Rule 14a–2(b)(9)(i) to result in 6,000 additional burden hours per proxy voting advice business.

The remainder of the additional paperwork burden associated with the amendments will derive from the requirements of Rules 14a–2(b)(9)(ii)(A) and (B). Because these rules have been designed to permit proxy voting advice businesses substantial flexibility over the manner in which they comply, we expect those businesses will implement mechanisms differently depending on, among other things, the facts and circumstances of their particular business operations and the nature of their client bases.[691] Furthermore, some proxy voting advice businesses may already have systems sufficient to address some or all of the mechanics required to comply with Rules 14a–2(b)(9)(ii)(A) and (B),[692] which would be expected to limit their overall burden but cannot be precisely estimated.

It appears that the more prescriptive nature of the proposed amendment regarding registrants' and certain other soliciting persons' advance review and response to proxy voting advice was a large driver of the hourly and cost burdens discussed by commenters. We believe the flexibility afforded by the principles-based approach reflected in the final rules should therefore result in significantly lower costs for proxy

voting advice businesses and their clients than under the proposal.[693]

We believe that much of the burden of the final amendments would be for the proxy voting advice business to develop policies that satisfy the principles and accordingly modify or develop systems and practices to implement such policies. To derive an estimate for these costs, we start with our estimated number of registrants filing proxy materials annually, which is 5,690.[694] We estimate that the burden on a proxy voting advice business in setting up, modifying, and implementing such policies and systems would involve approximately one half-hour per registrant (2,845 hours) for the notice to registrants under Rule 14a–2(b)(9)(ii)(A) and one half-hour per registrant (2,845 hours) for the notice to clients of any response by the registrants under Rule 14a–2(b)(9)(ii)(B).[695] Our revised estimates take into consideration our understanding that some proxy voting advice businesses have systems and practices in place that may complement or overlap with the new requirements, which could substantially mitigate any increases to their overall burden. Also, these estimates represent the average annual burden increase over three years, as we assume that the burden would be greatest in the first year after adoption as proxy voting advice businesses incorporate the new requirements into

their existing practices and procedures, but would be less in subsequent years.

In addition to these system-related costs, we expect that the proxy voting advice businesses would, as a general matter, obtain acknowledgments or agreements with respect to the use of any information shared with a registrant, as we expect that the business would seek to limit disclosure of its report. Given that the rules do not require proxy voting advice businesses to give pre-release copies of proxy voting advice to registrants, in contrast to the proposal, we believe the need for proxy voting advice businesses to individually negotiate and secure detailed confidentiality agreements from registrants will be substantially lessened. This is particularly true to the extent that a proxy voting advice business already maintains a practice of providing copies of its proxy voting advice to registrants and can therefore utilize its existing practices with respect to confidentiality provisions. This would include, for example, the practice of requiring registrants to agree to or acknowledge certain terms of use before accessing the proxy voting advice. In this regard, we note that some proxy voting advice businesses currently provide reports to registrants without requiring formal confidentiality agreements, instead requiring only an electronic acknowledgement of terms of use.[696]

We recognize that there nevertheless may be some hourly and cost burden associated with a proxy voting advice business's efforts to obtain acknowledgements[697] or other kinds of agreements with registrants before sharing proxy voting advice materials and that there could be a range of approaches. One approach may be to develop a standardized form of acknowledgement regarding the report's terms of use and implementing systems to track the acknowledgments. Under such an approach, we estimate that each proxy voting advice business would incur 100 hours in the first year of compliance to draft such standardized terms of use and update systems to implement and track it, and 25 hours each year thereafter to implement the terms of use and systems on a going-forward basis, for a three-year average of 50 hours per year per proxy voting advice business associated with securing an acknowledgment or other assurance that the proxy advice will not

---

whom Glass Lewis determined it had disclosable conflict information, Glass Lewis estimated an increased burden of 5,969 hours annually to comply with the new conflicts of disclosure requirements in proposed Rule 14a–2(b)(9)(i).

[691] As one example, to be eligible for the safe harbor in Rule 14a–2(b)(9)(iv), a proxy voting advice business has the option to provide notice on its electronic client platform that the registrant has filed additional soliciting materials, or it could choose to provide notice through email or other electronic means. Both mechanisms for informing clients could involve initial set-up costs as well as ongoing costs that are hard to predict. Since they are not required to rely on the safe harbor, proxy voting advice businesses may also put in place other mechanisms to inform their clients of a registrant's views about the proxy voting advice, which could be more or less costly than satisfying the conditions of the safe harbor.

[692] See supra note 609 in Section IV.C.3.b.2.

[693] For example, one commenter enumerated a number of elements of the proposal that it believed would have an impact on a proxy voting advice business's paperwork burden and provided estimates of the hourly burden expected to be incurred that totaled 59,999 burden hours. Of this amount, we have already addressed and incorporated the 5,969 hours estimate regarding identifying and disclosing conflicts. See supra note 690. We address the 19,648 hour estimate regarding confidentiality agreements below. We believe the remaining 34,382 burden hours pertained to elements of the proposed rules that are not directly relevant in light of our revisions in favor of a more principle-based framework that no longer requires mandatory review and feedback periods. See letter from Glass Lewis I.

[694] See supra note 549.

[695] In deriving our estimates of one half-hour per registrant for each of Rule 14a–2(b)(9)(ii)(A) and Rule 14a–2(b)(9)(ii)(B), we considered estimates provided by one commenter who estimated that the "Implementation of final notice period" component of the proposal would impose a burden of 0.5 hours per registrant, as would the "Process, review and implement requests for a hyperlinked response" component. See letter from Glass Lewis I. While these two proposed components are not part of the final rules, they are in some ways analogous to the two principles for which proxy voting advice businesses may need to implement systems under the final rules. Accordingly, we believe one half-hour burden per registrant for each of these components is an appropriate estimate as to the burden on each proxy voting advice business.

[696] See supra note 615. For example, Glass Lewis requires a registrant to click and acknowledge/ accept/agree to certain "terms of use" before being able to access the notice and recommendations.

