# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INSTITUTIONAL SHAREHOLDER
SERVICES INC.,

PLAINTIFF,

v.

SECURITIES AND EXCHANGE
COMMISSION and WALTER CLAYTON III
in his official capacity as Chairman of the
Securities and Exchange Commission,

DEFENDANTS.

NO. 1:19-cv-3275-APM

**ORAL HEARING REQUESTED**

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Mari-Anne Pisarri (DC Bar #362597)
PICKARD DJINIS AND PISARRI LLP
1990 M Street, NW, Suite 660
Washington, DC 20036
(202) 223-4418
pisarri@pickdjin.com

Jeffrey M. Harris (DC Bar #994058)
James F. Hasson (*pro hac vice* motion pending)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
james@consovoymccarthy.com

*Counsel for Institutional Shareholder Services Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

BACKGROUND ................................................................................................................. 4

I.      The Regulatory Regime for Proxy Solicitation ...................................................... 4

II.     Independent Proxy Voting Advice is Fundamentally Different from Proxy Solicitation......... 5

        A.      Overview of ISS and proxy voting advice. ................................................. 5

        B.      Proxy voting advice is comprehensively regulated under the Advisers Act..................... 7

III.    The Commission Has Never Before Regulated Proxy Advice as Proxy Solicitation. ............... 9

IV.     The Commission Adopts an Unprecedented Regulatory Framework for Proxy Advice
        Through the Proxy Solicitation Rules. ...................................................................... 11

        A.      The Commission announces through sub-regulatory guidance that proxy voting
                advice is now proxy solicitation............................................................................. 11

        B.      The Final Rules .......................................................................................... 13

LEGAL STANDARD ...................................................................................................... 16

ARGUMENT .................................................................................................................... 16

I.      The SEC's Attempt to Regulate Independent Proxy Voting Advice as Proxy Solicitation
        Is Contrary to Law. ................................................................................................. 16

        A.      The Commission's redefinition of proxy advice as proxy solicitation is foreclosed by
                the plain text of Section 14(a). ........................................................................... 16

        B.      The Commission's new interpretation of proxy solicitation is unreasonable even if
                the statutory text is ambiguous. ....................................................................... 22

II.     The Final Rules and Proxy Guidance Are Arbitrary and Capricious. ...................... 25

        A.      The Commission has never articulated a reasonable basis for creating an intrusive
                and burdensome new regulatory scheme for proxy voting advice. ...................... 25

        B.      The Commission failed to adequately explain why the Advisers Act insufficiently
                regulates proxy voting advice................................................................................. 31

        C.      The Commission failed to acknowledge that the Final Rules and Proxy Guidance
                change its longstanding position and upend reliance interests.............................. 34

III.  The Amendments to the Proxy Rules Violate the First Amendment. ........................................ 37

    A.  The Final Rules impose content-based and viewpoint-based burdens on proxy advisers' protected speech. ........................................................................................ 37

    B.  Rule 14a-2(b)(9) fails any level of First Amendment scrutiny. ............................ 40

        1.  Rule 14a-2(b)(9) does not further a legitimate or compelling state interest. ............ 40

        2.  Rule 14a-2(b)(9) ignores less restrictive alternatives. .................................... 42

IV.  This Court Should Vacate and Permanently Enjoin the Final Rules and Proxy Guidance. .... 45

CONCLUSION ........................................................................................................................ 45

# TABLE OF AUTHORITIES

**Cases**

*Agape Church v. FCC,*
  738 F.3d 397 (D.C. Cir. 2013) ............................................................. 24

*Allegheny Def. Project v. Fed. Energy Regul. Comm'n,*
  964 F.3d 1 (D.C. Cir. 2020) ................................................................. 17

*\*Am. Equity Invs. Life Ins. Co. v. SEC,*
  613 F.3d 166 (D.C. Cir. 2010) ......................................................... 31, 33

*Am. Library Ass'n. v. FCC,*
  406 F.3d 689 (D.C. Cir. 2005) ............................................................. 16

*Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of Treasury,*
  392 F. Supp. 3d 22 (D.D.C. 2019) ....................................................... 22

*\*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) .................................................. 29, 30, 31

*Capital Real Estate Invr's v. Schwartzberg,*
  917 F. Supp. 1050 (S.D.N.Y. 1996) ..................................................... 21

*Carter v. State,*
  81 Ark. 37 (1906) ............................................................................... 18

*Chevron U.S.A, Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ............................................................................ 17

*Christopher v. SmithKline Beecham Corp.,*
  567 U.S. 142 (2012) ............................................................................ 24

*Citizens United v. FEC,*
  558 U.S. 310 (2010) ............................................................................ 38

*City of Arlington v. FCC,*
  569 U.S. 290 (2013) ............................................................................ 17

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) ........................................................................ 37

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016) ................................................................... 36, 37

*\*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ....................................................................... 35, 37

*Gas Nat. Inc. v. Osborne*,
  624 Fed. Appx. 944 (6th Cir. 2015) ............................................................ 21

*Good Fortune Shipping, SA v. Comm'r of Internal Revenue Serv.*,
  897 F.3d 256 (D.C. Cir. 2018) .................................................................... 22

*Humane Soc'y of the U.S. v. Jewell*,
  76 F. Supp. 3d 69 (D.D.C. 2014) ............................................................... 45

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
  140 S. Ct. 768 (2020) ................................................................................. 17

*Itserve All., Inc. v. Cissna*,
  443 F. Supp. 3d 14 (D.D.C. 2020) ............................................................. 16

*J.I. Case v. Borak*,
  377 U.S. 426 (1964) ............................................................................. 11, 23

*Janus v. Am. Fed'n of State, County, & Mun. Emps., Council 31*,
  138 S. Ct. 2448 (2018) ............................................................................... 38

*Kiefer v. State*,
  106 Ohio St. 285 (1922) ............................................................................. 17

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ................................................................................... 16

*Legal Servs. Corp. v. Velasquez*,
  531 U.S. 533 (2001) ................................................................................... 38

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020) ............................................................................... 25

*Long Island Lighting Co. v. Barbash*,
  779 F.2d 793 (2d Cir. 1985) ....................................................................... 21

*Loving v. IRS*,
  917 F. Supp. 2d 67 (D.D.C. 2013) ............................................................. 45

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ................................................................................... 44

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
  512 U.S. 218 (1994) ................................................................................... 19

*Merck & Co., Inc. v. U.S. Dept. Health & Human Servs.*,
  385 F. Supp. 3d 81 (D.D.C. 2019) ....................................................... 22, 24

*Miami Herald Pub. Co. v. Tornillo,
    418 U.S. 241 (1974) ................................................................................................ 41

Mills v. Dist. of Columbia,
    571 F.3d 1304 (D.C. Cir. 2009) ............................................................................... 45

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) .................................................................................................. 25

Music Choice v. Copyright Royalty Bd.,
    2020 WL 4782379 (D.C. Cir. Aug. 18, 2020) ........................................................ 37

*N.Y. Stock Exch. v. SEC,
    962 F.3d 541 (D.C. Cir. 2020) .......................................................................... passim

NAACP v. Button,
    371 U.S. 415 (1963) ................................................................................................ 38

Nat'l Mining Ass'n v. U.S. Army Corps Eng'rs,
    145 F.3d 1399 (D.C. Cir. 1998) ............................................................................... 45

New York v. U.S. Dep't of Labor,
    363 F. Supp. 3d 109 (D.D.C. 2019) ........................................................................ 23

*NIFLA v. Becerra,
    138 S. Ct. 2361 (2018) ............................................................................ 38, 40, 41, 42

*Pac. Gas & Elec. Co. v. PUC of Cal.,
    475 U.S. 1 (1986) .................................................................................... 38, 41, 42

People v. Rice,
    383 Ill. 584 (1943) .................................................................................................. 18

Perrin v. United States,
    444 U.S. 37 (1979) .................................................................................................. 17

Pursuing America's Greatness v. FEC,
    831 F.3d 500 (D.C. Cir. 2016) ................................................................................. 39

Ramirez v. U.S. Immigr. & Customs Enf't,
    338 F. Supp. 3d 1 (D.D.C. 2018) ............................................................................ 22

Reed v. Town of Gilbert,
    135 S. Ct. 2218 (2015) ....................................................................................... 39, 40

Riley v. Nat'l Fed. for the Blind,
    487 U.S. 781 (1988) ..................................................................................... 38, 42, 43

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995) .......................................................................................... 39

*SEC v. Capital Gains Research Bureau, Inc.,*
375 U.S. 180 (1963) ............................................................................................ 8

*Sorenson Comm'cns Inc. v. FCC,*
755 F.3d 702 (D.C. Cir. 2014) ........................................................................ 29

*\*Sorrell v. IMS Health,*
564 U.S. 552 (2011) ............................................................................... 38, 39, 40

*\*State of N.Y. v. Scalia,*
No. 1:20-CV-1689-GHW, 2020 WL 5370871 (S.D.N.Y. Sept. 8, 2020) ........................................ 30

*Transamerica Mortg. Advisors, Inc. v. Lewis,*
444 U.S. 11 (1979) .............................................................................................. 8

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision,*
967 F.2d 598 (D.C. Cir. 1992) ........................................................................ 16

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) ..................................................................................... 39, 40

*United States v. United Foods, Inc.,*
533 U.S. 405 (2001) .......................................................................................... 43

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) .......................................................................................... 24

*Verizon v. FCC,*
740 F.3d 623 (D.C. Cir. 2014) ........................................................................ 16

*Zauderer v. Office of Disciplinary Counsel,*
471 U.S. 626 (1985) .......................................................................................... 42

*Zukerman v. U.S. Postal Serv.,*
961 F.3d 431 (D.C. Cir. 2020) ........................................................................ 39

**Statutes**

15 U.S.C. §78c ................................................................................................... 29

15 U.S.C. §78m ................................................................................................. 32

15 U.S.C. §78n ..................................................................................... 5, 17, 22

15 U.S.C. §78n-1 ................................................................................................ 4

15 U.S.C. §78w ................................................................................................. 29

15 U.S.C. §80b-2 ........................................................................................................... 7

15 U.S.C. §80b-6 ...................................................................................................... 8, 32

5 U.S.C. §706 .................................................................................................. 16, 25, 45

National Securities Markets Improvement Act of 1996,
    Pub. L. No. 104-290, 110 Stat. 3416 ................................................................... 33

**Other Authorities**

*Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice,*
    84 Fed. Reg. 66518 (Dec. 4, 2019) ..................................................... 13, 15, 27, 28

*Amendments to Proxy Rules,*
    21 Fed. Reg. 577 (Jan. 26, 1956) .......................................................................... 9

*Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other*
    *Persons Who Provide Investment Advisory Services as a Component of Other Financial Services,*
    52 Fed. Reg. 38400 (Oct. 16, 1987) ...................................................................... 9

*Black's Law Dictionary* (3d ed. 1933) ............................................................... 17, 18

*Broker-Dealer Participation in Proxy Solicitations,*
    29 Fed. Reg. 341 (Jan. 15, 1964) ...................................................................... 9, 10

*Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers,*
    SEC Rel. No. IA-5325 (Aug. 21, 2019) ................................................................ 8

*Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to*
    *Proxy Voting Advice,* 84 Fed. Reg. 47416 (Sept. 10, 2019) ................................. *passim*

*Commission Interpretation Regarding Standard of Conduct for Investment Advisers,*
    84 Fed. Reg. 33669 (Jul. 12, 2019) ....................................................................... 8

*Concept Release on the U.S. Proxy System,*
    75 Fed. Reg. 42982 (Jul. 22, 2010) ..................................................................... 8, 9

*Exemptions from the Proxy Rules for Proxy Voting Advice,*
    85 Fed. Reg. 55082 (Sept. 3, 2020) ................................................................. *passim*

H.R. Rep. 1383, 73d Cong., 2d Sess. (Apr. 27, 1934) ................................... 4, 5, 23

*Legislative Proposals to Examine Corporate Governance:* Hearing Before the S. Comm.
    On Banking, Housing, and Urban Affairs, 115th Cong. (2018) ........................ 43

*Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers;*
    *Request for Comment on Enhancing Investment Adviser Regulation,*
    83 Fed. Reg. 21203 (May 9, 2018) ...................................................................... 32

