**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

INSTITUTIONAL SHAREHOLDER
SERVICES INC.,

      Plaintiff,

      v.

SECURITIES AND EXCHANGE
COMMISSION and WALTER CLAYTON III, in
his official capacity as Chairman of the Securities
and Exchange Commission,

      Defendants.

No. 1:19-cv-3275-APM

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF
AMERICA, BUSINESS ROUNDTABLE, THE CENTER ON EXECUTIVE
COMPENSATION, AND THE NATIONAL INVESTOR RELATIONS INSTITUTE,
AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

David W. Ogden (DC Bar No. 375951)
Kelly P. Dunbar (DC Bar No. 500038)
Jessica Lutkenhaus (DC Bar No. 1046749)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC  20006
Tel.: (202) 663-6000
Fax: (202) 663-6363

*Counsel for Amici Curiae*

*(Additional counsel listed on signature
page)*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 7(o) and Federal Rules of Appellate Procedure 29(a)(4) and 26.1, *amici* state as follows:

The Chamber of Commerce of the United States of America (the "Chamber") states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia.  The Chamber has no parent corporations, and no publicly held company owns 10% or more of its stock.

Business Roundtable states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia.  Business Roundtable has no parent corporations, and no publicly held company owns 10% or more of its stock.

The HR Policy Association ("HRPA") and its subdivision the Center On Executive Compensation (the "Center") state that they are non-profit, tax-exempt organizations incorporated in the District of Columbia.  The HRPA and the Center have no parent corporations, and no publicly held company owns 10% or more of the stock.

The National Investor Relations Institute ("NIRI") states that it is a non-profit, tax-exempt 501(c)(6) organization incorporated in Virginia.  NIRI has no parent corporations, and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST OF AMICUS CURIAE .................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................................3

ARGUMENT ...........................................................................................................6

I.      The SEC Has Statutory Authority Under § 14(a) To Regulate Proxy Advisory
        Firms, Which Have Great Influence On Shareholder Votes................................6

II.     The Final Rules Are Tailored To Address Significant Concerns About Conflicts
        Of Interest, Quality, And Completeness In The Provision of Proxy Voting Advice.........10

        A.      The Final Rules Are Reasonably Designed To Address Documented
                Conflicts Of Interest In The Proxy Advisory Business .........................10

        B.      The Final Rules Are Reasonably Designed To Address Documented
                Concerns With The Quality And Completeness Of Proxy Advice......................13

CONCLUSION........................................................................................................18

# TABLE OF AUTHORITIES

Page(s)

## CASES

*J. I. Case Co. v. Borak*, 377 U.S. 426 (1964) ...............................................................6

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
  § 78n(a)(1) ...............................................................................................................6
  § 80b-1 *et seq.* (Investment Advisers Act of 1940) ........................................12

17 C.F.R.
  § 240.14a-1(*l*)(1)(iii) ..............................................................................................6
  § 240.14a-2(b)(9)(i) .................................................................................................13
  § 240.14a-2(b)(9)(ii)(A) ..........................................................................................16
  § 240.14a-2(b)(9)(ii)(B) ..........................................................................................16

*Exemptions from the Proxy Rules for Proxy Voting Advice*,
  85 Fed. Reg. 55,082 (Sept. 3, 2020) ........................................................ *passim*

Fed. R. App. P. 29 ........................................................................................................1

U.S. Dist. Ct. Rules D.C., LCvR 7(o) .......................................................................1

## OTHER AUTHORITIES

Ertimur, Yonca, Ferr, Fabrizio, & David Oesch, *Shareholder Votes and Proxy
  Advisors: Estimates from Say on Pay* (Feb. 25, 2013) ......................................4

Letter from Gary A. LaBranche, President and CEO, National Investor Relations
  Institute, to Jay Clayton, Chairman, U.S. Securities and Exchange
  Commission (Aug. 3, 2017), https://www.niri.org/NIRI/media/NIRI-
  Resources/NIRI-SEC-Letter-PA-Firms-August-2017.pdf.................................9

Letter from Gary A. LaBranche, President and CEO, National Investor Relations
  Institute, to Vanessa Countryman, Secretary, U.S. Securities and
  Exchange Commission (Feb. 3, 2020), https://www.sec.gov/comments/s7-
  22-19/s72219-6745389-207951.pdf...............................................................16

Letter from Henry Eickelberg, Chief Operating Officer, Center On Executive
  Compensation, to Vanessa A. Countryman, Secretary, U.S. Securities and
  Exchange Commission (Feb. 3, 2020), https://www.sec.gov/comments/s7-
  22-19/s72219-6743676-207834.pdf ........................................................ *passim*

