## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INSTITUTIONAL SHAREHOLDER
SERVICES INC.,

PLAINTIFF,

v.

SECURITIES AND EXCHANGE
COMMISSION and WALTER CLAYTON III
in his official capacity as Chairman of the
Securities and Exchange Commission,

DEFENDANTS.

No. 1:19-cv-3275-APM

## PLAINTIFF'S COMBINED OPPOSITION TO
## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND
## REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Mari-Anne Pisarri (DC Bar #362597)
PICKARD DJINIS AND PISARRI LLP
1990 M Street, NW, Suite 660
Washington, DC 20036
(202) 223-4418
pisarri@pickdjin.com

Jeffrey M. Harris (DC Bar #994058)
James F. Hasson (*pro hac vice*)
Daniel Shapiro
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Counsel for Institutional Shareholder Services Inc.*

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................................................1

ARGUMENT ......................................................................................................................2

I.   THE COMMISSION'S ATTEMPT TO REGULATE INDEPENDENT PROXY VOTING ADVICE AS
PROXY SOLICITATION IS CONTRARY TO LAW..................................................................2

    A.   The Commission's redefinition of proxy voting advice as proxy solicitation is
foreclosed by the plain text of Section 14(a)..............................................................2

    B.   The Commission's new interpretation of proxy solicitation is unreasonable even if
the statutory text is ambiguous....................................................................................10

    C.   NAM's new defenses of the Commission's redefinition of proxy advice as proxy
solicitation are barred by *Chenery* and fail on the merits.........................................14

II.  THE FINAL RULES AND PROXY GUIDANCE ARE ARBITRARY AND CAPRICIOUS. .....................17

    A.   The Commission has never articulated a reasonable basis for creating an intrusive
and burdensome new regulatory regime for proxy voting advice and has failed to
adequately assess the costs and benefits of the new rules...........................................17

    B.   The Commission failed to adequately explain why the Advisers Act insufficiently
regulates proxy voting advice. ....................................................................................24

    C.   The Commission failed to acknowledge that the Final Rules and Proxy Guidance
change its longstanding position and upend reliance interests....................................29

III. THE PROXY RULE AMENDMENTS VIOLATE THE FIRST AMENDMENT. ...........................................33

    A.   The issuer-review and issuer-response rules are fully subject to the
First Amendment. ........................................................................................................34

    B.   The Final Rules are subject to strict scrutiny because they discriminate on the
basis of content and viewpoint.....................................................................................36

    C.   The Final Rules are not subject to any exemptions from strict scrutiny. ....................39

    D.   The Final Rules cannot survive any level of scrutiny..................................................43

IV.  THE COURT SHOULD SET ASIDE THE FINAL RULES AND PROXY GUIDANCE
IN THEIR ENTIRETY. ..................................................................................................45

CONCLUSION.................................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Aaron v. SEC*, 446 U.S. 680 (1980) ................................................................................................10

*Agape Church v. FCC*, 738 F.3d 397 (D.C. Cir. 2013) ..................................................................13

*Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23 (D.D.C. 2017) ......................................................20

*Am. Equity Invs. Life Ins. Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010) ..................................24, 26

*Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) ..........................................42

*Am. Petroleum Inst. v. SEC*, 953 F. Supp. 2d 5 (D.D.C. 2013) .....................................................20

*Amalgamated Clothing and Textile Workers Union v. Wal-Mart Stores, Inc.*, 54 F.3d 69 (2d Cir. 1995) .......12

*American Equity Investors Life Insurance Company v. SEC*, 613 F.3d 166 (D.C. Cir. 2010) .......................24

*Ash v. GAF Corp.*, 723 F.2d 1090 (3d Cir. 1983) .........................................................................21

*Ass'n of Am. Railroads v. Surface Transp. Bd.*, 162 F.3d 101 (D.C. Cir. 1998) .............................9

*Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279 (D.C. Cir. 2020) ...........................................29

*Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668 (1996) ..............................35

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ......................................................*passim*

*Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133 (D.C. Cir. 2005) .........................................23

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) .................................................14

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 2020 WL 4816459 (D.D.C. Aug. 19, 2020) ...............23

*Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*,
316 F. Supp. 3d 349 (D.D.C. 2018) ...........................................................................16

*Director, Office of Workers Compensation Programs v. Newport News Shipbuilding*, 514 U.S. 122 (1995) ... 9, 10

*Dyer v. SEC*, 291 F.2d 774 (8th Cir. 1961) ......................................................................................7

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) .........................................................33

*Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018) .........................................................10

*Estes v. U.S. Dep't of the Treasury*, 219 F. Supp. 3d 17 (D.D.C. 2016) ........................................30

*FCC v. Fox Television Stations, Inc.*, 565 U.S. 502 (2009) ...........................................................29

*First Nat'l Bank & Tr. Co. v. Nat'l Credit Union Admin.*, 90 F.3d 525 (D.C. Cir. 1996) ...........................16

*Flournoy v. Peyson*, 701 F. Supp. 1370 (N.D. Ill. 1988) ................................................................5

*Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.C. Cir. 2002) ....................................21, 24

*Full Value Advisors v. SEC*, 633 F.3d 1101 (D.C. Cir. 2011) ........................................................40

*Fuller v. Dame*, 35 Mass. 472 (1836) ..............................................................................................6

*Gas Nat. Inc. v. Osborne*, 624 Fed. Appx. 944 (6th Cir. 2015) ......................................................6

*Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006) ..................................................................9

*Good Fortune Shipping, SA v. Comm'r of Internal Revenue Serv.*, 897 F.3d 256 (D.C. Cir. 2018) ...............10

*Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718 (2017) .....................................10

*Herbert v. Long*, 23 S.W. 658 (Ky. Ct. App. 1893) ...............................................................6

*In re Grobe's Estate*, 102 N.W. 804 (Iowa 1905) ................................................................6

*Int'l Ladies Garment Workers' Union v. Donovan*, 722 F.2d 795 (D.C. Cir. 1983) ........................20

*Investment Co. Inst. v. CFTC*, 720 F.3d 370 (D.C. Cir. 2013) ..............................................26

*Investment Co. Inst. v. CFTC*, 891 F. Supp. 2d 162 (D.D.C. 2012) .....................................26

*J.I. Case Co. v. Borak*, 377 U.S. 426 (1964) .......................................................................11

*Knight v. Commissioner*, 552 U.S. 181 (2008) ....................................................................8

*Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018) .......................................17

*Long Island Lighting Co. v. Barbash*, 779 F.2d 793 (2d Cir. 1985) .......................................7

*Loving v. IRS*, 742 F.3d 1013 (D.C. Cir. 2014) ..................................................................14

*Lowe v. SEC,* 472 U.S. 181 (1985) .....................................................................................27

*McCullen v. Coakley*, 573 U.S. 464 (2014) ...................................................................44, 45

*Merck & Co., Inc. v. U.S. Dept. Health & Human Servs.*, 385 F. Supp. 3d 81 (D.D.C. 2019) ..............9, 13

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) .....................................................37

*Milk Indus. Found. v. Glickman*, 949 F. Supp. 882 (D.D.C. 1996) .....................................14

*Music Choice v. CRB*, 970 F.3d 418 (D.C. Cir. 2020) ....................................................30, 33

*N.Y. Stock Exch. v. SEC*, 962 F.3d 541 (D.C. Cir. 2020) ...............................................*passim*

*NAM v. SEC*, 800 F.3d 518 (D.C. Cir. 2015) ...............................................................42, 43

*Nat. Res. Def. Council v. EPA*, 489 F.3d 1364 (D.C. Cir. 2007) ...........................................9

*Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831 (D.C. Cir. 2006) .................................24

*Neely v. McDaniel*, 677 F.3d 346 (8th Cir. 2012) .................................................................5

*New York v. EPA*, 964 F.3d 1214 (D.C. Cir. 2020) .............................................................14

*NIFLA v. Becerra*, 138 S. Ct. 2361 (2018) ....................................................................*passim*

*NLRB v. S.W. Gen., Inc.*, 137 S. Ct. 929 (2017) ..................................................................8

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1 (1986) ..................*passim*

*Petit v. U.S. Dep't of Educ.*, 675 F.3d 769 (D.C. Cir. 2012) ..................................................9

*Pursuing America's Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ..........................39, 42, 45

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992) ......................................................43

*Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1 (D.D.C. 2018) ........................9

*Rapanos v. United States*, 547 U.S. 715 (2006) ................................................................16

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) ..............................................................38

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................................34, 37, 38

*Roosevelt v. E.I. DuPont de Nemours & Co.*, 958 F.2d 416 (D.C. Cir. 1992) ......................12

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) ....................37

*Rumsfeld v. Forum for Academic and Institutional Rights*, 547 U.S. 47 (2006) ...............36

*Sargent v. Genesco, Inc.*, 492 F.2d 750 (5th Cir. 1974) .....................................................7

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) .......................................................................14

*SEC v. Wall Street Publishing*, 851 F.2d 365 (D.C. Cir. 1988) ......................................40, 41

*Sekhar v. United States*, 570 U.S. 729 (2013) ..................................................................10

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ......................................................................5

*Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008) ........................................................8

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ...........................16

*Sorenson Comm'ns Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014) .......................................20

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ........................................................35, 42, 43

*Speiser v. Randall*, 357 U.S. 513 (1958) ..........................................................................35

*Stilwell v. Office of Thrift Supervision*, 569 F.3d 514 (D.C. Cir. 2009) ...........................20

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017) ................35

*Union Pacific R.R. Co. v. Chicago and North Western Ry. Co.*, 226 F. Supp. 400 (N.D. Ill. 1964) ............ 7, 8

*United States v. Am. Library Assn.*, 539 U.S. 194 (2003) ................................................35

*United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557 (D.C. Cir. 2010) .......................20

*USPS v. NLRB*, 969 F.2d 1064 (D.C. Cir. 1992) ...............................................................14

*Vector Marketing Corp. v. Employment Dept.*, 365 P.3d 686 (Or. Ct. App. 2015) ..........6

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650 (D.C. Cir. 2011) ...............4

*Walsh & Levine v. Peoria & E.R. Co.*, 222 F. Supp. 516 (S.D.N.Y. 1963) ........................17

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ....................................41

## Statutes

15 U.S.C. §77q ..................................................................................................................41

15 U.S.C. §78c ..................................................................................................................22

15 U.S.C. §78j ....................................................................................................................8

15 U.S.C. §78n ....................................................................................................................2

15 U.S.C. §78w ................................................................................................................22

15 U.S.C. §80b-2 ........................................................................................................26

15 U.S.C. §80b-4 ........................................................................................................27

15 U.S.C. §80b-6 ........................................................................................................25

**Other Authorities**

*Shareholder Communications, Shareholder Participation in the Corporate Electoral Process,*
  44 Fed. Reg. 68764 (Nov. 29, 1979) ....................................................................32

Antonin Scalia & Bryan A. Garner, Reading Law (2012) ...........................................17

Black's Law Dictionary (3d ed. 1933) .........................................................................3

*Broker-Dealer Participation in Proxy Solicitations*, 29 Fed. Reg. 341 (Jan. 15, 1964) ....................................32

*Commission Interpretation Regarding Standard of Conduct for Investment Advisers,*
  84 Fed. Reg. 33669 (July 12, 2019) ......................................................................28

*Concept Release on the U.S. Proxy System*, 75 Fed. Reg. 42982 (Jul. 22, 2010) ......................................25, 31

*Regulation of Communications Among Shareholders*, 57 Fed. Reg. 48276 (Oct. 22, 1992) ..........30, 32, 35, 36

S. Rep. No. 73-792 (1934) .........................................................................................11

Statement of Comm'r Allison Lee (July 22, 2020) ("Lee Dissent") ..........................18

The Concise Oxford Dictionary of Current English (1931) ..........................................3

U.S. Gov't Accountability Office, *Corporate Shareholder Meetings, Proxy Advisory Firms' Role in*
  *Voting and Corporate Governance Practices* (2016) .............................................3

Webster's New International Dictionary (2d ed. 1934) ................................................4

**Regulations**

17 C.F.R. §275.206(4)-6 .............................................................................................25

17 C.F.R. §206(4)-7 ....................................................................................................27

17 C.F.R. §240.14a-2 ..................................................................................................34

17 C.F.R. §240.14a-5 .............................................................................................19, 44

17 C.F.R. §275.206(4)-7 .............................................................................................25

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Commission's summary judgment brief fails to show that the Final Rules are within the Commission's statutory authority, the product of reasoned decisionmaking, or consistent with the First Amendment. The Commission notably does not contend that Section 14(a) unambiguously covers proxy voting advice; at most, the Commission strains to portray the statute as ambiguous and asks for deference. But the Commission's alternative definitions of solicitation—ranging from influence to recommendations to suggestions—cannot eliminate the fundamental aspect of solicitation that the solicitor must have a predetermined *objective* or *outcome* that he or she is pursuing. The Commission's own cases recognize as much, and the Commission does not identify a single case, ever, from any jurisdiction in which "influence" or a "suggestion" by someone not seeking a certain outcome was deemed to be solicitation.