[697] See paragraph (B) of the Rule 14a–2(b)(9)(iii) safe harbor.

be disclosed. However, we recognize that proxy voting advice businesses could choose instead to negotiate individual terms of use with each registrant. As a result of modifications we have made from the proposal in response to commenters, we anticipate that the burden in those cases would nonetheless be significantly less than the four hours per issuer burden estimate provided by a commenter regarding the proposal.[698] We estimate an average burden of one hour per registrant [699] under those circumstances, for a total estimate of 5,690 hours per year associated with securing an acknowledgment or other assurance that the proxy advice will not be disclosed. Accordingly, depending on which approach a proxy voting advice business chooses, we expect that the burden could range from 50 hours to 5,690 hours per year per proxy voting advice business. Given current practices, we expect that proxy voting advice business would generally seek to rely on standardized terms of use. Nevertheless, for purposes of this PRA analysis, and so as to not underestimate the burden, we use an estimate of 5,690 hours per proxy voting advice business to obtain acknowledgments.

Overall, we believe that proxy voting advice businesses will incur an annual incremental paperwork burden to comply with Rule 14a–2(b)(9) as follows.

| New requirement | Proxy voting advice business estimated incremental annual compliance burden |
|---|---|
| **Rule 14a–2(b)(9)(i)—Conflicts Disclosure** .......................................... <br> Proxy voting advice business must include conflicts of interest disclosure in its proxy voting advice (or electronic medium used to deliver the advice), as well as a discussion of any policies and procedures used to identify and address conflicts, and any actual steps taken to address any conflicts. | Increase in paperwork burden corresponding to: <br> To the extent that the proxy voting advice business's current practices and procedures do not already satisfy the requirement: <br> • Identification and disclosure to clients of qualifying conflicts of interest. Includes burden associated with internal processes and procedures for: <br> ○ Reviewing and preparing disclosures describing conflicts of interest, relevant conflicts policies and procedures, and actual steps taken to address conflicts identified; <br> ○ Developing and maintaining methods for tracking conflicts of interest; <br> ○ Seeking legal or other advice; and <br> ○ Updating electronic client platforms, as applicable. <br> We estimate the increase in paperwork burden to be 6,000 hours per proxy voting advice business. |
| **Rule 14a–2(b)(9)(ii)(A)—Notice to Registrants and Rule 14a–2(b)(9)(iii) Safe Harbor**. <br> The proxy voting advice business has adopted and publicly disclosed written policies and procedures reasonably designed to ensure that registrants who are the subject of proxy voting advice have such advice made available to them at or prior to the time the advice is disseminated to clients of the proxy voting advice business. <br> • Safe Harbor—The proxy voting advice business has written policies and procedures that are reasonably designed to provide a registrant with a copy of the proxy voting advice business's proxy voting advice, at no charge, no later than the time it is disseminated to the business's clients. Such policies and procedures may include conditions requiring that: <br> (A) The registrant has filed its definitive proxy statement at least 40 calendar days before the security holder meeting date (or if no meeting is held, at least 40 calendar days before the date the votes, consents, or authorizations may be used to effect the proposed action); and <br> (B) The registrant has acknowledged that it will only use the copy of the proxy voting advice for its internal purposes and/or in connection with the solicitation and it will not be published or otherwise shared except with the registrant's employees or advisers. | Increase in paperwork burden corresponding to: <br> To the extent that the proxy voting advice business's current practices and procedures are not already sufficient: <br> • Developing new or modifying existing systems, policies and methods, or developing and maintaining new systems, policies and methods to ensure that it has the capability to timely provide each registrant with information about its proxy advice necessary to satisfy the requirement in Rule 14a–2(b)(9)(ii)(A) and/or the safe harbor in Rule 14a–2(b)(9)(iii). <br> • If applicable, obtaining acknowledgments or agreements with respect to use of any information shared with the registrant; and <br> • Delivering copies of proxy voting advice to registrants. <br> We estimate the increase in paperwork burden to be 8,535 hours per proxy voting advice business, consisting of 2,845 hours for system updates and 5,690 hours for acknowledgments regarding sharing information. |

---

[698] *See* letter from Glass Lewis I.

[699] Out of the estimated 18,534 registrants that may be affected to a greater or lesser extent by the final amendments, 5,690 filed proxy materials with the Commission during calendar year 2018. *See* Section IV.B.1. and *supra* note 549.

**Federal Register**/Vol. 85, No. 172/Thursday, September 3, 2020/Rules and Regulations **55149**

| New requirement | Proxy voting advice business estimated incremental annual compliance burden |
|---|---|
| **Rule 14a–2(b)(9)(ii)(B)—Notice to Clients of Proxy Voting Advice Businesses and Rule 14a–2(b)(9)(iv) Safe Harbor.**<br>The proxy voting advice business has adopted and publicly disclosed written policies and procedures reasonably designed to ensure that the proxy voting advice business provides clients with a mechanism by which they can reasonably be expected to become aware of any written statements regarding proxy voting advice by registrants who are the subject of such advice, in a timely manner before the shareholder meeting.<br>• Safe harbor—The proxy voting advice business has written policies and procedures that are reasonably designed to inform clients who receive the proxy voting advice when a registrant that is the subject of such voting advice notifies the proxy voting advice business that it intends to file or has filed additional soliciting materials with the Commission setting forth the registrant's statement regarding the voting advice, by:<br>(A) Providing notice to its clients on its electronic client platform that the registrant intends to file or has filed such additional soliciting materials and including an active hyperlink to those materials on EDGAR when available; or<br>(B) The proxy voting advice business providing notice to its clients through email or other electronic means that the registrant intends to file or has filed such additional soliciting materials and including an active hyperlink to those materials on EDGAR when available. | Increase in paperwork burden corresponding to:<br>To the extent that the proxy voting advice business's current practices and procedures are not already sufficient:<br>• Developing new or modifying existing systems, policies and methods, or developing and maintaining new systems, policies and methods capable of:<br>○ Tracking whether the registrant has filed additional soliciting materials;<br>○ Ensuring that proxy voting advice businesses provide clients with a means to learn of a registrant's written statements about proxy voting advice in a timely manner that satisfies the requirement in Rule 14a–2(b)(9)(ii)(B) and/or the safe harbor in Rule 14a–2(b)(9)(iv).<br>• If relying on the safe harbor in Rule 14a–2(b)(9)(iv)(A) or (B), the associated paperwork burden would include the time and effort required of the proxy voting advice businesses firm to:<br>○ Provide notice to its clients through the business's electronic client platform or email or other electronic medium, as appropriate, that the registrant intends to file or has filed additional soliciting materials setting forth its views about the proxy voting advice; and<br>○ include a hyperlink to the registrant's statement on EDGAR<br>We estimate the increase in paperwork burden to be 2,845 hours per proxy voting advice business. |
| Total .......................................................................................... | 17,380 hours per proxy voting advice business. |

Altogether, we estimate an annual total increase of 52,640 hours[700] in compliance burden to be incurred by proxy voting advice businesses that would be subject to the amendments to Rule 14a–2(b)(9). We assume that the burden would be greatest in the first year after adoption, as proxy voting advice businesses incorporate the new requirements into their existing practices and procedures.

b. Registrants

In addition to proxy voting advice businesses, we anticipate that registrants would incur some additional paperwork burden as a result of the amendments. Registrants could experience increased burdens associated with coordinating with proxy voting advice businesses to receive the proxy voting advice, reviewing the proxy voting advice, and preparing and filing supplementary proxy materials in response to the proxy voting advice, if they choose to do so.