*Regulation of Communications Among Shareholders*,
   57 Fed. Reg. 48276 (Oct. 22, 1992) ............................................................................ 10, 11, 35, 36

Remarks of Michelle Anderson, Moderator, *Transcript of the Roundtable on the*
   *Proxy Process* (Nov. 15, 2018), bit.ly/2DVAbiO ................................................................ 12

Rick A. Fleming, SEC Investor Advocate, Report on Activities for FY 2019
   (Dec. 19, 2019), bit.ly/31Er3Im .......................................................................................... 27

Roget's 21st Century Thesaurus (3d ed. 2013) .................................................................. 18

S. Rep. No. 73-1455 (June 6, 1934) ........................................................................... 2, 4, 23

*Securities and Exchange Commission Release Notice*,
   1935 WL 29270 (Sept. 24, 1935) ......................................................................................... 9

*Shareholder Communications, Shareholder Participation In the Corporate Electoral Process*
   *and Corporate Governance Generally*, 44 Fed. Reg. 68764 (Nov. 29, 1979) ...................... 10, 35

Statement of Chairman Jay Clayton, *Open Meeting on Proposals to Enhance the Accuracy,*
   *Transparency and Effectiveness of Our Proxy Voting System* (Nov. 5, 2019), bit.ly/3fUf51c ................... 28

The Concise Oxford Dictionary of Current English (1931) ................................................ 17

Webster's New International Dictionary (2d ed. 1934) ...................................................... 19

Zachary Mider & Ben Elgin, *SEC Chairman Cites Fishy Letters in Support of Policy Change*,
   Bloomberg News (Nov. 19, 2019), bloom.bg/31OdaGq .................................................... 28

## Rules

Fed. R. Civ. P. 56 ................................................................................................................ 16

## Regulations

17 C.F.R §240.14a-1 ............................................................................................................ 9

17 C.F.R. §§275.206 ........................................................................................................ 8, 32

17 C.F.R. §240.14a .............................................................................................................. 5

17 C.F.R. §240.14a-16 ......................................................................................................... 5

17 C.F.R. §240.14a-2 ...................................................................................................... 10, 11

17 C.F.R. §240.14a-3 ........................................................................................................... 5

17 C.F.R. §240.14a-5 ......................................................................................................... 43

17 C.F.R. §240.14a-6 ........................................................................................................... 5

17 C.F.R. §240.14a-8 ................................................................................................................ 43

17 C.F.R. §240.14a-9 ................................................................................................................. 5

17 C.F.R. §275.203-1 ................................................................................................................. 8

17 C.F.R. §275.204-2 ................................................................................................................. 8

17 C.F.R. §275.206(4)-7 ......................................................................................................... 8, 32

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff Institutional Shareholder Services Inc. (ISS) is the world's largest "proxy adviser." ISS's core business is to help its investor clients make informed decisions about how to vote their shares in corporate ballot measures. To that end, ISS provides its clients independent analysis and vote recommendations based on the voting criteria chosen by each client. But one thing ISS emphatically does not do is *solicit* proxy votes. ISS does not take sides in contested votes; does not assist proponents or opponents of a ballot measure in achieving their desired outcome; and is ultimately indifferent as to how its clients vote their shares or, indeed, whether they vote at all. ISS may even offer different recommendations about the *same vote* depending on the voting criteria specified by the client.

Some issuers (*i.e.*, publicly traded companies) do not like independent proxy advisers because they sometimes advise their clients to vote against management-backed ballot measures. Those companies and their representatives have engaged in a longstanding campaign to diminish the independence of proxy advice by seeking burdensome new regulations that would inject issuers into the process through which proxy voting advice is developed and disseminated.

In August 2019, the Securities and Exchange Commission bowed to pressure from corporate interests and adopted—through a sub-regulatory guidance document—an unprecedented interpretation of Section 14(a) of the Securities and Exchange Act of 1934. *Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice*, 84 Fed. Reg. 47416 (Sept. 10, 2019) ("Proxy Guidance"). For the first time in the 86-year history of the Exchange Act, the Commission claimed the authority to regulate proxy voting *advice* provided in a fiduciary capacity through a regulatory framework that addresses *solicitation* of proxy votes.

The Commission subsequently formalized that interpretation following a notice-and-comment rulemaking proceeding. *Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55082 (Sept. 3, 2020) ("Final Rules"). Based on the reclassification of proxy voting advice as proxy

solicitation, the Final Rules impose several burdensome new obligations on proxy advisers, which the Commission clunkily renames "proxy voting advice businesses."[1] Most notably, the Final Rules seek to inject issuers into the development and promulgation of proxy advice by requiring proxy advisers to share their recommendations and analyses with issuers and develop a "mechanism" to disseminate issuers' responses. The Final Rules would also impose potential liability under Rule 14a-9 for alleged misstatements or omissions in proxy advice.

The Final Rules and Proxy Guidance are unlawful, unconstitutional, and arbitrary and capricious, and must be set aside. The Commission's novel redefinition of proxy voting advice as proxy solicitation fails at the starting gate because it is foreclosed by the plain text of Section 14(a), which limits the Commission's authority to persons who "solicit any proxy." Both in 1934 and today, the plain meaning of "solicit" refers to a person who seeks to achieve a certain goal or objective; to "solicit any proxy" thus means to *seek a certain outcome* in a shareholder vote. Management might solicit proxies in support of a ballot proposal, while a dissident shareholder might solicit votes against the proposal. But no reasonable user of English would confuse proxy solicitation with advice provided by an independent third-party adviser like ISS. *Advise* and *solicit* mean different things, would never be used interchangeably, and no one would confuse one for the other.

Although the plain text of Section 14(a) is sufficient to resolve this case, the purpose and legislative history eliminate any doubt that the Commission's interpretation is untenable. Section 14(a) was enacted to protect investors against abusive or manipulative solicitation of proxies by "unscrupulous corporate officials" or "irresponsible outsiders seeking to wrest control of a corporation." S. Rep. No. 73-1455 at 77 (June 6, 1934). Those concerns are inapposite in the context

---

[1] Before the rulemaking at issue here, Westlaw reveals zero instances in which the term "proxy voting advice business" was used in the Federal Register, a news article, or a judicial decision. Even the Commission acknowledged it was "introducing a new term" to the industry. 85 Fed. Reg. at 55108 n.334. ISS will adhere to the longstanding industry terminology.

of a proxy adviser that is hired by an investor to provide independent advice and recommendations and has no interest in the ultimate outcome of shareholder votes.

The Final Rules and Proxy Guidance are also arbitrary and capricious on a number of levels. These rules are a paradigmatic solution in search of a problem. Investors—the ostensible beneficiaries of the Commission's rules—overwhelmingly *opposed* them on the ground that the rules were unnecessary and burdensome and would unduly interfere with the independence of the advice they receive from proxy advisers. The Commission initially suggested that it needed new regulations to address "errors and inaccuracies" in proxy voting advice—but then declined to rely on that theory in the Final Rules after it was discredited by numerous commenters. The Commission and its Chairman also initially relied on letters from "main street investors" who purportedly asked for these rules—but then disavowed that reliance as well after those letters turned out to be fake. The Commission also failed to meaningfully grapple with the fact that proxy voting advice is already comprehensively regulated under the Investment Advisers Act of 1940 ("Advisers Act")—a regulatory scheme that, unlike the ill-fitting proxy solicitation regime, is actually designed to regulate investment advice.

At bottom, in the absence of any concrete evidence suggesting a problem with proxy advice, the Commission was left with nothing more than an amorphous desire to promote "investor access to enhanced discussion of proxy voting matters." 85 Fed Reg. at 55107. But, far from justifying the Final Rules, this merely underscores that they also violate the First Amendment. The Final Rules do not seek to "enhance discussion of proxy voting matters" *generally*. Instead, the Final Rules seek to enhance *one specific viewpoint*: that of corporate issuers. The Final Rules co-opt and commandeer proxy advisers' speech by forcing them to share their advice and recommendations with issuers and then provide a "mechanism" for the issuer to respond. Simply put, the Commission's rules force proxy advisers to disseminate speech that will often *disagree* with the proxy adviser's own analysis or

recommendations. The Supreme Court has repeatedly invalidated laws that seek to commandeer one person's speech to facilitate someone else's, and the Final Rules should meet the same fate.

## BACKGROUND

### I. The Regulatory Regime for Proxy Solicitation

Public companies are generally required by state law to hold annual shareholders meetings to address matters that require shareholder approval, such as the election of directors. Under the Dodd-Frank Wall Street Reform and Consumer Protection Act, public companies must also periodically give shareholders the right to a non-binding vote on executive compensation through so-called "say on pay" votes. *See* 15 U.S.C. §78n-1. A company may also call a special meeting to seek shareholder approval of time-sensitive transactions such as mergers or acquisitions. Shareholders cast their votes by appearing at such meetings in person or authorizing a "proxy" to vote on their behalf.

During a contested vote, proponents or opponents of a ballot measure may solicit shareholders to encourage them to support or oppose the measure (sometimes using a third-party specialist proxy solicitor). Proxy solicitation carries a clear risk of abuse. Those seeking to pass or oppose a ballot measure could, for example, seek to achieve their preferred outcome through fraudulent or manipulative practices such as making false or misleading statements to shareholders.

After the stock market crash of 1929 and the Great Depression, Congress concluded that abusive proxy solicitation posed a significant threat to investors and that the proxy voting system needed appropriate safeguards. *See* H.R. Rep. 1383, 73d Cong., 2d Sess., at 13 (Apr. 27, 1934) (A "renewal of investors' confidence in the exchange market can be effected only by a clearer recognition upon the part of the corporate managers … of their responsibilities as trustees for their corporations."). Congress was especially concerned about abuse from "irresponsible outsiders seeking to wrest control of a corporation [and] … unscrupulous corporate officials" who "conceal[ed] and distort[ed] facts" while soliciting proxy votes. S. Rep. No. 73-1455 at 77.

4

To protect shareholders' "fair suffrage" rights, Congress granted the Commission "power to control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which have frustrated the free exercise of the voting rights of stockholders." H.R. Rep. 73-1383 at 13-14. To that end, Section 14(a) of the Securities Exchange Act of 1934 makes it "unlawful for any person … in contravention of such rules and regulations as the Commission may prescribe … to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security…" 15 U.S.C. §78n(a). In short, those who "solicit any proxy" must comply with the Commission's rules regulating such practices.

The Commission promulgated those rules in 17 C.F.R. §240.14a-1, *et seq.* Under Rule 14a-3, a person who solicits a proxy must furnish each person solicited with a "publicly-filed preliminary or definitive proxy statement" that contains mandatory disclosures about the nature and date of the shareholder vote and "a clear and impartial identification of each separate matter" to be voted on. *Id.* at §240.14a-3(a). That statement must typically be provided at least 40 days before the scheduled vote. *Id.* at §240.14a-16(a). Rule 14a-6 also imposes significant informational and filing obligations on those who solicit proxies. For example, anyone soliciting a proxy must file with the Commission "copies of the proxy statement, form of proxy and all other soliciting materials, in the same form as the materials sent to securities holders" no later than the date those materials are sent to shareholders. *Id.* at §240.14a-6(b). And Rule 14a-9 makes it unlawful for a person to solicit proxies through any communication that contains material misstatements or omissions. *See id.* at §240.14a-9.

## II.    Independent Proxy Voting Advice is Fundamentally Different from Proxy Solicitation

### A.    Overview of ISS and proxy voting advice.

Many institutional investors participate in a significant number of proxy votes every year and lack the resources or expertise to independently analyze the ramifications of each individual proposal. For example, a large mutual fund or index fund may face the prospect of voting on ballot measures

across thousands of publicly traded companies in their portfolios, often over a short period of time. *See* 85 Fed. Reg. at 55083, 55123. Those investors may accordingly hire *proxy advisers* such as ISS to provide independent advice to help navigate those issues. *Id.* ISS is a full-service proxy adviser that helps institutional investors make informed proxy voting decisions.