Letter from Neil A. Hansen, Vice President, Investor Relations and Secretary,
  ExxonMobil, to Vanessa Countryman, Secretary, U.S. Securities and
  Exchange Commission (Feb. 3, 2020), https://www.sec.gov/comments/s7-
  22-19/s72219-6742834-207796.pdf...............................................9, 12, 14, 15

Letter from Niels Holch, Exec. Director, Shareholder Communications Coalition,
    to Vanessa A. Countryman, Secretary, U.S. Securities and Exchange
    Commission (May 1, 2020), https://www.sec.gov/comments/s7-22-
    19/s72219-7144491-216233.pdf ................................................................................8, 9

Letter of Paul Rose, Professor, The Ohio State University, to Vanessa
    Countryman, Secretary, U.S. Securities and Exchange Commission (Nov.
    14, 2019), https://www.sec.gov/comments/s7-22-19/s72219-6429308-
    198569.pdf ...............................................................................................................8

Letter from Robert G. Haiman, Exec. Vice President, General Counsel, and
    Secretary, Braemar Hotels & Resorts Inc., to Vanessa A. Countryman,
    Secretary, U.S. Securities and Exchange Commission (Feb. 3, 2020),
    https://www.sec.gov/comments/s7-22-19/s72219-6733895-207556.pdf ...................15, 16

Letter from Tom Quaadman, Exec. Vice President, U.S. Chamber of Commerce
    Center for Capital Markets Competitiveness, to Vanessa A. Countryman,
    Secretary, U.S. Securities and Exchange Commission (Jan. 31, 2020),
    https://www.sec.gov/comments/s7-23-19/s72319-6730870-207447.pdf ................. *passim*

Paul Rose & Christopher J. Walker,
    *Examining the SEC's Proxy Advisor Rule* (2020),
    https://www.centerforcapitalmarkets.com/resource/examining
    -the-secs-proxy-advisory-rule/ ...................................................................7, 10, 13, 14, 16

U.S. Chamber of Commerce, Center for Capital Markets Competitiveness and
    Nasdaq, *Proxy Season Survey* (2020),
    https://www.centerforcapitalmarkets.com/wp-content/uploads/
    2020/10/CCMC_Nasdaq_ProxySeasonSurvey2020.pdf ...................................................11

Webster's New International Dictionary (2d ed. 1934)................................................................7

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici* are associations and organizations representing the interests of a significant number of public companies in the United States.  As the issuers of securities that are exchanged or sold on public markets and as corporate professionals who work for those issuers, *amici*'s members have a direct interest in the rules regulating proxy advisory firms promulgated by the Securities and Exchange Commission ("SEC") that are challenged here.

*Amicus* the Chamber of Commerce of the United States of America is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than three million businesses and professional organizations of every size, in every industry, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  One way the Chamber promotes the interests of its members and the broader business community is by participating in cases with important implications for its members—including cases regarding the proxy voting system used to facilitate thousands of shareholder meetings held by publicly traded corporations each year.

*Amicus* Business Roundtable is an association of chief executive officers of over 200 leading U.S. companies that together have more than $7 trillion in annual revenues and more than 15 million employees.  Business Roundtable was founded on the belief that businesses should play an active and effective role in the formulation of public policy, and Business

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than the *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission.  Plaintiff, Defendants, and proposed Intervenor consent to the filing of this brief.  *See* Fed. R. App. P. 29; D.D.C. LCvR 7(o).

Roundtable participates in litigation as *amicus curiae* where important business interests are at stake.

*Amicus* the Center On Executive Compensation is dedicated to developing and promoting principled pay and governance practices and advocating compensation policies that serve the best interests of shareholders and other corporate stakeholders. Headquartered in Arlington, Virginia, the Center is a division of HR Policy Association, a nonprofit trade association, which represents the chief human resource officers of more than 325 of the largest companies doing business in the United States, and is organized under section 501(c)(6) of the Internal Revenue Code. The Center's 140 subscribing companies are HR Policy members representing a broad cross-section of industries.

*Amicus* the National Investor Relations Institute ("NIRI") was founded in 1969 and is the professional association of corporate officers and investor relations consultants responsible for communication among corporate management, shareholders, securities analysts, and other financial community constituents. NIRI's more than 3,000 members represent more than 1,600 publicly held companies and $9 trillion in stock market capitalization. Its members, together with corporate secretaries, play a vital role in communicating with institutional and retail investors on proxy voting matters. This role is especially critical when a public company needs to engage promptly with shareholders during a proxy contest, or after receiving a negative proxy advisor recommendation on an equity incentive plan or during a say-on-pay vote.