The Commission's discussion of the history and purpose of Section 14(a) also misses the mark. Far from promoting some generic interest in "transparency" or "replicating in-person shareholder meetings," the history of Section 14(a) is clear that Congress's goal was to ensure that *those seeking to win or defeat a shareholder vote* provide complete information and do not engage in fraud or deception. The Commission's novel attempt to use Section 14(a) to give more power to corporate management at the expense of investors' fiduciary advisers twists the purpose of Section 14(a) beyond recognition.

The Commission also fails to identify any meaningful *problem* that these rules were needed to solve. Throughout 81 pages in the Federal Register and 45 pages in its summary judgment brief, the Commission has yet to identify a single concrete instance in which investors, markets, or issuers were harmed by faulty or conflicted advice from a proxy adviser. In the absence of any tangible evidence of harm, the Commission retreats to claims that the Final Rules are based on its "predictive judgments." But merely labeling the Final Rules "predictive" or "prophylactic" does not constitute reasoned decisionmaking. Indeed, D.C. Circuit precedent is clear that when an agency bases its

rulemaking on "predictive" judgments, it has a heightened duty to explain why existing law is inadequate to serve the agency's regulatory objectives. The Commission cannot make that showing, as every one of the Commission's stated objectives for the Final Rules concerns matters already comprehensively regulated by the Investment Advisers Act of 1940 ("Advisers Act").

The Commission and its amici also fail to show that the Final Rules are consistent with the First Amendment. The Commission repeatedly invokes a general interest in "transparency" or "complete information," but that is not what these rules do. Instead, the new rules commandeer proxy advisers' speech in order to give issuers—alone among all participants in the proxy system—a special right to review proxy voting advice and have the last word before any shares are voted. This is unquestionably a viewpoint-based and content-based regulation of speech, and the Commission does not come close to showing that the Final Rules can pass First Amendment muster.

## ARGUMENT

I.    **The Commission's Attempt to Regulate Independent Proxy Voting Advice as Proxy Solicitation Is Contrary to Law.**

Section 14(a) of the Exchange Act grants the Commission authority to regulate persons who "solicit any proxy." 15 U.S.C. §78n(a)(1). The Commission does not even attempt to argue that Section 14(a) *unambiguously* applies to proxy voting advice provided to a client in a fiduciary capacity. At most, the Commission asserts (at 21-28) that the statute is "inherent[ly] vague" and urges the Court to find ambiguity and defer to the agency under *Chevron*. Those arguments fail at each step.

A.    **The Commission's redefinition of proxy voting advice as proxy solicitation is foreclosed by the plain text of Section 14(a).**

The Commission does not dispute that what ISS does is most naturally and accurately characterized as *advising*. That is why longstanding industry terminology refers to companies like ISS as proxy *advisory* firms or proxy *advisers*—a characterization bolstered by ISS's status as a registered investment adviser under the Advisers Act. ISS does not hold any publicly traded securities for its

own account, so it does not solicit votes as a shareholder. *See* ISS SJ Mem. 7. Nor does ISS act as a "[s]pecialist (firm) hired to gather proxy votes" or "secure votes" on behalf of anyone else. *See* U.S. Gov't Accountability Office, Corporate Shareholder Meetings, Proxy Advisory Firms' Role in Voting and Corporate Governance Practices 6 (2016), *available at* https://bit.ly/36NZCgA.

Instead, ISS's sole objective in providing analyses and recommendations is to help its clients make informed voting decisions in *their own* best interests. ISS provides its services only to clients who have hired it to do so; analyzes only the companies and issues designated by its clients; and bases its recommendations on voting criteria or policies selected, and in many cases, customized, by the clients. *See* ISS SJ Mem. 5-7. Like any investment adviser, ISS routinely offers different recommendations about the same matter depending on each client's investment goals and voting preferences. No one would describe any of this in common parlance as ISS *soliciting* proxy votes. Instead, ISS would be described—accurately—as *advising* or *counseling* its clients about their voting decisions.

The Commission does not dispute any of the basic facts about what ISS does, nor does it dispute that ISS is most naturally characterized as an adviser rather than a solicitor. The ordinary, well-established meaning of "solicit" is to "[i]nvite, make appeals or requests to, importune," Concise Oxford Dictionary of Current English, 1150 (1931), or "[t]o ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, to invite," Black's Law Dictionary (3d ed. 1933). ISS emphatically does not "ask for," "petition" for, "appeal" for, or "endeavor to obtain" proxy votes. To the contrary, ISS merely helps its clients make informed decisions about how to vote their shares *in their own best interest*, in accordance with voting criteria chosen by each client.

The Commission has no plausible, textually based answer to the critical question of what exactly ISS is soliciting. It is awkward and counterintuitive to suggest that ISS is somehow "soliciting" proxies given that its clients retain and pay ISS for its advice, specify the companies to be analyzed, and create or select the criteria for that advice. The Commission also has no response to the fact that

ISS routinely provides different recommendations about the same vote depending on the policy or criteria chosen by the client. In that situation, does the Commission really think ISS is "soliciting" proxy votes both for and against the same proposal? At bottom, there is no linguistically plausible way to describe ISS's core advisory business as *soliciting* proxy votes, as opposed to providing investment advice about such votes.[1]

In an effort to pull independent proxy voting advice within Section 14(a), the Commission (at 22-24) attempts to redefine solicitation in a manner so expansive that it would capture conduct such as "urging," "suggesting," "recommending," or "moving to action." At the outset, the Commission does not dispute that its own preferred dictionary characterizes definitions like this as "rare." Webster's New International Dictionary (2d ed. 1934).

Regardless, the Commission's textual arguments suffer from a more fundamental flaw: even under the Commission's alternative definitions, a solicitor must still have a specific *objective* or *outcome* that he or she is seeking to achieve by urging, suggesting, or recommending a course of action. Solicitors come in many shapes and sizes, but the one unifying characteristic is that someone who is soliciting—unlike someone who is advising or counseling—acts in pursuit of a specific outcome. Even if the Commission has a "range of interpretive" discretion in defining the outer limits of solicitation, it has "clearly exceeded" the scope of that discretion by extending its rules to conduct that in no relevant sense constitutes solicitation of proxies. *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 659-60 (D.C. Cir. 2011).

---

[1]   In the Final Rules, the Commission suggested that proxy advisers' "marketing, offering, and selling" of their services is a form of solicitation. 85 Fed. Reg. 55082, 55095 (Sept. 3, 2020); *see also id.* at 55091 (proxy advisers "market [their] expertise" as providers of voting advice). But the Commission now backtracks from that theory and asserts (at 24) that proxy advisers' marketing activities merely show their *influence* on proxy votes. As discussed below, however, the Commission cannot redefine solicitation to mean mere influence by someone not seeking a specified outcome.

The Commission points to no case, ever, from any jurisdiction, in which a person was deemed to engage in "solicitation" even though he or she was not seeking to achieve a certain objective or outcome in the matter at hand. In every case the Commission cites in support of its alternative definitions, *see* SEC SJ Mem. 22-24, the person who engaged in solicitation did so while seeking to achieve some goal or objective. For example, the law at issue in *Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005), provided that a national committee of a political party may not "'solicit, receive, or direct to another person'" certain types of "soft money" political contributions. *Id.* at 102 (quoting 2 U.S.C. §441i(a)(1)). The D.C. Circuit held that solicitation under this statute did not necessarily require a formal "ask" or "request" and could include "indirect" or "nuanced" forms of fundraising that involved "coded statements" or "winks and nods." *Id.* at 104. The Commission cites *Shays* in support of its alternative definitions but glosses over the fact that the statute at issue there regulated political parties *seeking to raise money*. In that context, it makes perfect sense to hold that a political party engages in solicitation when it makes suggestions or recommendations to potential donors as an "indirect" way of requesting a contribution. *Id.* But *Shays* provides zero support for the notion that a person who provides independent advice to a client *without* seeking to achieve a certain objective or outcome would be deemed to engage in solicitation.

The Commission's other cases are no more helpful to its position. *Neely v. McDaniel*, 677 F.3d 346 (8th Cir. 2012), involved a vagueness challenge to a statute that made it a crime to solicit a minor to engage in sexual intercourse. The court cited the same definitions discussed above and reached the straightforward conclusion that a man who placed phone calls to minors asking them to have sex with him had engaged in "solicitation." *Id.* at 350. Similarly, in *Flournoy v. Peyson*, 701 F. Supp. 1370 (N.D. Ill. 1988), the court noted that solicitation included a "'person who successfully solicits the purchase [of securities], *motivated at least in part by a desire to serve his own financial interests or those of the securities owner.*'" *Id.* at 1379 (emphasis added). And *Vector Marketing Corp. v. Employment Dept.*, 365 P.3d 686 (Or. Ct.

5

App. 2015), adopted an even narrower view of solicitation, holding that a reference to "commissions … realized on orders solicited" applied—in the unique context of that statute—only to "orders that the salesperson actually obtained by inciting the consumer to make the orders." *Id.* at 689-90. None of these cases remotely supports the proposition that a suggestion or recommendation by someone not seeking to achieve a certain outcome or objective constitutes solicitation.

Several other cases the Commission cites in support of its alternative definitions did not involve defined statutory terms at all, nor did they include a textual analysis of the meaning of "solicit" or "solicitation." *In re Grobe's Estate*, 102 N.W. 804 (Iowa 1905), applied a common-law doctrine that prohibits contracts for "promoting or bringing about a marriage." *Id.* at 804. *Herbert v. Long*, 23 S.W. 658 (Ky. Ct. App. 1893), involved a common-law undue influence doctrine, and found that a son "solicited his father to make his will, or so alter it, as to keep the estate in the family of the son." *Id.* at 659. The son obviously sought to achieve the objective of changing his father's will. *Fuller v. Dame*, 35 Mass. 472 (1836), also involved a common-law doctrine (not a statute) that prohibited paying another person for "soliciting a will in his favor." *Id.* at 481. There, too, the person doing the soliciting plainly had the *objective* of obtaining changes to the will.

The Commission (at 23-24) also cites cases interpreting Section 14(a) for the proposition that solicitation can include mere *influence* on a proxy vote even where the communications "do not themselves request or seek to obtain anything." That assertion is baffling, as literally every one of the cited cases involved a party that was seeking to achieve a certain outcome in a shareholder vote. In *Gas Natural Inc. v. Osborne*, 624 F. App'x 944 (6th Cir. 2015), the court found a solicitation where the former CEO of a company sent a letter to shareholders in which he criticized its current board and asked for shareholders' help in "running these greedy individuals out of our company." *Id.* at 951. The court concluded that "[f]airly read, the letter can be understood as *requesting shareholders to withhold or revoke proxies* for the then upcoming … shareholder meeting at which directors would be elected." *Id.*

(emphasis added). Similarly, in *Long Island Lighting Co. v. Barbash*, 779 F.2d 793 (2d Cir. 1985) ("*LILCO*"), the court held that a shareholder who "initiated a proxy contest" to elect his preferred slate of directors was covered by the proxy rules even though he was engaging in solicitation through public advertising rather than direct communication with shareholders. *Id.* at 794. The court merely recognized that the solicitation rules apply "not only to direct requests to furnish, revoke or withhold proxies, but also to communications which may indirectly *accomplish such a result* or constitute a step in a chain of communications designed ultimately to *accomplish such a result.*" *Id.* at 796 (emphasis added).