As the rules do not require registrants to engage with proxy voting advice businesses or take any action in response to proxy voting advice, we expect a registrant would bear additional paperwork burden only if it anticipated the benefits of engaging with the proxy voting advice business would exceed the costs of participation. These costs will vary depending upon the particular facts and circumstances of the proxy voting advice and any issues identified therein, as well as the resources of the registrant, which makes it difficult to provide a reliable quantifiable estimate of these costs. Nevertheless, in the Proposing Release, the Commission stated its belief that the corresponding burden on registrants would be not significant in most cases, particularly when averaged among all affected registrants.[701] As such, the Commission estimated that registrants would each incur, on average, an increase of ten additional burden hours

each year, for a total increase among all registrants of 18,970 hours annually.[702]

In consideration of commenters' views that the Commission's estimates were too low,[703] we have adjusted our prior burden estimates upward. Nevertheless, we do not believe the annual burden to be incurred by an individual registrant would be considerably greater than was reflected in the Proposing Release, particularly in light of the modifications we are making to the registrant review process that was originally proposed. For example, the rules as adopted do not mandate that registrants be afforded fixed periods of review of proxy voting advice, as was the case with the proposal.[704] Furthermore, our estimates consider the extent to which some registrants' current practices and procedures may already involve reviewing proxy voting advice businesses' voting advice, filing additional soliciting materials, and some amount of investor outreach in response to adverse voting recommendations. Assuming that a

---

[700] This represents the annual total burden increase expected to be incurred by proxy voting advice businesses (as an average of the yearly burden predicted over the three-year period following adoption) and is intended to be inclusive of all burdens reasonably anticipated to be associated with compliance with the conditions of Rule 14a–2(b)(9). The Commission is aware of three businesses in the U.S. (*i.e.*, Glass Lewis, ISS, and Egan-Jones) whose activities fall within the scope of proxy voting advice constituting a solicitation under amended Rule 14a–1(l)(1)(iii)(A). We estimate that each of these will have a burden of 17,380 hours per year. We recognize that there could be other proxy voting advice businesses, including both smaller firms and firms operating outside the U.S., which may also be subject to the final rules. However, we expect such a number to be small. Accordingly, rather than increasing our estimate of the number of affected proxy voting advice businesses beyond the three discussed above, we are increasing our annual total burden estimate by 500 hours to account for those businesses. As a result, the annual total burden that we estimate will result from this amendment will be: (17,380 × 3) + 500 = 52,640 hours.

[701] *See* Proposing Release, PRA Table 1 at 66553 and note e of the table.

[702] *Id.*

[703] *See* letters from Glass Lewis I (". . . the ten hour estimate and resulting burden hour estimate is both unsupported and likely significantly understated") and ProxyVote I ("We believe the Proposed Rulemaking vastly understates the actual burden imposed on ProxyVote and thus the actual costs we will incur.")

[704] *See* proposed Rule 14a–2(b)(9)(ii)(2). One commenter criticized the Commission for not giving proper consideration to registrants' burden hours associated with the "review and feedback" periods. *See* Glass Lewis I.

registrant's annual meeting of shareholders is covered by at least two of the three major U.S. proxy voting advice businesses, and the registrant has opted to review both sets of proxy advice and file additional soliciting materials in response, we estimate an average increase of 50 hours per

registrant in connection with the amendments for a total annual increase of 284,500 hours.[705] As discussed above, however, it is difficult to predict the effect of the amendments on a registrant's paperwork burden with a great degree of precision.

## 2. Aggregate Increase in Burden

Table 1 summarizes the calculations and assumptions used to derive our estimates of the aggregate increase in burden for all affected parties corresponding to the amendments.

PRA TABLE 1—CALCULATION OF AGGREGATE INCREASE IN BURDEN HOURS RESULTING FROM THE AMENDMENTS

| | Affected parties | |
| --- | --- | --- |
| | Proxy voting advice businesses | Registrants |
| | (A) | (B) |
| Burden Hour Increase ................................................................. | 52,640 | 284,500 |
| Aggregate Increase in Burden Hours ......................................... | [Column Total (A)] + [Column Total (B)] = [337,140] | |

## 3. Increase in Annual Responses

We believe that the amendments would increase the number of annual responses[706] to the existing collection of information for Regulation 14A. Although we do not expect registrants to file any different number of proxy statements as a result of our amendments, we do anticipate that the number of additional soliciting materials filed under 17 CFR 240.14a–

6 may increase in proportion to the number of times that registrants choose to provide a statement in response to a proxy voting advice business's proxy voting advice as contemplated by Rule 14a–2(b)(9)(ii)(B) and/or the safe harbor under Rule 14a–2(b)(9)(iv). For purposes of this PRA, we estimate that there would be an additional 783 annual responses to the collection of information as a result of the amendments.[707]

## 4. Incremental Change in Compliance Burden for Collection of Information

Table 2 below illustrates the incremental change to the total annual compliance burden for the Regulation 14A collection of information in hours and in costs[708] as a result of the amendments. The table sets forth the percentage estimates we typically use for the burden allocation for each response.

---

[705] In the Proposing Release, for purposes of its PRA analysis, the Commission assumed that, on average, one-third of the 5,690 registrants that filed proxy materials with the Commission during calendar year 2018 (1,897) would be the subject of proxy voting advice each year. *See* Proposing Release, note b. of PRA Table 1 at 66553. Some commenters who disagreed with this assumption stated that this figure was too low. *See* letter from Glass Lewis I. (suggesting that the correct number was ''likely much closer to 100% of those that filed proxy materials with the Commission'') and ProxyVote I (''The appropriate number of registrants that should be subject to the Proposed Rulemaking's estimates should be 5,690 registrants, not 1,897 registrants''). We also note certain statements from some proxy voting advice businesses indicating that they cover tens of thousands of shareholder meetings annually across global markets. *See* letters from Glass Lewis I and II; ISS; Egan-Jones. Accordingly, we have reconsidered our original estimate of one-third, and agree that our calculations should be based on the larger number of 5,690 registrants, given the significant volume of registrants and shareholder meetings that are the subject of proxy voting advice each year. This results in a total annual burden increase of 50 × 5,690 = 284,500 hours. We note that such burden increase would be offset against any corresponding reduction in burden resulting from the registrant foregoing other methods of responding to the proxy voting advice (such as investor outreach) the registrant determines are no longer necessary or are less preferable in light of the new rules.