ISS's core advisory business is to provide proxy voting recommendations to its investor clients based on specific policies created or selected by investors themselves. ISS currently implements over 400 custom voting policies that are tailored to the investors' specific goals. *See* ISS Comments at 1.[2] Alternatively, an investor could select: (1) ISS's "benchmark" voting policies that focus on promoting long-term shareholder value, good governance, and risk mitigation; or (2) a "thematic" policy that evaluates governance and voting issues from the perspective of sustainability, socially responsible investing, labor-friendly investing, or faith-based investing. *Id.*; *see also* 85 Fed. Reg. at 55083. Whether offering vote recommendations under a custom policy, benchmark policy, or thematic policy, ISS supports its recommendations with extensive corporate governance data as well as ISS's own research and analysis. Although some commenters in this proceeding suggested that proxy advisers are insufficiently attentive to management's views, proxy advisers make recommendations favoring management approximately 85% of the time. *See* CalPERS Comments at 2-3, 5.

ISS provides proxy voting advice only to investors that have specifically engaged it for that purpose. ISS Comments at 2. Once engaged, ISS is contractually obliged to analyze and provide a voting recommendation for each corporate agenda item related to every security held in the client's portfolio (including non-U.S. securities), and to do so in accordance with the policies the client designates. *Id.* There is no "correct" way to vote a proxy. A shareholder's vote necessarily turns on

---

[2]   Unless otherwise indicated, any citation of "comments" refers to comments filed in the rulemaking docket that culminated in the Final Rules, SEC File No. S7-22-19.

that shareholder's goals and priorities, and ISS provides analysis and recommendations about proxy votes based on the criteria and policies selected by its clients. *Id.*

One thing ISS emphatically does not do is *solicit* proxies. ISS does not make voting recommendations at the behest of any proponent or opponent of a ballot proposal; does not choose the ballots or agenda items about which it renders advice; and does not hold securities for its own account. *Id.* Although ISS provides advice and voting recommendations tailored to its clients' specific criteria, ISS is ultimately agnostic as to whether its clients support a proposal, reject a proposal, or abstain from voting. *Id.* Indeed, due to the diversity of policies and guidelines adopted by its various clients, ISS may issue different recommendations to different clients about the *same ballot measure*. *Id.* In some instances, ISS may even offer different recommendations about the same vote to the *same* client if that client has selected more than one set of voting criteria in response to the varying investment objectives of its own clients. For example, ISS may advise clients using its benchmark voting policy to vote for a certain proposal, while advising clients who employ sustainability-based or faith-based voting criteria to vote against that same proposal. ISS's role is not to advocate for the passage or defeat of any particular ballot proposal but to instead help its clients make fully informed voting decisions in light of their individual priorities and objectives. *Id.*

**B. Proxy voting advice is comprehensively regulated under the Advisers Act.**

The fact that ISS does not solicit proxies hardly means it lacks regulatory oversight. Quite the opposite. The Advisers Act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities, or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities …." 15 U.S.C. §80b-2(a)(11). In short, an investment adviser is someone who is paid to advise others about securities. ISS is a registered investment adviser, and the Commission has

acknowledged that proxy advisers are subject to the Advisers Act. *See* 85 Fed. Reg. at 55086 (proxy advisers "meet the definition of an investment adviser unless an exclusion applies"); *Concept Release on the U.S. Proxy System*, 75 Fed. Reg. 42982, 43010 (Jul. 22, 2010) ("Concept Release").

Investment advisers are subject to a comprehensive scheme of regulation under the Advisers Act. In particular, the Act establishes a federal fiduciary standard of conduct for investment advisers based on equitable common law principles. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963). This fiduciary standard is comprised of duties of care and loyalty. The duty of loyalty requires an adviser to act in the best interests of its clients and not to place its own interests ahead of its clients' interests. *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 84 Fed. Reg. 33669, 33670-71 (Jul. 12, 2019). And an investment adviser's duty of care requires it to, among other things, "conduct an investigation reasonably designed to ensure that its voting determination is not based on materially inaccurate or incomplete information." *Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers*, SEC Rel. No. IA-5325 (Aug. 21, 2019) at 4.

Investment advisers must also: (1) maintain and regularly test a comprehensive compliance program that includes policies and procedures reasonably designed to (i) eliminate—or manage and disclose—conflicts of interest, and (ii) ensure that proxies are voted in their clients' best interests, 17 C.F.R. §§275.206(4)-6, 275.206(4)-7; (2) fully disclose to clients the methodologies used in rendering investment advice, *id.* at §275.203-1, Form ADV; and (3) maintain a comprehensive set of books and records and to submit to the SEC's periodic examination of that information, *id.* at §275.204-2. The Advisers Act also establishes an antifraud standard that make it unlawful for an adviser "to employ any device, scheme, or artifice to defraud any client or prospective client," or "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. §80b-6(1)-(2). Under that standard, an adviser must "disclose

material facts to his clients whenever the failure to do so would … operate as a fraud or deceit upon any client or prospective client." *Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services,* 52 Fed. Reg. 38400, 38404 (Oct. 16, 1987). The Commission has made clear that the Advisers Act's fiduciary standard of conduct, and the regulations the Commission has promulgated thereunder, apply to any person that meets the definition of investment adviser, regardless of whether that person has registered with the Commission. *See* Concept Release, 75 Fed. Reg. at 43010.

## III. The Commission Has Never Before Regulated Proxy Advice as Proxy Solicitation.

Until the Commission issued the Proxy Guidance in August 2019, independent proxy voting advice provided in a fiduciary capacity was never deemed subject to the ill-fitting regulatory regime for proxy solicitation. Consistent with the Exchange Act's clear text and history, the Commission initially adopted a narrow definition of proxy "solicitation" that covered only a request, consent, authorization, or furnishing of a form of proxy. *See Securities and Exchange Commission Release Notice,* 1935 WL 29270 (Sept. 24, 1935). In 1956, the Commission expanded that definition to include the "furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." *See* 17 C.F.R §240.14a-1(*l*). When the Commission adopted this language, it explained that "statements made for the purpose of inducing security holders to give, revoke or withhold a proxy with respect to a matter to be acted upon by security holders of an issuer … *by any person who has solicited or intends to solicit proxies* … may involve a solicitation" in certain circumstances. *See Amendments to Proxy Rules*, 21 Fed. Reg. 577 (Jan. 26, 1956) ("1956 Release") (emphasis added).

In 1964, the Commission released an opinion addressing whether the participation of broker-dealers in the proxy process could constitute a solicitation under the 1956 definition. *See Broker-Dealer Participation in Proxy Solicitations*, 29 Fed. Reg. 341 (Jan. 15, 1964) ("1964 Release"). The opinion stated

that proxy voting advice provided by brokers to investors could constitute a solicitation in very limited circumstances. *Id.* For example, a broker-dealer could be covered by the proxy solicitation rules if he "goes beyond [his] advisory function" and "voluntarily" distributes solicitation-type material "to *persons who have not asked for it* whether they are his customers or not." *Id.* (emphasis added). Conversely, the Commission emphasized that a broker-dealer is *not* engaged in proxy solicitation when he simply gives proxy voting advice "in his capacity as adviser to the customer." *Id.*

In 1979, the Commission adopted an exemption from the proxy rules' information and filing requirements for persons who render financial advice in the ordinary course of business and meet certain conditions. *See* 17 C.F.R. §240.14a-2(b)(3). The 1979 exemption reaffirmed that proxy voting advice provided to an investor upon request is not a "solicitation" under Rule 14a-1. *See Shareholder Communications, Shareholder Participation In the Corporate Electoral Process and Corporate Governance Generally*, 44 Fed. Reg. 68764, 68767 n.11 (Nov. 29, 1979) ("1979 Release") (noting that the rules apply only to "those who participate in the solicitation of proxies"). For example, it stated that, under ordinary circumstances, those who render advice in the course of a fiduciary relationship with an investor are *not* solicitors. *Id.* Furthermore, by titling its discussion of the exemption "Unsolicited Voting Advice Furnished by Financial Advisors," the Commission specified that financial advisors engage in "solicitation" only when they voluntarily distribute soliciting material to *persons who have not asked for it.* *Id.*

In 1992, the Commission announced additional reforms designed to remove "unnecessary government interference in discussions among shareholders" and empower shareholders to challenge corporate management through the proxy voting process. *Regulation of Communications Among Shareholders*, 57 Fed. Reg. 48276 (Oct. 22, 1992) ("1992 Release"). The Commission adopted these measures with the support of the shareholder community and over the objection of the corporate community (which sought many of the same restrictions at issue here). *Id.* at 48278-79.

The 1992 Release recognized that Section 14(a)'s goal is to "prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations." *Id.* at 48277 (quoting *J.I. Case v. Borak*, 377 U.S. 426, 431 (1964)). Importantly, the Commission admitted that the phrase "reasonably calculated to result in the procurement, withholding or revocation of a proxy" in the 1956 definition could be misread to mean "'reasonably calculated' *to influence* a shareholder to give, deny or revoke a proxy," which would extend the proxy rules to disinterested advisers who do not petition shareholders to grant, revoke, or withhold a proxy. *Id.* at 48277-78 (emphasis added). The Commission explained that the "literal breadth of the new definition of solicitation was so great as potentially to turn almost every expression of opinion concerning a publicly-traded corporation into a regulated proxy solicitation." *Id.* at 48278.

The Commission feared that a literal reading of the 1956 definition of "solicitation" could lead to a "distortion of the purposes of the proxy rules." *Id.* To address those concerns, the Commission created a second exemption that applied to persons who do not seek proxy authority and whose only interest in the ballot proposal is a general interest as a shareholder or, in some cases, as an employee of the registrant. *See* Rule 14a-2(b)(1), 17 C.F.R. §240.14a-2(b)(1). But the Commission made no attempt to argue that independent proxy voting advice provided in a fiduciary capacity fell within the text or purpose of the statutory language of Section 14(a).

## IV. The Commission Adopts an Unprecedented Regulatory Framework for Proxy Advice Through the Proxy Solicitation Rules.

### A. The Commission announces through sub-regulatory guidance that proxy voting advice is now proxy solicitation.

In August 2019, the Commission issued a purported "guidance" document that significantly changed the regulatory regime applicable to proxy voting advice. *See* Proxy Guidance, 84 Fed. Reg. at 47416. The Proxy Guidance followed a November 2018 roundtable discussion the Commission hosted on the topic. Notably, none of the roundtable participants recommended additional

regulations. *See* Remarks of Michelle Anderson, Moderator, *Transcript of the Roundtable on the Proxy Process*, 250 (Nov. 15, 2018), bit.ly/2DVAbiO ("Is there anyone on the panel that thinks there should be additional regulation? I haven't heard it yet, and I'm kind of surprised.")

The Proxy Guidance passed by a 3-2 vote over dissents from Commissioners Lee and Jackson. The Commission decreed—for the first time—that all advice rendered by a proxy adviser in the course of a fiduciary relationship with its clients now constitutes proxy "solicitation." 84 Fed. Reg. at 47417 & n.17. The Commission reasoned that proxy advisers engage in solicitation because they "market ... their expertise in researching and analyzing proxy issues for purposes of helping clients make proxy voting determinations." *Id.* at 47418. And it further asserted that proxy advice may be regulated as a solicitation due to "[t]he fact that proxy advisory firms typically provide their recommendations shortly before a shareholder meeting [which] further enhances the likelihood that the recommendations are designed to influence" shareholders' voting decisions. *Id.*

The Commission made no attempt to justify its new interpretation under the text, purpose, or history of Section 14(a) of the Exchange Act. Rather, it asserted that the Proxy Guidance merely reflected existing law. Commissioner Lee argued in dissent that the new interpretation would "create serious risks to our system of corporate democracy by adding cost, adding time pressure, and potentially compromising the independence of voting recommendations." Statement of Comm'r Allison Herren Lee (Aug. 21, 2019), bit.ly/34n8Osw.

On October 31, 2019, ISS filed a complaint in this Court challenging the Proxy Guidance under the Administrative Procedure Act. ISS argued that the Proxy Guidance was contrary to law because it impermissibly treated proxy voting advice as proxy solicitation; was arbitrary and capricious because it silently departed from longstanding precedent and failed to consider important aspects of the supposed problem; and was procedurally invalid because it was a substantive rule issued without observance of notice-and-comment procedures.