*Amici* respectfully submit that they have a distinct perspective on the issues in this case. On behalf of their members, *amici* have long advocated for changes to and improvements in the proxy advisory system. Proxy advisory firms play an important role for institutional investors, which own more than 70% of shares outstanding in U.S. public companies. Yet proxy advisory

firms are characterized by conflicts of interest, a lack of transparency, and quality concerns over their voting recommendations—flaws that harm not only *amici*'s members, but also individual shareholders and the public markets generally by virtue of the significant influence of proxy advice on shareholder voting outcomes.  The reforms adopted by the SEC at issue here add reasonable and necessary structure to the proxy advisory firm reporting process and will go a long way toward preventing many of the significant problems with proxy advice that damage *amici*'s members, shareholders, and the investing public.  *Amici* have a strong interest in ensuring an effective and efficient proxy voting system that helps shareholders make informed decisions, and accordingly in the implementation of the final rules.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The SEC rules challenged in this case bring much needed and commonsense reform to the proxy advisory process and will help to improve transparency and accountability in the provision of proxy advice.  From the perspective of *amici* and their members, proxy advisory firms play an important role in assisting, directing, and executing the participation of institutional investors in corporate governance.  Prior to thousands of shareholder meetings each year, proxy advisory firms make voting recommendations on matters presented by public companies for shareholder vote—including, for example, on the election of directors, proposed mergers and acquisitions, executive compensation, and other issues that affect companies' successful operation and value.  Institutional investors frequently follow those recommendations.

It is difficult to overstate the influence that proxy advisory firms have on shareholder voting.  Evidence in the administrate record demonstrates that the two major proxy advisory firms—Institutional Shareholder Services Inc. ("ISS") and Glass Lewis & Co.—are a duopoly and they effectively control up to 38% of the shareholder vote for U.S. public companies through

their proxy advice.[2] Yet, prior to the SEC rules at issue here, these firms were the only major participants in the proxy voting system (which includes public companies, banks, broker-dealers, exchanges, and transfer agents) that were virtually unregulated—despite their outsized ability to influence shareholder votes and thus affect shareholder investments.

For years, *amici*, their members, and others (including the SEC) have raised concerns about well-documented problems with proxy advisory firms, including sharp conflicts of interest and a lack of transparency and accuracy in proxy recommendations. These concerns are far from theoretical; they are grounded in real-world experience. *Amici*'s members have witnessed proxy advisory firms in action over many years regarding thousands of corporate governance proposals subject to a shareholder vote. Based on this wealth of experience, *amici*'s members know first-hand about numerous factual mistakes and serious methodological weaknesses in recommendations by proxy advisory firms, as well as conflicts of interest and a lack of transparency in these firms' assumptions, sources, and analyses. As just one example, and as the administrative record demonstrates, with respect to executive compensation—often subject to shareholder vote and thus a frequent topic of proxy recommendations—proxy advisory firms have embraced a "one-size-fits-all" approach, one that undermines many public companies' ability to align executive compensation with viable long-term growth strategies.

---

[2] *See* Letter from Tom Quaadman, Exec. Vice President, U.S. Chamber of Commerce Center for Capital Markets Competitiveness, to Vanessa A. Countryman, Secretary, U.S. Securities and Exchange Commission 1 (Jan. 31, 2020) ("Chamber Comments") (citing Ertimur, Yonca, Ferr, Fabrizio, & David Oesch, *Shareholder Votes and Proxy Advisors: Estimates from Say on Pay* (Feb. 25, 2013)); *see also* Letter from Henry Eickelberg, Chief Operating Officer, Center On Executive Compensation, to Vanessa A. Countryman, Secretary, U.S. Securities and Exchange Commission 2 n.2 (Feb. 3, 2020) ("Center On Executive Compensation Comments") (describing research showing that "a year-over-year change in ISS recommendation on 'Say on Pay' has yielded an average percentage point change of +/- 27%").

After engaging in a multi-year process, the SEC reasonably responded to these concerns by enacting final rules designed to enhance the transparency of proxy advisory firms and the accuracy and completeness of the information they provide.  ISS's effort to set aside these modest reforms is unpersuasive.  First, contrary to ISS's claims, these reforms were well within the SEC's statutory authority.  The SEC has long understood that "solicitation" under the Securities Exchange Act of 1934 should be read as including communications—like those that are the bread and butter of proxy advisory firms—intended to influence or affect the outcome of proxy voting.  The SEC's decision to codify that longstanding interpretation reasonably places proxy advisory firms on equal footing with other market participants who already must comply with proxy rules.  Second, the final rules are certainly not arbitrary and capricious; they are reasonable and well-explained, a measured response to documented problems with proxy advisory firms.  The rules impose flexible requirements on proxy advisory firms that recognize the value that firms provide while also promoting transparency and the flow of more accurate and complete information to investors who make use of these firms' services.