Like *LILCO*, the other cases cited by the Commission recognize that *indirect* solicitation of shareholders to take a certain action can still constitute solicitation, but they provide no support for treating fiduciary investment advice as solicitation. In *Sargent v. Genesco, Inc.*, 492 F.2d 750 (5th Cir. 1974), the court found that the plaintiff had adequately pleaded a violation of the solicitation regulations when management sent shareholders a letter whose "purpose was to forestall the common shareholders from interposing obstacles in the path of the refinancing plan through the exercise of their rights as shareholders." *Id.* at 767. Similarly, in *Dyer v. SEC*, 291 F.2d 774 (8th Cir. 1961), the trial court made an explicit finding that a shareholder who was mailing postcards about an upcoming vote "*had a substantial interest in the outcome of the proxy solicitation* by reason of his eight proposals which under the proxy regulations were included in management's proxy statement." *Id.* at 778 (emphasis added). And *Union Pacific R.R. Co. v. Chicago and North Western Ry. Co.*, 226 F. Supp. 400 (N.D. Ill. 1964), involved an analyst report that favored the bid of one suitor over another in a contested merger. The report—which was mass-distributed to shareholders of the target company—was written with the assistance of the favored suitor by an analyst employed by a broker-dealer that owned stock in the target company. *Id.* at 407-08. On these facts, the plaintiff adequately alleged a Section 14(a) violation against the suitor, which "candidly and repeatedly admitted in open court" that its distribution of the

report violated the solicitation rules. *Id.* at 408. But this case provides no support for the notion that independent proxy voting advice constitutes solicitation merely because it might "influence" a vote.

In addition to having no support in the caselaw, the Commission's textual arguments suffer from another significant flaw. If Congress wanted the Commission to have plenary authority to regulate any communication that might merely *influence* a proxy vote, the language of Section 14(a) would have been an exceedingly odd way to confer such authority. *See, e.g.*, *NLRB v. S.W. Gen., Inc.*, 137 S. Ct. 929, 939 (2017) (rejecting textual argument where Congress "could easily have chosen clearer language" to achieve such a result); *Knight v. Commissioner*, 552 U.S. 181, 188 (2008) (fact that Congress did not adopt "readily available and apparent alternative" statutory language "strongly supports rejecting" this reading). Consider Section 10(b) of the Exchange Act, which prohibits any person from using or employing "*in connection with* the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe…." 15 U.S.C. §78j(b) (emphasis added). Congress could have easily crafted Section 14(a) to grant the Commission comparable authority to regulate manipulative or deceptive practices "*in connection with*" any proxy vote. Instead, however, Congress limited the Commission's authority under Section 14(a) to regulating *solicitation* of proxies. That intentional choice of language—which is entirely consistent with the purpose and history of Section 14(a), *see infra* Section I.B—must be given effect. *See Sierra Club v. EPA*, 551 F.3d 1019, 1028 (D.C. Cir. 2008) (agency "'may not construe [a] statute in a way that completely nullifies textually applicable provisions meant to limit its discretion'").

Straining to bolster its textual arguments, the Commission (at 23) seeks extra deference because the Exchange Act does not specifically define "solicit." But as the D.C. Circuit previously reminded the Commission, "[t]here is no such rule of law," and "[t]he lack of a statutory definition of a word does not necessarily render the meaning of a word ambiguous." *Goldstein v. SEC*, 451 F.3d 873,

878 (D.C. Cir. 2006); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1372-73 (D.C. Cir. 2007) (same). Even in "the absence of an express definition," courts must construe the relevant statutory text in light of "its ordinary meaning" by using "the traditional tools of statutory construction." *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012).

Nor can the Commission's "general rulemaking and definitional authority," SEC SJ Mem. 23, justify an interpretation that goes beyond the text of the authorizing statute. As this Court has explained, "[a]n agency's general rulemaking authority plus statutory silence" do not "equal congressional authorization," and "[a]n agency cannot appropriate the power to regulate simply because Congress has not explicitly taken that power away." *Merck & Co., Inc. v. U.S. Dept. Health & Human Servs.*, 385 F. Supp. 3d 81, 92-94 (D.D.C. 2019) (Mehta, J.). "[T]hat an agency has broad authority in a realm does not give it license to ignore Congress's specific directions or restrictions on its authority." *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 29 (D.D.C. 2018); *see also N.Y. Stock Exch. v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020) ("[T]he mere reference to 'necessary' or 'appropriate' in a statutory provision authorizing an agency to engage in rulemaking does not afford the agency authority to adopt regulations as it sees fit."). Even when Congress delegates an agency broad rulemaking and definitional authority, the agency cannot "sidestep what Congress has plainly prohibited." *Nat. Res. Def. Council*, 489 F.3d at 1372-73; *see also Ass'n of Am. Railroads v. Surface Transp. Bd.*, 162 F.3d 101, 103-04 (D.C. Cir. 1998) (rejecting definition promulgated under agency's general adjudicatory authority that could not be "squar[ed] ... with the statute's plain language").

Finally, the Commission (at 22-23) contends that solicitation should be given "the broadest meaning necessary to effectuate its stated purposes." But that argument rests on the now-discredited proposition that a statute should be "liberally construed to achieve its purposes." *Director, Office of Workers Compensation Programs v. Newport News Shipbuilding*, 514 U.S. 122, 135 (1995). The Supreme Court unanimously described that remedial-construction canon as "that last redoubt of losing causes,"

emphasizing that courts "have no right to play favorites" between the two sides to a dispute and may not "add features [to a statute] that will achieve the statutory 'purposes' more effectively." *Id.* at 135-36; *see also Aaron v. SEC*, 446 U.S. 680, 695 (1980) ("'[G]eneralized references to the remedial purposes' of the securities laws 'will not justify reading a provision more broadly than its language and the statutory scheme reasonably permit.'"). Courts should not "presume … that any result consistent with [a party's] account of the statute's overarching goal must be the law but will presume more modestly instead 'that [the] legislature says ... what it means and means what it says.'" *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017); *see also Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (instructing courts to give a "fair reading" to statutory text, rather than a reading in favor of one party or the other based on purported statutory purposes).

### B. The Commission's new interpretation of proxy solicitation is unreasonable even if the statutory text is ambiguous.

"Whether an agency's construction is reasonable depends, in part, 'on the construction's fit with the statutory language, as well as its conformity to statutory purposes.'" *Good Fortune Shipping, SA v. Comm'r of Internal Revenue Serv.*, 897 F.3d 256, 262 (D.C. Cir. 2018). Here, the purpose and legislative history of Section 14(a), as well as the broader structure of the federal securities laws, further corroborate the plain meaning of "solicit any proxy" and underscore that the Commission's interpretation is unreasonable even if there is some ambiguity. *See* ISS SJ Mem. 22-24.

Although it is true that proxy advisers have emerged only in recent decades, *see* SEC SJ Mem. 26, there remains a fundamental mismatch between what the Commission has done in the Final Rules and the goals of Section 14(a). The Commission has taken a statute designed to prevent abuses by those seeking to win or defeat a shareholder vote, and has used it to give corporate management more power at the expense of investors' third-party fiduciary advisers. That approach to the statutory scheme "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). The concerns

that led Congress to enact Section 14(a) are utterly inapposite in the context of proxy voting advice provided in a fiduciary capacity.

As the Supreme Court has explained, "the purpose of §14(a) is to prevent management or others from *obtaining authorization for corporate action* by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) (emphasis added). The specific "abuses" that led Congress to enact this law involved the solicitation of proxies "without explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." *Id.* (quoting S. Rep. No. 73-792 at 12 (1934)). That is, Congress sought to protect investors from "promiscuous solicitation of their proxies, on the one hand, by irresponsible outsiders seeking to wrest control of a corporation away from honest and conscientious corporation officials; and on the other hand, by unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts." S. Rep. No. 73-1455 at 77.

The Commission (at 25-26) invokes lofty statutory purposes of promoting "transparent, accurate, and complete information." But that assertion itself is incomplete. Section 14(a) and the Commission's proxy regulations ensure that investors have "transparent, accurate, and complete information" *from those who solicit proxies*, to ensure that investors can make fully informed voting decisions. But it is highly counterintuitive to invoke that interest to justify regulation of fiduciary advisers that investors hire to help them evaluate how to vote their shares. Put differently, the Commission has taken a law intended to protect shareholders against abusive practices by those seeking to win a shareholder vote and used it to give more power to corporate management at the expense of third-party advisers that investors hire to help them evaluate shareholder votes. That makes no sense on its own terms and badly distorts the purpose of Section 14(a) as well as its text.

Once again, the Commission's cases do not support its view of the history or purpose of Section 14(a). In *Amalgamated Clothing and Textile Workers Union v. Wal-Mart Stores, Inc.*, 54 F.3d 69 (2d

Cir. 1995), the court invoked the need to "ensur[e] that shareholders are properly informed," in holding that *management* violated the proxy rules when it "thwarted" shareholders' "right to have their proposal included in the company's proxy materials." *Id.* at 72. Similarly, in *Roosevelt v. E.I. DuPont de Nemours & Co.*, 958 F.2d 416 (D.C. Cir. 1992), the court discussed shareholders' interest in "becom[ing] informed about management policies" and "communicat[ing] with each other" in addressing a rule that required *management* to include shareholder proposals in its proxy materials. *Id.* at 421-22. Again, the purpose was to ensure full disclosure by those seeking to win or defeat a shareholder proposal—not to protect shareholders from their own voluntarily retained fiduciary investment advisers.

The Commission repeatedly asserts (at 1-2, 13, 15, 25, 29-30, 41) that another purpose of the solicitation rules was to "replicate as closely as possible the open exchange of views that would be possible at an in-person meeting." That argument fails on multiple levels. As the D.C. Circuit explained, the "Senate Report [on Section 14(a)] contains no vague language about 'corporate suffrage,' but rather explains the purpose of the proxy protections as ensuring that stockholders have 'adequate knowledge' about the 'financial condition of the corporation ... [and] the major questions of policy, which are decided at stockholders' meetings.'" *Bus. Roundtable v. SEC*, 905 F.2d 406, 410 (D.C. Cir. 1990) (quoting S. Rep. No. 73-792 at 12). Because "[p]roxy solicitations are, after all, only communications with potential absentee voters," the "goal of federal proxy regulation was to improve those communications and thereby to enable proxy voters to control the corporation as effectively as they might have by attending a shareholder meeting." *Id.* When read in its complete context, this language is clear that the goal of Section 14(a) is not some vague desire to "replicate" shareholder meetings, but to ensure that management and soliciting shareholders provide adequate information about the issues that are to be voted at a shareholder meeting.

More fundamentally, even if Section 14(a) were somehow intended to help "replicate" in-person shareholder meetings, it is inconceivable that a proxy adviser would be speaking at such a meeting. At such meetings, management and *shareholders* can debate the merits of the matters up for a vote. But a proxy adviser would never have a comparable speaking role. ISS does not own stock in the companies it analyzes, so it would not be allowed to speak even if it wanted to (which it does not). *See*, *e.g.*, Exxon Mobil Corp., Schedule 14A, *Notice of 2019 Annual Meeting and Proxy Statement* 7 (Apr. 11, 2019) ("Only shareholders or their valid proxy holders may address the meeting."). Instead, the proxy adviser's role is limited to helping its shareholder-clients analyze and weigh the competing proposals based on each client's specific criteria and priorities. Moreover, as noted, ISS routinely offers different recommendations about the same vote depending on the criteria selected, and often drafted, by each client. In that common situation, does the Commission believe that ISS would speak both in favor of and against the same proposal? The Commission's rules also expressly *exclude* dissident shareholders and shareholder proponents—indeed, anyone other than issuers—from the new review-and-response provisions, *see* 85 Fed. Reg. at 55109 n.338, 55116, which significantly undermines the notion that the rules are merely designed to replicate the "debate" that would occur at an in-person meeting.

Finally, for the reasons discussed more fully below, the Commission's interpretation of "solicit any proxy" is unreasonable because it is substantively arbitrary and capricious, *see Agape Church v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013), and the Commission continues to implausibly assert that it is merely reaffirming a longstanding position. Moreover, it should not be "lost on the court that [the Commission] has never before attempted to use [Section 14(a)] to directly regulate the market for [proxy voting advice]." *Merck*, 385 F. Supp. 3d at 97. "While it may be possible for [proxy advisers] to be in violation of [Section 14(a)] for a long time without [the Commission] noticing, the more plausible hypothesis is that the [Commission] did not think the industry's practice was unlawful." *Christopher v.*

*SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012). And an agency's interpretation of a statute is especially likely to be unreasonable where other statutory provisions—here, the Advisers Act, *see infra* Section II.B—"have already covered all (or virtually all) of the conduct" that the agency claims authority to regulate. *Loving v. IRS*, 742 F.3d 1013, 1020 (D.C. Cir. 2014).