[706] For purposes of the Regulation 14A collection of information, the number of annual responses corresponds to the estimated number of new filings

that will be made each year under Regulation 14A, which includes filings such as DEF 14A; DEFA14A; DEFM14A; and DEFC14A. When calculating PRA burden for any particular collection of information, the total number of annual burden hours estimated is divided by the total number of annual responses estimated, which provides the average estimated annual burden per response. The current inventory of approved collections of information is maintained by the Office of Information and Regulatory Affairs (OIRA), a division of OMB. The total annual burden hours and number of responses associated with Regulation 14A, as updated from time to time, can be found at *https://www.reginfo.gov/public/do/PRAMain.*

[707] Because a registrant's decision to review and file additional soliciting materials in response to proxy voting advice will be entirely voluntary, it is difficult to predict how frequently such parties will choose to do so. For purposes of the PRA estimate in the Proposing Release, the Commission used as its baseline the average number of times firms filed additional definitive proxy materials in response to proxy voting advice over the three calendar years 2016 (99), 2017 (77) and 2018 (84), or 87. *See* Proposing Release at n. 269. For purposes of its PRA analysis, the Commission estimated that at least three times as many registrants would choose to prepare responses to proxy voting advice and request that their hyperlink be provided to the recipients of the advice pursuant to proposed Rule 14a–2(b)(9)(iii) than otherwise had historically chosen to file additional soliciting materials. As a result, the Commission estimated that three times as many supplemental proxy filings would be made each year, which would increase the annual responses to the Regulation 14A collection of

information by the same amount. For purposes of this PRA analysis, we apply a similar methodology. To the extent that registrants believe that the efficacy of providing a response to proxy voting advice via additional soliciting materials will be enhanced by the amendments, and make registrants more likely to use this mechanism than they have in the past, we expect that the number of annual responses to the Regulation 14 collection of information will increase correspondingly. However, it is difficult to reliably predict what this overall increase would be. In light of comments we received that, as a general matter, our PRA estimates were too low, we think it is appropriate to increase our estimate of additional soliciting materials filed each year from three times the current number to ten times the current number. Taking the average of the Rule 14a–6 filings made in years 2016, 2017, 2018 (87), we multiply by ten for an estimate of 870 Rule 14a–6 filings, or an increase of 783 annual responses to the Regulation 14A collection of information.

[708] Our estimates assume that 75% of the burden is borne by the company and 25% is borne by outside counsel at $400 per hour. We recognize that the costs of retaining outside professionals may vary depending on the nature of the professional services, but for purposes of this PRA analysis, we estimate that such costs would be an average of $400 per hour. This estimate is based on consultations with several registrants, law firms, and other persons who regularly assist registrants in preparing and filing reports with the Commission.

PRA TABLE 2—CALCULATION OF INCREASE IN BURDEN HOURS RESULTING FROM THE AMENDMENTS

| Number of estimated responses (A) † | Total increase in burden hours (B) †† | Increase in burden hours per response (C) = (B)/(A) | Increase in internal hours (D) = (B) x 0.75 | Increase in professional hours (E) = (B) x 0.25 | Increase in professional costs (F) = (E) x $400 |
|---|---|---|---|---|---|
| 6,369 | 337,140 | ††† 50 | 252,855 | 84,285 | $33,714,000 |

†This number reflects an estimated increase of 783 annual responses to the existing Regulation 14A collection of information. *See supra* note 707. The current OMB PRA inventory estimates that 5,586 responses are filed annually.

††Calculated as the sum of annual burden increases estimated for proxy voting advice businesses (52,640 hours) and registrants (284,500 hours). *See supra* PRA Table 1.

†††The estimated increases in Columns (C), (D), and (E) are rounded to the nearest whole number.

5. Program Change and Revised Burden Estimates

Table 3 summarizes the estimated change to the total annual compliance burden of the Regulation 14A collection of information, in hours and in costs, as a result of the amendments.

PRA TABLE 3—REQUESTED PAPERWORK BURDEN UNDER THE AMENDMENTS

| | Current burden | | | Program change | | | Revised burden | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current annual responses (A) | Current burden hours (B) | Current cost burden (C) | Increase in responses (D) ᵃ | Increase in internal hours (E) ᵃᵃ | Increase in professional costs (F) ᵃᵃᵃ | Annual responses | Burden hours (H) = (B) + (E) | Cost burden (I) = (C) + (F) |
| Reg. 14A | 5,586 | 551,101 | $73,480,012 | 783 | 252,855 | $33,714,000 | 6,369 | 803,956 | $107,194,012 |

ᵃ *See* Column (A) in PRA Table 2 noting an estimated increase of 783 annual responses to the existing Regulation 14A collection of information.
ᵃᵃ *See* Column (D) in PRA Table 2.
ᵃᵃᵃ From Column (F) in PRA Table 2.

## VI. Final Regulatory Flexibility Analysis

This Final Regulatory Flexibility Analysis ("FRFA") has been prepared in accordance with the Regulatory Flexibility Act ("RFA").[709] It relates to the amendments to: The definition of "solicitation" in Rule 14a–1(l); the proxy solicitation exemptions in Rule 14a–2(b); and the prohibition on false or misleading statements in solicitations in Rule 14a–9 of Regulation 14A under the Exchange Act. An Initial Regulatory Flexibility Analysis ("IRFA") was prepared in accordance with the RFA and was included in the Proposing Release.

### A. Need for, and Objectives of, the Final Amendments

Given the importance of a properly functioning proxy system to investors and the capital markets, the purpose of the amendments is to help ensure that investors, or those acting on their behalf, who use proxy voting advice have access to more transparent and complete information with which to make their voting decisions, while not imposing undue costs or delays that could adversely affect the timely provision of proxy voting advice, with the ultimate aim of facilitating informed voting decisions. The need for, and

objectives of, these amendments are discussed in more detail in Sections I, II, and IV above.