In November 2019, the Commission published a notice of proposed rulemaking that proposed formalizing the new interpretation set forth in the Proxy Guidance. *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, 84 Fed. Reg. 66518 (Dec. 4, 2019) ("Proposed Rules"). Based on the redefinition of proxy advice as proxy solicitation, the Commission proposed several burdensome new restrictions on proxy advice that would commandeer proxy advisers' speech for the benefit of issuers and subject proxy advisers to potential liability under Rule 14a-9. Because the Proposed Rules implicated many of the same issues that ISS raised in its challenge to the Proxy Guidance, the Court agreed to stay this case pending the outcome of the rulemaking proceeding. *See* Order, ECF No. 14 (Jan. 17, 2020).

## B. The Final Rules

On July 22, 2020, the Commission finalized its new regulatory scheme for proxy advice by a 3-1 vote (one Commissioner seat was vacant at the time). The Final Rules have three basic components: proxy voting advice would now be reclassified as proxy solicitation; proxy advisers would be obligated to share their analysis and vote recommendations with issuers and disseminate issuer responses; and proxy advisers could be subject to new forms of liability under Rule 14a-9.

*First*, the Final Rules formally revise the definition of proxy solicitation to include proxy advice, based largely on the analysis set forth in the Proxy Guidance. Under the Final Rules, proxy solicitation now includes "proxy voting advice that makes a recommendation to a shareholder as to its vote, consent, or authorization on a specific matter" and that "is furnished by a person who markets its expertise as a provider of such advice, separately from other forms of investment advice, and sells such proxy voting advice for a fee." 85 Fed. Reg. at 55091. The new definition of solicitation contains an exemption for proxy voting advice provided in response to an unprompted request, but this exemption is unavailable to a proxy adviser that "market[s] its expertise as a provider of such proxy voting advice, separately from other forms of investment advice." *Id.* at 55095-96.

*Second*, having redefined proxy solicitation to include proxy advice, the Commission imposed significant new regulatory burdens on proxy advice and proxy advisers. The Final Rules amend the conditions under which proxy solicitation—now redefined to include proxy advice—may be exempt from the proxy rules' burdensome information and filing requirements. Under the Final Rules, proxy advisers must satisfy three new requirements to qualify for an exemption. The first condition—added as 14a-2(b)(9)(i)—relates to conflict-of-interest disclosures and largely duplicates the Advisers Act's regulation of that issue. *Id.* at 55098-55101. The second condition—added as 14a-2(b)(9)(ii)—requires proxy advisers to provide their reports to corporate issuers before or at the same time they deliver them to their clients. *Id.* at 55107-12. The final condition—added as 14a-2(b)(9)(iii)—requires proxy advisers to develop "written policies and procedures reasonably designed to inform clients who have received proxy voting advice" about an issuer's "views regarding such advice" before any voting occurs. *Id.* at 55112-15. Simply put, the Final Rules require proxy advisers to share their reports and recommendations with issuers and then disseminate the issuer's "views" to their clients, even if those views are contrary to the proxy advisers' analysis and recommendations.

*Third*, the Commission expanded the scope of potential liability for proxy advice by amending Rule 14a-9 to include examples of information that, if omitted from proxy advice, could serve as the basis of anti-fraud claims against a proxy adviser. Problematic omissions include details about the proxy adviser's methodology, its sources of information, or its conflicts of interest, among others. *Id.* at 55121. The Commission based this amendment on the Proxy Guidance, which indicated that a proxy adviser could be sued for its "opinions, reasons, recommendations, or beliefs." 84 Fed. Reg. at 47419. In response to commenters' concerns, the Commission stated that the "amendment does not make *mere differences of opinion* actionable," 85 Fed. Reg. at 55121 (emphasis added), but it did not explicitly disavow its statement in the Proxy Guidance that Rule 14a-9 could be implicated by "opinions, recommendations, or similar views." 84 Fed. Reg. at 47416.

The Commission's rationale for adopting all of these intrusive new rules was tenuous, to put it mildly. Investors—the purported beneficiaries of the new rules—overwhelmingly *opposed* the changes. Nearly all of the support for the rules came from large, publicly traded companies and industry groups who, unsurprisingly, wanted to give more power to corporate management in the proxy process. The Proposed Rules suggested that the regulatory changes were needed to address "inaccurate or incomplete" proxy advice, 84 Fed. Reg. at 66520, but the Final Rules abandoned that rationale after numerous commenters explained why it was unfounded, *see* 85 Fed. Reg. at 55107. The Proposed Rules also relied on individual comments from so-called "main street investors," 84 Fed. Reg. at 66520, but the Final Rules disavowed that reliance as well after many of those comments were exposed as fake, *see* 85 Fed. Reg. at 55091 n.123. At bottom, the Commission's primary basis for adopting an entirely new regulatory framework for proxy voting advice was an amorphous desire to facilitate "investor access to enhanced discussion of proxy voting matters." *Id.* at 55107.

Commissioner Lee again dissented, arguing that the Final Rules were "unwarranted, unwanted, and unworkable." Statement of Comm'r Allison Lee (July 22, 2020) ("Lee Dissent"), bit.ly/2R92vkL. She found any concerns about the "accuracy and soundness" of proxy voting advice to be "unwarranted" and "not sufficient to justify the forced consideration of issuer views that these rules require." *Id.* She emphasized that "[t]hese rules are not wanted by those they purport to benefit," and that "there was almost universal opposition from investors, the supposed beneficiaries of this rulemaking." *Id.* And, finally, Commissioner Lee noted that the new review-and-response provision of the Final Rules will lead to "uncertainty and delays" in providing proxy advice, all "to solve a problem that we have not established exists." *Id.*

On August 17, 2020, this Court accepted the parties' joint proposal to reactivate this case, under which ISS would file an amended complaint to add its challenge to the Final Rules and the parties would proceed directly to summary judgment.

Summary judgment is required if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the administrative-law context, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Itserve All., Inc. v. Cissna*, 443 F. Supp. 3d 14, 30 (D.D.C. 2020). Under the APA, courts "shall ... hold unlawful and set aside agency action ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... contrary to constitutional right, [or] in excess of statutory jurisdiction." 5 U.S.C. §706(2)(A)-(C).

## ARGUMENT

I.   **The SEC's Attempt to Regulate Independent Proxy Voting Advice as Proxy Solicitation Is Contrary to Law.**

A.   **The Commission's redefinition of proxy advice as proxy solicitation is foreclosed by the plain text of Section 14(a).**

Because "an agency literally has no power to act … unless and until Congress confers power on it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), "all agency actions beyond delegated authority are *ultra vires* and should be invalidated," *Itserve*, 443 F. Supp. 3d at 30 (citing *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992)). The "task [of] a reviewing court is not to assess the wisdom of [challenged] regulations, but rather to determine whether the Commission has demonstrated that the regulations fall within the scope of its statutory grant of authority." *Verizon v. FCC*, 740 F.3d 623, 634-35 (D.C. Cir. 2014); *see also Am. Library Ass'n. v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005) (agency's "power to promulgate legislative regulations is limited to the scope of the authority Congress has delegated to it").

When assessing the validity of an agency action, "the court must determine 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end

of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron U.S.A, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)). "Supreme Court precedent emphatically establishes that courts must take statutory language at its word. Doing so requires courts to start with the statutory text, and to end there as well when, as here, the statute speaks clearly." *Allegheny Def. Project v. Fed. Energy Regul. Comm'n*, 964 F.3d 1, 18 (D.C. Cir. 2020) (en banc) (citing *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020)).

      1.      Section 14(a) of the Exchange Act makes it "unlawful for any person … in contravention of such rules as the Commission may prescribe … to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security …" 15 U.S.C. §78n(a). There is no ambiguity about whether Congress authorized the Commission to regulate independent proxy voting advice through a statute that governs proxy "solicit[ation]." It did not.

      "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning … at the time Congress enacted the statute." *Perrin v. United States*, 444 U.S. 37, 42 (1979). When Congress enacted Section 14(a) in 1934, the plain meaning of "solicit" was to "[i]nvite, make appeals or requests to, importune." The Concise Oxford Dictionary of Current English, 1150 (1931); *see also* Black's Law Dictionary (3d ed. 1933) (defining "solicit" as "[t]o ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, to invite"). Contemporaneous judicial decisions also embrace this plain meaning of "solicit." The Supreme Court of Ohio noted that "[t]he word solicit is defined in the standard dictionaries as meaning: 'to apply to for obtaining something;' 'to try to obtain;' 'to seek to acquire,' etc.'" *Kiefer v. State*, 106 Ohio St. 285, 290 (1922). The Illinois Supreme Court likewise observed that the "universally understood" definition of "solicit" is to "to make petition to, to entreat, importune" or to "endeavor to obtain by asking or pleading." *People v. Rice*, 383 Ill. 584, 588

(1943); *see also Carter v. State*, 81 Ark. 37 (1906) ("solicit" defined as "[t]o importune, entreat, implore, ask, attempt, [or] try to obtain").

Reading Section 14(a) consistent with its ordinary, contemporaneous meaning, "solicit any proxy" plainly refers to actions taken by a person who seeks to *achieve a certain outcome* in a proxy vote. A solicitor—one who "endeavors to obtain" something by "asking or pleading"—necessarily has a certain objective or goal (*e.g.*, to make a sale, win a vote, raise money for charity, etc.) and engages in solicitation in an attempt to *achieve* that objective. The phrase "solicit any proxy" thus has a clear and unambiguous meaning: to seek proxy authority or ask a shareholder to vote a certain way in order to achieve a specific outcome in a shareholder vote.

Proxy *advice* is fundamentally distinct from proxy *solicitation*. Independent proxy advisers like ISS do not seek to support one side or the other in a contested proxy vote and are indifferent to the ultimate outcome of the vote. *See supra* at 6-7. Instead, they provide independent advice, analysis, and recommendations to help inform their clients' decisions about how to vote. This distinction is self-evident from the plain meaning of "advise," as well as the plain meaning of "solicit." The contemporaneous definition of "advise" was "[t]o give an opinion or counsel, or recommend a plan or course of action." Black's Law Dictionary (3d ed. 1933) at 68. That meaning remains the same today, and it precisely describes what ISS does. No one familiar with the English language would use "advised" as a substitute for "solicited," or vice versa. *Compare* Roget's 21st Century Thesaurus (3d ed. 2013) (synonyms for "solicit" include "seek," "beg," "beseech," "demand," "implore," "importune," "pray," and "supplicate") *with id.* (synonyms for "advise" include "admonish," "point out," "recommend," "suggest," and "warn").

**2.** Notably, the Commission does not even attempt to argue that Section 14(a) unambiguously grants it authority to regulate independent proxy advice through the proxy solicitation rules. At most, the Commission strains to cast the law as ambiguous to avail itself of agency deference.

*See* 85 Fed. Reg. at 55092 ("[N]othing in either the text or legislative history of Section 14(a) indicates that Congress intended to limit its scope to solicitations conducted by those parties.").

The Commission's handful of textual theories about why independent proxy voting advice can be regulated as proxy solicitation all lack merit. Based on a single dictionary from 1934, the Commission asserts that "solicit" could also mean "[t]o move to action," to "urge," and to "insist upon." *Id.* at 55092 & n.137. But the Commission neglects to mention that this dictionary labeled those definitions "rare." Webster's New International Dictionary (2d ed. 1934). The definitions that Webster's does *not* list as "rare" are the exact ones cited above: "to make petition to," "to entreat," "importune," "to endeavor to obtain by asking or pleading," "to plead for," "to tempt," "to lure on," and "to attract." *Id.* In all events, Supreme Court precedent is clear that a word with a well-established meaning does not become ambiguous just because the agency can find one alternative definition that might support its position if you squint hard enough. *See, e.g., MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225-226 (1994).