The SEC and proposed Intervenor the National Association of Manufacturers (the "NAM") persuasively set forth the legal foundation of the final rules.  *Amici* write separately to explain why the SEC has statutory authority to regulate proxy advisory firms that exert enormous influence on shareholder voting and why the SEC's reforms are reasonably designed to facilitate more transparent and better informed shareholder decisionmaking, consistent with the longstanding objectives of the securities laws.

5

## ARGUMENT

I. **THE SEC HAS STATUTORY AUTHORITY UNDER § 14(A) TO REGULATE PROXY ADVISORY FIRMS, WHICH HAVE GREAT INFLUENCE ON SHAREHOLDER VOTES**

*Amici* agree with the SEC and the NAM that the provision of proxy advice is plainly encompassed by the term "solicit" in Section 14(a) of the Securities Exchange Act of 1934. Firms like ISS offer and sell specific voting advice to institutional investors with the expectation that their advice will drive shareholder voting decisions. They then often execute those votes themselves. The advice is calculated to result in a proxy voting decision by these firm's clients and therefore fits comfortably within the types of "solicitation" Congress intended to regulate through the Exchange Act.

Section 14(a)'s text is conspicuously broad. It makes it unlawful for "*any* person" to "solicit … *any* proxy … in respect of *any* security" without complying with "rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a)(1) (emphases added). The Supreme Court has recognized that this provision has "broad remedial purposes," including "to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). Consistent with those weighty purposes, the SEC has refined the definition of "solicitation" over the years to "respond to new and changing market practices that have raised the concerns underlying Section 14(a)." *Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082, 55,087-55,088 (Sept. 3, 2020). Of particular relevance, the SEC revised the definition in 1956 to include not only an express "request" for a proxy, but also any "communication to security holders under circumstances reasonably calculated to result in the procurement ... or revocation of a proxy." 17 C.F.R. § 240.14a-1(*l*)(1)(iii).

Proxy advice by proxy advisory firms fits within the plain meaning of "solicitation" under Section 14(a). At the time of Section 14(a)'s enactment in 1934, according to contemporary dictionaries, the term "solicit" included "[t]o move to action" or "[t]o urge" or "insist upon." Webster's New International Dictionary (2d ed. 1934); *see also* SEC Br. 22 (collecting cases applying this definition of "solicit" prior to the enactment of Section 14(a)). The term "solicitation" thus certainly *includes* "asking or pleading" in order "to achieve a specific outcome in a shareholder vote," as ISS points out, ISS Br. 17-18, but the term also sweeps more broadly. The definition naturally encompasses proxy advice provided by firms like ISS, which provide detailed recommendations on how shareholders should vote each matter on a corporate proxy card with the obvious expectation that many or all will follow that advice; and then frequently execute their clients' votes in line with those specific recommendations. This conduct is clearly calculated to result in proxy votes by shareholders consistent with the proxy advisory firm's recommendations. Accordingly, the SEC has long understood the provision of proxy advice to be a "solicitation." *See* Paul Rose & Christopher J. Walker, *Examining the SEC's Proxy Advisor Rule* 29 & n.109 (2020) (describing 1964 SEC release regarding understanding of proxy advice as a solicitation).[3]

ISS's effort to distinguish (at 7, 18) purportedly disinterested "advice" from the "solicitation" of a proxy ignores the proper scope of the term "solicit" as well as the reality of proxy advisory firms' significant (and expected) influence on proxy voting decisions. As the SEC put it in promulgating the final rules, "proxy voting advice businesses have become uniquely situated in today's market to influence, and in many cases directly execute,

---

[3] *Available at* https://www.centerforcapitalmarkets.com/resource/examining-the-secs-proxy-advisory-rule/.

[institutional] investors' voting decisions." 85 Fed. Reg. at 55,083 (footnotes omitted). That finding is well supported. Research in the administrative record demonstrates that many proxy advisor clients vote fully, or almost fully, in line with the recommendations of their proxy advisor. *See, e.g.*, Letter from Paul Rose, Professor, The Ohio State University, to Vanessa Countryman, Secretary, U.S. Securities and Exchange Commission (Nov. 14, 2019) (providing data showing how dozens of institutional investors voted on at least 5,000 management resolutions in line with ISS 99.5% or more of the time); Letter from Niels Holch, Exec. Director, Shareholder Communications Coalition, to Vanessa A. Countryman, Secretary, U.S. Securities and Exchange Commission 5 (May 1, 2020) ("Shareholder Communications Coalition Comments") (describing study that found investment managers with more than $5 trillion in assets under management followed ISS recommendations more than 95% of the time).