### C. NAM's new defenses of the Commission's redefinition of proxy advice as proxy solicitation are barred by *Chenery* and fail on the merits.

**1.**    NAM (at 13) does not dispute that solicitation ordinarily means "endeavor to obtain," "awake or excite to action," or similar concepts.[2] NAM nonetheless offers an entirely new theory about why ISS engages in solicitation, arguing (at 1, 13-15) that ISS "solicits" proxy votes because it offers its clients an electronic platform that automates some of the operational aspects of proxy voting. *See also* Chamber Br. 8-9 (arguing that automated vote platforms "underscore[] why proxy advice is a solicitation").

Under the *Chenery* doctrine, this Court must "reject" any attempt by a putative intervenor "to achieve disposition of [a] case on a rationale [not] set forth by the agency itself." *USPS v. NLRB*, 969 F.2d 1064, 1069 (D.C. Cir. 1992); *see also New York v. EPA*, 964 F.3d 1214, 1225 (D.C. Cir. 2020) ("Because the agency did not rest its decision on either of those bases, we reject both [of intervenor's] arguments."); *Milk Indus. Found. v. Glickman*, 949 F. Supp. 882, 895 (D.D.C. 1996) (agency action cannot be upheld based on an intervenor or amicus "combing through the record and picking out the materials they think support the Secretary's finding"); *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943). NAM's arguments about ISS's electronic voting platform should be disregarded for this reason alone, as the Commission did not in any way rely on that theory in adopting its new definition of solicitation. *See* 85 Fed. Reg. at 55087-96 (discussing new interpretation of solicitation).

---

[2]    ISS responds to NAM's proffered summary judgment brief in the interests of caution while adhering to its view that NAM's untimely intervention motion should be denied. *See* Dkt. Nos. 32, 37. NAM should, at most, be granted amicus status and directed to re-file its brief in accordance with LCvR 7(o).

In fact, this is even worse than a typical *Chenery* problem because during the rulemaking process the Commission *affirmatively rejected* requests by some commenters—including NAM—to regulate electronic proxy voting platforms. Raising the same arguments NAM raises here, those commenters urged the Commission to "generally limit or disable the automatic submission of votes." *Id.* at 55144. But the Commission expressly declined to adopt that suggestion, explaining that "disabling these functions permanently under certain circumstances could increase costs for clients if they need to devote greater resources to managing the voting process as a result, which may in turn also reduce the value of the services of the proxy voting advice businesses." *Id.*

The Commission had good reason to reject those arguments, as NAM's attack on ISS's electronic voting platform is unfounded. *See* ISS Comments at 2-3. ISS's ProxyExchange platform automates some operational aspects of voting by, for example, allowing investors to prepopulate their votes based on recommendations flowing from their chosen voting guidelines, and to flag certain votes or issues for manual follow-up review. *Id.* Notably, this platform also allows investors to *override* ISS's vote recommendations and to change any vote already cast, typically up to the day of the shareholder meeting. *Id.* Far from showing that ISS engages in solicitation, the operations of the ProxyExchange platform only underscore that ISS's sole role is to assist *its clients* in making informed voting decisions in their own best interest. [3]

    **2.**    NAM (at 16-19)—but not the Commission—also argues that Congress has acquiesced in or ratified the Commission's interpretation of solicitation. But claims of congressional acquiescence must be approached "with extreme care," *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of*

---

[3] There are some companies that, unlike ISS, do exercise discretionary voting authority on behalf of shareholders. Yet the Commission expressly *excluded* those companies from the new rules, finding that they do not engage in proxy solicitation because they vote the clients' shares directly rather than providing recommendations. *See* 85 Fed. Reg. at 55095. This distinction further underscores the irrationality of the Final Rules. Companies like ISS that merely provide vote recommendations are deemed to be solicitors, whereas other companies that *actually vote their clients' shares* are not.

*Engineers*, 531 U.S. 159, 169 (2001), because "Congress takes no governmental action except by legislation," *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (plurality op.). Only "overwhelming evidence of acquiescence" suffices to "replace the plain text and original understanding of a statute with an amended agency interpretation." *SWANCC*, 531 U.S. at 169 n.5.

NAM comes nowhere close to meeting that burden. Even assuming, incorrectly, that the Commission's interpretation can be deemed "longstanding," Congress's failure to correct or override an agency interpretation "frequently betokens unawareness, preoccupation, or paralysis." *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 316 F. Supp. 3d 349, 410 n.47 (D.D.C. 2018), *aff'd*, 971 F.3d 340 (D.C. Cir. 2020) (quoting *Zuber v. Allen*, 396 U.S. 168, 185–86 n.21 (1969)). "Thus, what may appear to be 'Congress'[s] deliberate acquiescence should more appropriately be called Congress's failure to express any opinion.'" *Id.* (quoting *Rapanos*, 547 U.S. at 749). The failure of a later Congress to intervene to change the Commission's purported interpretation is thus of no relevance. *See also First Nat'l Bank & Tr. Co. v. Nat'l Credit Union Admin.*, 90 F.3d 525, 530 (D.C. Cir. 1996) ("[T]he silence of a later Congress says nothing about the intent of the earlier Congress that spoke directly to the question here at issue.").

NAM (at 18-19) also makes a convoluted argument that Congress somehow ratified the Commission's interpretation of Section 14(a) when it used the phrase "solicit any proxy" in Section 14(h) in 1993. This theory seems to be that Congress intended to include proxy voting advice within Section 14(h) in 1993 and that—since the same words must be given the same interpretation—this new provision then retroactively changed the meaning of Section 14(a), which was enacted in 1934. But there is no "uniform interpretation by the lower courts or the responsible agency" to justify treating Section 14(h) as implicitly enacting the interpretation urged by NAM. *See* Antonin Scalia & Bryan A. Garner, Reading Law 324 (2012); *see also Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018) (reenactment canon applies only to "longstanding" and "settled" interpretations).

And NAM cites nothing in the text or history of Section 14(h) to suggest that Congress was contemplating proxy voting advice *at all* when it enacted that provision in 1993—much less that Congress intended to alter the meaning of Section 14(a), which was enacted nearly 60 years earlier.

**3.**      Finally, NAM (at 21-22) asserts that interpreting solicitation in accordance with its plain meaning would "make little sense in light of other, unchallenged portions of the proxy solicitation rules," *e.g.*, those regarding securities held in "street name." That analogy is inapt and there is no risk that a ruling for ISS will affect those separate regulations. For most retail equity investors, a broker-dealer holds the securities in the broker-dealer's name on behalf of its customers. In that situation, the broker-dealer—as holder of record—has the *legal right* to vote the shares however it wants. The Commission has thus required broker-dealers to forward proxy materials to, and request voting instructions from, the beneficial owners of the securities, to ensure that "the electoral rights of shareholders will not be taken away, nor their power to solicit proxies from other beneficial holders weakened, by arbitrary actions of brokers with bare legal title." *Walsh & Levine v. Peoria & E.R. Co.,* 222 F. Supp. 516, 519 (S.D.N.Y. 1963). These rules merely ensure that the relevant proxy materials— which would otherwise be sent only to the legal owner of the securities—ultimately end up in the hands of the actual beneficial owners. A holding that ISS, as a fiduciary investment adviser, does not engage in solicitation would in no way jeopardize the legality of the "street name" rules.

## II.      The Final Rules and Proxy Guidance Are Arbitrary and Capricious.

### A.  The Commission has never articulated a reasonable basis for creating an intrusive and burdensome new regulatory regime for proxy voting advice and has failed to adequately assess the costs and benefits of the new rules.

**1.**      The Commission continues to have no good answer to the question of what *problem* the Final Rules were intended to solve. In order to justify an entirely new regulatory regime that redefines proxy solicitation; imposes new disclosure requirements on proxy advisers; mandates sharing of vote recommendations and the dissemination of issuer feedback; and exposes proxy advisers to

new sources of liability, the Commission must be able to point to *something* in the record beyond its own ipse dixit that would justify these new mandates. The Commission's brief does nothing to bolster the Final Rules' lack of any evidentiary basis for this new regulatory regime. *See* Statement of Comm'r Allison Lee (July 22, 2020), *available at* bit.ly/2R92vkL (Final Rules are an attempt "to solve a problem that we have not established exists").

At the outset, the Commission does not—and cannot—dispute that these rules were broadly opposed by every segment of the investment community: public and private pension funds, mutual funds, hedge funds, private equity funds, investment groups, investment advisers, and countless others. *See* ISS SJ Mem. 25-27. This is not just nose counting, as NAM suggests (at 25). Investors are the direct consumers of proxy voting advice and the parties that would be most directly impacted by any problems with such advice. Investors hire proxy advisers, pay them for their services, and rely on them to help analyze hundreds or thousands of shareholder votes across publicly traded companies in the U.S. and around the world. Those investors obviously want to ensure the maximum possible returns on their investments, consistent with their broader objectives and strategies. Thus, if there were some material *problem* with proxy voting advice—if proxy advice were inaccurate; if proxy advisers had unmitigated conflicts of interest; if proxy advisers were impairing the value of investors' shares—the Commission would expect to hear about this from investors. Instead: nothing. The record is utterly bereft of evidence suggesting that proxy voting advice has harmed investors in any way. When a rule is purportedly designed to achieve a certain objective yet the purported beneficiaries of the rule almost uniformly oppose it, this is a rather significant red flag that something is amiss.

The Commission's primary response (at 29-31) is to again invoke the need for "complete, accurate, and transparent" proxy voting advice. But the Commission remains unable to identify some concrete *problem* or *market failure* that the Final Rules are needed to solve. It did not—and could not— make any *findings* of material errors or inaccuracies in proxy voting advice. *See* 85 Fed. Reg. at 55107

(asserting that Final Rules were appropriate "[r]egardless of the incidence of errors in proxy voting advice").[4] It did not—and could not—make any *findings* of material conflicts of interests that were detrimental to investors, which is unsurprising given that potential conflicts are already addressed under the Advisers Act. *See* ISS SJ Mem. 7-9, 31-34; *infra* Section II.B. And the Commission did not—and could not—make any *findings* that investors are unable under existing law to make informed voting decisions based on the proxy materials supplied by issuers and shareholders as well as any analyses or recommendations from a proxy adviser.

Management already has the ability under existing law to submit voluminous proxy materials to make a comprehensive case about why shareholders should vote for management-backed proposals and against shareholder-backed proposals. *See* 17 C.F.R. §240.14a-5. So the Final Rules are not about allowing management to make a "complete" or "transparent" argument in favor of their proposals. The rules are instead about giving management—and only management, not any other shareholders—the last word before investors vote their shares. Again, the Commission has not come close to making any concrete findings of a problem or market failure that could justify that *specific* intervention.

Merely invoking the "blanket proposition" that the Final Rules are needed to promote transparency or complete information is insufficient to constitute reasoned decisionmaking. *See, e.g., Am. Petroleum Inst. v. SEC*, 953 F. Supp. 2d 5, 23 (D.D.C. 2013) (holding that "[a] general statement about incentive problems" is insufficient to justify costly new rules). Instead, the Commission must identify specific problems such as empirically verified instances of fraud. *See Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 58-59 (D.D.C. 2017). It is not enough that a problem is merely "possible," *Bus.*

---

[4]  NAM and the Chamber—but not the Commission—repeatedly assert that the Final Rules were justified by "errors, mistakes, and deficiencies" in proxy advice. *See* NAM Br. 2, 8, 22-25, 27, 43; Chamber Br. 15-17. The Commission made no such findings in the Final Rules. Any reliance on purported "errors" or "inaccuracies" in proxy advice is thus barred by *Chenery*. It is also wrong on the merits for the reasons set forth at length in CII's comments and brief. *See* CII Amicus Br. 9-17.

*Roundtable*, 647 F.3d at 1150, and the Commission's "naked conclusion" regarding the need to increase transparency is insufficient, *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 564-65 (D.C. Cir. 2010). The Commission has ultimately offered "no basis" for the new requirements "beyond mere speculation." *Bus. Roundtable*, 647 F.3d at 1150; *see also N.Y. Stock Exch.*, 962 F.3d at 556-57 ("Rules are not adopted in search of regulatory problems to solve; they are adopted to correct problems with existing regulatory requirements that an agency has delegated authority to address.").