### B. Significant Issues Raised by Public Comments

In the Proposing Release, we requested comment on any aspect of the IRFA, including how the proposed amendments could achieve their objective while lowering the burden on small entities, the number of small entities that would be affected by the proposed amendments, the existence or nature of the potential effects of the proposed amendments on small entities discussed in the analysis, and how to quantify the effects of the proposed amendments. We also requested comment on the number of proxy voting advice businesses that would be small entities subject to the proposed amendments.

We did not receive estimates from commenters on the number of small entities that would be affected by the proposed amendments or the number of proxy voting advice businesses that would be small entities subject to the proposed amendments. However, several commenters asserted that the Commission's economic analysis failed to consider the cost and effect of the proposed amendments on smaller proxy

voting advice businesses.[710] One such commenter stated that the proposals would be particularly burdensome for small proxy voting advice businesses.[711] Another commenter, who identified itself as a small entity (with under $5 million in assets) providing proxy voting services to institutional investor clients, asserted that small entities like itself would face significant resource and capacity burdens when complying with the proposed amendments, with no gain in the quality of voting or results for their clients.[712] In addition, one commenter believed that small and medium-sized investment advisers would be disproportionately affected by increased costs that may result from the proposed amendments because they are less likely to be able to have staff solely dedicated to the proxy voting process,[713] while another predicted that delays and increased costs resulting from the proposed amendments would most heavily impact smaller institutional investors, such as churches, endowments, unions, pension funds, etc.[714] Several commenters stated that small entities may not have sufficient staffing and resources to

---

[709] 5 U.S.C. 601 *et seq.*

[710] *See, e.g.,* letters from Felician Sisters II; Good Shepherd; IASJ; Interfaith Center II; St. Dominic of Caldwell.
[711] *See* letter from Interfaith Center II.
[712] *See supra* note 518.
[713] *See* letter from IAA.
[714] *See* letter from J. McRitchie I.

comply with the review and feedback process, and therefore should either be exempted from the proposals or, at a minimum, be given an extended timeframe for compliance.[715] In developing the FRFA, we considered these comments as well as comments on the proposed amendments generally.[716] As discussed throughout this release, including in Section VI.D below, we note that the shift to a principles-based approach for the final amendment should help alleviate a number of the concerns raised by commenters about the potential impact on small entities.

*C. Small Entities Subject to the Final Amendments*

The amendments could affect some small entities; specifically, those small entities that are: (i) Proxy voting advice businesses (*i.e.,* persons who provide proxy voting advice that falls within the definition of a "solicitation" under Rule 14a–1(l)(1)(iii), as amended); and (ii) registrants conducting solicitations covered by proxy voting advice. Although not directly subject to the amendments, clients of proxy voting advice businesses and the investors on whose behalf such clients vote proxies may be indirectly affected by the amendments to the extent that the costs borne by the proxy voting advice businesses result in increased fees for such services.

The RFA defines "small entity" to mean "small business," "small organization," or "small governmental jurisdiction." [717] The definition of "small entity" does not include individuals. For purposes of the RFA, under our rules, an issuer of securities or a person, other than an investment company or an investment adviser, is a "small business" or "small organization" if it had total assets of $5 million or less on the last day of its most recent fiscal year.[718] An investment company, including a business development company,[719] is considered to be a "small business" if it, together with other investment companies in the same group of related investment companies, has net assets of $50 million or less as of the end of its most recent fiscal year.[720] An investment adviser

generally is a small entity if it: (1) Has assets under management having a total value of less than $25 million; (2) did not have total assets of $5 million or more on the last day of the most recent fiscal year; and (3) does not control, is not controlled by, and is not under common control with another investment adviser that has assets under management of $25 million or more, or any person (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year.[721]

As discussed in Section IV.B.1, we are not aware of smaller entities that currently supply research, analysis, and recommendations to support the voting decisions of their clients that would fall within the definition of "solicitation" and would therefore be directly affected by the amendments.[722] As far as registrants that may be directly affected, we estimate that there are 1,011 issuers that file with the Commission, other than investment companies and investment advisers, that may be considered small entities.[723] In addition, we estimate that, as of December 31, 2019, there were 92 registered investment companies that may be considered small entities.[724] Finally, we estimate that, as of December 31, 2019, there were 452 investment advisers that may be considered small entities and may be indirectly affected by the amendments.[725]

*D. Projected Reporting, Recordkeeping, and Other Compliance Requirements*

We anticipate that any costs resulting from the amendments will primarily relate to Rule 14a–2(b)(9) and, as such, predominantly affect the proxy advice voting businesses that will be required to comply with Rule 14a–2(b)(9) in order to rely on the exemptions in Rule

14a–2(b)(1) or (b)(3).[726] These businesses, including any affected small entities, will likely incur costs to ensure that their internal practices, procedures, and systems are sufficient to meet the conflicts of interest disclosure and notice requirements under Rule 14a–2(b)(9). As noted above, we are not aware of smaller entities that currently provide services that would cause them to be subject to the proposed amendments; nevertheless, in the interest of completeness, we have considered the potential effects of the amendments on smaller proxy voting advice businesses throughout this FRFA. Registrants of all sizes also could incur costs associated with coordinating with proxy voting advice businesses to receive the proxy voting advice, reviewing the proxy voting advice, and determining whether to prepare and file additional soliciting materials in response to the proxy voting advice.[727] Compliance with the amendments may require the use of professional skills, including legal skills.

The amendments apply to small entities to the same extent as other entities, irrespective of size. Therefore, we expect that the nature of any benefits and costs associated with the amendments will be similar for large and small entities. Accordingly, we refer to the discussion of the amendments' economic effects on all affected parties, including small entities, in Section IV above.[728] Consistent with that discussion, to the extent that any small entities currently or in the future may provide proxy voting advice, we anticipate that the economic benefits and costs likely will vary widely among such entities based on a number of factors, including the nature and conduct of their businesses, as well as the extent to which they are already meeting or exceeding the requirements established by the amendments, which makes it difficult to project the

---

[715] *See* letters from Felician Sisters II; Good Shepherd; IASJ; Interfaith Center II; St. Dominic of Caldwell.

[716] *See* supra Sections II; IV.

[717] 5 U.S.C. 601(6).

[718] *See* Exchange Act Rule 0–10(a) [17 CFR 240.0–10[a]].

[719] Business development companies are a category of closed-end investment company that are regulated under the Investment Company Act [15 U.S.C. 80a–2(a)(48); 80a–53–64].

[720] *See* Investment Company Act Rule 0–10(a) [17 CFR 270.0–10[a]].