The Commission further asserts that proxy advisers "solicit[ ] a proxy by influencing a shareholder to act" in a certain way. 85 Fed. Reg. at 55092. Relatedly, the Commission suggests that proxy voting advice may be deemed a solicitation because its temporal proximity to shareholder meetings "enhance[s] the likelihood that [advisers'] recommendations will influence" investors' voting decisions. *Id.* at 55088. Those theories, however, remain unmoored from the plain meaning of "solicit." There is no question that a proxy adviser's recommendations might "influence" the decisions of the investor-client. Why else would the investor hire the proxy adviser? But the fact that the adviser's recommendations might *influence* the voting decision does not convert that recommendation into a *solicitation* of a particular outcome in the proxy vote. Consider another scenario in which a philanthropist calls a trusted friend for advice about whether a certain charity is a worthy cause. That friend might heartily endorse the charity and urge the philanthropist to contribute. But no reasonable

speaker of English would describe this interaction as the friend "soliciting" charitable contributions, even if the friend's recommendation *influenced* the ultimate decision. The influence or persuasiveness of a particular piece of advice has no bearing on whether providing that advice is itself a solicitation.

The Commission next contends that proxy advisers are engaged in solicitation because their provision of proxy advice has been "invited and encouraged by such business's marketing, offering, and selling" of its services. 85 Fed. Reg. at 55095; *see also id.* at 55091 (noting that a proxy adviser "markets its expertise as a provider of such [voting] advice"). But that theory is doubly flawed as a textual matter. First, the statutory text applies only to persons who "solicit *any proxy.*" To the extent a proxy adviser markets its expertise to potential clients, the adviser may be soliciting new *business* but is not soliciting "any proxy" (*i.e.,* is not seeking a certain outcome in any particular vote). Second, even if the Commission had some statutory authority to regulate proxy advisers based on their solicitation of new clients—which it does not—that still would not provide authority for the rules the Commission ultimately adopted. The Final Rules do not regulate proxy advisers' solicitation of new business or how they market their expertise to potential clients. Instead, those rules impose onerous new requirements on the *advice* proxy advisers provide to their clients. Thus, even under the Commission's own theory, there is a fundamental mismatch between the statutory authority it claims and the rules it ultimately promulgated.

The Commission also resists the plain meaning of "solicit any proxy" on the ground that whether a solicitation occurs does not depend on the "*subjective intent* to obtain a proxy, but rather the effect on a [shareholder's] proxy vote." *Id.* at 55092 (emphasis added). But that argument is a red herring. Whether one is soliciting a proxy vote, a charitable contribution, or a new client, the word "solicit" necessarily connotes that the solicitor has a specific goal he is seeking to achieve. That basic reality is unchanged regardless of whether the inquiry is "objective" (would a reasonable person think this was solicitation?) or "subjective" (did this particular person intend to engage in solicitation?).

Someone who "solicits" necessarily does so in pursuit of a particular goal or objective, and any suggestion to the contrary is simply not consistent with the historical or current meaning of that word.

The cases the Commission cites are no more helpful to its position. *See id.* at 55093 & n.142-145. For example, *Long Island Lighting Co. v. Barbash*, 779 F.2d 793 (2d Cir. 1985), merely held that a shareholder who "initiated a proxy contest" to *elect his preferred slate of directors* remained covered by the proxy rules even though he was engaging in solicitation through public advertising rather than direct communication with shareholders. The court explained that the proxy rules "apply not only to direct requests to furnish, revoke or withhold proxies, but also to communications which may indirectly *accomplish such a result* or constitute a step in a chain of communications designed ultimately to *accomplish such a result.*" *Id.* at 796 (emphasis added). If anything, the court's reasoning undermines the Commission's position, as it makes clear that a proxy solicitation—whether direct or indirect— must be designed to "accomplish" a certain "result." Similarly, in *Gas Nat. Inc. v. Osborne*, 624 Fed. Appx. 944 (6th Cir. 2015), the court found a solicitation where the former CEO of a company sent a letter to shareholders in which he criticized its current board and asked for shareholders' help in "running these greedy individuals out of our company." *Id.* at 951. The court concluded that "[f]airly read, the letter can be understood as *requesting shareholders to withhold or revoke proxies* for the then upcoming … shareholder meeting at which directors would be elected." *Id.* (emphasis added). These cases do not remotely support treating disinterested proxy voting advice as a solicitation.[3]

The Commission's last shot at a textual theory is to assert that Congress delegated it "broad authority" to "prescribe rules and regulations to govern proxy solicitations as necessary or appropriate in the public interest and to protect investors in the proxy voting process." 85 Fed. Reg. at 55088. But

---

[3] *See also Capital Real Estate Invr's v. Schwartzberg*, 917 F. Supp. 1050, 1059 (S.D.N.Y. 1996) (finding proxy solicitation where a disgruntled former business partner issued inflammatory press releases with the "goal" of defeating a merger and supplanting current management).

that is still no answer to the fundamental problem with the Commission's theory: even this grant of rulemaking authority is contained within a provision that limits its coverage to persons who "solicit any proxy." 15 U.S.C. §78n(a)(1). As the D.C. Circuit recently reminded the Commission, "the mere reference to necessary or appropriate in a statutory provision authorizing an agency to engage in rulemaking does not afford the agency authority to adopt regulations as it sees fit." *N.Y. Stock Exch. v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020). And, as this Court has recognized, "that an agency has broad authority in a realm does not give it license to ignore Congress's specific directions or restrictions on its authority." *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 29 (D.D.C. 2018). Even if the Commission were right that the Exchange Act is merely silent about proxy voting advice, "[a]n agency's general rulemaking authority plus statutory silence" does not "equal congressional authorization." *Merck & Co., Inc. v. U.S. Dept. Health & Human Servs.*, 385 F. Supp. 3d 81, 92 (D.D.C. 2019) (Mehta, J.). "An agency cannot appropriate the power to regulate simply because Congress has not explicitly taken that power away." *Id.* at 94.

### B. The Commission's new interpretation of proxy solicitation is unreasonable even if the statutory text is ambiguous.

The plain meaning of "solicit any proxy" is sufficient to resolve this case because it unambiguously forecloses the SEC's position. But even if this Court found some ambiguity, the SEC's construction of the Exchange Act must be rejected as unreasonable. To avail itself of the deference provided by the second step of *Chevron*, an agency must "engage in reasoned analysis." *Good Fortune Shipping, SA v. Comm'r of Internal Revenue Serv.*, 897 F.3d 256, 263 (D.C. Cir. 2018). "Whether an agency's construction is reasonable depends, in part, on the construction's fit with the statutory language, as well as its conformity to statutory purposes." *Id.* at 262. Put differently, *Chevron* "step two asks whether the same statutory text, history, and purpose [considered in *Chevron* step one] *permit* the interpretation chosen by the agency." *Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of Treasury*, 392 F. Supp. 3d 22, 42 (D.D.C. 2019).

Here, any attempt to shoehorn independent proxy voting advice into a statutory provision regulating proxy solicitation "twists the language of the statute and defeats the purposes of Congress." *New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 136 (D.D.C. 2019). Congress enacted Section 14(a) to eliminate the kinds of abuses that were deemed to have contributed to the stock market crash of 1929 and the Great Depression. Section 14(a) reflects Congress's belief that "[a] renewal of investors' confidence in the exchange markets can be effected only by a clearer recognition upon the part of the corporate managers of companies whose securities are publicly held of their responsibilities as trustees for their corporations." H.R. Rep. No. 73-1383 at 13.

Congress's goal in authorizing the Commission to regulate proxy solicitation was to prevent *self-interested parties* from exerting undue influence over the proxy voting process, to avoid "the recurrence of abuses which have frustrated the free exercise of the voting rights of shareholders." *Id.* at 13-14. To that end, Congress was specifically concerned about two classes of individuals:

> It is contemplated that the rules and regulations promulgated by the Commission will protect investors from promiscuous solicitation of their proxies, on the one hand, by *irresponsible outsiders seeking to wrest control of a corporation* away from honest and conscientious corporation officials; and on the other hand, by *unscrupulous corporate officials seeking to retain control of the management* by concealing and distorting facts.

S. Rep. No. 73-1455 at 77 (emphasis added). There is a clear risk of abuse when "irresponsible outsiders" or "unscrupulous corporate officials" engage in proxy solicitation in an attempt to sway the outcome of a shareholder vote. *Id.*; *see also J.I. Case*, 377 U.S. at 431 (goal of Section 14(a) is to "prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations"). But those concerns are inapposite in the context of independent proxy advisers who are indifferent to the outcome of a vote and whose sole objective is to help their clients make informed voting decisions based on *the clients'* objectives and voting criteria.

Moreover, Section 14(a) was enacted in 1934 and ISS—the world's largest proxy adviser—has been in business since 1985. Yet it was only in 2019 that the Commission first attempted to invoke

the solicitation rules to regulate proxy voting advice provided to investors in a fiduciary capacity. In *Merck*, this Court was justifiably skeptical of an agency's sudden discovery of an allegedly long-extant power. *See* 385 F. Supp. 3d at 97 ("[I]t is not lost on the court that HHS has never before attempted to use the SSA to directly regulate the market for pharmaceuticals."); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism."); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012) ("[W]hile it may be possible for an entire industry to be in violation of [a federal law] for a long time without [an agency] noticing, the more plausible hypothesis is that the [agency] did not think the industry's practice was unlawful.").

Finally, "[t]he analysis of [a] disputed agency action under *Chevron* Step Two and arbitrary and capricious review is often 'the same, because under *Chevron* Step Two, the court asks whether an agency interpretation is arbitrary and capricious in substance.'" *Agape Church v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013). For the reasons set forth below, the Final Rules flunk arbitrary and capricious review several times over and should therefore receive no deference from this Court.

\* \* \*

In sum, the Commission's attempt to regulate independent proxy voting advice as a proxy solicitation fails at the starting gate because the Commission's position contravenes the plain text, purpose, and history of Section 14(a)—and is, at a minimum, unreasonable. Because the Final Rules and Proxy Guidance were premised on the Commission's finding that proxy advice could be regulated under the solicitation rules, both agency actions must be set aside for this reason alone.

## II.     The Final Rules and Proxy Guidance Are Arbitrary and Capricious.

### A.  The Commission has never articulated a reasonable basis for creating an intrusive and burdensome new regulatory scheme for proxy voting advice.

The APA requires courts to invalidate and set aside "arbitrary or capricious" agency actions. 5 U.S.C. §706(2)(A). An agency's failure to "articulate a satisfactory explanation for its action," or to "consider an important aspect of the problem," is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency must offer "a rational connection between the facts found and the choice made." *Id.* "This requirement allows courts to assess whether the agency has promulgated an arbitrary and capricious rule by entirely failing to consider an important aspect of the problem or offering an explanation for its decision that runs counter to the evidence before it." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383-84 (2020). "Rules are not adopted in search of regulatory problems to solve; they are adopted to correct problems with existing regulatory requirements that an agency has delegated authority to address." *N.Y. Stock Exch.*, 962 F.3d at 556-57. The Final Rules are the definition of a solution in search of a problem. The Commission's rationale for why these rules were needed at all is vanishingly thin and does not come close to showing that the agency engaged in reasoned decisionmaking.

At the outset, it should be a major red flag that investors—the direct consumers of proxy voting advice and purported beneficiaries of the Commission's new rules, *see* 85 Fed. Reg. at 55088, 55092—overwhelmingly *opposed* any additional regulation of proxy advisers. *See* Lee Dissent, *supra* (noting "almost universal opposition from investors"). The Proposed Rules drew widespread opposition from all corners of the investment community, including public pension plans,[4] mutual

---

[4] *See e.g.,* Comments from New York State Comptroller; Ohio Public Employees Retirement System; Colorado Public Employees' Retirement Association; California State Teachers' Retirement System; California Public Employee Retirement System; RailPen.

funds,[5] hedge funds,[6] investor trade associations,[7] other investment advisers,[8] labor groups,[9] faith-based groups,[10] and even a majority of the Commission's own Investor Advisory Committee.[11]

For example, the Council of Institutional Investors, whose members have approximately $4 trillion of assets under management, stated in no uncertain terms that "most of the paying customers of proxy voting advice businesses—institutional investors—*have not asked for and do not support* the SEC establishing a new regulatory framework and forcing a significant change to the industry's business model." Council of Institutional Investors Comments (Jan. 30, 2020) at 9 ("CII Comments") (emphasis added). Similarly, CalPERS—the largest defined-benefit pension fund in the U.S., with more than $400 billion in assets—argued that the new rules "would make the process more complicated and expensive for clients/customers that use proxy advisor research services without materially improving the quality, quantity, or timeliness of information." CalPERS Comments at 1.[12] Even the Commission's own Investor Advocate questioned the need for these rules, asserting that "the prevailing view of institutional investors … is that the proxy advisory firms perform essential services relatively well, and that there is no market failure warranting further regulatory intervention."