Indeed, as revealed by investment adviser disclosures, many clients have effectively outsourced their voting decisions to a proxy advisor. For example, one investment adviser discloses, "[w]e generally follow ISS's recommendations and do not use our discretion in voting." Shareholder Communications Coalition Comments 4. Another states, "[w]e outsource all proxy voting services to ISS and have adopted the ISS annual voting guidelines based on their research and diligence." *Id.* Consistent with those disclosures, *amicus* the Center On Executive Compensation explained in its comments to the SEC that, within 24 hours of publication of an ISS or Glass Lewis voting recommendation, "a statistically significant percentage of proxy votes are cast by investors—often automatically—based on the proxy advisory firm recommendations." Center On Executive Compensation Comments 7.

The automated ("robo-voting") nature of the votes of many proxy advisory firms' clients underscores why proxy advice is a solicitation. *See* NAM Br. 14. As the administrative record

demonstrates, proxy advisory firms increasingly use automated voting platforms through which the firms cast votes automatically on behalf of their clients—without any affirmative consent or real-time voting decisions by the clients.  *See* Shareholder Communications Coalition Comments 4-5; *see also* Letter from Gary A. LaBranche, President and CEO, National Investor Relations Institute, to Jay Clayton, Chairman, U.S. Securities and Exchange Commission (Aug. 3, 2017). The firm generates an electronic ballot for each of its clients, pre-populated with voting decisions based on the client's pre-established guidelines and policies.  Then, when the firm's recommendations are distributed, the shares of the clients are voted without the client needing to review the recommendations or confirm the vote.  *See* Shareholder Communications Coalition Comments 4-5; Letter from Neil A. Hansen, Vice President, Investor Relations and Secretary, ExxonMobil, to Vanessa Countryman, Secretary, U.S. Securities and Exchange Commission 30 (Feb. 3, 2020) ("ExxonMobil Comments").  Evidence of this automation is abundant:  In 2019, for example, several public companies reported that between 15% and 40% of their outstanding shares were voted in line with an ISS recommendation within two days after a proxy advisory firm issued its vote recommendation.  *See, e.g.*, Chamber Comments 12; *see also* ExxonMobil Comments 31-32.[4]

Such arrangements and expectations make any purported distinction between such "advice" and solicitation wholly illusory.  It is simply implausible that Congress would have intended such key participants in the proxy voting system to be beyond the scope of the SEC's regulatory authority over the proxy process under Section 14(a).

---

[4] *See also* Shareholder Communications Coalition Comments 5 (describing an American Council for Capital Formation study that found in the 2016 and 2017 proxy seasons, between 15-20% of shareholder votes were cast within three days of an adverse recommendation by a proxy advisory firm).

## II.     THE FINAL RULES ARE TAILORED TO ADDRESS SIGNIFICANT CONCERNS ABOUT CONFLICTS OF INTEREST, QUALITY, AND COMPLETENESS IN THE PROVISION OF PROXY VOTING ADVICE

In addition to its misconceived statutory objections to the final rules, ISS argues that the SEC's rules are arbitrary and capricious.  The core of ISS's claim is that the "rules are a paradigmatic solution in search of a problem."  ISS Br. 3; *see id.* at 25-31.  Nothing could be farther from the truth.  As *amici* and their members can emphatically attest from experience and as the administrative record before the SEC reflects, unregulated proxy advice had led to conflicts of interest and poor-quality information—problems that detrimentally affect shareholders and that the final rules are reasonably tailored to address.

### A.     The Final Rules Are Reasonably Designed To Address Documented Conflicts Of Interest In The Proxy Advisory Business

Conflicts of interest by proxy advisory firms are among the principal problems experienced by *amici*'s members.  *See generally* Rose & Walker, *supra*, at 8-9 (collecting materials reflecting conflict-of-interest concerns).  ISS, the plaintiff here, itself presents these conflicted-advice concerns.  On the one hand, ISS provides its institutional investor clients with recommendations regarding proxy voting and ratings of corporate governance; at the same time, ISS offers corporate governance consulting services to the very same public companies that are subject to proxy voting recommendations.  *See* Chamber Comments 7.  Notably, 58% of issuers responding to a 2019 survey reported that they "have been approached by the corporate consulting arm of ISS in the same year that the company received a negative vote

10

recommendation" from the ISS advisory arm.  *Id.* at 4, 7.[5]  This conflicted business model creates incentives for companies to subscribe to ISS's consulting services, with the implication that not doing so would generate unfavorable recommendations from ISS's advisory arm.  *Id.* at 7; *see also* Center On Executive Compensation Comments, appx. at 7 ("Center Subscribers universally report the sole reason for purchasing consulting services from ISS Corporate Solutions is due to ISS Research's influence over shareholder votes.  Without ISS Research's ability to influence shareholder votes, it is unlikely many companies would purchase services from ISS Corporate Solutions.").