Given the lack of any meaningful evidence of *actual* harm to investors or the public, the Commission pivots to arguing that it may adopt "prophylactic" rules to "prevent potential problems before they arise." SEC SJ Mem. 30-31 (quoting *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009)). But labeling a regulation "prophylactic" does not constitute reasoned decisionmaking. Courts may not "treat the predictive nature of the judgment 'as though it were a talisman under which any agency decision is by definition unimpeachable.'" *Int'l Ladies Garment Workers' Union v. Donovan*, 722 F.2d 795, 821-22 (D.C. Cir. 1983). Even predictive judgments "must be based on some logic and evidence, not sheer speculation," *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708-09 (D.C. Cir. 2014), and an agency may not adopt a broad prophylactic rule without showing "a substantial enough probability" of harm to justify such a rule, *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1051 (D.C. Cir. 2002); *see also Bus. Roundtable*, 647 F.3d at 1150 (agency must "support its predictive judgments" with actual evidence).[5]

---

[5]   The Commission (at 31) cites *Ash v. GAF Corp.*, 723 F.2d 1090, 1093-94 (3d Cir. 1983), in support of Section 14(a)'s "prophylactic purpose." But the court used the word "prophylactic" there to refer to the statute's purpose of requiring *management* to provide "critical business and financial information [to] shareholders," thereby "protect[ing] investors … and assist[ing] them in keeping management accountable to the corporate [populace]." *Id.* It is ironic that the Commission now invokes those purposes in an effort to give greater rights to corporate management at the expense of shareholders' use of independent third-party advisers.

The Commission's brief confirms that the Final Rules are premised on pure conjecture rather than concrete factual findings or actual evidence. Proxy advisers "may" have conflicts of interest. SEC SJ Mem. 28. Investors "may" vote without adequately considering the registrant's views. *Id.* at 29. Votes "could" be cast without complete information. *Id.* But nowhere in either the Final Rules or its summary judgment brief does the Commission identify a single concrete instance—much less some meaningful trend—in which defective or conflicted proxy advice has *actually* harmed an investor, an issuer, or the broader marketplace. At bottom, the Commission has "presented no evidence that [the problem it purported to solve] is ever seen in practice." *Bus. Roundtable*, 647 F.3d at 1150; *see also N.Y. Stock Exch.*, 962 F.3d at 556 (regulations "must be designed to address identified problems").

The absence of any such evidence is unsurprising given that proxy advisers' clients are some of the most well-resourced, experienced, and sophisticated entities in the financial system. Even if there were some meaningful problem with the quality of proxy voting advice—which, again, the record does not establish, *see* ISS SJ Mem. 25-28; CII Amicus Br. 9-17—proxy advisers' investor-clients would have countless ways to address this without the Commission's intervention. *See* 85 Fed. Reg. at 55125 (collecting numerous comments arguing that "contractual arrangements in the private sector" or "other market based mechanisms" were sufficient to ensure quality of proxy advice). An institutional investor could insist on certain disclosures in its contract. It could choose a different adviser. It could skip a proxy adviser altogether and rely on in-house employees to help it analyze proxy votes. And, most relevant here, it could decline to vote until it closely analyzes management's proxy materials as well as the proxy adviser's analyses in the (relatively rare) instances where the proxy adviser recommends a vote against management. The many market-based solutions for the purported problems identified by the Commission only underscore the lack of any plausible, record-based justification for the Commission's interventions.

2.	Compounding its failure to identify a meaningful regulatory problem in need of a solution, the Commission's cost-benefit analysis was also deeply flawed. *See* ISS SJ Mem. 29-31. In defense of this cost-benefit analysis, the Commission (at 38-39) and NAM (at 26) repeat over and over that agencies can rely upon qualitative evidence of unquantifiable costs and benefits. That is true but irrelevant. The Commission has a "unique obligation" under the Exchange Act to "consider the effect of a new rule upon efficiency, competition and capital formation." *Bus. Roundtable*, 647 F.3d at 1148 (citing 15 U.S.C. §§78c(f), 78w(a)(2)). But the Commission did not even attempt to seriously determine the economic impact of the new requirements on investors and proxy advisers and arbitrarily drew opposite inferences from the lack of quantifiable data.

On the cost side, the Commission admitted that the new requirements *will* impose significant direct and indirect costs on proxy advisers and their clients. *See, e.g.*, 85 Fed. Reg. 55136 ("[P]roxy [advisers] will bear direct costs associated with modifying current systems and methods, or developing and maintaining new systems and methods, to ensure the conditions of the exemption are met and with delivering the report to registrants."). Yet the Commission discounted those costs as "difficult to quantify." *Id.*; *see also id.* at 55139 ("Without more detailed information about proxy voting advice businesses' fee schedules and information about the revenues they currently generate from selling proxy voting reports to registrants, we are unable to quantify the magnitude of these revenue losses."). The Commission's dismissal of these costs rests on "ipse dixit, without any meaningful evidentiary support," *Bus. Roundtable*, 647 F.3d at 1155, and fails to fulfill its "statutory obligation to determine as best it can the economic implications of the rule it has proposed," *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005).

On the benefit side, the Commission noted that the new requirements "may" or "could" benefit investors by increasing "the availability of additional information upon which to base their voting decision[s]," 85 Fed. Reg. at 55136—a surprising conclusion given that the purportedly

benefitted parties overwhelmingly *opposed* the new rules. The Commission acknowledged that the claimed benefits were "qualitative in nature," *id.* at 55123, and based on "theoretical" concerns, *id.* at 55124. But nowhere does the agency "'provide[] substantial detail on the benefits of the rule'" or "'the reasons why quantification was not possible.'" *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 2020 WL 4816459, at *13 (D.D.C. Aug. 19, 2020) (citing *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013)). Indeed, the Commission acknowledged that investors may themselves bear additional monetary costs passed through from proxy advisers. *See* 85 Fed. Reg. at 55139 ("Proxy [advisers] may pass through a portion of the costs of modifying or developing systems to meet the requirements to their clients through higher fees for proxy advice."). Yet the Commission never attempted to explain why these monetary costs to investors are outweighed by the (unwanted) benefit to investors of giving issuers the final word before shares are voted. *Cf. Bus. Roundtable*, 647 F.3d at 1155 ("These observations do not adequately address the probability the rule will be of no net benefit as applied to investment companies.").

Although agencies may consider qualitative benefits, they cannot treat benefits and costs according to different standards. *See id.* at 1153-54 ("[T]he Commission anticipated frequent use of Rule 14a–11 when estimating benefits, but assumed infrequent use when estimating costs."). Here, the Commission used the lack of empirical data regarding costs to discount the importance of those costs, but drew the exact opposite inference from the lack of empirical data regarding benefits. *Cf. id.* at 1148-49 ("[T]he Commission inconsistently and opportunistically framed the costs and benefits of the rule."). And the Commission further skewed its cost-benefit analysis by implausibly asserting that the 2019 Proxy Guidance represents the baseline from which the economic effects of the Final Rules should be analyzed. *See* ISS SJ Mem. 30-31. Such arbitrary reasoning does not satisfy the Commission's "unique obligation" under the Exchange Act to engage in serious economic analysis. *Bus. Roundtable*, 647 F.3d at 1148.

**B.  The Commission failed to adequately explain why the Advisers Act insufficiently regulates proxy voting advice.**

An agency acts arbitrarily and capriciously when it adopts a new regulation without adequately explaining "what problems with the existing regulatory requirements it meant for the Rule to correct." *N.Y. Stock Exch.*, 962 F.3d at 554; *see also American Equity Investors Life Insurance Company v. SEC*, 613 F.3d 166, 178-79 (D.C. Cir. 2010) (agency must consider whether "the existing regime" already provided "sufficient protections … to enable investors to make informed investment decisions"); *Bus. Roundtable*, 647 F.3d at 1154 (agency must consider whether existing "regulatory requirements … reduce the need for, and hence the benefit to be had from," the challenged rules).

Moreover, because the Commission seeks to justify the Final Rules based not on actual, existing harm but as a "prophylactic" measure to prevent "emerging risks," SEC SJ Br. 30-31, it is especially imperative for the agency to explain why existing law is insufficient to mitigate those risks. When an agency promulgates "costly prophylactic rules" based on a "theoretical threat" of harm, it must first show that existing law "does not suffice" to prevent the alleged problems. *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 844-45 (D.C. Cir. 2006); *see also Fox Television Stations, Inc.*, 280 F.3d at 1051 ("[T]he Commission has not shown a substantial enough probability of discrimination to deem reasonable a prophylactic rule as broad as the cross-ownership ban, especially in light of the already extant conduct rules.").

The Commission does not dispute that, as a registered investment adviser, ISS is already subject to a robust regulatory regime under the Advisers Act that directly addresses the integrity and transparency of proxy voting advice. *See* ISS SJ Mem. 7-9, 31-34. The fiduciary duty of care obliges a proxy adviser to "make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information." *Concept Release on the U.S. Proxy System*, 75 Fed. Reg. 42982, 43012 (Jul. 22, 2010) ("Concept Release"). The fiduciary duty of loyalty obliges advisers to "'eliminate, or at least to expose, all conflicts of interest which might incline

[them]—consciously or unconsciously—to render advice which [is] not disinterested." 85 Fed. Reg. 55086 n.42. And the Advisers Act's antifraud provision and related rules prohibit fraud or deception in the provision of investment advice and oblige proxy advisers to maintain comprehensive compliance programs and specific policies and procedures about proxy voting, including how they address potential conflicts. 15 U.S.C. §80b-6; 17 C.F.R. §§275.206(4)-6, 275.206(4)-7.

The Commission's primary response (at 8-9, 35-36) is to assert that the Advisers Act is insufficient because—even though ISS is a registered investment adviser—"proxy [advisers] have different views as to whether they fall within the Advisers Act's definition of an investment adviser and should be registered with the Commission." Notably, however, the Commission does *not* assert that the other proxy advisers are excluded or exempt from the Advisers Act regulatory regime. Instead, it simply refuses to decide. This is not reasoned decisionmaking. If the other proxy advisers are covered by the Advisers Act but are refusing to register, then the Commission should make them register. And if they are not covered by the Advisers Act, then the Commission should say so explicitly.

The Commission asserts (at 37) that ISS "identifies no authority requiring the Commission to resolve uncertainty" about whether the Advisers Act applies. But the Commission identifies "no authority" that would allow it to adopt a sweeping new regulatory regime without making basic determinations about the scope of preexisting law. As the cases cited above make clear, the Commission cannot create an entirely new regulatory apparatus before *determining* whether the claimed goals of that regime are already addressed by the existing regulatory framework. *See Am. Equity Invs.*, 613 F.3d at 178-79; *N.Y. Stock Exch.*, 962 F.3d at 554. In *American Equity Investors*, for example, the D.C. Circuit held that the Commission's analysis was "incomplete" because it "*fails to determine* whether, under the existing regime, sufficient protections existed to enable investors to make informed investment decisions," and "*did not assess* the baseline level of price transparency and information disclosure under state law." 613 F.3d at 178-79 (emphasis added). The Commission cannot plausibly

contend that the outcome of that case would have been different if—instead of ignoring state law altogether—the Commission had merely summarized commenters' views about the scope of state law and stopped there without making any actual determinations or findings.

*Investment Company Institute v. CFTC*, 720 F.3d 370 (D.C. Cir. 2013), is not to the contrary, as that case did not involve an agency's arbitrary refusal to consider the scope of preexisting law before launching new regulations. Instead, the agency there "'*did* consider whether [registered investment companies] were otherwise regulated, and concluded that CFTC regulation was necessary'" despite those preexisting regulations. *Id.* at 378; *see also Investment Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 218 (D.D.C. 2012) (noting that agency made "a full acknowledgment of the existing regulatory regime").