[721] *See* Advisers Act Rule 0–7(a) [17 CFR 275.0–7[a]].

[722] In this regard, commenters did not provide data that would allow us to ascertain the extent to which there are smaller entities that would be considered proxy voting advice businesses within the scope of the amendments.

[723] This estimate is based on staff analysis of issuers, excluding co-registrants, with EDGAR filings of either Form 10–K or amendments, filed during the calendar year of January 1, 2019 to December 31, 2019. The data used for this analysis were derived from XBRL filings, Compustat, and Ives Group Audit Analytics.

[724] This estimate is derived from an analysis of data obtained from Morningstar Direct as well as data filed with the Commission (Forms N–Q and N–CSR) for the period ending December 2019.

[725] Based on SEC-registered investment adviser responses to Items 5.F. and 12 of Form ADV. As discussed above, ISS, one of the three major firms that comprise the proxy advisory industry in the U.S., is also registered investment advisor. *See* supra Section IV.B.1.a.

[726] The amendments are discussed in detail in Section II, above. We discuss the economic impact, including the estimated costs and benefits, of the amendments to all affected entities, including small entities, in Section IV above.

[727] *See* supra Section V.C.1.b. We do not expect that the amendments to Rule 14a–1(l) and Rule 14a–9 will have a significant economic impact on affected parties, including any small entities, because they codify already-existing Commission positions on the applicability of these rules to proxy voting advice. *See* supra note 685.

[728] In particular, we discuss the estimated benefits and costs of the amendments on all affected parties, including larger and smaller entities, in Section IV.C. above. We also discuss the estimated compliance burden associated with the amendments for purposes of the PRA in Section V above.

economic impact on small entities with precision.[729]

As a general matter, however, we recognize that any costs of the amendments borne by the affected entities, such as those related to compliance with the amendments, or the implementation or restructuring of internal systems needed to adjust to the amendments, could have a proportionally greater effect on small entities, as they may be less able than larger entities to bear such costs. Further, as discussed in Section IV.B.1.a., the three major proxy voting advice businesses currently operating in the U.S. have existing processes in place for identifying and disclosing conflicts of interest to their clients, as well as providing some registrants access to versions of the businesses' proxy voting advice prior to making a voting recommendation to clients. If competing proxy voting advice businesses do not have such processes in place, they could be disproportionately affected by the amendments. Finally, the amendments may impact competition, in particular for any small entities that provide proxy voting advice services. To the extent that a proxy voting advice business's existing practices and procedures do not satisfy the conditions of Rule 14a–2(b)(9), such entities, including any affected small entities, will incur additional compliance costs and, consequently, may be more likely to exit the market for such services or less able to enter the market in the first place.

We believe that the principles-based approach we are adopting should address many of the concerns commenters raised about the proposed amendments' potential disparate effect on smaller firms. By providing proxy voting advice businesses, including those that are small entities, with the flexibility to design policies and procedures that are scaled to the scope of their business operations, we believe these entities will be able to find the most cost-effective means to comply with the requirements.

With respect to costs that may be incurred by registrants as a result of the amendments, these costs will vary depending upon the particular facts and circumstances of the proxy voting advice as well as the resources of the registrant. Consequently, as with proxy voting advice businesses, it is difficult to quantify these costs with precision, particularly since the degree to which a registrant elects to review and respond to proxy voting advice is entirely

voluntary.[730] As a function of their smaller size, registrants that are small entities may incur proportionally greater costs associated with amendments than larger entities, but the extent of such costs is uncertain. Importantly, while registrants of all sizes may take advantage of the ability to review proxy voting advice provided pursuant to the amendments and potentially file additional soliciting material in response, they are not required to do so; as a result, we expect that registrants would engage in the process only to the extent that they anticipate the benefits of such review to be greater than the costs.

*E. Agency Action To Minimize Effect on Small Entities*

The RFA directs us to consider alternatives that would accomplish our stated objectives, while minimizing any significant adverse impact on small entities. In connection with the amendments, we considered the following alternatives:

• Establishing different compliance or reporting requirements that take into account the resources available to small entities;

• Exempting small entities from all or part of the requirements;

• Using performance rather than design standards; and

• Clarifying, consolidating, or simplifying compliance and reporting requirements under the rules for small entities

We do not believe that establishing different compliance or reporting requirements for small entities in connection with the amendments would accomplish the objectives of this rulemaking. The amendments are intended to improve the completeness and transparency of information available to shareholders and those acting on their behalf when making voting decisions and enhance the overall functioning of the proxy voting process, in furtherance of Section 14 of the Exchange Act. These objectives would not be as effectively served if we were to establish different conditions for smaller proxy voting advice businesses that wish to rely on the solicitation exemptions in Rules 14a–2(b)(1) or (b)(3).[731] For similar reasons, we do not

believe that exempting smaller proxy voting advice businesses from all or part of the amendments would accomplish our objectives.[732]

In a change from the proposal, the amendments generally use performance standards rather than design standards. Based on commenter feedback, including that related to the potential impact on smaller entities, we believe that moving from an approach that emphasizes design standards to one that emphasizes performance standards will provide all entities, and in particular smaller entities, with sufficient flexibility to find the most cost-effective means of compliance while still achieving our objectives. We recognize that using performance standards rather than design standards may increase the degree of uncertainty that proxy voting advice businesses and their clients have regarding whether such businesses are in full compliance with the rules. However, we also are adopting certain safe harbors that we believe will help mitigate such uncertainty to the extent proxy voting advice businesses choose to rely on them.

In adopting these amendments, we have undertaken to provide rules that are clear and simple for all affected parties. We do not believe that further clarification, consolidation, or simplification for small entities is necessary.

**VII. Statutory Authority**

We are adopting the rule amendments contained in this release under the authority set forth in Sections 3(b), 14, 16, 23(a), and 36 of the Securities Exchange Act of 1934, as amended.

**List of Subjects in 17 CFR Part 240**

Brokers, Confidential business information, Fraud, Reporting and recordkeeping requirements, Securities.

In accordance with the foregoing, we are amending title 17, chapter II, of the Code of Federal Regulations as follows:

---

[729] *See supra* Section IV.C.5.

[730] For purposes of the PRA analysis in Section V, we estimate an annual increase of 50 burden hours per registrant in connection with the amendments.