---

[5] *See, e.g.*, Comments of T. Rowe Price; Everence and the Praxis Mutual Funds.

[6] *See, e.g.*, Comments of Elliott Management Corporation; BlackRock, Inc.

[7] *See, e.g.*, Comments of Council of Institutional Investors; Investment Adviser Association; Investment Company Institute; CFA Institute; North American Securities Administrators Association.

[8] *See, e.g.*, Comments of Boston Trust Walden; Rockefeller Asset Management; Neuberger Berman; Dana Investment Advisors; First Eagle Investment Management; and AllianceBernstein.

[9] *See, e.g.*, Comments of AFL-CIO.

[10] *See, e.g.*, Comments from Ursuline Convent of the Sacred Heart; The Episcopal Church; Dominicans of Sinsinawa; United Church Funds; and Interfaith Center on Corporate Responsibility.

[11] *See* Comments from SEC Investor Advisory Committee; J. Coates, Professor of Law and Economics, Harvard Law School and Barbara Roper, Consumer Federation of America.

[12] *See also, e.g.*, Comments of Sisters of Notre Dame Base Community Unit at 1 ("[T]he Rule Changes proposed are attempts to stamp out problems that don't exist and using a sledgehammer to do so."); Seattle City Employees' Retirement System at 1 (proposed rules "offer nothing of value").

Rick A. Fleming, SEC Investor Advocate, Report on Activities for FY 2019 at 5, (Dec. 19, 2019), bit.ly/31Er3Im.

The handful of commenters that supported the core components of the new rules—which require proxy advisers to share their recommendations with issuers and disseminate issuers' responses—were overwhelmingly large corporations and their representatives, not investors or consumers. *See* 85 Fed. Reg. at 55103 n.253 (collecting comments supporting issuer-review provisions); *id.* at 55106 n.303 (collecting comments supporting issuer-response provisions). It is understandable that corporations would want to limit independent criticism of management-backed proposals. But those self-interested comments are plainly insufficient to show that the Commission's rules were needed to protect the *investing public* from some problem with proxy voting advice.

So why did the Commission actually think these new rules were needed? The explanation kept shifting. When it announced the Proposed Rules, the Commission stated that it was "concerned about the risk of proxy voting advice businesses providing inaccurate or incomplete voting advice …." 84 Fed. Reg. at 66520, 66528. But that rationale was thoroughly debunked in the rulemaking record. *See* 85 Fed. Reg. 55104 n.265 (collecting comments arguing that there was "an absence of compelling evidence of frequent errors or significant deficiencies in proxy voting advice"). The Council of Institutional Investors comprehensively analyzed the allegations of so-called "errors and inaccuracies" and found them to be "unfounded and misleading." CII Letter re Data Analysis (Feb. 4, 2020); *see also* CII Comments 20-24, 46-47; Carl Icahn Comments at 4 ("These claims of errors … seem more like proof of the absence of a problem rather than the basis for regulation."); Florida State Board of Administration Comments at 3-4 (pension fund has "not encountered a single error that was … significant"). For example, what Exxon called "weaknesses" in proxy advice typically just involved "a different perspective … on how executive pay should be analyzed." CII Comments at 22. Proxy advisers recommend that their clients vote with management approximately 85% of the time, and

"when a company loses a vote it isn't because of an error by a proxy adviser" but because management has "not addressed a major concern that needs to be addressed." CalPERS Comments at 5-6.

In the Final Rules, the Commission acknowledged the numerous critiques of its "errors and inaccuracies" theory, 85 Fed. Reg. 55104 n.265, but made no attempt to rebut or respond to those critiques. *See also id.* at 55125 (conceding that research about "the quality of voting advice" provided by proxy advisers is "inconclusive"). The Commission ultimately backtracked from that theory, asserting that "the proposed amendments were not motivated *solely* by the Commission's interest in the factual accuracy of proxy voting advice." *Id.* at 55107 (emphasis added). Yet, despite its non-response to the many critiques of the "errors and inaccuracies" theory, the Commission arbitrarily continued to insist that the Final Rules were needed to ensure investors receive "accurate" information when making voting decisions. *Id.* at 55082, 55084-85, 55093, 55102, 55107-09, 55114, 55118, 55122, 55126, 55128, 55131-32, 55140-42.

The Proposed Rules also relied on a number of individual comments from so-called "main street investors." 84 Fed. Reg. at 66520 n.24. The Chairman featured those comments prominently in his announcement of the rulemaking, stating that "[s]ome of the letters that struck me the most … came from long-term Main Street Investors, including an Army veteran and a Marine veteran, a police officer, a retired teacher, a public servant, a single mom, a couple of retirees who saved for retirement, all of whom expressed concerns about the current proxy process." Statement of Chairman Jay Clayton, *Open Meeting on Proposals to Enhance the Accuracy, Transparency and Effectiveness of Our Proxy Voting System* (Nov. 5, 2019), bit.ly/3fUf51c. Those "main street investor" comments, however, turned out to be fake. A reporter who contacted the signatories found that most had never even heard of this rulemaking. *See* Zachary Mider & Ben Elgin, *SEC Chairman Cites Fishy Letters in Support of Policy Change*, Bloomberg News (Nov. 19, 2019), bloom.bg/31OdaGq. After those comments were exposed as

fraudulent, the Commission sheepishly disavowed any reliance on them and insisted that the Final Rules did not "rest on those letters or their validity." 85 Fed. Reg. at 55091 n.123.

With no meaningful support from investors, with no actual evidence of significant errors in proxy advice, and with the letters prominently cited by the Chairman shown to be fakes, the Commission's rationale for promulgating these intrusive new rules boiled down to an amorphous interest in promoting "investor access to enhanced discussion of proxy voting matters." *Id.* at 55107. But that vague invocation of the need for "enhanced discussion" cannot justify the new rules, as the Commission "presented no evidence that [the problem it purported to solve] is ever seen in practice." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150 (D.C. Cir. 2011); *see also N.Y. Stock Exch.*, 962 F.3d at 556 (regulations "must be designed to address identified problems"). Although agencies have some leeway in making predictive judgments, a regulation must be based on something more than "sheer speculation." *Sorenson Comm'cns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014); *see also Bus. Roundtable*, 647 F.3d at 1149-50 (agency must "support its predictive judgments" with actual evidence). The Commission also has a "unique obligation" under the Exchange Act to "consider the effect of a new rule upon efficiency, competition and capital formation." *Bus. Roundtable*, 647 F.3d at 1148 (citing 15 U.S.C. §§78c(f), 78w(a)(2)).

The Commission's analysis of the purported benefits of the Final Rules is based on little more than conjecture and speculation. According to the Commission, the "clients of proxy voting advice businesses"—*i.e.*, the investors who almost uniformly *opposed* the new rules—"may benefit from the availability of additional information [provided by issuers] upon which to base their voting decision." 85 Fed. Reg. at 55136. But much of the Commission's analysis of the purported benefits of these rules "remain[ed] qualitative in nature," *id.* at 55123, and was based on concededly "theoretical" concerns, *see, e.g., id.* at 55124 ("Recent theoretical research on the role of proxy voting advice suggests that the

presence of proxy voting advice businesses may induce investors to over-rely on information produced by these businesses to make voting decisions.").

The Commission touted the benefits of the Final Rules in qualitative terms because it lacked "the necessary data" to quantify their effects. *Id.* at 55122; *see also id.* at 55123 ("many of the economic effects of the amendments cannot be reliably quantified"). But the Commission simultaneously downplayed the cost of the new rules because those costs were "difficult to quantify." *Id.* at 55137; *see also id.* at 55136 ("we do not have data that would allow us to estimate the costs associated with" implementing the issuer-review and issuer-response rules). The Commission cannot have it both ways. It is not "entitled to count unquantifiable and uncertain benefits on one side of the ledger but ignore them on the other." *State of N.Y. v. Scalia*, No. 1:20-CV-1689-GHW, 2020 WL 5370871, at *33 (S.D.N.Y. Sept. 8, 2020). To the contrary, it "must make more than a perfunctory attempt to consider important costs" and "explain why the benefits of the new rule outweigh those costs." *Id.*; *see also Bus. Roundtable*, 647 F.3d at 1148-49 (invalidating SEC rule that "failed adequately to quantify" costs and "economic effects"). In short, the Commission did not put forth "any reliable information about the possible benefits" of the new rules, Kempen Capital Management Comments at 2, and instead offered "evidence-free wishful thinking as a … counterpoint to the significant real costs" imposed on advisers and investors, Shareholder Ass'n for Research & Education Comments at 3; *see also* Coates & Roper Comments at 3 (Commission used "inconsistent and unreliable estimates" of costs and benefits).

Finally, rather than measuring the economic effects of the Final Rules by comparing them to the *status quo ante*, the Commission used the August 2019 Proxy Guidance as the "appropriate baseline" for comparison. 85 Fed. Reg. at 55126, 55131-32. In essence, the Commission: (1) altered the status quo through a sub-regulatory guidance document issued without notice and comment that was promptly challenged in court; (2) proposed to codify and expand upon that guidance through a proposed rule; and then (3) used the *very same guidance it sought to codify* as the baseline for comparing the

effects of the proposed rule to "existing regulatory requirements." *Id.* The Commission "acted arbitrarily and capriciously" by "inconsistently and opportunistically fram[ing] the costs and benefits of the rule." *Bus. Roundtable*, 647 F.3d at 1144.

### B. The Commission failed to adequately explain why the Advisers Act insufficiently regulates proxy voting advice.

The Final Rules are not just solutions in search of a problem—they also would impose duplicative burdens on activities that are already comprehensively regulated elsewhere. In *American Equity Investors Life Insurance Company v. SEC*, the D.C. Circuit held that the Commission acted arbitrarily and capriciously when it expanded oversight of fixed annuity contracts without adequately considering "whether, *under the existing regime*, sufficient protections existed to enable investors to make informed investment decisions and sellers to make suitable recommendations to investors." 613 F.3d 166, 178-79 (D.C. Cir. 2010) (emphasis added). More recently, the D.C. Circuit vacated a rule because "the Commission acted" without sufficiently explaining "what problems with the existing regulatory requirements it meant for the Rule to correct." *N.Y. Stock Exch.*, 962 F.3d at 554; *see also Bus. Roundtable*, 647 F.3d at 1154 (finding rules arbitrary and capricious where "the Commission failed adequately to address whether the regulatory requirements of the [Investment Company Act] reduce the need for, and hence the benefit to be had from," the challenged rules).

Here, the Commission failed to adequately explain in the Final Rules and Proxy Guidance why the Advisers Act is insufficient to address its purported concerns about proxy voting advice. The Advisers Act and its regulations comprehensively regulate ISS and other investment advisers that provide advice about securities in exchange for a fee. *See supra* at 7-9. All of the Commission's purported concerns about proxy voting advice are already addressed under that regulatory framework. For example, the Commission asserts that it has concerns about the quality of proxy voting advice and whether proxy advisers are adequately responding to issuers' views—but the Advisers Act's duty of care already requires every investment adviser to "make a reasonable investigation to determine

that it is not basing its recommendations on materially inaccurate or incomplete information." *Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 83 Fed. Reg. 21203, 21207 n.31 (May 9, 2018). And the Commission expresses concerns about alleged conflicts of interest, 85 Fed. Reg. at 55098-101—but the Advisers Act already requires advisers to maintain and test a compliance program that includes policies and procedures designed to eliminate (or manage and disclose) any such conflicts. 17 C.F.R. §§275.206(4)-6, 275.206(4)-7. Finally, the Commission deems it necessary to subject proxy voting advice to potential liability under Rule 14a-9, *see* 85 Fed. Reg. at 55121, but fails to explain what this new liability adds to the existing antifraud protections of the Advisers Act, *see* 15 U.S.C. §80b-6(1)-(2).