A real-world example described in the comments of *amicus* the Center On Executive Compensation illustrates this problem:

> [I]n September of 2013 when ISS Corporate Solutions sent an email to Motorola Solutions, referencing the fact that in the spring of 2013, when the research side of ISS recommended its clients vote against Motorola's say on pay vote (in its non-custom voting recommendation), Motorola's say on pay resolution received the support of just above 68% of its shareholders.  The email said that ISS Research would be subjecting Motorola to a higher level of scrutiny in 2014 and solicited a meeting with the ISS Corporate Solutions staff.
>
> A call was set up, during which the ISS Corporate Solutions representative referenced very high success rates (over 90%) in say on pay votes for companies that engaged ISS Corporate Solutions after receiving a low vote.  The exchange left the impression that by engaging ISS Corporate Services, Motorola Solutions would receive advice and information unavailable elsewhere and that it would give the company an advantage when ISS Research analyzed its 2014 proxy.

Center On Executive Compensation Comments, appx. at 8.

---

[5] This is a survey conducted annually by the Chamber and Nasdaq.  The "survey examines the interactions that public companies had with proxy advisory firms during the [most recent] proxy season and is intended to inform policymakers and the general public about current practices within the proxy advisory industry."  U.S. Chamber of Commerce, Center for Capital Markets Competitiveness & Nasdaq, *Proxy Season Survey* (2020).  Survey respondents are public companies of all sizes and a variety of industries.  *Id.* at 5.

And concerns that this conflict of interest creates a real potential for biased advice to shareholders are far from theoretical.  ISS Research could continually modify quantitative models used to evaluate say-on pay proposals or equity plan approval proposals (which are binding rather than advisory) in order to encourage issuers to subscribe to services from the consulting affiliate.  As fellow proxy advisor Glass Lewis has said: "[T]he provision of consulting services creates a problematic conflict of interest that goes against the very governance principles that proxy advisors like ourselves advocate…. a consulting business is not only in conflict with the interests of our clients, but in conflict with the interests of the companies who are entitled to a fair, reasonable and independent assessment."  ExxonMobil Comments 12 (quoting Glass Lewis's opening statement to the Senate Banking, Housing and Urban Affairs Committee on June 1, 2018).[6]  Regulation to avoid such conflicts is obviously important and has been lacking.

In its summary judgment brief, ISS seeks to paper over these troubling conflict-of-interest concerns.  ISS argues only (at 8, 14) that the Investment Advisers Act of 1940 already requires "investment advisers" to eliminate or manage and disclose conflicts of interest.  But the SEC addressed this point head-on in promulgating the final rules, explaining that "[t]he Advisers Act and Section 14(a) serve distinct, though overlapping, regulatory purposes.  The Advisers Act is a principles-based regulatory framework, at the center of which is a federal fiduciary duty to clients that is based on equitable common law principles.  Section 14(a) grants the Commission

---

[6] A different, but also troubling, conflict of interest afflicts Glass Lewis, which is owned by two large institutional investors.  *See* Chamber Comments 7.  Both institutional investors invest in public companies about which Glass Lewis makes voting recommendations.  *See* Center On Executive Compensation Comments, appx. at 9.  That raises questions about Glass Lewis's ability to provide fair and objective voting recommendations, to the detriment of institutional investors and the many individual shareholders who are their beneficiaries.

broad power to adopt rules to control the conditions under which proxies may be solicited in order to address a Congressional concern that the solicitation of proxy voting authority be conducted on a fair, honest, and informed basis." 85 Fed. Reg. at 55,086 (footnotes omitted). In light of persisting conflict-of-interest concerns as well as differing objectives of the Advisers Act and Section 14(a), the SEC's decision to regulate proxy advisory firms under Section 14(a) was entirely sensible. *See* SEC Br. 35; NAM Br. 27-29.