The arguments the Commission identifies in support of its "uncertainty" theory—but refuses to actually resolve—are also deeply flawed. For example, the Commission (at 36) acknowledges that proxy advisers fit the statutory definition of investment adviser unless an exclusion applies, *see* 85 Fed. Reg. at 55086; 15 U.S.C. §80b-2(a)(11), but notes that one large proxy adviser has asserted that it can rely on the exclusion for "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation." 15 U.S.C. §80b-2(a)(11)(D). While recognizing that the "publisher's exclusion" is available only to publications that render impersonal advice and does not extend to advice that is tailored to the objectives of any particular clients, *see Lowe v. SEC*, 472 U.S. 181 (1985), 85 Fed. Reg. 55086, n.48, the Commission fails to explain how such an exclusion could possibly apply to proxy advisory services that include vote recommendations based on clients' customized proprietary voting guidelines, since those services are neither "impersonal" nor of "general and regular circulation," SEC SJ Mem. 11 (citing 85 Fed. Reg. at 55083.).[6]

---

[6] The Commission (at 36) also feigns ignorance about whether other proxy advisers subject to the Final Rules would qualify for registration under the Advisers Act based on their pension consulting businesses. *See* 15 U.S.C. §80b-3a(a), 17 C.F.R. §275.203A-2. But both of those advisers prominently state on their websites that they have pension plan clients. *See* Glass Lewis, Company

The Commission also fails to properly analyze the extent to which the Advisers Act regulatory regime applies to unregistered parties. While the Commission acknowledges that the Advisers Act's antifraud provision applies to any person that meets the definition of investment adviser regardless of whether that person is registered, the Commission erroneously asserts (at 9-10, 36) that critical Advisers Act antifraud rules—including a rule requiring the adoption of a comprehensive compliance program and a rule requiring specific policies and procedures regarding proxy voting—do not. However, each of these rules, *by its very terms,* applies to any "investment adviser registered or required to be registered under [the Advisers Act]." 17 C.F.R. §§275.206(4)-6 and 206(4)-7. The Commission is correct that its ability to examine unregistered advisers for compliance with these antifraud rules is limited, 15 U.S.C. §80b-4(a), but that limitation is self-inflicted. The Commission cannot abdicate its responsibility to enforce the Advisers Act's registration requirements and then complain about the consequences.

In all events, the Commission's arguments about why proxy voting advice should be regulated under the solicitation rules in addition to the Advisers Act rules lack merit. The Commission contends (at 3, 19, 35-36) that regulation under the solicitation rules is needed to "safeguard[] the interests not only of the clients of proxy [advisers]—the solicited shareholders—but also of the company's other shareholders, the company, and the broader proxy voting system." Exactly one sentence later, however, the Commission concedes that the Final Rules seek to promote those "broader" interests by "ensuring that *clients of proxy [advisers]* have access to more accurate, complete, and transparent

---

Overview, *available at* https://bit.ly/35qHEBg (clients include "the majority of the world's largest pension plans, mutual funds and asset managers, who collectively manage more than $35 trillion in assets"); Egan-Jones Proxy Services Taft-Hartley Proxy Voting Principles and Guidelines 1, *available at* https://bit.ly/3ntJGa5 (discussing "Taft-Hartley Voting Guidelines" that apply to "rules under which pension fund assets must be managed and invested").

information…" SEC SJ Mem. 35 (emphasis added); *accord* NAM Br. 27 (Final Rules "help ensure that investors have all material information needed for proxy voting").

Thus, regardless of any "broader" interests claimed by the Commission and NAM, the Final Rules seek to advance those interests through regulation of the *quality* or *content* of proxy advice—matters that fall within the heartland of the Advisers Act's duties of care and loyalty. The only way proxy voting advice could have a deleterious effect on "other shareholders, the company, and the broader proxy voting system," SEC SJ Mem. 35, is if it is somehow incomplete, erroneous, conflicted, or fraudulent. But a proxy adviser that provided such shoddy advice would necessarily be violating its duties of care and loyalty under the Advisers Act. In the absence of some concrete finding or determination that proxy advisers are not satisfying their existing fiduciary duties—findings entirely lacking in the Final Rules—it was arbitrary and capricious for the Commission to determine that the existing regime needed supplementation.

The Commission's and NAM's arguments about "broader" interests also raise another problem. As a registered investment adviser acting in a fiduciary capacity, ISS must provide proxy voting advice *solely* in the best interests of its clients. *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 84 Fed. Reg. 33669, 33671 (July 12, 2019); *see also* 29 U.S.C. §404(a)(1)(A) (ERISA) (plan fiduciary must discharge its duties "solely in the interest of" plan participants and beneficiaries). The role of a fiduciary investment adviser is not to promote "broader" interests or facilitate some amorphous "dialogue," but to help its clients make informed decisions based on their own voting criteria and investment objectives. Remarkably, NAM (at 27) seems to view this as a problem, noting—correctly—that under the Advisers Act, "the Commission could compel an advisor to [make disclosures] to *her* customer" but could not "expand[] disclosure to the issuer." But this argument just underscores why regulating proxy voting advice as proxy solicitation is incompatible with the existing regulatory framework and a misguided attempt to fit a square peg into a round hole.

By forcing proxy advisers to take actions for the purported benefit of the "broader proxy voting system," the Commission is simultaneously undermining their ability to act solely in the best interests of their clients as the Advisers Act (and, where pension clients are involved, ERISA) requires.

Finally, the Commission (at 35 & n.12) insists that the "principles-based nature" of the Advisers Act's fiduciary duties "distinguish the focus and scope of the fiduciary duty from that of Section 14(a)." It is unclear what this means given that the Commission describes the Final Rules as "principles-based" no fewer than 50 times in the regulatory preamble. The Commission has yet to articulate any plausible explanation about why layering an entirely new "principles-based" solicitation regime atop the existing "principles-based" Advisers Act regime is reasonable or in the public interest.

### C. The Commission failed to acknowledge that the Final Rules and Proxy Guidance change its longstanding position and upend reliance interests.

The Final Rules fail the "rigorous standards of *FCC v. Fox Television Stations, Inc.*" because the Commission has failed to adequately acknowledge its prior positions and provide "good reasons for the new policy." *Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020) (quoting 565 U.S. 502, 515-16 (2009)). When an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy," it must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox*, 556 U.S. at 515.

Most glaringly, the Commission's conclusions in the Final Rules represent a complete about-face from its findings in the 1992 Release. *See* ISS SJ Mem. 35-36. There, the Commission stated in no uncertain terms that "[t]he purposes of the proxy rules themselves are better served by promoting free discussion, debate and learning among shareholders and interested persons, *than by placing restraints on that process to ensure that management has the ability to address every point raised in the exchange of views.*" Final Rules, *Regulation of Communications Among Shareholders*, 57 Fed. Reg. 48276, 48279 (Oct. 22, 1992) (emphasis added). The Commission also correctly recognized that "[a] regulatory scheme that inserted the Commission staff and corporate management into every exchange and conversation among

shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment, particularly where no proxy authority is being solicited by such persons." *Id.*

The Final Rules adopt the precise types of issuer-backed policies that the Commission found unwarranted and likely unconstitutional in 1992. The Final Rules "plac[e] restraints" on proxy advisers "to ensure that management has the ability to address every point raised in" proxy voting advice. *Id.* And the new rules insert "corporate management into every exchange … among shareholders [and] their advisors," by giving issuers a special right to have the last word—and have proxy advisers disseminate issuers' views—before shares are voted. The Commission (at 34) correctly notes that the 1992 Release was specifically addressing communications among shareholders. But the Commission's *reasoning* and *findings* from the 1992 Release apply with full force in the context of communications between a shareholder and its fiduciary proxy adviser. The Commission has not pointed to "any evidence that these concerns have been ameliorated" nor has it presented adequate "new reasons for adopting the … procedure that it previously rejected." *Music Choice v. CRB*, 970 F.3d 418, 429 (D.C. Cir. 2020). And nowhere in the Final Rules does the Commission "engage[] with all of" its "inconsistent statements that Plaintiffs now identify." *Estes v. U.S. Dep't of the Treasury*, 219 F. Supp. 3d 17, 33-34 (D.D.C. 2016).

The Commission (at 32-33) and NAM (at 29-30) are also wrong to suggest that there is a "longstanding policy" of treating proxy voting advice provided in a fiduciary capacity as proxy solicitation. The Commission (at 8, 32) relies heavily on the 2010 Concept Release, but that reliance is misplaced. The Concept Release was merely a request for comments rather than an authoritative agency action, and it primarily addressed issues regarding the mechanics of the voting process such as accurate vote counts, vote reconciliations, and vote confirmations. *See* 75 Fed. Reg. at 42982 (table of contents).

With regard to the regulatory status of proxy advisers, the Commission *confirmed* that proxy advisers "meet the definition of investment adviser because they, for compensation, engage in the business of issuing reports or analyses concerning securities and providing advice to others as to the value of securities." *Id.* at 43010. But the Commission was more circumspect about the applicability of the Exchange Act proxy rules, saying only that proxy advisers "*may* be subject to our proxy rules." *Id.* at 43009 (emphasis added). While opining that, as "a general matter, the furnishing of proxy advice constitutes a 'solicitation,'" the Commission went on to say, "[o]f course, the issue of whether or not a particular communication constitutes a solicitation depends both upon the specific nature and content of the communication and the circumstances under which it is transmitted." *Id.* at 43009 n.243 (citing 1964 Release). The Commission asserts (at 32) that ISS did not "dispute" that it was engaged in solicitation, but the comments ISS submitted in response to the Concept Release were clear that "[a]lthough we do not see the need for additional regulation at this time, to the extent that the Commission and market constituents believe that additional regulation is required, we believe the best approach would be to *make appropriate adjustment to the Advisers Act*…" ISS Comments at 14, File No. S7-14-10 (Oct. 20, 2010), *available at* https://bit.ly/3lygPAB.

The Commission's discussion (at 32-33) of the 1964 Release and 1979 Release fares no better. In the 1964 Release, the Commission staff stated that while *unsolicited* vote recommendations (*i.e.*, those distributed to "persons who have not asked for [them]") may be subject to the proxy rules, "ordinary investment advisory material distributed in the ordinary course of business is not necessarily a solicitation." *Broker-Dealer Participation in Proxy Solicitations*, 29 Fed. Reg. 341, 342 (Jan. 15, 1964); *see also id.* at 341 ("[A] broker normally is not engaged in solicitation where he merely responds, whether orally or in writing, to an unsolicited request from a customer for advice as to how to vote."). The Commission concedes (at 33) that the 1964 Release "had no occasion" to specifically address whether proxy voting advice provided for a fee in a fiduciary relationship constitutes solicitation. Similarly, the

1979 Release, by its terms, was addressing only "*Unsolicited* Voting Advice Furnished by Financial Advisors," 44 Fed. Reg. 68764, 68766 (Nov. 29, 1979) (emphasis added)—in other words, advice provided to persons who have not asked for it, not advice provided by a retained adviser in a fiduciary capacity in exchange for a fee. And the 1992 Release briefly addressed proxy voting advice in a footnote in the context of discussing an exemption but made no attempt to interpret the ordinary meaning of solicitation or address the threshold question of whether a fiduciary proxy adviser like ISS engages in solicitation. *See* 57 Fed. Reg. at 48282 n.41. The 2019 Proxy Guidance marked the first time the Commission had ever specifically found proxy voting advice provided in a fiduciary capacity to constitute solicitation, *see* ISS SJ Mem. 9-12, 34-37, yet the Commission continues to implausibly insist that this is its "longstanding" position.[7]

NAM (at 5-6, 29) and the Commission (at 7 n.2, 33 n.11) further assert that ISS conceded in a 1988 letter to the Commission staff that it was engaged in proxy solicitation. Not so. In that letter, ISS sought assurance that it could rely on an exemption from the solicitation rules, but never suggested that its voting advice constituted solicitation. To the contrary, ISS argued that it should be treated the same as another proxy adviser (IRRC) that the staff had previously determined was *not* engaged in solicitation. *See Institutional Shareholder Services, Inc.*, 1991 SEC No-Act. LEXIS 17 (Dec. 15, 1988) ("The Commission found that IRRC's materials did not constitute proxy solicitations because, like ISS, IRRC is 'a disinterested party with respect to the outcome of the stockholder proposal controversies upon

---

[7] ISS was hardly the only commenter in the rulemaking to emphasize that the 2019 Proxy Guidance was a clear departure from the Commission's past practice and precedent. *See* CII Amicus Br. 5-9 (noting Commission's "refusal to acknowledge historical reality" in changing position); CalPERS Comments at 3 ("Treating [proxy voting advice] as a 'solicitation' constitutes a fundamental shift . . . The Proposed Rule's explanation for this shift is not clear to us."); Council for Investor Rights and Corporate Accountability Comments at 7 ("[T]he proposed amendment of Rule 14a-1(l) is not merely a codification of existing law."); Colorado Public Employees Retirement Association Comments at 2 ("[T]he new interpretation of proxy advisory services as solicitation is contrary to the original and historically accepted qualification….").

which it reports.' So are we."). In the 1988 letter, ISS also supported its arguments by citing the 1964 Release's statement that a broker does not engage in solicitation "where he merely responds … to an unsolicited requested from a customer for advice as to how to vote." *Id.* at *10. As ISS explained, "[t]hat standard could also apply to the advice we give to clients, who by definition ask us for our advice when they retain us." *Id.* NAM is thus flat wrong to suggest (at 29) that "[t]he Final Rules simply codify proxy [advisers'] own understanding."