[731] Moreover, because the amendments reflect a principles-based, rather than a more prescriptive, framework, there is no practicable way to establish different compliance requirements for smaller proxy voting advice businesses without also compromising the principles-based nature of the requirements. Under the rules that we are adopting,

proxy voting advice businesses may comply in whatever manner they choose so long as they satisfy the principles set forth.

[732] *See supra* Section IV.E.6. Exempting smaller proxy voting advice businesses from the additional conditions of Rules 14a–2(b)(1) and (3) would reduce the resulting costs of the amendments for such businesses, but it also would mean that their clients would not realize the same benefits in terms of potential improvements in the reliability and transparency of the voting advice they receive. This, in turn, could put smaller proxy voting advice businesses at a competitive disadvantage if they chose to avail themselves of such an exemption.

## PART 240—GENERAL RULES AND REGULATIONS UNDER THE SECURITIES EXCHANGE ACT OF 1934

■ 1. The authority citation for part 240 continues to read, in part, as follows:

**Authority:** 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z–2, 77z–3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78c–3, 78c–5, 78d, 78e, 78f, 78g, 78i, 78j, 78j–1, 78k, 78k–1, 78*l*, 78m, 78n, 78n–1, 78o, 78o–4, 78o–10, 78p, 78q, 78q–1, 78s, 78u–5, 78w, 78x, 78dd, 78*ll*, 78mm, 80a–20, 80a–23, 80a–29, 80a–37, 80b–3, 80b–4, 80b–11, and 7201 *et seq.,* and 8302; 7 U.S.C. 2(c)(2)(E); 12 U.S.C. 5521(e)(3); 18 U.S.C. 1350, Pub. L. 111–203, 939A, 124 Stat. 1376 (2010); and Pub. L. 112–106, sec. 503 and 602, 126 Stat. 326 (2012), unless otherwise noted.

\*    \*    \*    \*    \*

Sections 240.14a–1, 240.14a–3, 240.14a–13, 240.14b–1, 240.14b–2, 240.14c–1, and 240.14c–7 also issued under secs. 12, 15 U.S.C. 78l, and 14, Pub. L. 99–222, 99 Stat. 1737, 15 U.S.C. 78n;

\*    \*    \*    \*    \*

■ 2. Amend § 240.14a–1 by:
■ a. Revising paragraph (l)(1)(iii);
■ b. In paragraph (l)(2)(iii), removing the word "or" from the end of the paragraph;
■ c. In paragraph (l)(2)(iv)(C), removing at the end of the paragraph "." and adding in its place "; or";
■ d. Adding paragraph (l)(2)(v).

The revisions and additions read as follows:

### § 240.14a–1  Definitions.

\*    \*    \*    \*    \*

(l) *Solicitation.* (1) \* \* \*
(iii) The furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy, including:

(A) Any proxy voting advice that makes a recommendation to a security holder as to its vote, consent, or authorization on a specific matter for which security holder approval is solicited, and that is furnished by a person that markets its expertise as a provider of such proxy voting advice, separately from other forms of investment advice, and sells such proxy voting advice for a fee.

(B) [Reserved]
(2) \* \* \*
(v) The furnishing of any proxy voting advice by a person who furnishes such advice only in response to an unprompted request.

■ 3. Amend § 240.14a–2 by adding paragraph (b)(9) to read as follows:

### § 240.14a–2  Solicitations to which § 240.14a–3 to § 240.14a–15 apply.

\*    \*    \*    \*    \*

(b) \* \* \*
(9) Paragraphs (b)(1) and (b)(3) of this section shall not be available to a person furnishing proxy voting advice covered by § 240.14a–1(l)(1)(iii)(A) ("proxy voting advice business") unless both of the conditions in (b)(9)(i) and (ii) of this section are satisfied:

(i) The proxy voting advice business includes in its proxy voting advice or in an electronic medium used to deliver the proxy voting advice prominent disclosure of:

(A) Any information regarding an interest, transaction, or relationship of the proxy voting advice business (or its affiliates) that is material to assessing the objectivity of the proxy voting advice in light of the circumstances of the particular interest, transaction, or relationship; and

(B) Any policies and procedures used to identify, as well as the steps taken to address, any such material conflicts of interest arising from such interest, transaction, or relationship; and

(ii) The proxy voting advice business has adopted and publicly disclosed written policies and procedures reasonably designed to ensure that:

(A) Registrants that are the subject of the proxy voting advice have such advice made available to them at or prior to the time when such advice is disseminated to the proxy voting advice business's clients; and

(B) The proxy voting advice business provides its clients with a mechanism by which they can reasonably be expected to become aware of any written statements regarding its proxy voting advice by registrants who are the subject of such advice, in a timely manner before the security holder meeting (or, if no meeting, before the votes, consents, or authorizations may be used to effect the proposed action).

**Note 1 to paragraph (b)(9)(ii):** For purposes of satisfying the requirement in paragraph (b)(9)(ii)(A) of this section, the proxy voting advice business's written policies and procedures need not require it to make available to the registrant additional versions of its proxy voting advice with respect to the same meeting, vote, consent or authorization, as applicable, if the advice is subsequently revised.

(iii) A proxy voting advice business will be deemed to satisfy the requirement in paragraph (b)(9)(ii)(A) of this section if it has written policies and procedures that are reasonably designed to provide a registrant with a copy of its proxy voting advice, at no charge, no later than the time such advice is disseminated to the proxy voting advice business's clients. Such policies and procedures may include conditions requiring that:

(A) The registrant has filed its definitive proxy statement at least 40 calendar days before the security holder meeting date (or if no meeting is held, at least 40 calendar days before the date the votes, consents, or authorizations may be used to effect the proposed action); and

(B) The registrant has acknowledged that it will only use the copy of the proxy voting advice for its internal purposes and/or in connection with the solicitation and such copy will not be published or otherwise shared except with the registrant's employees or advisers.

(iv) A proxy voting advice business will be deemed to satisfy the requirement in paragraph (b)(9)(ii)(B) of this section if it has written policies and procedures that are reasonably designed to inform clients who receive proxy voting advice when a registrant that is the subject of such advice notifies the proxy voting advice business that it intends to file or has filed additional soliciting materials with the Commission pursuant to § 240.14a–6 setting forth the registrant's statement regarding the advice, by:

(A) The proxy voting advice business providing notice to its clients on its electronic platform that the registrant intends to file or has filed such additional soliciting materials and including an active hyperlink to those materials on EDGAR when available; or

(B) The proxy voting advice business providing notice to its clients through email or other electronic means that the registrant intends to file or has filed such additional soliciting materials and including an active hyperlink to those materials on EDGAR when available.