The Commission's only response is a general argument that Congress may provide overlapping regulation. 85 Fed. Reg. at 55085-87. But none of the cited examples involve overlapping regulation of the *same activity*. It is one thing to regulate the same company under different sections of the law that govern different types of activities, but it is wholly another to regulate the very same activity—here, the provision of proxy voting advice—under multiple complex regulatory schemes.

Even the examples the Commission cites do not support its conclusion. For example, Sections 13(d) and 14(a) of the Exchange Act may complement each other but do not regulate the same activity twice. Section 13(d) requires shareholders to make public disclosures when they acquire more than five percent of a class of registered securities, or when they agree to act together with other shareholders for the purpose of acquiring, voting or disposing of such securities. 15 U.S.C. §78m(d). The filing requirements under Section 14(a), on the other hand, are tied to the solicitation of proxies and do *not* depend on whether a shareholder or group of shareholders was obliged to make disclosure under 13(d). Unlike the Final Rules, Sections 13(d) and 14(a) regulate different activities in support of different regulatory objectives and do not subject the same conduct to duplicative regulation.

The Commission's argument in favor of duplicative regulation is further undercut by the fact that the Advisers Act has been expressly designed to avoid such a result. For example, the statute provides exceptions to the definition of "investment adviser" and an exemption from the registration requirements for parties whose advisory activities are already governed by (or are incidental to financial services governed by) another regulatory regime. The Advisers Act provides such exclusions to banks (Section 202(a)(11)(A)); broker-dealers (Section 202(a)(11)(C)); nationally recognized statistical rating organizations (Section 202(a)(11)(F)); and certain advisers who are registered as commodity trading advisers with the Commodity Futures Trading Commission (Section 203(b)(6)). And, in 1996, Congress divided jurisdiction over investment advisers between the Commission and the states for the express purpose of eliminating redundant regulation. *See* National Securities Markets Improvement Act of 1996, Pub. L. No. 104-290, 110 Stat. 3416. The Advisers Act thus reflects a clear preference for *avoiding*—not encouraging—redundant regulation of the same conduct or activity.

In all events, the Commission's overlapping-authority argument is a red herring. The arbitrary-and-capricious standard requires agencies to assess whether a proposed rule is necessary in light of "existing" regulatory frameworks. *See Am. Equity Invs.*, 613 F.3d at 178-79; *N.Y. Stock Exch.*, 962 F.3d at 554. That is, the Commission bore the burden to explain not just why overlapping regulation is permissible in the abstract but *why the current regulatory regime is insufficient*. The Commission utterly failed at that task. The Commission briefly suggested that the Advisers Act is insufficient because it "is a principles-based framework, at the center of which is a federal fiduciary duty to clients that is based on equitable common law principles." 85 Fed. Reg. at 55086. But that argument is hard to square with the Commission's repeated praise for the "flexibility" and "principles-based approach" it was purportedly adopting in the Final Rules. *See, e.g.*, *id.* at 55098-99, 55107-111. The Commission makes no attempt to explain why a "principles-based" approach is a benefit under the proxy solicitation rules but a liability under the Advisers Act.

The Commission also suggested that the Advisers Act is inadequate because, although ISS is a registered investment adviser, two other proxy advisers are not registered under the Act. 85 Fed. Reg. 55086 n.49. As already noted, however, the Advisers Act's fiduciary duties and related regulations apply to all investment advisers, regardless of registration. *See supra* at 9. Either way, if the Commission is concerned that certain proxy advisers are not meeting their obligations under the Advisers Act, the obvious solution is to enforce the Advisers Act against those companies—not to create a redundant regulatory apparatus under the ill-fitting proxy solicitation framework.

In addition to giving short shrift to the Advisers Act, the Commission also failed to adequately explain why market-based solutions could not address the alleged problems it identified. *See* 85 Fed. Reg. at 55125 (collecting numerous comments arguing that "contractual arrangements in the private sector" or "other market based mechanisms" were sufficient to ensure quality of proxy advice). Proxy advisers' clients include many of the world's largest and most sophisticated institutional investors. If those investors are unhappy with the proxy voting advice they are receiving, they can demand better performance, choose not to follow the advice, or hire a different proxy adviser. *See, e.g.,* BMO Global Asset Management Comments at 2 ("We believe that we already have mechanisms in place to ensure the quality of research and accuracy of vote implementation by our proxy adviser."); CII Comments at 5 (Commission "seems to entirely ignore the value of market-based solutions and overvalues highly prescriptive regulation."); Connecticut State Treasurer Comments at 2 (Final Rules "presume a greater undue influence exerted by proxy advisory firms than what is borne out by fact."). The Commission made no attempt to explain why these market-based remedies, especially as supplemented by the Advisers Act's fiduciary duties, were inadequate to address its purported concerns.

## C. The Commission failed to acknowledge that the Final Rules and Proxy Guidance change its longstanding position and upend reliance interests.

Changes to agency policies are not necessarily invalid, but sudden reversals of this nature do require a sufficient explanation. "An agency must show awareness that it *is* changing its position" and

"may not … depart from a prior policy *sub silentio.*" *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009). And when an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy," it must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.*

The Commission characterizes its interpretation of proxy solicitation as "longstanding," "long-held," and "long recognized" at least seventeen times in the Final Rules. *See also* Proxy Guidance, 84 Fed. Reg. at 47418 (describing interpretation as "long-held"). Saying it that often does not make it so. Until the issuance of the Proxy Guidance in August 2019, the Commission had consistently recognized for decades that the 1956 definition of solicitation applied only to persons who offered or requested proxy authority. In 1964 and 1979, the Commission noted that *unsolicited* proxy voting advice could constitute a solicitation, *see* 1979 Release, 44 Fed. Reg. at 48941 n.25 (citing 1964 Release)—but the Commission never suggested that proxy voting advice provided in the course of a fiduciary relationship would be treated as such. And the 1992 Release further explained that:

> The Commission does not seem to have been aware, or to have intended, that the [1956] definition might also sweep within all the regulatory requirements persons who did not request a shareholder to grant or to revoke a deny a proxy, but whose expressed opinions might be found to have been reasonably calculated to affect the views of other shareholders positively or negatively towards a particular company.

1992 Release, 57 Fed. Reg. at 48278.

The alleged concerns that underlie the Final Rules are hardly novel, as the Commission considered and rejected extremely similar arguments in 1992. At that time, the Commission correctly dismissed corporate managers' argument "that disclosure of communications among shareholders is necessary to allow management 'a role to play' in rebutting any misstatements or mischaracterizations, to the benefit of the shareholders as a whole in ensuring that proxies are executed on the basis of 'correct' information." *Id.* The Commission understood that "much commentary concerning corporate performance, management capability or directorial qualifications of the desirability of a

particular initiative subject to a shareholder vote is by its nature judgmental," and therefore "there typically is not a 'correct' viewpoint." *Id.* It observed that "while voting rights are valuable assets and an uninformed exercise of those rights could represent a wasted opportunity for the voting shareholder, that concern *does not justify*" government intrusion into advisers' fiduciary relationships with shareholders. *Id.* (emphasis added). For these reasons and others, the Commission concluded that "[t]he purposes of the proxy rules themselves are better served by promoting free discussion, debate and learning among shareholders and interested persons, than by placing restraints on that process to ensure that management has the ability to address every point raised in the exchange of views." *Id.* at 48279.

The Final Rules also reverse the Commission's prior stance that "[a] regulatory scheme that inserted … corporate management into every exchange and conversation among shareholders [and] their advisers … on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment." *Id.* The Commission now seeks to insert corporate management into private discussions between investment advisers and their clients in precisely the manner it had long believed (for good reason) to be unconstitutional. *See infra* at 37-44.

Finally, the Commission's policy reversals in the Final Rules and Proxy Guidance disregard the significant reliance interests engendered by its prior positions. An agency "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," when it considers whether to change its regulatory positions. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). Proxy advisers' entire business model relies on providing *independent* advice to their clients pursuant to a fiduciary relationship. That independence is the key value they offer to clients, and the chief reason clients hire them. Yet the SEC now wants to compromise that independence by forcing advisers to seek and disseminate issuers' views on their independent advice, with the goal of amplifying issuers' voices while diminishing proxy advisers'.

Agencies must provide a "reasoned explanation" for upending "decades of industry reliance." *Id.* Yet instead of providing a reasoned explanation—or any explanation at all—the Commission "failed to address whether there was legitimate reliance on" its former policies. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). The Commission simply denied that it had made any changes to the meaning of "solicitation" and published new rules without a shred of evidence that they were needed or desirable, disregarding Supreme Court precedent that it is "arbitrary and capricious to ignore such matters." *Id.* In short, the Commission's "scant explanation and casual disregard for its former position," upon which proxy advisers and the investors they serve had relied for decades, "do not satisfy the APA's requirements for rational decisionmaking." *Music Choice v. Copyright Royalty Bd.*, 2020 WL 4782379, at *8 (D.C. Cir. Aug. 18, 2020).

## III. The Amendments to the Proxy Rules Violate the First Amendment.

The new requirements codified in Rule 14a-2(b)(9) are a paradigmatic example of compelled speech and cannot satisfy even the most forgiving level of First Amendment review, much less the demanding standard of strict scrutiny. Those rules impose two new mandates on proxy advisers, which now must: (1) provide their reports to corporate issuers before or at the same time they deliver them to their clients (the "issuer-review" rule), *see* 85 Fed Reg. at 55107-12; and (2) develop "written policies and procedures reasonably designed to inform clients who have received proxy voting advice" about an issuer's "views regarding such advice" before any voting occurs (the "issuer-response" rule), *see id.* at 55112-15. Simply put, the Final Rules require proxy advisers to share their analysis and recommendations with the subjects of that advice and convey issuers' "views" to their clients, even if those views are contrary to the proxy advisers' own analysis and recommendations.

### A. The Final Rules impose content-based and viewpoint-based burdens on proxy advisers' protected speech.

Proxy advisers engage in speech and expression protected by the First Amendment when they provide independent advice, recommendations, and analysis to their clients. This speech addresses

matters of critical importance—including corporate transactions such as mergers and acquisitions, executive compensation, and corporate governance policies—and ensures that investors have "the information needed to hold corporations … accountable." *Citizens United v. FEC*, 558 U.S. 310, 370 (2010). Proxy advisers may also offer their views about corporate proposals' compatibility with an investor's unique voting priorities regarding sustainability, labor relations, social responsibility, or other investor-specific criteria. In short, proxy advisers' communications to their clients are unquestionably "form[s] of expression protected by the Free Speech Clause of the First Amendment." *Sorrell v. IMS Health*, 564 U.S. 552, 557 (2011); *see also NAACP v. Button*, 371 U.S. 415, 438 (1963) (First Amendment protects advice from attorneys to potential litigants about seeking legal assistance); *Legal Servs. Corp. v. Velasquez*, 531 U.S. 533, 546 (2001) (First Amendment implicated by law that impaired "the adequacy and fairness of professional representations"); *NIFLA v. Becerra*, 138 S. Ct. 2361 (2018) ("professional speech" of crisis pregnancy center to patients protected by First Amendment).

There is no question that the Final Rules will burden proxy advisers' protected speech. The First Amendment protects citizens' freedom to decide "both what to say and what *not* to say." *Riley v. Nat'l Fed. for the Blind,* 487 U.S. 781, 797 (1988). Yet the Final Rules trample both rights: the issuer-review provision forces proxy advisers to share their analysis and recommendations with companies that are not their clients, while the issuer-response provision forces proxy advisers to facilitate and disseminate issuers' responses to the proxy voting advice. A requirement that forces one speaker to "assist in disseminating [someone else's] message … necessarily burdens the expression of the disfavored speaker." *Pac. Gas & Elec. Co. v. PUC of Cal.*, 475 U.S. 1, 15 (1986); *see also Janus v. Am. Fed'n of State, County, & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) ("[M]easures compelling speech are at least as threatening" as measures restricting speech.).

Strict scrutiny applies to laws that "impose[] a burden based on the content of speech and the identity of the speaker." *Sorrell*, 564 U.S. at 567; *see also Turner Broad. Sys. v. FCC*, 512 U.S. 622, 658

(1994) ("laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference"). A regulation is content based "on its face" if it defines regulated speech "by particular subject matter" or "by its function or purpose." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). If a law, "by its terms, discriminates based on content," then a reviewing court must "apply strict scrutiny 'regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech.'" *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 509 (D.C. Cir. 2016). Viewpoint discrimination is "an egregious form of content discrimination" that occurs when "the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 446 (D.C. Cir. 2020) (asking whether government "singled out a subset of messages for disfavor based on the views expressed").