The final rules reasonably respond to the problem of conflicted advice through modest disclosure requirements. The rules provide "clear minimum disclosure standards" for proxy advisory firms, 85 Fed. Reg. at 55,108, about (1) information regarding an interest, transaction, or relationship of the proxy advisory firm that is "material to assessing the objectivity of the proxy voting advice in light of the circumstances," and (2) any policies and procedures used to identify, as well as the steps taken to address, any such material conflicts of interest, 17 C.F.R. § 240.14a-2(b)(9)(i). As the SEC has explained, these straightforward disclosure requirements will result in a "more tailored and comprehensive disclosure … than is currently required" and will enable shareholders to "better assess the objectivity of proxy voting advice." 85 Fed. Reg. at 55,123. And the rules provide flexibility to proxy advisory firms as to how the disclosures are made: either in the proxy voting advice or in an electronic medium used to deliver the proxy voting advice. *See* Rose & Walker, *supra*, at 31 (describing the increased flexibility in the final rules as compared to the proposed rules). Nothing ISS says in its brief remotely calls into question the reasonableness of these judgments by the SEC.

**B.    The Final Rules Are Reasonably Designed To Address Documented Concerns With The Quality And Completeness Of Proxy Advice**

*Amici* and their members can also attest to significant concerns about the quality and completeness of proxy voting advice—concerns that also underly the SEC's reforms. *See, e.g.*,

85 Fed. Reg. at 55,141 (explaining how the final rules could promote competition for better "quality of advice").  These concerns with the quality of voting recommendations have been compounded by the difficulty that public companies face in engaging with proxy advisory firms during the proxy process and the fact that many issuers lack access to the proxy advice to which they are subject.  *See, e.g.*, Center On Executive Compensation Comments 4.  The final rules take important steps toward addressing these practical concerns.

Comments submitted to the SEC demonstrated that proxy advisory firms have adopted an inappropriate "one-size-fits-all" approach to corporate governance issues that may result in poor quality advice.  As *amicus* the Chamber explained:  "Members have found that the proxy advisors often misunderstand basic business fundamentals and market realities in certain industries (including energy, high technology, manufacturing, real estate and financial services), and that the proxy advisors' one-size-fits-all criteria do not adequately account for differences among individual firms or industries."  Chamber Comments 9.  Indeed, only 39% of issuers responding to a 2019 survey believed that proxy advisory firms carefully researched and took into account all relevant aspects of issues on which the firms provided advice.  *Id.* at 10; *see also* Rose & Walker, *supra*, at 9-10 (collecting materials addressing the one-size-fits-all approach to assessing proposals taken by advisory firms).

Executive compensation recommendations concretely illustrate this problem.  Comments from one major public company to the SEC explained, "[t]he capital-intensive nature of our business, and the extended cost recovery and production profiles of many of our projects, means that the results of the decisions made by management (such as new projects, acquisitions or divestments) are often not experienced by shareholders until 5 to 10 years (or longer) from the time the decision was made."  ExxonMobil Comments 19.  The company explained that it

carefully designs compensation to account for this reality:  "performance-based shares for the senior executives in our executive compensation program vest 50% at 5 years and 50% at 10 years or retirement, whichever is later.  We believe this design incentivizes a long-term perspective in decision making and mitigates the risks of a shorter-term vesting period where executives could prefer to underinvest in the long term by pursuing fleeting, short-term returns that would provide an outsized impact on their compensation."  *Id.*  When it comes to recommendations about executive compensation, however, ISS applies a one-size-fits-all standard that purports to measure the alignment between executive pay and shareholder returns over a three-year period.  *Id.* at 21.  As the company explained to the SEC, this "surface-level analysis" fails to "incorporate company-specific factors" and it irrationally assumes "that every company should use a similar target-setting executive compensation model for their business that is sensitive to short-term (three years or less) changes" in shareholder value.  *Id.*  The result is that a company experiences pressure to design its compensation in line with ISS's benchmark— thus disrupting its efforts to structure compensation to capture long-term value—or "risk an 'AGAINST' recommendation and a possible vote against directors in future years."  *Id.*

The administrative record before the SEC points to other concerns with the quality of advice, ranging from the use of faulty algorithms to misinterpretation of issuer statements to factual errors.  One commenter, for example, recounted to the SEC its recent experience with factual inaccuracies and misleading statements in an ISS recommendation to "withhold" votes for five of the company's six directors.  *See* Letter from Robert G. Haiman, Exec. Vice President, General Counsel, and Secretary, Braemar Hotels & Resorts Inc., to Vanessa A. Countryman, Secretary, U.S. Securities and Exchange Commission (Feb. 3, 2020) ("Braemar Hotels Comments").  As the comments explain, an ISS report "strongly suggested that the