Finally, although the Commission (at 34-35) and NAM (at 31) attempt to downplay ISS's reliance on the previous regulatory regime, the Final Rules do not meaningfully address ISS's reliance interests, despite ISS's specific discussion of this problem in its comments. *See, e.g.*, ISS Comments at 54-55. This oversight is fatal. *See Music Choice*, 970 F.3d at 429 (citing *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)).

## III. The Proxy Rule Amendments Violate the First Amendment.

The Final Rules condition proxy advisers' eligibility for an exemption from the proxy rules' information-and-filing requirements on two new mandates: first, advisers must provide their reports to corporate issuers before or at the same time they deliver them to their clients (the "issuer-review" rule), *see* 85 Fed Reg. at 55107-12; second, they must develop "written policies and procedures reasonably designed to inform clients who have received proxy voting advice" about an issuer's "views regarding such advice" before any voting occurs (the "issuer-response" rule), *see id.* at 55112-15.

These restrictions on proxy advisers' speech cannot survive any level of First Amendment scrutiny. *See* ISS SJ Mem. 37-44. Indeed, they are the paradigmatic case of viewpoint-based and content-based discrimination, singling out a class of speakers (proxy advisers) for unique restrictions based on the content of their speech (advice to investors regarding proxy votes). *See Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 9 (1986). Such measures are subject to strict scrutiny

and "presumptively unconstitutional," *NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)), but would be invalid even under lower forms of scrutiny.

### A. The issuer-review and issuer-response rules are fully subject to the First Amendment.

NAM—but not the Commission—argues that the Final Rules are not subject to *any* First Amendment scrutiny because they "do not compel ISS to say anything." NAM Br. 32-33, 36-37. Under this theory, the issuer-review and issuer-response rules merely constitute a "beneficial exemption" from the information-and-filing rules, and "ISS is entirely free not to provide the various disclosures it complains of and instead comply with the general proxy rules." *Id.* at 33.

NAM's argument rests on the false premise that ISS "concedes" it is subject to the "general regulatory framework for proxy solicitation" and "does not challenge" being subject to the information-and-filing requirements. *Id.*; *see also id.* at 36 (asserting that ISS "does not challenge the broader regulatory framework"). That is wrong. The information and filing rules apply to "every solicitation of a proxy" with respect to registered securities unless an exemption applies. 17 C.F.R. §240.14a-2. ISS's core contention in this case is that it *does not engage in solicitation of proxies*, and that the Commission acted contrary to law and arbitrarily and capriciously when it reclassified proxy voting advice as proxy solicitation. It thus strains credulity for NAM to suggest that ISS has somehow "conceded" that it is subject to the information-and-filing requirements of the proxy rules.[8]

In all events, NAM's argument fails on the merits. As the Supreme Court recently reiterated, "[i]t is too late in the day to doubt that the liberties of … expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Trinity Lutheran Church of Columbia, Inc. v. Comer*,

---

[8] Many of the information-and-filing rules also make little sense in the context of proxy voting advice, which further underscores why proxy advisers do not engage in solicitation. For example, these rules require a soliciting party to "prepare a proxy statement and mail it to every shareholder who [has] been solicited." 1992 Release, 57 Fed. Reg. at 48278. To comply with that rule, ISS would apparently have to re-format its analyses and recommendations as a proxy statement and mail it to its own clients, which would serve no conceivable regulatory (or practical) purpose.

137 S. Ct. 2012, 2022 (2017). After all, "[t]o deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech," and the "deterrent effect" of such a rule "is the same as if the [Commission] were to fine them for this speech." *Speiser v. Randall*, 357 U.S. 513, 518-20 (1958); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 573-74 (2011); *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996). Under the Final Rules, proxy advisers will become subject to the burdensome information-and-filing requirements for proxy materials *unless* they comply with the new issuer-review and issuer-response rules. By "condition[ing]" an exemption "in this way," the Final Rules "'effectively penalize[] the free exercise of [ISS's] constitutional liberties.'" *Trinity Lutheran*, 137 S. Ct. at 2020; *see also United States v. Am. Library Assn.*, 539 U.S. 194, 210 (2003). These rules are thus fully subject to First Amendment scrutiny even though ISS is not formally obligated to pursue the new exemptions.

NAM further argues (at 33) that the denial of a benefit on the basis of protected speech is a First Amendment violation only if the benefit is a "virtual necessity." But the Supreme Court recently reiterated that this is not the standard: "The 'imposition of such a condition upon *even a gratuitous benefit* inevitably deter[s] or discourage[s] the exercise of First Amendment rights.'" *Trinity Lutheran*, 137 S. Ct. at 2022 (emphasis added). Instead, strict scrutiny applies if the exercise of a First Amendment right "comes at the cost of automatic and absolute exclusion" from a government benefit. *Id.*; *accord Sorrell*, 564 U.S. at 574 (rejecting a "contrived choice" between eligibility and speech). That is precisely the case here. Unless ISS conforms to the Commission's new mandates, it will be deemed non-exempt from the solicitation rules and subject to the full sweep of information-and-filing requirements. The Commission itself has characterized the information-and-filing rules as "very costly" because "the person making the communication would be required to prepare a proxy statement and mail it to every shareholder of the company who is deemed to have been solicited." 1992 Release, 57 Fed. Reg. at 48278.

The Commission does not endorse NAM's argument that the Final Rules should receive *no* First Amendment scrutiny, but does argue that any burden on speech is minimal because the new rules do not affect ISS's "'autonomy to choose the content of [its] own message'" and do not "'limit'" what ISS may say. SEC SJ Mem. 41-42 (citing *Rumsfeld v. Forum for Academic and Institutional Rights*, 547 U.S. 47, 60 (2006)). *FAIR* does not support the sweeping proposition that speech may be restricted or compelled merely because the speaker can still convey its message in other ways. *FAIR* upheld a federal law conditioning certain federal education funds on universities' willingness to allow military recruiting on the same terms as other employers. But the Court explained at length that its deference to Congress was "at its apogee" in that context because Congress was legislating "under its authority to raise and support armies." *Id.* at 58.

Numerous other Supreme Court cases make clear that the government cannot restrict or compel one type of speech merely because the speaker can still convey its message in other ways. In *NIFLA*, the pro-life crisis pregnancy center remained free to say whatever it wanted about abortion, and in *Pacific Gas & Electric*, the utility remained free to say whatever it wanted about rate regulation, but none of this prevented the Supreme Court from finding unconstitutional coerced expression. *See NIFLA*, 138 S. Ct. at 2371; *Pac. Gas & Electric*, 475 U.S. at 16. The notion that a speaker can be compelled to voice certain messages as long as it has other outlets for speech merely "begs the core question" because the actual inquiry is whether the *compelled* speech or expression violates the First Amendment. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256 (1974).

**B.  The Final Rules are subject to strict scrutiny because they discriminate on the basis of content and viewpoint.**

**1.**      Viewpoint discrimination occurs when the government "favor[s] one speaker over another," *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995), or regulates speech "based on … the opinion or perspective of the speaker," *Reed*, 576 U.S. at 168. The Final Rules do both. They single out proxy advisers for disfavored treatment and provide another, favored type of

speaker with a special right to have the last opportunity to comment on proxy advice before shares are voted.

The Commission and NAM cannot dispute that the issuer-review and issuer-response rules regulate one type of speaker (proxy advisers) in order to enable another type of speaker (issuers) to *criticize* the advice proxy advisers provide to their clients. These rules are indistinguishable from the order at issue in *Pacific Gas & Electric*, as one of the Commission's "acknowledged purposes" is to "assist" a particular subset of speakers—issuers—in criticizing and responding to proxy advisers' speech. 475 U.S. at 12-13; *compare* 85 Fed. Reg. at 55113 (rules force advisers to disseminate "the input and views of registrants on proxy voting advice").

NAM asserts (at 34-35 & 40 n.5) that the issuer-review and issuer-response rules do not prioritize any particular viewpoint by issuers because they apply "whether a proxy [adviser] chooses to recommend voting *in favor* of management-backed proposals or *against* management-backed proposals." In practice, however, there is no conceivable reason why an issuer would prepare a written response to proxy advice unless it *disagreed* with the adviser's analysis or recommendation. Worse still, the Commission has made clear that issuers may use their special response right not just to comment on a specific voting recommendation but to attack proxy advisers more generally by criticizing their "methodological approach" or offering "other perspectives that [the issuer] believes are relevant to the voting advice." 85 Fed. Reg. at 55113; *see also* NAM Br. 25 (acknowledging that issuers can use response right for "disagreements that extend beyond the data used," including "differences of opinion that [issuers] believe are relevant to the voting advice").

At bottom, these rules are viewpoint-based because they grant a special right "only to those who disagree with [proxy advisers'] views and who are hostile to [proxy advisers'] interests." *Pac. Gas & Elec. Co.*, 475 U.S. at 14. By "identif[ying] a favored speaker 'based on the identity of the interests that the speaker may represent'" and forcing the disfavored speaker "to assist in disseminating the

speaker's message," the Commission has "necessarily burden[ed] the expression of the disfavored speaker"—proxy advisers like ISS. *Id.* at 15. Under the First Amendment, the government may not "require corporations to carry the messages of third parties, where the messages themselves are biased against or are expressly contrary to the corporation's views." *Id.* at 15 n.12.

2. At a minimum, the issuer-review and issuer-response rules are paradigmatic content-based restrictions on speech. These provisions compel proxy advisers to share their recommendations with issuers and inform their clients about an issuer's "views regarding" the proxy advice, 85 Fed. Reg. 55112-15, thereby compelling them to "speak a particular message" and "alter the content of their speech," *NIFLA*, 138 S. Ct. at 2371. Because "all speech inherently involves choices of what to say and what to leave unsaid," *Pac. Gas & Elec. Co.*, 475 U.S. at 11, the First Amendment protects proxy advisers' right to refrain from giving their reports to issuers or disseminating issuers' views. Moreover, the issuer-review and issuer-response rules "defin[e] regulated speech by particular subject matter" or "by its function or purpose," *Reed*, 576 U.S. at 163-64, because they single out one type of speech— proxy voting advice—for the new regulatory burdens. Accordingly, these measures are content-based "on [their] face" and must satisfy strict scrutiny. *Id.*

The Commission's only answer to the content-based nature of its rules is to point to its supposedly good motives for targeting proxy advice. According to the Commission (at 42-43), its rules have no "desire to elevate" the views of issuers and are merely designed to ensure "more, and not less, discussion of matters presented for a vote." But courts have repeatedly rejected similar attempts to avoid strict scrutiny based on a purportedly benign regulatory purpose. In *Pursuing America's Greatness v. FEC*, the D.C. Circuit rejected the FEC's argument that the challenged law was not content-based because it was needed to "avoid[] voter confusion." 831 F.3d 500, 509 (D.C. Cir. 2016). Under the proper approach, courts must "apply strict scrutiny 'regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech.'"

*Id.* (quoting *Reed*, 576 U.S. at 165). The issuer-review and issuer-response rules involve "content-based discrimination pure and simple" and are thus subject to strict scrutiny. *Id.*[9]

### C.  The Final Rules are not subject to any exemptions from strict scrutiny.

Unable to plausibly contend that the issuer-review and issuer-response rules are not content-based or viewpoint-based, the Commission and NAM nonetheless urge this Court to apply less exacting scrutiny because the regulations address securities matters and purportedly require the disclosure of only factual and noncontroversial information. Both arguments lack merit.

1.      The Commission (at 40-42) and NAM (at 36-37) assert that the Final Rules are exempt from strict scrutiny because they arise in the securities context, but the cited cases do not endorse that sweeping proposition.