(v) Paragraph (b)(9)(ii) of this section does not apply to proxy voting advice to the extent such advice is based on custom voting policies that are proprietary to a proxy voting advice business's client.

(vi) Paragraph (b)(9)(ii) of this section does not apply to any portion of the proxy voting advice that makes a recommendation to a security holder as to its vote, consent, or authorization in a solicitation subject to § 240.14a–3(a):

(A) To approve any transaction specified in § 230.145(a); or

(B) By any person or group of persons for the purpose of opposing a solicitation subject to this regulation by any other person or group of persons.

\* \* \* \* \*

■ 4. Amend § 240.14a–9 by adding paragraph e. to the Note to read as follows:

### § 240.14a–9  False or misleading statements.

\* \* \* \* \*

**Note:** \* \* \*

e. Failure to disclose material information regarding proxy voting advice covered by § 240.14a–1(l)(1)(iii)(A), such as the proxy voting advice business's methodology, sources of information, or conflicts of interest.

\* \* \* \* \*

By the Commission.

Dated: July 22, 2020.

**Vanessa A. Countryman,**

*Secretary.*

[FR Doc. 2020–16337 Filed 9–1–20; 8:45 am]

**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

### 17 CFR Part 276

**[Release No. IA–5547]**

### Supplement to Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Guidance.

**SUMMARY:** The Securities and Exchange Commission ("Commission") is publishing supplementary guidance regarding the proxy voting responsibilities of investment advisers under its regulations issued under the Investment Advisers Act of 1940 (the "Advisers Act") in light of the Commission's amendments to the rules governing proxy solicitations under the Securities Exchange Act of 1934 (the "Exchange Act").

**DATES:** *Effective:* September 3, 2020.

**FOR FURTHER INFORMATION CONTACT:** Thankam A. Varghese, Senior Counsel; or Holly Hunter-Ceci, Assistant Chief Counsel, at (202) 551–6825 or *IMOCC@sec.gov,* Chief Counsel's Office, Division of Investment Management, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–8549.

**SUPPLEMENTARY INFORMATION:** The Commission is publishing

supplementary guidance regarding the proxy voting responsibilities of investment advisers under 17 CFR 275.206(4)–6 [Rule 206(4)–6 under the Advisers Act [15 U.S.C. 80b]].[1]

### I. Introduction

The Commission previously issued guidance discussing how the fiduciary duty and rule 206(4)–6 under the Advisers Act relate to an investment adviser's exercise of voting authority on behalf of clients and also provided examples to help facilitate investment advisers' compliance with their obligations in connection with proxy voting.[2] We are supplementing this guidance in light of information gained in connection with our ongoing review of the proxy voting process and our related regulations, including the amendments to the proxy solicitation rules under the Exchange Act that we are issuing at this time.[3]

We expect that the Exchange Act amendments adopted in Release No. 34–89372 will result in improvements in the mix of information that is available to investors and material to a voting decision. In particular, we expect issuers will have access to proxy advisory firm recommendations in a timeframe that will permit those issuers to make available to shareholders additional information that may be material to a voting decision in a more systematic and timely manner than they could previously.[4] We also expect that the amendments will result in the

availability of that additional information being made known to proxy advisory firms and their clients in a timely manner, including because proxy advisory firms, as a condition to the availability of the exemptions in 17 CFR 240.14a–2(b)(1) and (b)(3), must adopt policies and procedures that are reasonably designed to provide investment advisers and other clients with a mechanism by which they can reasonably be expected to become aware of that additional information prior to making voting decisions. Accordingly, we are providing supplementary guidance to assist investment advisers in assessing how to consider the additional information that may become more readily available to them as a result of these amendments, including in circumstances where the investment adviser utilizes a proxy advisory firm's electronic vote management system that "pre-populates" the adviser's proxies with suggested voting recommendations and/or for voting execution services. The supplementary guidance also addresses disclosure obligations and considerations that may arise when investment advisers use such services for voting.

### II. Supplemental Guidance Regarding Investment Advisers' Proxy Voting Responsibilities

*Question 2.1:* In some cases, proxy advisory firms assist clients, including investment advisers, with voting execution, including through an electronic vote management system that allows the proxy advisory firm to: (1) Populate each client's votes shown on the proxy advisory firm's electronic voting platform with the proxy advisory firm's recommendations based on that client's voting instructions to the firm ("pre-population"); and/or (2) automatically submit the client's votes to be counted ("automated voting"). Pre-population and automated voting generally occur prior to the submission deadline for proxies to be voted at the shareholder meeting. In various circumstances, an investment adviser, in the course of conducting a reasonable investigation into matters on which it votes,[5] may become aware that an issuer that is the subject of a voting recommendation intends to file or has filed additional soliciting materials with the Commission setting forth the issuer's views regarding the voting recommendation. These materials may or may not reasonably be expected to affect the investment adviser's voting

---

[1] Unless otherwise noted, when we refer to the Advisers Act, or any paragraph of the Advisers Act, we are referring to 15 U.S.C. 80b of the United States Code, at which the Advisers Act is codified, and when we refer to rules under the Advisers Act, or any paragraph of these rules, we are referring to title 17, part 275 of the Code of Federal Regulations [17 CFR part 275], in which these rules are published.

[2] Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers, Release No. IA–5325 (Aug. 21, 2019), 84 FR 47420 (Sept. 10, 2019) ("Commission Guidance on Proxy Voting Responsibilities").

[3] *See* Exemptions from the Proxy Rules for Proxy Voting Advice, Release No. 34–89372 (July 22, 2020) ("Amendments to Proxy Solicitation Rules"); *see also* 17 CFR 240.14a–2(b)(9)(iv); *see also* Commission Guidance on Proxy Voting Responsibilities, *supra* n. 2. Proxy advisory firms will not be required to comply with certain of the amendments we are making to the proxy solicitation rules until December 1, 2021. This guidance addresses the application of the fiduciary duty, Form ADV, and rule 206(4)–6 under the Advisers Act to an investment adviser's proxy voting responsibilities in connection with current practices, as well as any policies or procedures that may be implemented by proxy advisory firms under the final amendments.

[4] *See infra* at n. 6. While 17 CFR 240.14a–2(b) uses the term "proxy voting advice business," we use the term "proxy advisory firm" in this release. This is consistent with the Commission Guidance on Proxy Voting Responsibilities, which this release supplements.

[5] *See* Commission Guidance on Proxy Voting Responsibilities, text at notes 15 and 37 and in response to Question 4.