The Final Rules unquestionably impose content-based and viewpoint-based restrictions on proxy advisers' speech. The issuer-review and issuer-response provisions are "directed at certain content and [] aimed at particular speakers." *Sorrell*, 564 U.S. at 567. They impose unique restrictions on one specific type of speech (proxy voting advice) and class of speakers (proxy advisers) based on the Commission's desire to elevate the viewpoints of other speakers (issuers). Indeed, the entire premise of these rules is that the *content* of proxy advisers' speech may be somehow inadequate or insufficient unless it can be supplemented with issuers' speech. *See* 85 Fed. Reg. at 55113, 55136 (claiming that investors will "benefit" from "access to the registrant's views on proxy advice"). Moreover, the new mandates apply only to proxy advisers such as ISS; they do not apply to proxy voting advice offered by other types of investment professionals, including other investment advisers. *See id.* at 55134 ("[V]oting advice from a person … who does not market its expertise as a provider or proxy voting advice, separately from other forms of investment advice, will not be deemed a solicitation."). And the Final Rules grant a special review-and-reply right only to U.S.-registered issuers;

no similar rights are granted to opponents of management-backed proposals. In short, the issuer-review and issuer-response provisions are riddled with content-based distinctions, and their express purpose is to elevate the viewpoints and messages of certain favored speakers.

### B. Rule 14a-2(b)(9) fails any level of First Amendment scrutiny.

Laws that impose content-based or viewpoint-based burdens on protected speech must satisfy "strict scrutiny." *NIFLA*, 138 S. Ct. at 2371; *accord Turner Broad. Sys.*, 512 U.S. at 642 ("Laws that compel speakers to utter or distribute speech bearing a particular message are subject to [strict] scrutiny."). Such laws "'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'" *NIFLA*, 138 S. Ct. at 2371 (quoting *Reed*, 135 S. Ct. at 2226). "In the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell*, 564 U.S. 552, 571.

#### 1. Rule 14a-2(b)(9) does not further a legitimate or compelling state interest.

The Commission's stated interest behind the issuer-review and issuer-response provisions is to "improv[e] the mix of information available to shareholders." 85 Fed. Reg. at 55110; *see also id.* at 55107 (asserting that rules promote "investor access to enhanced discussion of proxy voting matters"); *id.* at 55118 (rules "facilitate … robust discussion"). But that asserted interest cannot justify the Commission's actions, for several reasons.

Most notably, although the Commission claims an amorphous interest in promoting a better "mix of information" or "enhanced discussion," that is not what the Final Rules do. The issuer-review and issuer-response provisions do not promote "information" or "discussion" *generally*, but instead merely seek to elevate *one specific viewpoint*: that of the issuer. *See, e.g., id.* at 55112-13 (issuer-response requirement ensures that investors can "consider the registrants' views"). The Commission's own description of the alleged benefits of the Final Rules begins with a generic statement about protecting

investors but then quickly pivots to the benefits that purportedly result from promoting "*access to the registrant's perspective* on [proxy] advice." *Id.* at 55136 (emphasis added).

Compounding further the First Amendment harms of the Final Rules, the issuer-response provision is likely to be invoked by issuers only when they *disagree* with a proxy adviser's vote recommendations or analysis. After all, an issuer would have no need to submit a response if the proxy adviser recommends that its clients vote in favor of management. The Commission was also quite candid that it expects issuers to use their coerced-response right to express "disagreements that extend beyond the voting recommendation itself," such as criticizing the broader methodology used by a proxy adviser to analyze a proxy vote. *See id.* at 55113 (issuer may offer "differing views about the proxy voting advice business's methodological approach or other perspectives that it believes are relevant to the voting advice").

The Final Rules thus ensure that the issuer-response provision will be invoked only in those situations that are most anathema to the First Amendment: when proxy advisers are forced to disseminate speech that is *directly contrary to their own*. The Supreme Court has repeatedly rejected efforts by the government to compel one speaker to disseminate someone else's opposing views. For example, the Court has struck down laws that require a utility company to "include in its billing envelopes speech of a third party with which the utility disagrees," *Pac. Gas*, 475 U.S. at 4, require a newspaper to "grant[] a political candidate a right to equal space to reply to [its] criticism and attacks on his record," *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 243 (1974), or require a pro-life crisis pregnancy center to inform its patients about how they can obtain abortions, *NIFLA*, 138 S. Ct. at 2374. In *Pacific Gas & Electric*, the Court found a First Amendment violation even though the government claimed—just as the Commission asserts here—that it was merely seeking to "foster" a "variety of views." 475 U.S. at 12-13. That purported interest could not justify a law that, in practice, forced the utility company to disseminate speech that "disagree[d] with [its] views." *Id.* at 13.

The Commission may attempt to argue that the issuer-review and issuer-response provisions are subject to the less-demanding First Amendment standard set forth in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). But *Zauderer* reserves that standard for rules that require the disclosure of "purely factual and uncontroversial information." *Id.* at 651. A rule that forces proxy advisers to disseminate issuers' critiques of the proxy advisers' analysis or "differing views about the [adviser's] methodological approach," 85 Fed. Reg. at 55113, is in no way limited to "purely factual and uncontroversial" information.

At bottom, the Final Rules elevate the viewpoints of one particular class of speakers (issuers of publicly traded securities) at the expense of another class of speakers (proxy advisers) merely to amplify the voice of issuers. No other speaker or participant in the proxy process—such as dissident shareholders or those who *oppose* management—is granted a comparable right. The issuer-review and issuer-response provisions thus do not merely involve promoting a "full mix of information," Final Rules at 94; instead, they involve a straightforward case of unconstitutional viewpoint discrimination that fails any level of First Amendment scrutiny. Although the Commission might have a legitimate interest in "making a variety of views available" via regulations that are "content neutral," the First Amendment prohibits it from "abridg[ing] [one side's] rights in order to enhance the relative voice" of another speaker. *See Pac. Gas*, 475 U.S. at 14, 20.

2. Rule 14a-2(b)(9) ignores less restrictive alternatives.

Rule 14a-2(b)(9) also imposes speech restrictions that are "broader than necessary" to achieve the stated objectives. *NIFLA*, 138 S. Ct. at 2377; *see also Riley,* 487 U.S. at 800 (noting "the First Amendment directive that government not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored").

The Commission discarded a number of less-restrictive ways of ensuring that institutional investors are well informed without meddling in private communications between a proxy adviser and

its clients. Issuers are already free to "communicate [their] desired information to the public without burdening a speaker with unwanted speech." *Riley,* 487 U.S. at 800. The Commission appears to have forgotten that a corporate issuer "has its own mouth too." *Legislative Proposals to Examine Corporate Governance:* Hearing Before the S. Comm. On Banking, Housing, and Urban Affairs, 115th Cong. (2018) (Statement of Prof. John C. Coates). Issuers are already at a significant advantage in any contested vote: there is no limit to how much information an issuer can include in its proxy statement, *see* 17 C.F.R. §240.14a-5, but shareholders who seek a vote on a certain proposal are limited to 500 words, *id.* §240.14a-8. Issuers can also provide "supplemental proxy materials" to respond to proxy voting advice or any other issue they wish to address. *See* 85 Fed. Reg. at 55113.

Moreover, the institutional investors who typically employ proxy advisers are not helpless or naïve; to the contrary, they are some of the most experienced and sophisticated actors in the financial system. To the extent an issuer's analysis or recommendations in its proxy materials diverge from the recommendation provided by a proxy adviser, investors can review the competing information and decide for themselves which recommendation to follow. *See, e.g.,* New York Comptroller Comments at 14 (large public pension fund "conduct[s] its own research" and considers any information from the issuer, as well as the proxy adviser, in determining how to vote). Under the First Amendment, "the general rule is that the speaker and the audience, not the government, assess the value of the information presented." *United States v. United Foods, Inc.,* 533 U.S. 405, 411 (2001).

The Commission did not even attempt to argue that the issuer-review and issuer-response provisions were the least restrictive means of achieving its stated objectives. Rather, it sought to justify those provisions in terms of efficiency, asserting that proxy advisers "have control over the timing of the dissemination of their proxy voting advice" and are "the best-positioned parties in the proxy system" to convey issuers' views to investors. 85 Fed. Reg. at 55108. That is, the Commission forced proxy advisers to disseminate issuers' contrary viewpoints because it was convenient to do so.

The Supreme Court, however, has flatly rejected the notion that "mere convenience" can justify a restriction on speech. *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). After all, "the prime objective of the First Amendment is not efficiency," and the government may not "too readily 'sacrific[e] speech for efficiency.'" *Id.* Yet that is exactly what the Commission has done here. The Commission has sought to commandeer proxy advisers' speech to disseminate viewpoints with which they disagree simply because it would be easier to do so.

Finally, the Commission suggested that, without the issuer-review and issuer-response provisions, issuers might not have ample time to review and prepare a response to a proxy adviser's analysis and recommendations. 85 Fed. Reg. at 55108, 55113. But nothing in the Exchange Act—much less the Constitution—gives issuers some special right to always have the last word. As noted, issuers are free to convey to shareholders as much information as they would like in their proxy statements in support of their preferred ballot measures. The investors who choose to hire proxy advisers can consider any information supplied by the issuer as well as the proxy adviser in making the ultimate decision of how to vote.

There is no other context in which an investment adviser has some obligation to ensure that the *subject* of the advice gets the last word before the client makes a decision. For example, an investment adviser who recommends that its clients sell their stock in a public company after determining it is poorly managed is not obligated to provide that recommendation to the company or ensure that its clients have "timely access" to the company's "perspectives" on that recommendation. Yet the Commission chooses to single out proxy advisers, alone among all investment advisers, for a unique obligation to facilitate a response from the subject of their recommendations. The Commission's fear that issuers might not always have the last word cannot justify commandeering proxy advisers' speech—and only underscores that this entire rulemaking reflects an arbitrary and unconstitutional effort to skew the playing field in favor of one specific set of speakers and viewpoints.

## IV. This Court Should Vacate and Permanently Enjoin the Final Rules and Proxy Guidance.

Under the APA, a reviewing court must "hold unlawful and set aside agency action[s] found to be invalid." 5 U.S.C. §706(2). Permanent injunctions are an appropriate remedy to set aside an unlawful rule under §706(2). *See Nat'l Mining Ass'n v. U.S. Army Corps Eng'rs*, 145 F.3d 1399, 1408-09 (D.C. Cir. 1998); *see also Loving v. IRS*, 917 F. Supp. 2d 67, 80-81 (D.D.C. 2013) (permanently enjoining IRS rule adopted without statutory authority); *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 137 (D.D.C. 2014) (vacating final rule where "the actions taken were not statutorily authorized"). Moreover, ISS would suffer irreparable harm if the Final Rules go into force because "it has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). If this Court concludes, as it should, that the Final Rules and Proxy Guidance are contrary to law, it should vacate and permanently enjoin those rules in addition to declaring them unlawful.

## CONCLUSION

For the foregoing reasons, ISS respectfully requests that this Court enter summary judgment in its favor and issue an order vacating and permanently enjoining the Final Rules and Proxy Guidance.

Respectfully submitted,

Dated: September 18, 2020

*s/Jeffrey M. Harris*

Mari-Anne Pisarri (DC Bar #362597)
PICKARD DJINIS AND PISARRI LLP
1990 M Street, NW, Suite 660
Washington, DC 20036
(202) 223-4418
pisarri@pickdjin.com

Jeffrey M. Harris (DC Bar #994058)
James F. Hasson (*pro hac vice forthcoming*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Counsel for Institutional Shareholder Services Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2020, I filed the foregoing document through the CM/ECF system, thereby serving all counsel of record.

_s/ Jeffrey M. Harris_

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the page limits of Local Rules 5.1(d) and 7(e) because it does not exceed 45 pages and is prepared in doubled-spaced 12-point font.

_s/ Jeffrey M. Harris_