Company had unfairly treated two directors who had joined the board in connection with a settlement agreement between the Company and an activist shareholder," making a number of factually inaccurate statements in the recommendations.  *Id.* at Ex. 1, at 1-2.  Ultimately, the commenter was forced to file a Form 8-K to correct the record—incurring significant legal fees and diverting management attention—and ISS then reversed its position.  *Id.* at Ex 1, at 2-3. This example demonstrates that "ISS' internal procedures fail to provide an adequate opportunity for most issuers to address concerns and lack sufficient transparency regarding its voting policies and recommendation process."  *Id.*

The SEC's final rules reflect a reasonable and tailored effort to improve the quality of proxy advice.  The rules require that, to achieve an exemption from certain filing and disclosure requirements, proxy advisory firms must make their advice available to the public companies that are the subject of such advice, at or prior to the time when such advice is disseminated to the proxy advisory firms' clients.  17 C.F.R. § 240.14a-2(b)(9)(ii)(A).  Such firms must also provide their clients "with a mechanism by which they can reasonably be expected to become aware of any written statements regarding its proxy voting advice by registrants who are the subject of such advice, in a timely manner."  *Id.* § 240.14a-2(b)(9)(ii)(B).

These final provisions represent a substantial change from the rules the SEC proposed. *See* Rose & Walker, *supra*, at 33.  Many commentors—*amici* included—supported a requirement that registrants receive proxy advice in advance of its dissemination to clients.  *See* Chamber Comments 8-11; Center On Executive Compensation Comments 4-8; Letter from Gary A. LaBranche, President and CEO, National Investor Relations Institute, to Vanessa Countryman, Secretary, U.S. Securities and Exchange Commission 1-2 (Feb. 3, 2020).  Such review would have allowed the public company that is subject to the advice to raise any factual

or methodological errors to the proxy advisory firm *before* erroneous advice is distributed. Ultimately, the SEC decided on a lighter regulatory touch that gives flexibility to the proxy advisory firms.  The rules do not require proxy advisors to include an issuer statement, analysis, viewpoint, or hyperlink within the proxy advisor's own recommendations.  Nor do the final rules require firms to provide issuers with the opportunity to review or comment upon proxy advice prior to its delivery to shareholders.  Proxy advisory firms are not required to make any changes to their reports or recommendations.  Thus, under the final rules, a firm need not "negotiate or otherwise engage in a dialogue with the registrant, or revise its voting advice in response to any feedback" and "is free to interact with the registrant to whatever extent and in whatever manner it deems appropriate."  85 Fed. Reg. at 55,112.  In light of those changes to the final rules, the concerns raised by ISS and its *amici* about the supposed effects of the final rules on proxy advisory firms' independence ring hollow—even more so because many of the requirements are business practices that have been employed by at least one of the proxy advisory firms, making clear that they are achievable and consistent with the firms' responsibilities.[7]

In short, the final rules promulgated by the SEC strike a reasonable balance.  Under the rules, public companies will have a chance to review final reports in order to identify errors and methodological weaknesses that have long been a concern of issuers, while providing proxy advisory firms with discretion to determine how to make their clients aware of this information. Moreover, the final rules help align proxy voting decisions with the economic interests of all investors by providing enhanced disclosures and making more complete information available to

---

[7] For example, ISS has provided draft versions of its proxy advice to S&P 500 companies, and Glass Lewis provides final versions to issuers for a fee.  *See* Center On Executive Compensation Comments 5.

shareholders.  The SEC's adoption of these rules was eminently sensible and certainly not arbitrary and capricious, as ISS claims.

## CONCLUSION

For the reasons set forth above, the Court should deny ISS's motion for summary judgment; grant the SEC's cross-motion for summary judgment; and grant the NAM's cross-motion for summary judgment.

Dated:  November 6, 2020

Liz Dougherty
BUSINESS ROUNDTABLE
1000 Maine Ave., S.W.
Washington, DC 20024

Charles Edward Allen
NATIONAL INVESTOR RELATIONS
    INSTITUTE
225 Reinekers Lane, Suite 560
Alexandria, VA 22314

Respectfully submitted,

/s/  *David W. Ogden*
David W. Ogden (DC Bar No. 375951)
Kelly P. Dunbar (DC Bar No. 500038)
Jessica Lutkenhaus (DC Bar No. 1046749)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC  20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
david.ogden@wilmerhale.com

Steven P. Lehotsky
Tara S. Morrissey
U.S. CHAMBER OF COMMERCE
    LITIGATION CENTER
1615 H Street NW
Washington, DC  20062
slehotsky@uschamber.com
tmorrissey@uschamber.com

*Counsel for Amici Curiae*