The Commission (at 40) cites *Pacific Gas & Electric* for the proposition that "speech in the proxy context is distinct for First Amendment purposes." There, however, the Court merely noted that it does not offend the First Amendment when a publicly traded company is required to include shareholder proposals in its proxy materials. *See* 475 U.S. at 14 n.10. Because "[m]anagement has no interest in corporate property except such interest as derives from the shareholders," "regulations that limit management's ability to exclude some shareholders' views from corporate communications do not infringe corporate First Amendment rights." *Id.* Because these communications involve speech between a corporation and its shareholders, the Court reasoned that "the regulations govern speech by a corporation *to itself.*" *Id.*

---

[9] NAM (at 36) cites *Pursuing America's Greatness* to assert that the Final Rules amount to mere disclosure requirements. But the court left open the question of "when the compulsion to speak becomes more like a speech restriction than a disclosure," noting that "the provision of information is necessary, but not sufficient, for a law to be a disclosure." 831 F.3d at 507 n.3. As discussed below, the Supreme Court has conclusively held that compelled speech is subject to lesser scrutiny only when "limited to 'purely factual and uncontroversial information.'" *NIFLA*, 138 S. Ct. at 2372.

The Court's discussion of this issue in *Pacific Gas & Electric* is inapposite here, as the Final Rules do not address corporate-shareholder communications, *i.e.*, a corporation's speech "to itself." The Commission asserts in passing (at 40) that proxy advisers should be subject to the same rules as issuers because their "role" is to "facilitate shareholders' participation in [] intra-corporate dialogue." Nonsense. Investors hire proxy advisers to provide independent third-party advice to help them make informed voting decisions. Proxy advisers' role is not some vague participation in "intra-corporate dialogue" but to provide fiduciary investment advice *in their clients' best interests*.

The Commission (at 40-41) and NAM (at 37-38, 40) also rely heavily on *Full Value Advisors v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011). But the court there declined to apply strict scrutiny on the ground that the challenged rules required information to be provided only to the government and thus did not "raise the same constitutional concerns" as provisions compelling speech to the public or a third party. *Id.* Requiring this information to be disclosed "to the Commission alone" is no different than "requir[ing] individuals to submit income tax information to the IRS." *Id.* at 1109. Here, of course, the Final Rules compel proxy advisers to share their speech with outside parties (issuers) and then disseminate issuers' responses to their own clients. *Full Value Advisors* is inapposite.

Nor does *SEC v. Wall Street Publishing*, 851 F.2d 365 (D.C. Cir. 1988), dictate some less demanding standard of review. That case involved the "anti-touting" provision of the Securities Act of 1933, which prohibits publishing a description of a security "without fully disclosing" any consideration received from the issuer. 15 U.S.C. §77q(b). In *Wall Street Publishing*, the Commission brought an enforcement action against a magazine that featured "unabashedly glowing" reviews of securities without disclosing that the articles were written and/or paid for by the featured companies. 851 F.2d at 366-67. In considering the magazine's First Amendment defenses, the court emphasized that it was addressing "speech employed directly or indirectly *to sell securities*." *Id.* at 373 (emphasis added). Just like abusive or manipulative proxy solicitation, *see* ISS SJ Mem. 4-5, there are serious risks

to the public when issuers can fund objective-looking news articles that are really just paid advertisements touting their securities to unwitting buyers.

The D.C. Circuit did *not* hold that all securities regulations are exempt from strict scrutiny but only that the "failure to disclose consideration received in return for publication is … in principle, constitutionally proscribable." *Id.* at 374. And even in that context—which is far afield from third-party fiduciary investment advice—the D.C. Circuit expressed concerns that overbroad relief could result in "interference with fully protected journalistic activity" or "content regulation of speech." *Id.* at 375. The court ultimately passed no judgment on the merits of the case and merely remanded for further proceedings about the nature of the "consideration" that issuers paid the magazine to run their chosen articles. *Id.*[10]

**2.**      NAM—but not the Commission—argues (at 37-41) that the issuer-review and issuer-response provisions should be subject to the *lowest* form of First Amendment scrutiny under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). But, as the Supreme Court recently reiterated in *NIFLA*, *Zauderer* scrutiny applies only to laws requiring the disclosure of "purely factual, uncontroversial information." 138 S. Ct. at 2372. Beyond this limited exception, the Court's precedents "have long protected the First Amendment rights of professionals," *id.* at 2374, and "[c]ommercial speech is no exception," *Sorrell*, 564 U.S. at 566. The Court has also been steadfast in rejecting NAM's suggestion (at 37 n.4) that lesser scrutiny applies to speech that "has an economic motive." *See id.* at 567 (applying strict scrutiny to content-based law and noting that "[w]hile the burdened speech results from an economic motive, so too does a great deal of vital expression").

---

[10]  The Commission's other cited cases are no more helpful to its position. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978), merely stated in passing that "corporate proxy statements" may be regulated without offending the First Amendment. And *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 64 (1973), noted that states may regulate "sellers of securities" to protect the public. Those cases do not address the standard of First Amendment scrutiny for a third-party independent adviser that does not issue or sell securities or work on behalf an issuer or seller.

In *National Association of Manufacturers v. SEC*, the D.C. Circuit read *Zauderer*'s strict scrutiny exception to reach only governmental attempts to "'prescribe what shall be orthodox in commercial advertising' by requiring the dissemination of 'purely factual and uncontroversial information.'" 800 F.3d 518, 523 (D.C. Cir. 2015) (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995)). The court emphasized that "'*outside that context*' (commercial advertising) the 'general rule' is 'that the speaker has the right to tailor the speech' and that this First Amendment right 'applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid.'" *Id.*

NAM's suggestion (at 39-40) that the Final Rules are limited to "purely factual and uncontroversial information" does not withstand scrutiny. The types of disclosure requirements that fall within *Zauderer* involve matters such as "requir[ing] speakers to identify those who fund their advertisements, ... the country of origin of the meat they sell, ... or the total price of their airline tickets." *Pursuing Am.'s Greatness*, 831 F.3d at 507; *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014) (en banc) (*Zauderer* applies to mandated disclosures of "unchallenged or substantially unchallenged" information).

Here, as discussed above, issuers are likely to invoke their response right only when they *disagree* with proxy advisers' recommendations or seek to offer broader critiques of proxy advisers' methodologies. None of this is remotely "factual" or "uncontroversial." NAM asserts (at 39-40) that the required disclosure should be deemed "factual" because a proxy adviser need only supply a hyperlink to the issuer's response rather than providing the full content of the response. But NAM identifies no case supporting that theory. For example, it is highly implausible that the outcome in *NIFLA* would have been different if the pro-life crisis pregnancy centers had been compelled to give their patients a hyperlink about the availability of abortion rather than a sheet of paper; indeed, the pregnancy centers had the option of delivering the mandated notice "digitally," *NIFLA*, 138 S. Ct. at

2369, but that in no way affected the outcome of the case. The First Amendment problem is not the mechanism of delivery (paper vs. hyperlink) but the fact that the government cannot "co-opt" someone's speech to "deliver [a] message" from someone else. *Id.* at 2376.

### D.  The Final Rules cannot survive any level of scrutiny.

"Content-based regulations are presumptively invalid," *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992), and "[i]n the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory," *Sorrell*, 564 U.S. at 571. This rule "is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." *Id.* The Commission's Final Rules do not advance a legitimate—much less compelling—government interest, and the Commission disregarded less restrictive alternatives in creating the issuer-review and issuer-response requirements. ISS SJ Mem. 40-44.

The Commission (at 44) doubles down on its amorphous interest in "ensuring that disputes over control of corporate resources are resolved based on accurate, complete, and transparent information." But the Commission fails to adequately link this goal to the issuer-review and issuer-response rules. Even under the standard that applies to commercial speech, "the government may not rest on such speculation or conjecture[,] [r]ather the SEC ha[s] the burden of demonstrating that the measure it adopted would 'in fact alleviate' the harms it recited 'to a material degree.'" *NAM*, 800 F.3d at 527. For all the reasons discussed above, *see supra* Section II.A, the Commission has failed to offer any meaningful, concrete evidence of some problem with proxy voting advice that would justify its new review-and-response rules. And, in practice, these rules are not about "accuracy" or "transparency" generally but merely about *giving issuers the last word* before shares are voted. This is not a legitimate government interest; it is unconstitutional viewpoint and content discrimination.

The issuer-review and issuer-response rules fare even worse under tailoring analysis. It is undisputed that issuers can use their general proxy statements, *see* 17 C.F.R. §240.14a-5, as well as

supplemental proxy materials, *see* 85 Fed. Reg. at 55113, to provide as much information as they would like about *any* matters pertaining to a shareholder vote. Yet the Commission brushed aside those less-restrictive alternatives for facilitating issuers' speech based on its conclusion that it would be easier to coopt proxy advisers to deliver issuers' message. The Commission (at 44) now claims that its rules are based not on convenience but on "the need to remove practical obstacles" to issuers' speech. But that is just a synonym for efficiency or convenience. The Final Rules are clear that the Commission imposed these new burdens on proxy advisers alone because they are "the best-positioned parties in the proxy system" to convey issuers' views to investors. 85 Fed. Reg. at 55108.

Whether framed as efficiency, convenience, or lifting "practical obstacles," the issuer-review and issuer-response rules are unconstitutional. In the commercial speech context, as in ordinary First Amendment analysis, that a regulation is "a more 'effective' way for the government to ... shape behavior than for the government to have to convey its views itself ... makes the requirement more constitutionally offensive, not less so." *NAM*, 800 F.3d at 530. Indeed, even under a First Amendment standard less exacting than strict scrutiny, the Supreme Court has rejected the notion that "mere convenience" can justify a restriction on speech. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). "[T]he prime objective of the First Amendment is not efficiency," and the government may not "too readily 'sacrific[e] speech for efficiency.'" *Id.* at 486, 495. It would be highly efficient—and would promote "accurate" and "complete" information—if newspapers were required to provide hyperlinks through which the subjects of their reporting could offer a response to the paper's articles. But no amount of "efficiency" and no benign motive to promote "accurate" and "complete" information could justify such an unconstitutional rule. *Cf. Miami Herald*, 418 U.S. at 256.

These constitutional problems are even more pronounced under the ordinary strict scrutiny applicable to this case. The means selected by the Commission inherently fail strict scrutiny because "advanc[ing] some points of view by burdening the expression of others ... is not a narrowly tailored

means of furthering th[e] interest." *Pac. Gas. & Elec.*, 475 U.S. at 20. Moreover, in the Final Rules and in its briefing, the Commission has failed to present any evidence beyond "conjecture," "anecdote[,] and supposition," *Pursuing Am.'s Greatness*, 831 F.3d at 510-11, to support the notion that investors will be inadequately informed about proxy votes unless the Commission can commandeer their proxy advisers' speech for the benefit of issuers. At bottom, the issuer-review and issuer-response rules regulate one party's speech in order to elevate the voice of another set of speakers to ensure that they always have the last word. Under the First Amendment, this is simply not an option available to the government.

## IV.     The Court Should Set Aside the Final Rules and Proxy Guidance in Their Entirety.

The Commission asserts in passing (at 45) that any remedies should be limited to the "specific" provisions found unlawful. But the Final Rules and Proxy Guidance, *in their entirety*, are premised on the Commission's redefinition of proxy solicitation to include proxy voting advice. If the Court agrees with ISS that this redefinition was contrary to law, then the Final Rules and Proxy Guidance must be set aside in their entirety. Similarly, ISS argues that—especially in light of the preexisting regulatory regime under the Advisers Act—the Commission failed to offer a reasoned explanation for *any* new regulatory burdens on proxy voting advice. The Final Rules and Proxy Guidance are a solution in search of a problem and should be set aside and permanently enjoined.

**CONCLUSION**

For the foregoing reasons, ISS respectfully requests that this Court enter summary judgment in its favor, deny the Commission's cross-motion for summary judgment, and issue an order vacating and permanently enjoining the Final Rules and Proxy Guidance.

Respectfully submitted,

Dated: November 20, 2020

    *s/ Jeffrey M. Harris*         

Mari-Anne Pisarri (DC Bar #362597)
PICKARD DJINIS AND PISARRI LLP
1990 M Street, NW, Suite 660
Washington, DC 20036
(202) 223-4418
pisarri@pickdjin.com

Jeffrey M. Harris (DC Bar #994058)
James F. Hasson (*pro hac vice*)
Daniel Shapiro
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Counsel for Institutional Shareholder Services Inc.*

46

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2020, I filed the foregoing document through the

CM/ECF system, thereby serving all counsel of record.

_s/ Jeffrey M. Harris_

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the page limits of Local Rules 5.1(d) and 7(e)

because it does not exceed 45 pages and is prepared in doubled-spaced 12-point font.

_s/ Jeffrey M. Harris_